1  MEGHANN A. TRIPLETT (SBN 268005)
   *Meghann@MarguliesFaithLaw.com*
2  SAMUEL M. BOYAMIAN (SBN 316877)
   *Samuel@MarguliesFaithLaw.com*
3  **MARGULIES FAITH LLP**
   16030 Ventura Boulevard, Suite 470
4  Encino, CA 91436
   Telephone: (818) 705-2777
5  Facsimile: (818) 705-3777

6  Attorneys for Plaintiff, Jeremy W. Faith,
   Chapter 11 Plan Fiduciary
7

8           **UNITED STATES BANKRUPTCY COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**
9              **SAN FERNANDO VALLEY DIVISION**
10

| | |
|---|---|
| 11  In re: | Case No.:  1:22-bk-11181-MB |
| 12  NATIONAL ASSOCIATION OF TELEVISION PROGRAM EXECUTIVES, | Chapter:    11 (Subchapter V) |
| 13  INC., | Adv. Case No.: |
| 14             Debtor. | **COMPLAINT FOR:** |
| 15  JEREMY W. FAITH, Chapter 11 Plan Fiduciary, | **(1) BREACH OF FIDUCIARY DUTY;** |
| 16 | **(2) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY** |
| 17             Plaintiff, v. | **(3) CORPORATE WASTE;** |
| 18  JEAN PIERRE BOMMEL, an individual; ARNOLD P. PETER, an individual d/b/a | **(4) NEGLIGENCE;** |
| 19  PETER LAW GROUP, and DOES 1-50, inclusive, | **(5) AVOIDANCE OF FRAUDULENT TRANSFERS WITH ACTUAL INTENT [11 U.S.C. § 548(A)(1)(A)];** |
| 20 | |
| 21             Defendants. | **(6) AVOIDANCE OF CONSTRUCTIVELY FRAUDULENT TRANSFERS [11 U.S.C. § 548(A)(1)(B)];** |
| 22 | **(7) AVOIDANCE OF 1-YEAR TRANSFERS [11 U.S.C. § 547];** |
| 23 | |
| 24 | **(8) AVOIDANCE OF UNAUTHORIZED POSTPETITION TRANSFERS [11 U.S.C. § 549];** |
| 25 | **(9) CONVERSION;** |
| 26 | **(10)RECOVERY OF AVOIDED TRANSFER [11 U.S.C. § 550];** |
| 27 | **(11)UNJUST ENRICHMENT; AND** |
| 28 | **(12)DISALLOWANCE OF PROOF OF CLAIM [11 U.S.C. § 502(d)]** |

FILED

3:20 pm

OCT 11 2024

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:_____ Deputy Clerk

Plaintiff Jeremy W. Faith ("Plaintiff"), the chapter 11 Plan Fiduciary for the chapter 11 bankruptcy estate ("Estate") of reorganized debtor National Association of Television Program Executives, Inc., (the "Debtor" or "NATPE"). Plaintiff brings this adversary proceeding on behalf of the Estate pursuant to 11 U.S.C. §§ 1123(b)(3)(B) and 1104(d) and this Court's *Order Confirming Second Amended Subchapter V Chapter 11 Plan with Modifications* appointing Plaintiff as the Plan Fiduciary for the Estate (Dkt. No. 258). As Plaintiff was not appointed until after NATPE filed bankruptcy, Plaintiff does not have personal knowledge of the facts alleged in this Compliant and therefore alleges those facts on information and belief.

## JURISDICTION AND VENUE

1.    In accordance with the requirements of Local Bankruptcy Rule 7008-1, the San Fernando Valley Division of the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334, because the claims asserted herein arise under title 11 of the United States Code or arise in or relate to the Chapter 11 case of the Debtor currently pending in the United States Bankruptcy Court for the Central District of California, as *In re National Association of Television Program Executives, Inc.*, Case Number 1:22-bk-11181-MB (the "Bankruptcy Case"). The outcome of this adversary proceeding will have a significant effect on the Estate because it will impact the disposition property of the Estate and the amount of money available for distribution to creditors. Certain of the claims for relief alleged in this Complaint constitute core proceedings under 28 U.S.C. § 157(b). Regardless of whether this proceeding is a core proceeding, consent is given to the entry of a final orders and judgment by the Bankruptcy Court. Each defendant is hereby notified that hat Fed. R. Bankr. P. 7008(a) requires each defendant to plead whether the claims for relief alleged against such defendant are core or non-core and, if non-core, whether consent is given to the entry of final orders and judgment by the Bankruptcy Court. Certain of the claims for relief alleged in this Complaint constitute core proceedings under 28 U.S.C. § 157(b). Regardless of whether this proceeding is a core proceeding, consent is

1    given to the entry of a final orders and judgment by the Bankruptcy Court. Each defendant

2    is hereby notified that that Fed. R. Bankr. P. 7008(a) requires each defendant to plead

3    whether the claims for relief alleged against such defendant are core or non-core and, if

4    non-core, whether consent is given to the entry of final orders and judgment by the

5    Bankruptcy Court.

6        2.    Venue is proper in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408

7    and 1409 because the Bankruptcy Case is pending in this district and division. Pursuant

8    to 28 U.S.C. § 1391, venue is also appropriate in this district and division because each

9    of the defendants either resides in or is authorized to and regularly does carry out

10    business in this district and many of their wrongful acts, omissions and/or conduct as

11    complained of in this Complaint took place within this district. Accordingly, this Court

12    also has personal jurisdiction over each of the defendants.

13    **PARTIES**

14        3.    Plaintiff Jeremy W. Faith ("Plaintiff") is the Chapter 11 Plan Fiduciary of the

15    Debtor's Estate and brings this action solely in his capacity as the chapter 11 Plan

16    Fiduciary for the debtor's Estate.

17        4.    Plaintiff is informed and believes that at all relevant times herein, Defendant

18    Jean Pierre Bommel ("Bommel") is the former President and CEO of the Debtor and is

19    subject to the jurisdiction of this Court.

20        5.    Plaintiff is informed and believes that Bommel is an insider of the Debtor as

21    that term is defined under 11 U.S.C. § 101(31).

22        6.    Plaintiff is informed and believes that at all relevant times herein, Defendant

23    Arnold P. Peter, doing business as Peter Law Group ("Peter") is the former outside general

24    counsel for NATPE and subject to the jurisdiction of this Court. (Bommel and Peter are

25    collectively referred to herein as the "Defendants").

26        7.    Plaintiff is informed and believes that Peter is an insider of the Debtor as that

27    term is defined under 11 U.S.C. § 101(31).

28        8.    Defendants Does 1 through 50, inclusive, are individually and/or jointly liable

1  to the Estate for the conduct alleged below.  The true names and capacities, whether

2  individual, corporate, associate or otherwise, of those Doe defendants are currently

3  unknown to Plaintiff.  Accordingly, Plaintiff sues defendants Does 1 through 50, inclusive,

4  by said fictitious names and will amend this Complaint to allege their true names and

5  capacities when ascertained with certainty.  Each of the Doe defendants is an immediate

6  or mediate transferee of the fraudulent, preferential, or other avoidable transfers alleged

7  in this Complaint or of the proceeds of such fraudulent, preferential, or other avoidable

8  transfers, and did not take such property for value, in good faith, and without knowledge

9  of the avoidability of such transfers, or is otherwise liable along with the named defendants

10  for the wrongful acts and omissions and damages alleged in this Complaint.

11  **GENERAL ALLEGATIONS**

12      9.      NATPE is a non-profit corporation organized under the laws of the State of

13  Delaware.  Until shortly after its bankruptcy filing, the company was operating as a global

14  content association and professional membership organization consisting of television,

15  media executives and other members of the content business. NATPE's main source of

16  revenue was its annual conference and market.

17      10.      From at least 2020, Bommel was the President and CEO of the Debtor who

18  was ultimately responsible for overseeing the day-to-day business operations and

19  financial performance of NATPE and involved in supervising all aspects of NATPE's

20  financial affairs. Other high-level executives with NATPE in the years leading up to the

21  Bankruptcy Case were Charlie Weiss, Senior Vice President of Sales, Marketing, and

22  Content, Wayneston Harbeson, Senior Vice President of Event and Operations, Gary

23  Mitchell, European Business Development Executive, and Mingfen Lee, Director of

24  Business Development and Client Relations (collectively with Bommel, the "Executive

25  Team").

26      11.      In the years leading up to the Bankruptcy Case and after, Bommel, the

27  Executive Team and the Board of Directors were advised by Peter as their primary outside

28  general counsel. Plaintiff is informed and believes that Peter served in the role as general

outside counsel for NATPE for more than 10 years. In the months leading up to the filing of the Bankruptcy Case, Peter was working on multiple matters for NATPE, billing the organization for several hundred thousand dollars in legal fees.

12.    At all relevant times herein, NAPTE's primary revenue source was derived from various income streams associated with the production of industry related conferences, with additional income derived from grants, contributions and investment income. NATPE's Form 990 federal income tax return for the fiscal year ending March 31, 2020 (the "3/31/20 Tax Return") reflected program service revenue of $6,333,273, contributions and grants of $567,788, investment revenue of $90,100, and other revenue of $82,406, for total revenue of $7,073,567. Total expenses for the fiscal year were $7,621,288, which generated a loss of $547,721. On the balance sheet side of the 3/31/20 Tax Return, NATPE showed total assets of $6,381,734, and liabilities of $2,471,930, leaving a net asset balance of $3,909,804.

13.    On or around October 24, 2018, NATPE entered into two contracts with Fontainebleau Florida Hotel, LLC d/b/a Fontainebleau Miami Beach Hotel ("Fontainebleau") for the hosting of NATPE's two large annual conferences at Fontainebleau's hotel property in Miami, Florida. The first contract was for the NATPE Market & Conference 2021 (the "2021 Event"), to be held on January 14 to January 27, 2021 (the "2021 Event Agreement"). The second contract related to the NATPE Market & Conference 2022 (the "2022 Event"), to be held on January 13 to January 26, 2022 (the "2022 Event Agreement").

14.    On October 16, 2020, NATPE cancelled the 2021 Event. NATPE identified the rise of COVID-19 as its basis for cancellation and asserted the *force majeure* provision under the 2021 Event Agreement as grounds for the cancellation. Fontainebleau disputed the applicability of the *force majeure* provision. The parties ultimately agreed to settle the dispute over the cancellation of the 2021 Event Agreement and entered into a Settlement Agreement dated May 24, 2021 (the "Settlement Agreement").

15.    Pursuant to the Settlement Agreement, NATPE agreed to pay Fontainebleau

a total of $100,000.00 as "Cancellation Damages" for the 2021 Event, to be paid in four equal installments of $25,000.00 as well as Fontainebleau's retention of the $75,000.00 deposit paid by NATPE in connection with the 2021 Event Agreement. The last installment payment under the Settlement Payment was due on or after January 31, 2022.

16.    NATPE's cancellation of the 2021 Event had a dramatic impact on the organization's finances. Pursuant to NATPE's Form 990 federal income tax return for the fiscal year ending March 31, 2021 (the "3/31/21 Tax Return"), NATPE had program service revenue of only $1,127,425, contributions and grants of $305,679, and investment income of $67,341, coming to a total revenue figure of $1,500,445 – a 78% drop from the prior fiscal year. The balance sheet portion of the 3/31/21 Tax Return reflected assets of $3,714,252 and liabilities of $679,570, leaving a net asset value of $3,034,682. These figures reflected an erosion of the gross asset value of NATPE of $2,667,482.

17.    NATPE remained in operation throughout 2021 and was promoting the 2022 Event at the Fontainebleau, with the organization counting on the event as an important step towards NATPE's financial recovery and stability. However, after internal deliberations by and amongst certain members of the Executive Team and Peter, NATPE elected to cancel the 2022 Event, informing Fontainebleau of such cancellation on January 8, 2022 - just 5 days before the 2022 Event was set to start. As it did when cancelling the 2021 Event, NATPE through Bommel and under the legal guidance of Peter sought to invoke the *force majeure* provision of the 2022 Event Agreement as grounds for termination of the contract.

18.    Fontainebleau swiftly and vigorously disputed the basis for NATPE's cancellation and asserted that NATPE was liable for cancellation damages amounting to $3,389,618.69 pursuant to the "Cancellation Schedule" agreed to by the parties in the 2022 Agreement (the "FB Liquidated Damages"). Furthermore, Bommel directed NATPE to breach the Settlement Agreement by not making the final $25,000.00 payment owed to Fontainebleau under the Settlement Agreement. Plaintiff is informed and believes that such decision was made in consultation with members of the Executive Team and Peter.

19.    On February 11, 2022, the Fontainebleau filed a demand for arbitration with the Judicial Arbitration and Mediation Service ("JAMS"), which instituted the arbitration action entitled *Fontainebleau Florida Hotel, LLC vs. National Association of Television Programming Executives*, JAMS case no. 5460000066, JAMS Resolution Center, Miami, Florida (the "Arbitration").

20.    At the time the Arbitration was instituted, NATPE had a liability insurance policy with Navigators Insurance Co. ("Navigators") entitled "Not-For-Profit InNAVation Policy" (the "Policy"). Plaintiff is informed and believes that the Policy could have provided coverage for the allegations in the Arbitration provided a timely claim was made by NATPE against the Policy. For reasons unknown, Defendants failed to make a claim on the Policy at the time the Arbitration was instituted.

21.    In May of 2022, an attorney for Fontainebleau sent a letter to Peter that raised potential claims against the officers and directors of NATPE for their actions in connection with the cancellation of the 2022 Event.  On or about June 16, 2022, Peter sent a letter to Navigators tending the Arbitration under the Policy.  Navigators responded by denying coverage due to the failure of NATPE to make a timely claim on the Policy as required by its terms within 90 days of NATPE's learning of the Arbitration.

22.    Peter contested on NATPE's behalf Navigators' denial of coverage through litigation in State Court which was removed to Federal Court.  However, Peter lost the litigation and Navigators was not required to cover the damages and fees associated with the Arbitration.

23.    Plaintiff is informed and believes that Bommel and Peter were aware of the Policy at the time of the serving of the demand for arbitration.  However, it was not until the directors and officers were directly threatened with litigation that Bommel and Peter sought the protections of the Policy, by which time it was too late. This was another example of Bommel and Peter prioritizing the interests of the executives of NATPE over the organization itself.

24.    The financial impact from the cancellation of the 2022 Event was profound,

1    a fact that was communicated to Bommel, the Executive Team and the NATPE Board of

2    Directors in March of 2022 through internal company communications.

3         25.    NATPE's Form 990 federal income tax return for the fiscal year ending

4    March 31, 2022 (the "3/31/22 Tax Return") provided a picture of NATPE the rapidly

5    deteriorating financial condition. Program service revenue was reduced to $544,707, with

6    contribution and grant revenue of $312,698, and investment income of $117,224, equaling

7    total revenue of just $974,629. Total expenses for NATPE remained relatively the same

8    at $3,020,885, resulting in negative income of $2,046,256.

9         26.    The balance sheet side of the 3/31/22 Tax Return was equally dire, though

10    the situation was in fact much worse than what was reflected in the return. NATPE

11    disclosed total assets in the 3/31/22 Tax Return of $2,616,816, and liabilities of

12    $1,592,759, the majority of which liabilities consisted of funds collected for future events

13    that had yet to be earned. This left an apparent net asset value of $1,024,057. However,

14    the disclosed liabilities did not take into account the asserted FB Liquidated Damages

15    $3,389,618.69, which if reflected would show a negative asset value of $2,365,561,

16    placing NATPE deeply into insolvency.

17         27.    With obligations to creditors reaching over $4.9 million and available cash of

18    approximately $2.6 million as of March of 2022, NATPE's Board of Directors and Executive

19    Team in consultation with Peter had a fiduciary duty to manage the organizations scarce

20    resources in a manner that did not place creditors at undue risk of non-payment through

21    risky business ventures and self-dealing transactions that benefited themselves and other

22    insiders. Unfortunately, this is precisely the direction adopted by Bommel and the

23    Executive Team with Peter's guidance. Instead of adopting a conservative approach that

24    would preserve NATPE's assets and minimize the harm to its creditors, Bommel, the

25    Executive Team and Peter spent over $1 million of the organization's funds on themselves.

26         28.    In April of 2022, at a point when NATPE's financial condition was in free-fall,

27    Bommel and NATPE's compensation committee decided to authorize Bommel to received

28    deferred compensation and entered into a new employment contract with him that

provided for a generous severance payment.  At the same time, Peter was doing more and more work for NATPE, billing the organization on multiple matters related to the Arbitration, employment issues, contract issue, and eventually consulting on bankruptcy issues.

29.    In the weeks and days leading up to the filing of the Bankruptcy Case, at which point Bommel and Peter were actively involved in attempting to sell NATPE's business, Peter assisted Bommel with the preparation of various termination agreements for the Executive Team, which included generous severance payments which clearly harmed NATPE's creditors by continuing to drain NATPE of cash while it had ceased to conduct business.  All of these actions were taken by Bommel while, as set forth below, NATPE was undercapitalized, insolvent, and unable to pay its debts as they became due in the ordinary course of business.

30.    From the January 8, 2022, the date on which NATPE cancelled the 2022 Event, to the Petition Date – at Bommel's direction, NATPE paid the following amounts to Bommel, members of the Executive Team and Peter's law firm –

-        Bommel = $450,000.  This included substantial deferred compensation, contractual severance and vacation pay, and a separate employee severance payout.  This included approximately $150,000 in severance and vacation "buyout".

-        The Peter Law Group = $221,410.50

-        Charlie Weiss $53,461.53

-        Wayneston Harbeson $56,538.50

-        Gary Mitchell = $65,243.94

-        The Lippin Group, Inc. a Public Relations firm controlled by NATPE director and board member Richard B. Lippin = $125,000

31.    NATPE paid over $825,000 to creditors during the 90 days before the Petition Date, the bulk of which went to Bommel, Peter's law firm, and the Executive Team.

32.    Even after the Bankruptcy Case was filed, Bommel, the Executive Team and Peter managed to continue their pattern of expending NATPE's dwindling cash reserves on themselves.

33.    Immediately prior to the Petition Date, NATPE terminated all of its employees effective October 14, 2022. These terminations included severance packages.

34.    NATPE filed for bankruptcy protection on October 11, 2022 (the "Petition Date"). NATPE elected to proceed as a Supchapter V debtor for the purpose of liquidating the Debtor's assets. According to NATPE's Schedules of Assets and Liabilities [Docket No. 40 (the "Schedules")], as of the Petition Date, its assets totaled approximately $533,834.75.

35.    On November 9, 2022, the Debtor filed a motion seeking a Bankruptcy Court order authorizing it to pay commissions, employee benefits and payment of related taxes and tax deposits, as well as approval of severance plans for its "critical" employees (the "Wage Motion," Dkt. No. 16).

36.    The Wage Motion sought Bankruptcy Court approval to pay the following individuals and amounts:

-    Wayneston Harbeson: Severance $39,487.70; proposed priority wage payment of $15,150;

-    Charlie Weiss: Severance $10,930.36 as priority wages;

-    Stephanie Berlhinque: Severance $3,597.70; commissions $7,580.00, total as proposed priority wages of $11,177.70;

-    Rebecca Shotland: Severance $3,522.46; commissions $7,375.00, total as proposed priority wages of $10,897.46; and

-    Sylvia Jagheshar: Severance $22,784.25; proposed priority wage payment of $15,150.00.

37.    Fontainbleau filed an opposition to the Wage Motion on November 16, 2022 (Dkt. No. 24). On November 22, 2022, the Debtor voluntarily dismissed the Wage Motion and never obtained Bankruptcy Court approval for payment of any of the pre-petition

1  wages (Dkt. No. 32).  However, what NATPE failed to mention in the Wage Motion was

2  that the payment of the pre-petition wages – even the amounts that exceeded the priority

3  wage maximum, were already paid by the Debtor in the days immediately after the Petition

4  Date as reflected in the Debtor's first Monthly Operating Report for the period October 11,

5  2022 through October 31, 2022 (Dkt. No. 34).

6      38.    Estate assets were further dissipated by Bommel post-petition through

7  various "Independent Contractor" agreements which are believed to have been drafted

8  by Peter. Under these Independent Contract agreements, Bommel, Mitchell, Harbeson,

9  and Lee continued to receive payments from the Debtor as consultants as opposed to

10  employees.  Plaintiff is informed and believes each of these individuals received at least

11  the following amounts post-petition:

12    -   Bommel, Executive Consulting Agreement = $92,312.50

13    -   Edward Jones, Asset Management Agreement = $3,870.00

14    -   Gary Mitchell, International Sales Rep Agreement = $2,015

15    -   Ming-Fen Lee, International Sales Rep Agreement = $4,029.31

16    -   The Lippin Group, Inc., PR Service contract =$5,000

17      39.    In addition to making post-petition payments to NATPE's former pre-petition

18  employees, Bommel continued to pay Pery Consulting Group, LLC ("PCG"), for outside

19  professional services including CFO, Controller and Accounting Manager pursuant to a

20  Vendor Agreement between NATPE and PCG dated November 16, 2020 (the "PCG

21  Agreement").  The PCG Agreement provided for a monthly fee of $7,000, which NATPE

22  regularly paid through July of 2022.  However, in or around September of 2022, there was

23  a modification of the PCG Agreement, and the monthly fee increased to $12,500.  As a

24  result, PCG continued to receive post-petition consulting fees during the Bankruptcy Case

25  from October of 2022 through May of 2022 which totaled $87,500.  Given that NATPE had

26  effectively ceased operating by the Petition Date, and subsequently sold all of its assets

27  by January of 2023, the Debtor was receiving little benefit from the type of services that

28  PCG was allegedly providing, showing continued financial mismanagement well after the

1  filing of the Bankruptcy Case.

2      40.    Immediately after the Petition Date, the Debtor sought to liquidate on an

3  extremely compressed timeline in the Bankruptcy Case.  NATPE did not require the

4  "consulting" services of these individuals and companies and as such, these expenditures

5  were just a further exercise in self-dealing by the NATPE executives and insiders.  To

6  make matters worse, several members of the Executive Team, including Harbeson,

7  Wiess, Mitchell and Lee, began working with competitors of NATPE prior to the close of

8  the proposed sale its customer list, bringing into question the loyalties of these individuals

9  who were continuing to receive consulting fees from NATPE at that time. This was another

10  example of the NATPE executives placing their own self interests over those of the Estate,

11  as had been the pattern prior to the Petition Date.

12      41.    The continued erosion of the Debtor's cash continued in the Bankruptcy

13  Case for nearly two years, leaving the Estate with less than $120,000 by the time Plaintiff

14  was appointed.  The only apparent beneficiaries of the bankruptcy process were the Estate

15  professionals and insiders. One of the professionals was Peter, who continued to serve

16  as counsel to the Debtor despite the clear claims the Estate had against him for

17  professional negligence when he failed to timely seek coverage under NATPE's insurance

18  policy for the Arbitration.  The obvious strategy of Peter was to not only continue to use

19  Estate resources to his own benefit, but to also try and run out the clock on the statutes of

20  limitations that are now faced by Plaintiff.

21      42.    Shortly after the Petition Date, NATPE sold substantially all of its assets for

22  $150,000 as well as the assumption of certain assumed deferred revenue liabilities of the

23  Debtor through a Court-approved sale (the "Asset Sale," Dkt. No. 48).  The Court approved

24  the Asset Sale on January 6, 2023, and there were no further operations (Dkt. No. 59).

25      43.    The Debtor filed its liquidating plan January 9, 2023 (Dkt. No. 61).

26      44.    On September 17, 2024, Plaintiff was appointed as the Plan Fiduciary to

27  administer the Debtor's Estate in which capacity he continues to serve.

28      45.    As of the Petition Date, the Debtor was indebted to Fontainebleau Florida

Hotel, LLC dba Fontainebleau Florida LLC d/b/a Fontainebleau Miami Beach Hotel ("Fontainebleau") in the amount of no less than $3,414,618.69, plus prejudgment interest and attorney's fees and costs.

46.    Plaintiff is informed and believes that within the one year prior to the Petition Date, Bommel received the transfers from the Debtor totaling in excess of $450,000 (the "Bommel 1-Year Transfers").

47.    Plaintiff is informed and believes that the Bommel 1-Year Transfers included substantial deferred compensation, contractual severance and vacation pay, and a separate severance payout.  This included approximately $150,000 in severance and vacation "buyout."

48.    Plaintiff is informed and believes that Bommel's employment contract creating the severance obligation was entered into on April 1, 2022, while Debtor was engaged in Arbitration with Fontainebleau.

49.    Plaintiff is informed and believes that within the one year prior to the Petition Date, Peter received the transfers from the Debtor totaling in excess of $421,783, of this amount, $221,410.50 was paid within the 90 days prior to the Petition Date, including a single payment of $76,642.25 on September 26, 2022 (the "Peter Pre-Petition Transfers," and collectively referred to herein with the Bommel 1-Year Transfers as the Preferential Transfers).

50.    Plaintiff is informed and believes that the Debtor had a property interest in the funds that made up each of the Preferential Transfers as each of the Preferential Transfers were drawn against and cleared one or more of the Debtor's bank accounts.

51.    Plaintiff is informed and believes that each of the Preferential Transfers was paid on account of outstanding debt(s) owed by the Debtor to Defendants at the time the payments were made.

52.    Plaintiff is informed and believes that the Debtor did not receive reasonably equivalent value in exchange for the severance and deferred compensation payments to Bommel, including the Bommel 1 Year Transfers, and these payments were fraudulent.

53.     Prior to commencing this action, Plaintiff performed reasonable due diligence regarding Defendants' potential affirmative defenses to the claims asserted herein.  The due diligence was performed with the assistance of Plaintiff's counsel and accountants by reviewing the Debtor's books and records, analyzing payments made by the Debtor to Defendants, and confirming associated information regarding Defendants' invoices to the Debtor.

54.     Plaintiff is informed and believes that after the Petition Date, Bommel received at least $200,015.00 from the Debtor (the "Post-Petition Transfers").

55.     Plaintiff is informed and believes that the Debtor had a property interest in the funds that made up each of the Post-Petition Transfers which were drawn against and cleared one or more of the Debtor's bank accounts.

56.     Plaintiff is informed and believes, that at all relevant times herein, Bommel had access to, and exercised control over, all of NATPE's bank accounts.

### FIRST CLAIM FOR RELIEF

### (Breach of Fiduciary Duty – against Bommel)

57.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

58.     During the relevant period, Bommel was an officer and/or director of the Debtor, and as such, owed fiduciary duties of care and loyalty to the Debtor and owed a duty not to engage in self-dealing conduct that could harm the Debtor. Moreover, these duties were heightened because the Debtor was a non-profit organization.

59.     In addition, Bommel also owed a duty of care to act with minimal competency to ensure that the Debtor was operated in accordance with the law, as well as a duty of loyalty to avoid placing his own interests ahead of the Debtor's interests, which prohibited him from undertaking or participating in activities adverse to the interests of the Debtor and its creditors and the duty to account to the Debtor to and keep it fully informed as to all matters pertaining to its interests.

60.     Moreover, Bommel owed the same fiduciary duties to the Debtor's creditors

1   because the Debtor was insolvent.

2       61.    The fiduciary duties of loyalty and good faith required that Bommel act in the

3   best interests of the Debtor and its creditors rather than his own self-interest, and to

4   correspondingly refrain from self-dealing, conflicts of interest, and prioritizing his own

5   personal gain or the enrichment of directors and officers at the expense of the Debtor.

6   Bommel was also required to ensure that the Debtor's resources were used for a pubic

7   benefit and avoid acting for purposes other than advancing the Debtor and its creditors'

8   best interests and to avoid failing to act when he had a known duty to act. Additionally,

9   Bommel was required under the duties of loyalty and good faith to exercise a level of

10  diligence in operating the Debtor's business such that he did not act grossly negligent or

11  disregard corporate formalities and financial reality.

12      62.    Because Bommel was ultimately responsible for overseeing the day-to-day

13  business operations and financial performance of the Debtor and involved in supervising

14  all aspects of the Debtor's financial affairs, at all relevant times, he was well aware of the

15  dire financial condition and insolvency of the Debtor. Despite this knowledge, Bommel

16  failed to act in good faith, and caused the Debtor to make the above-described distributions

17  to or for himself, Peter, the Executive Team and the others, as well as preferring some

18  creditors over other creditors while the Debtor was in severe financial distress. Bommel's

19  substantial payments to himself amounted to self-dealing, and included improperly

20  authorizing his severance and deferred compensation package while the Debtor was

21  insolvent in violation of Debtor's rights and obligations to its creditors. In so doing, Bommel

22  breached his fiduciary duties to Debtor.

23      63.    Additionally, Bommel committed numerous other acts and omissions in

24  blatant violation of law or policy giving rise to claims for breach of fiduciary duty, including,

25  but not limited to:

26  a.  Ignoring conflicts of interests;

27  b.  Failing to report and mishandling of insurance coverage issues;

28  c.  Mismanaging the Debtor's affairs for personal gain or failing to act in the Debtor's

best interests;

d. Failing to ensure that the Debtor's resources were used to achieve its public benefit purposes as a non-profit organization;

e. Withholding knowable information material to the Debtor's board and creditors;

f. Transferring the Debtor's business operations (and employees) to competitors;

g. Authorizing substantial severance and deferred compensations packages to employees while the Debtor was insolvent.

64.     Consequently, per the allegations herein, Bommel breached his fiduciary duties as an officer and director of the Debtor, and was a direct and proximate cause of, and a substantial factor in causing damage to the Debtor and its creditors in the amount of the transfers made by the Debtor to or for his own benefit and the benefit of the other insiders, and preferring some creditors over other creditors, improperly authorizing deferred compensation and severance payments while the Debtor was in severe financial distress.

65.     These breaches of fiduciary duty directly contributed to the Debtor filing for bankruptcy and depleted the Estate's assets both pre- and post-petition, and thereby damaged NATPE in an amount to be proven at trial, but currently estimated to be at least $4 million.

### SECOND CLAIM FOR RELIEF

**(Aiding and Abetting Breach of Fiduciary Duty – against Peter)**

66.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

67.     Peter was aware Bommel owed fiduciary duties to the Debtor.

68.     Peter knowingly, recklessly, and /or negligently engaged in conduct to aid and abet Bommel's breaches of fiduciary duty described above.

69.     As a direct and proximate result of Peter aiding and abetting Bommel's breaches of fiduciary duty, the Debtor has been damaged in an amount subject to proof at trial, which sum is believed to be in excess of $4 million.

### THIRD CLAIM FOR RELIEF

### (Corporate Waste – against Bommel)

70.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

71.    An officer of an entity may be held liable where he causes the entity to enter into transactions in which no person of ordinary sound business judgment could view the benefits received in such transaction by the entity as a fair exchange for the consideration paid by the entity.

72.    Bommel caused Debtor to enter into numerous transactions for which it received very little or no consideration without limitation, Bommel made payments, to himself, Peters, various insiders out of the Bank Accounts and for which NATPE received very little or nothing in return.

73.    In addition, Bommel actively mismanaged and failed adequately oversee the Debtor's finances and continued to engage in self-dealing, irrationally squandered corporate assets, and actively drained the Debtor's cash in the months leading up to NAPE's bankruptcy filing, thereby causing unreasonable and knowable losses to NATPE where no businessperson of ordinary and sound judgment could conclude that the corporation has received adequate consideration.

74.    Bommel's actions were egregious or irrational and were not based on a valid assessment of NATPE's best interests and amounted to Corporate Waste.

75.    As a direct and proximate result of Bommel's conduct, the Debtor has been damaged in an amount subject to proof at trial, which sum is believed to be in excess of $4 million.

### FOURTH CLAIM FOR RELIEF

### (Negligence – Legal Malpractice Against – Peter)

76.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

77.    Peter acted as general counsel for the Debtor from at least 2010 until 2024.

1  During this time, the Peter represented the Debtor in multiple different capacities.

2      78.    In representing the Debtor, Peter owed a professional duty to use such skill,

3  prudence and diligence as other members of his profession commonly possess and

4  exercise under the circumstances in the performance of the tasks which they undertake.

5  This included a duty to avoid representation of interests adverse to the Debtor and withdraw

6  from representation when a conflict of interest arose.

7      79.    Peter breached his professional duty to the Debtor by his ongoing

8  mishandling of insurance coverage issues. The Debtor suffered at least (i) the loss of

9  coverage for its defense fees in Arbitration, which would have been covered had Peter

10  timely tendered the claim to Debtor's liability insurance carrier Navigators Insurance Co.

11  ("Navigators"), which is no less than $218,410.50, the amount paid to Peter during the 90-

12  day preference period; (ii) the loss of potential coverage for Debtor's liabilities stemming

13  from its disputes with Fontainebleau, including but not limited to the Arbitration, and (iii) the

14  fees and costs incurred in the coverage litigation against Navigators.

15      80.    Additionally, Peter breached his professional duty to the Debtor by, among

16  other things:

17      a.    Disclosure failures and misrepresentations in connection with Peter's

18          Application for employment as Special Counsel in the Bankruptcy Case.

19      b.    Peter failed to disclose his adverse interests to the Estate with respect to

20          its post-petition billing of the Estate in connection with potential fraudulent

21          transfer claims against Peter;

22      c.    Counseling in favor of payment of deferred compensation, severance, and

23          vacation pay to Debtor's Insiders and employees despite Debtor's

24          insolvency or near insolvency;

25      d.    Counseling in favor of Debtor's cancellation of the 2021 Agreement;

26      e.    Counseling in favor of Debtor's cancellation of the 2022 Agreement;

27      f.    Counseling in favor of Debtor's breach of the 2021 Settlement Agreement;

28      g.    Counseling in favor of other fraudulent transfers discussed above;

h.      Failing to disclose conflicts of interest and/or recuse Peter from

employment following ;

i.      Counseling and preparing independent contractor agreements for Debtor's

former employees who continued to perform in the same capacity as the

Debtor in violation of California employment laws and possibly state and

federal tax laws;

j.      Failing to advise the Debtor that its prepetition compensation to insiders

was excessive and in breach of such insider's fiduciary duties to the

Debtor.

81.     Peter's negligence directly contributed to the Debtor filing for bankruptcy and depleted the Estate's assets both pre- and post-petition, and thereby damaged NATPE.

82.     As a direct and proximate result of Peter's breaches, the Debtor has been damaged in an amount subject to proof at trial, which sum is believed to be in excess of $4 million.

**FIFTH CLAIM FOR RELIEF**

**(Avoidance of Intentionally Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(A) –**

**against Bommel)**

83.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

84.     Plaintiff is informed and believes that within two years of the Petition Date, the Debtor made certain transfers to, or for the benefit of Bommel totaling at least $450,000 (the "2-Year Transfers").

85.     Plaintiff is informed and believes that the 2-Year Transfers constituted an interest in property of the Debtor.

86.     Plaintiff is informed and believes and thereupon alleges that the 2-Year Transfers were transfers that were made with the actual intent to hinder, delay and defraud the creditors of the Debtor.

87.     Plaintiff is informed and believes that at the time the 2-Year Transfers were

1  paid to Bommel, the Debtor was in serious financial distress and was not paying its debts

2  as they came due and was facing substantial claims for its breaches of the 2021 and 2022

3  Agreements with Fontainebleau and involved in Arbitration.

4        88.    Plaintiff is informed and believes that the 2-Year Transfers included

5  payments for substantial deferred compensation, contractual severance and vacation pay,

6  and separate severance payouts for which the Debtor did not receive reasonably

7  equivalent value.

8        89.    Plaintiff is entitled to avoid and set aside the 2-Year Transfers pursuant to

9  11 U.S.C. § 548(a)(1)(A).

10  **<u>SIXTH CLAIM FOR RELIEF</u>**

11  **(Avoidance of Constructively Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(B)**

12  **– against Bommel)**

13        90.    Plaintiff realleges and incorporates herein by reference each and every

14  allegation contained in all prior paragraphs of this Complaint.

15        91.    Plaintiff is informed and believes that on or within two years before the

16  Petition Date, the Debtor made the 2-Year Transfers to, or for the benefit of Bommel.

17        92.    Plaintiff is informed and believes that the 2-Year Transfers were transfers of

18  property in which the Debtor had an interest.

19        93.    Plaintiff is informed and believes that the Debtor did not receive reasonably

20  equivalent value in exchange for any of the 2-Year Transfers.

21        94.    Plaintiff is informed and believes that at the time of the 2-Year Transfers the

22  Debtor was insolvent or became insolvent as a result thereof.

23        95.    At all relevant times within the two years prior to the Petition Date, the Debtor

24  (i) was insolvent, or became insolvent as a result of each such transfer; (ii) was engaged

25  in or was about to engage in a business or a transaction for which its remaining assets

26  were unreasonably small in relation to the business or transaction; or (iii) intended to incur,

27  or believed or reasonably should have believed that it would incur, debts beyond its ability

28  to pay as they became due.

96. Plaintiff is entitled to avoid and set aside the 2-Year Transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

### SEVENTH CLAIM FOR RELIEF

**(Avoidance of Preferential Transfers Under 11 U.S.C. § 547 –**

**against all Defendants)**

97. Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

98. Plaintiff is informed and believes that the Preferential Transfers were a transfer of an interest of the Debtor in property.

99. Plaintiff is informed and believes and thereupon alleges that the Preferential Transfers were made to the Defendants or for the benefit of the Defendants.

100. Plaintiff is informed and believes that the Preferential Transfers were made to or for the benefit of Defendants at a time in which Defendants were a creditor of the Debtor, as the term "creditor" is defined by 11 U.S.C. § 101(10).

101. Plaintiff is informed and believes that the Preferential Transfers were made for or on account of an antecedent debt owed by the Debtor to Defendants.

102. Plaintiff is informed and believes that the Preferential Transfers were made while the Debtor was insolvent.

103. Plaintiff is informed and believes that the Preferential Transfers enabled Defendants to receive more than it would have received as a creditor if: (a) the Preferential Transfers had not been made; and (b) Defendants received payment of the debts they were owed to the extent provided under the Bankruptcy Code.

104. Plaintiff is informed and believes that interest on the Preferential Transfers has accrued and continues to accrue at the maximum legal rate pursuant to 28 U.S.C. § 1961 from the time the Preferential Transfers were made.

105. Plaintiff performed reasonable due diligence in the circumstances of Defendants' known or reasonably knowable affirmative defenses.

106. Plaintiff is entitled to avoid and set aside the Preferential Transfers pursuant

1    to 11 U.S.C. § 547.

2    **EIGHTH CLAIM FOR RELIEF**

3    **(Avoidance of Post-Petition Transfers Under 11 U.S.C. § 549 – against Bommel)**

4    107.  Plaintiff realleges and incorporates herein by reference each and every

5    allegation contained in all prior paragraphs of this Complaint.

6    108.  Plaintiff is informed and believes that the Post-Petition Transfers were

7    transfers of property of the Estate.

8    109.  Plaintiff is informed and believes that the Post-Petition Transfers occurred

9    after the commencement of the Debtor's Bankruptcy Case.

10    110.  Plaintiff is informed and believes that the Post-Petition Transfers were not

11    authorized by the Bankruptcy Court or made in accordance with the provisions of the

12    Bankruptcy Code.

13    111.  Plaintiff is entitled to avoid the Post-Petition Transfer pursuant to 11 U.S.C.

14    § 549.

15    **NINTH CLAIM FOR RELIEF**

16    **(Conversion – against all Defendants)**

17    112.  Plaintiff realleges and incorporates herein by reference each and every

18    allegation contained in all prior paragraphs of this Complaint.

19    113.  As described above, the Debtor disposed of its assets to Defendants, the

20    Executive Team, and others leading up, and subsequent, to this bankruptcy case, despite

21    the Debtor's own dire financial circumstances.

22    114.  Defendants exerted control over the Debtor's assets, and knowingly

23    participated in, or was negligent in the management and supervision of the Debtor's affairs

24    causing or contributing to the Debtor's ultimate liquidation.

25    115.  These assets are rightfully the property of the Estate, as they were

26    transferred to the Debtor's insiders or entities controlled by the Debtor's insiders, who used

27    the Debtor for their own convenience and benefit and disregarded the Debtor's public

28    purpose as a non-profit organization and were outside of the ordinary course of business.

1   Moreover, to the extent that the subject transfers were made post-petition, they were not

2   authorized by the Bankruptcy Code or the Bankruptcy Court.

3       116.   Consequently, the recipients of these assets now wrongfully have control

4   over the Debtor's assets, in an amount which shall be proven at trial, but currently

5   estimated to be at least $2 million, which are rightfully Estate property.

6       117.   Defendants' acts were undertaken for improper purposes as alleged above

7   and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of

8   the Estate's creditors, and were designed and intended to cause and did, in fact, cause the

9   Estate's creditors to suffer actual damages and therefore justify the awarding of exemplary

10  and punitive damages.

11              **TENTH SEVENTH CLAIM FOR RELIEF**

12       **(Recovery of Avoided Transfers 11 U.S.C. § 550 – against all Defendants)**

13       118.   Plaintiff realleges and incorporates herein by reference each and every

14  allegation contained in all prior paragraphs of this Complaint.

15       119.   Plaintiff is informed and believes that the Preferential Transfers, the 2-Year

16  Transfers, and the Post-Petition Transfers (collectively, the "Transfers") are avoidable,

17  variously, pursuant to 11 U.S.C. §§ 547, 548, and/or 549.

18       120.   Plaintiff is informed and believes that Defendants and Does 1-50, inclusive,

19  were, variously, the initial transferee and/or was the entity for whose benefit the Transfers

20  were made or the mediate or immediate transferee of the Transfers.

21       121.   Plaintiff, therefore, is entitled to recover and preserve the Transfers from

22  Defendants for the benefit of the Estate pursuant to 11 U.S.C. §§ 550(a) and 551, plus

23  interest at the maximum legal rate from and after the date of each of the Transfers.

24              **ELEVENTH CLAIM FOR RELIEF**

25            **(Unjust Enrichment – against all Defendants)**

26       122.   Plaintiff realleges and incorporates herein by reference each and every

27  allegation contained in all prior paragraphs of this Complaint.

28       123.   Plaintiff is informed and believes that Defendants engaged in wrongful and

1    inappropriate conduct as described above, without valid justification or excuse which

2    resulted in harm to the Debtor. Such conduct includes, but is not limited to, breaching their

3    fiduciary duties of loyalty, care and good faith.

4    124.    Defendants' actions were targeted at Fontainebleau and almost certain to

5    cause financial harm to its creditors and primarily Fontainebleau by intentionally depleting

6    the Debtor's resources without just cause at a time when the Debtor faced substantial

7    liability to Fontainebleau and was insolvent.

8    125.    In many cases, Defendants received benefits from such conduct that were

9    rightly due to the Debtor or its creditors.  Defendants had actual knowledge or reasonable

10    foreseeability that their conduct would result in injury and substantially harm the Debtor's

11    creditors.

12    126.    It would be unjust for Defendants to retain such benefits.

13    127.    Plaintiff is entitled to restitution from the Defendants in an amount subject to

14    proof at trial.

15    **TWELFTH CLAIM FOR RELIEF**

16    **(Disallowance of Claim - 11 U.S.C. § 502(d) – against all Defendants)**

17    128.    Plaintiff realleges and incorporates herein by reference each and every

18    allegation contained in all prior paragraphs of this Complaint.

19    129.    Defendants are a transferee of property subject to avoidance pursuant to 11

20    U.S.C. §§ 547, 548, and/or 549.

21    130.    Plaintiff may recover the property transferred by the Transfers, or the value

22    thereof, from Defendants pursuant to 11 U.S.C. § 550(a).

23    131.    Defendants have not paid the amount or turned over the property to the

24    Estate for which they are liable pursuant to 11 U.S.C. § 550(a).

25    132.    Plaintiff is entitled to disallowance of any claim against the Estate asserted

26    by Defendants, pursuant to 11 U.S.C. § 502(d) and Rule 3001(c) of the Federal Rule of,

27    because Defendants, and each of them are a transferee of property pursuant to 11 U.S.C.

28    §§ 547, 548, and/or 549.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for a judgment hereon ordering the following relief.

**On the First and Second Claims for Relief:**

1. Compensatory, special and consequential damages, disgorgement of all sums received by Defendants for the period in which they were in breach of fiduciary duties or aiding and abetting that breach, and punitive damages from Defendants, the exact amount of which to be proved at trial, and presently alleged to be no less than $4 million;

**On the Third Claim for Relief**

2. Compensatory, special, and consequential damages, and punitive damages, all in an amount to be determined at trial;

**On the Fourth Claim for Relief**

3. Compensatory, special and consequential damages, the exact amount of which to be proved at trial, and presently alleged to be no less than $4 million;

**On the Fifth, Sixth, Seventh, Eighth and Tenth Claims for Relief:**

4. Avoiding, recovering, and preserving the subject Transfers, directing that the subject Transfers of the Debtor's money and property be set aside, and recovering the subject Transfers, or the value thereof, from the Defendants for the benefit of the Debtor's bankruptcy estate, all in an amount to be determined at trial, which sums are believed to be in excess of $2 million;

**On the Ninth Claim for Relief:**

5. Compensatory damages and punitive damages, the exact amount of which to be proved at trial, and presently alleged to be no less than $2 million;

**On the Eleventh Claim for Relief:**

6. Restitution and disgorgement of all amounts unjustly held by the Defendants, the exact amount of which to be proved at trial, and presently alleged to be no less than $1 million;

**On the Twelfth Claim for Relief:**

7. For disallowance of any claims asserted by Defendants, pursuant to 11

1    U.S.C. § 502(d);

2            **On all Claims for Relief:**

3            8.      For costs of suit and interest at the legal rate on all damages and sums

4    awarded to Plaintiff, for the benefit of the Estate; and

5            9.      For such other and further relief as this Court deems just and proper.

6

7    DATED:  October 11, 2024                      **MARGULIES FAITH, LLP**

8

9                                                   By: _Samuel Boyamian_

10                                                  Meghann A. Triplett
                                                    Samuel M. Boyamian
11                                                  Attorneys for Plaintiff, Jeremy W. Faith,
                                                    Chapter 11 Plan Fiduciary

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET **FILED**<br>(Instructions on Reverse)<br>**OCT 11 2024**<br>CLERK U.S. BANKRUPTCY COURT<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____ Deputy Clerk | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Jeremy W. Faith, Chapter 11 Plan Fiduciary | DEFENDANTS<br>Jean Pierre Bommel, Arnold P. Peter d/b/a Peter Law Group |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Meghann A. Triplett       Phone: (818) 705-2777<br>Margulies Faith, LLP<br>16030 Ventura Blvd., Suite 470, Encino, CA 91436 | ATTORNEYS (If Known) |

| PARTY (Check One Box Only)<br>☐ Debtor      ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☑ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor      ☑ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☑ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(1) Breach of Fiduciary Duty; (2) Aiding and Abetting Breach of Fiduciary Duty; (3) Corporate Waste; (4) Negligence; (5) Avoidance of Fraudulent Actual Transfers; (6) Avoidance of Constructively Fraudulent Transfers; (7) Avoidance of Preferential Transfers; (8) Avoidance of Unauthorized Post-Petition Transfers; (9) Conversion; (10) Recovery of Avoided Transfers; (11) Unjust Enrichment; (12)

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- [1] 12-Recovery of money/property - §547 preference
- [2] 13-Recovery of money/property - §548 fraudulent transfer
- [3] 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
- [4] 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| **NAME OF DEBTOR** <br> National Association of Television Program Executives, Inc. | | **BANKRUPTCY CASE NO.** <br> 1:22-bk-11181-MB |
| **DISTRICT IN WHICH CASE IS PENDING** <br> Central District of California | **DIVISION OFFICE** <br> San Fernando Valley | **NAME OF JUDGE** <br> Martin R. Barash |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| **PLAINTIFF** | **DEFENDANT** | **ADVERSARY PROCEEDING NO.** |
| **DISTRICT IN WHICH ADVERSARY IS PENDING** | **DIVISION OFFICE** | **NAME OF JUDGE** |
| **SIGNATURE OF ATTORNEY (OR PLAINTIFF)** <br><br><br> | | |
| **DATE** <br> 10/11/24 | **PRINT NAME OF ATTORNEY (OR PLAINTIFF)** <br> Samuel M. Boyamian | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.