1  MEGHANN A. TRIPLETT (SBN 268005)
   *Meghann@MarguliesFaithLaw.com*
2  JONATHAN SERRANO (SBN 333225)
   *Jonathan@MarguliesFaithLaw.com*
3  **MARGULIES FAITH LLP**
   16030 Ventura Boulevard, Suite 470
4  Encino, CA 91436
   Telephone: (818) 705-2777
5  Facsimile:   (818) 705-3777

6  Attorneys for Plaintiff Jeremy W. Faith,
   Chapter 11 Plan Fiduciary
7

8              **UNITED STATES BANKRUPTCY COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10              **SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| 11  In re: | Case No.: 1:22-bk-11181-MB |
| 12  NATIONAL ASSOCIATION OF TELEVISION PROGRAM EXECUTIVES, | Chapter 11 (Subchapter V) |
| 13  INC., | Adv. Proc. No.: 1:24-ap-01055-MB |
| 14                         Debtor. | **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR AN ORDER GRANTING LEAVE TO AMEND THE COMPLAINT** |
| 15  JEREMY W. FAITH, Chapter 11 Plan Fiduciary, | |
| 16 | |
| 17                         Plaintiff, v. | Hearing: |
| 18  JEAN PIERRE BOMMEL, an individual; ARNOLD P. PETER, an individual d/b/a | Date:   February 12, 2026 Time:   1:30 p.m. |
| 19  PETER LAW GROUP, and DOES 1–50, inclusive, | Place:  Courtroom 303 (and via ZoomGov) 21041 Burbank Boulevard |
| 20 | Woodland Hills, CA 91367 |
| 21                         Defendants. | |

22

23

24

25

26

27

28

## TABLE OF CONTENTS                                              Page

MEMORANDUM OF POINTS AND AUTHORITIES……………….……………....3

  I.   INTRODUCTION……………………………………………..…………….3

  II.  BACKGROUND……………………………………………………….4

      A. Plaintiff's Appointment and Filing of the Adversary Proceeding……..4

      B. Defendant's Delay in Turning Over Documents and Resulting

         Turnover Motions……………………………………………..…….5

      C. Recently Discovered Evidence Supporting Amendment…………..…7

  III.  ARGUMENT…………………………………………..…………….8

      A. No Undue Delay by Plaintiff…………………………………….9

      B. No Bad Faith by Plaintiff; Bad Faith by Defendants………………...9

      C. No Futility of Amendment………………………………………9

      D. No Prejudice to Defendants…………………………………….10

  IV.  CONCLUSION…………………………………………………….11

DECLARATION OF MEGHANN A. TRIPLETT………………………..……….12-15

# TABLE OF AUTHORITIES

**CASES**                                                                                                                 Page

Brown v. Stored Value Cards, Inc.,
        953 F.3d 567, 574 (9th Cir. 2020)……………………………………………....8

DCD Programs, Ltd. v. Leighton,
        833 F.2d 183, 188 (9th Cir. 1987)………………………………………………10

Eminence Capital, LLC v. Aspeon, Inc.,
        316 F.3d 1048 (9th Cir. 2003)………………………………………………..3

Foman v. Davis,
        371 U.S. 178, 182 (1962)………………………………………………8

In re Desertrain v. City of L.A.,
        754 F.3d 1147 (9th Cir. 2014)………………………………………………..3

In re Eminence Cap., LLC,
        316 F.3d at 1052………………………………………………8

United States v. Webb
        655 F.2d 977, 979 (9th Cir. 1981)………………………………………8, 10

1

**STATUES**                                                                                       **Page**

2   11 U.S.C. § 546(a)……………………………………………………………………………4

3   11 U.S.C. § 502(d)……………………………………………………………………1, 5

4

5   **RULES**                                                                                          **Page**

6   Federal Rules of Bankruptcy Procedure 7015…………………………………………8

7   Federal Rules of Civil Procedure Rule 15(a)(2)………..…………..………………3, 8, 10

8   Local Bankruptcy Rule 9013-1…………………..………………………………………1

9   Cal. Civ. Code §§ 1598, 1667, and 1668………………………………………………4, 7

10  Cal. Corp. Code § 23304.1(A)……………………………………………………………4, 7

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY
JUDGE; JEAN PIERRE BOMMEL; ARNOLD P. PETER; AND ARNOLD P. PETER, A
PROFESSIONAL CORPORATION D/B/A PETER LAW GROUP:**

 **PLEASE TAKE NOTICE** that Plaintiff Jeremy W. Faith ("Plaintiff"), the Plan
Fiduciary for the bankruptcy estate of reorganized debtor National Association of
Television Program Executives, Inc. (the "Debtor"), has filed *Plaintiff's Motion for an
Order Granting Leave to Amend the Complaint* (the "Motion"), which will be heard on
**February 12, 2026 at 1:30 p.m.** in Courtroom 303 of the above-referenced courthouse
located at 21041 Burbank Boulevard, Woodland Hills, CA 91367 and via ZoomGov as
provided in the concurrently filed *Supplemental Notice Re: Availability of ZoomGov
Audio and Video for Remote Appearance*. The Motion seeks an order granting Plaintiff
leave to amend the *Complaint for: (1) Breach of Fiduciary Duty; (2) Aiding and Abetting
Breach of Fiduciary Duty; (3) Corporate Waste; (4) Negligence; (5) Avoidance of
Fraudulent Transfers with Actual Intent [11 U.S.C. § 548(a)(1)(A)]; (6) Avoidance of
Constructively Fraudulent Transfers [11 U.S.C. § 548(a)(1)(B)]; (7) Avoidance of 1-Year
Transfers [11 U.S.C. § 547]; (8) Avoidance of Unauthorized Postpetition Transfers [11
U.S.C. § 549]; (9) Conversion; (10) Recovery of Avoided Transfer [11 U.S.C. § 550];
(11) Unjust Enrichment; and (12) Disallowance of Proof of Claim [11 U.S.C. § 502(d)]*
[Adv. Docket No. 1] (the "Complaint") to add claims for void contracts due to unlawful
purpose, voidable contract, fraud in the inducement, and declaratory relief, while
removing certain claims based on newly discovered evidence.

 **PLEASE TAKE FURTHER NOTICE** that the Motion is based on this notice of
Motion; the attached Memorandum of Points and Authorities; the attached Declaration of
Meghann A. Triplett; the pleadings, records, and files herein; and, if any hearing is held
on the Motion, on argument of counsel at said hearing.

 **PLEASE TAKE FURTHER NOTICE** that this Motion is being heard on regular
notice pursuant to Rule 9013-1 of the Local Bankruptcy Rules of the United States
Bankruptcy Court for the Central District of California. If you wish to oppose this Motion,

1    you must file a written response with the Court and serve a copy of it upon the Movant

2    and the Movant's attorney at the address set forth above no less than 14 days prior to

3    the above hearing date. If you fail to file a written response to this Motion within such

4    time period, the Court may treat such failure as a waiver of your right to oppose the

5    Motion and may grant the requested relief.

6    Dated:  January 22, 2026                **MARGULIES FAITH LLP**
                                              By:  */s/ Meghann A. Triplett*
7                                                 Meghann A. Triplett
                                                  Jonathan Serrano
8                                             Attorneys for Plaintiff Jeremy W. Faith,
                                              Chapter 11 Plan Fiduciary
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

Under the Ninth Circuit's mandate that leave to amend "shall be freely given when justice so requires" and "this policy is to be applied with extreme liberality," Plaintiff respectfully seeks leave to amend his Complaint based on substantial newly discovered evidence. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003), *Desertrain v. City of L.A.*, 754 F.3d 1147 (9th Cir. 2014).

The proposed amendments arise directly from Jean Pierre Bommel ("Bommel"), Arnold P. Peter ("Peter"), and Arnold P. Peter, APC d/b/a Peter Law Group ("PLG" and, together with Peter and Bommel, "Defendants") prolonged and bad faith delay in turning over the Debtor's documents and records, which prevented Plaintiff from accessing critical evidence until recently.  Due to Defendants being evasive and recalcitrant in turning over the Debtor's documents and records, Plaintiff did not review additional evidence supporting new and existing claims in this adversary proceeding until recently.

The proposed amendments include adding claims for (1) void contracts due to unlawful purpose; (2) voidable contract; (3) fraud in the inducement; and (4) declaratory relief while removing claims for aiding and abetting breach of fiduciary duty and disallowance of proof of claim based on the evidence now available, and to amend the caption of the Complaint to appropriately reflect the claims and parties in the adversary proceeding, including the addition of PLG. Plaintiff seeks to add PLG, as Peter never disclosed that his firm was a separate professional corporation and Plaintiff was unable to find it as when he filed the Complaint.

Under Rule 15(a)(2) of the Federal Rules of Civil Procedure and the Ninth Circuit's extremely liberal application thereof, this Motion should be granted.  Plaintiff respectfully requests entry of an order that grants leave to amend the Complaint in substantially the same form as the *First Amended Complaint for: (1) Breach of Fiduciary Duty; (2) Corporate Waste; (3) Negligence; (4) Void Contracts Due to Unlawful Purpose*

*[Cal. Civ. Code §§ 1598, 1667, and 1668]; (5) Voidable Contract Under Cal. Corporations Code § 23304.1(a); (6) Fraud in the Inducement; (7) Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers [11 U.S.C. §§ 548(a)(1)(A), 550, and 551]; (8) Avoidance, Recovery, and Preservation of Constructively Fraudulent Transfers [11 U.S.C. § 548(a)(1)(B), 550, and 551]; (9) Avoidance, Recovery, and Preservation of Preferential Transfers [11 U.S.C. §§ 547, 550, and 551]; (10) Avoidance, Recovery, and Preservation of Unauthorized Postpetition Transfers [11 U.S.C. §§ 549, 550, and 551]]; (11) Conversion; (12) Unjust Enrichment; and (13) Declaratory Relief* (the "Amended Complaint") attached hereto as **Exhibit 1**.

## II.

## BACKGROUND

### A. Plaintiff's Appointment and Filing of the Adversary Proceeding

On September 17, 2024, the Court entered the *Order Confirming Second Amended Subchapter V Chapter 11 Plan, with Modifications [Case Dkt. 251]* [Bankr. Docket No. 258] (the "Confirmation Order"), thereby confirming the Debtor's plan of reorganization and approving the appointment of Plaintiff as the Plan Fiduciary of the Debtor's estate. Just 24 days later, on October 11, 2024, Plaintiff filed the Complaint based on the limited evidence he had and to preserve claims against Defendants, as the two-year statute of repose under 11 U.S.C. § 546(a) for the commencement of avoidance actions expired on October 11, 2024. A copy of the Complaint is attached hereto as **Exhibit 2**.

On March 11, 2025, Bommel filed *Jean Pierre Bommel's Answer to Complaint for: (1) Breach of Fiduciary Duty; (2) Aiding and Abetting Breach of Fiduciary Duty; (3) Corporate Waste; (4) Negligence; (5) Avoidance of Fraudulent Transfers with Actual Intent [11 U.S.C. § 548(a)(1)(A)]; (6) Avoidance of Constructively Fraudulent Transfers [11 U.S.C. § 548(a)(1)(B)]; (7) Avoidance of 1-Year Transfers [11 U.S.C. § 547]; (8) Avoidance of Unauthorized Postpetition Transfers [11 U.S.C. § 549]; (9) Conversion; (10) Recovery of Avoided Transfer [11 U.S.C. § 550]; (11) Unjust Enrichment; and*

4

*(12) Disallowance of Proof of Claim [11 U.S.C. § 502(d)]* [Adv. Docket No. 22]. To date, Peter has not filed a response to the Complaint.

On December 10, 2025, the Court entered the *Order Approving Stipulation to Continue Status Conference Hearing and Set Deadlines for Plaintiff's First Amended Complaint and Motion for Leave to Amend* [Adv. Docket No. 51] (the "Order on Stipulation"). In the Order on Stipulation, the Court continued the status conference; ordered Plaintiff to circulate a draft of the Amended Complaint to Defendants no later than January 9, 2026; set January 22, 2026 as the deadline for Plaintiff to file this Motion; and established February 12, 2026 at 1:30 p.m. as the time for the hearing on the Motion and the status conference to take place. To date, the status conference has not taken place and no dates for discovery or trial have been set in this adversary proceeding.

On January 15, 2026, Plaintiff's counsel circulated via email a draft of the Amended Complaint to Peter and counsel for Bommel. On January 22, 2024, Bommel's counsel and Peter both conveyed that they would not stipulate to amend the Complaint.

**B. Defendants' Delay in Turning Over Documents and Resulting Turnover Motions**

Beginning on October 3, 2024, Plaintiff sent an email to Peter and demanded turnover of the Debtor's records in his possession. Despite multiple requests and Peter's representation that he would produce documents, Peter engaged in a pattern of delay and obfuscation spanning more than a year.  Peter initially provided only approximately 1,050 pages in PDF format on October 14, 2024 (after the two-year statute of repose), despite having generated "over 5,000 pages of electronically stored documents" in prior litigation.

The pattern of delay continued through 2025, with Peter making repeated promises to produce documents while failing to do so. On June 10, 2025, after nine months of obfuscation and undue delay, Peter finally provided an additional batch of documents yet still had not turned over all relevant documents including invoices.

Similarly, Bommel failed to disclose and turn over the Debtor's documents and records, producing documents that were intentionally converted from their original format. As a result of Defendants' conduct, Plaintiff was forced to file Turnover Motions on June 26, 2025.  The detailed timeline of Plaintiff's extensive efforts to obtain Debtor's documents from Bommel and Peter and supporting evidence is set forth in the (1) *Chapter 11 Plan Fiduciary's Motion for Turnover of Recorded Information Relating to The Debtor's Property or Financial Affairs in the Possession of its Former Directors* (the "Directors Turnover Motion") [Bankr. Docket No. 319] and (2) *Chapter 11 Plan Fiduciary's Motion for Turnover of Recorded Information Relating to The Debtor's Property or Financial Affairs in the Possession of Arnold Peter dba Peter Law Group* [Bankr. Docket No. 321] (the "Peter Turnover Motion" and, together with the Directors Turnover Motion, the "Turnover Motions"). A copy of the Directors Turnover Motion is attached hereto as **Exhibit 3**, a copy of the Peter Turnover Motion is attached hereto as **Exhibit 4.** and both Turnover Motions are incorporated herein by this reference.

As detailed in the Directors Turnover Motion and herein, Bommel failed to disclose and did not turn over all documents in his possession and the documents that he produced were intentionally converted from their original format. Directors Turnover Mot. 9–12, Ex. 3. Similarly, the Peter Turnover Motion details Peter and his law firm's failure to turn over significant portions of the Debtor's documents and recorded information in its possession, including, among others, email communications. Peter Turnover Mot. 6–13, Ex. 4.

In fact, Bommel turned over documents and records as late as July 31, 2025, and Peter turned over documents and records as late as December 15, 2025. Not to mention, emails turned over by Peter were not turned over in the form in which they were ordinarily maintained or in a format that reasonably maintains the usability of the information and preserves the integrity of the original data, as required by the *Order Granting Chapter 11 Plan Fiduciary's Motion for Turnover of Recorded Information Relating to the Debtor's Property, Including Its Client File, or Financial Affairs, in the*

1   *Possession of Arnold P. Peter and Arnold P. Peter, APC dba Peter Law Group to*

2   *Chapter 11 Plan Fiduciary* [Bankr. Docket No. 365]. Since then and since filing the

3   Complaint, Plaintiff has reviewed additional evidence that supports the majority of the

4   existing claims as well as additional claims for (1) void contracts due to unlawful purpose

5   under Cal. Civ. Code §§ 1598, 1667, and 1668; (2) voidable contract under Cal. Corp.

6   Code § 23304.1(A); (3) fraud in the inducement; and (4) and declaratory relief.  As a

7   result, Plaintiff did not have the opportunity to review the documents and other evidence

8   that support the proposed amendments to the Complaint until recently.

9          **C.  Recently Discovered Evidence Supporting Amendment**

10          Due to Defendants' delay, Plaintiff did not have the opportunity to review

11   documents and evidence supporting the proposed amendments until recently.

12   Specifically, Bommel turned over documents and records as late as July 31, 2025, and

13   Peter turned over documents and records as late as December 15, 2025.

14          Review of the multitude of turned over documents has revealed that Bommel and

15   Peter participated in a deliberate scheme to extract funds from the Debtor during its

16   economic distress and ultimate insolvency.  The evidence shows a siphoning scheme

17   involving a plan that enabled Bommel alone to receive $857,000 in transfers within one

18   year pre-petition, almost double the amount he represented in the Debtor's Statement of

19   Financial Affairs.  The newly discovered evidence also reveals that Bommel unilaterally

20   increased his salary from $258,000 to $296,000 in June 2021 without proper

21   authorization.  Further that Bommel and Peter engaged in a deliberate campaign to

22   conceal the true nature of a conditional bonus agreement by recharacterizing it as

23   "deferred compensation" for "tax purposes."  As part of this scheme, Bommel executed a

24   new employment contract (drafted by Peter) in May 2022 containing material

25   misrepresentations about his salary and contract expiration date, designed to provide a

26   pretext for unearned bonus payments.

27          New evidence highlights Peter's dual role as the Debtor's general counsel and

28   owner of the suspended PLG, with documents confirming PLG's corporate suspension

7

1  during key advisory periods. This suspension, discovered through state records, raises

2  issues about the validity of legal services provided, including Peter's application for

3  special counsel employment post-petition. Emails exchanged in late 2025 reveal

4  conflicts of interest, such as Peter's failure to disclose PLG's status while billing the

5  Debtor over $221,000 in fees.

6        Expert analyses from insolvency reviews, conducted after the original complaint,

7  further demonstrate the Debtor's undercapitalization as early as January 6, 2022, with

8  projections showing cash deficits exacerbated by event cancellations and insider

9  transfers. Timelines compiled from board packages and financial reporting further

10  illustrate a pattern of prioritizing executive enrichment over creditor interests.

11                                III.

12                            **ARGUMENT**

13        Rule 15(a)(2) of the Federal Rules of Civil Procedure, which is incorporated in this

14  adversary proceeding by Rule 7015 of the Federal Rules of Bankruptcy Procedure,

15  provides that a court "should freely give leave [to amend a complaint] when justice so

16  requires." Fed. R. Civ. P. 15(a)(2). Rule 15 should be interpreted with "extreme

17  liberality." *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981) (citation omitted).

18        In determining whether to grant leave to amend, the bankruptcy court should

19  consider several factors including: (1) undue delay; (2) bad faith or dilatory motive by the

20  movant; (3) repeated failure to cure deficiencies by previous amendments; (4) undue

21  prejudice to the opposing party; and (5) futility of amendment. *Brown v. Stored Value

22  Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (citing *Foman v. Davis*, 371 U.S. 178, 182

23  (1962)). The consideration of prejudice to the opposing party carries the greatest weight.

24  *Eminence Cap.*, LLC, 316 F.3d at 1052. "Absent prejudice, or a strong showing of any of

25  the remaining *Foman* factors, there exists a presumption under [Civil] Rule 15(a) in favor

26  of granting leave to amend." *Id*. (citation omitted).

27        The proposed amendments satisfy all requirements under Rule 15(a)(2) and Ninth

28  Circuit precedent. Each *Foman* factor supports granting leave to amend.

### A.  No Undue Delay by Plaintiff

The proposed amendments are not the result of any delay or bad faith by Plaintiff. Plaintiff was appointed as the Plan Fiduciary at plan confirmation and filed the Complaint based on the limited evidence he had and to preserve claims against Defendants before the statute of repose expired. On the contrary, the proposed amendments are the result of Defendants' bad faith and undue delay in turning over the Debtor's documents and records.  The timeline demonstrates Plaintiff's diligence: he was appointed on September 17, 2024, and filed the Complaint just 24 days later on October 11, 2024, to preserve claims. Any delay in seeking amendment is directly attributable to Defendants' conduct in withholding documents.

### B. No Bad Faith by Plaintiff; Bad Faith by Defendants

Plaintiff has acted in good faith throughout this proceeding. In contrast, Defendants engaged in bad faith by failing to timely produce the Debtor's documents and records, and Plaintiff had to seek Court intervention by filing the Turnover Motions. As detailed in the Directors Turnover Motion and herein, Bommel did not turn over all documents in his possession and the documents that he produced were intentionally converted from their original format. Similarly, Peter and his law firm failed to turn over significant portions of the Debtor's documents and recorded information in its possession, including, among others, email communications leading to protracted litigation.

The evidence of bad faith is overwhelming: Bommel turned over documents as late as July 31, 2025, and Peter turned over documents as late as December 15, 2025, with emails not produced in their original format as required.

### C. No Futility of Amendment

The proposed amendments are not futile as they are supported by substantial newly discovered evidence, Plaintiff has worked diligently to review. The amendments add viable claims for void contracts due to unlawful purpose, voidable contract, fraud in the inducement, and declaratory relief, while removing claims that are not supported by

1  the evidence. The amendments also add allegations supporting existing claims based on

2  the comprehensive evidence now available. The proposed amendments are also not

3  futile as they are not being made following a motion to dismiss or to remedy a supposed

4  failure to state a claim or other defect.

5  **D. No Prejudice to Defendants**

6  Defendants will not face prejudice from the proposed amendments. Peter has not

7  filed a response to the Complaint, and although Bommel has filed an answer, his delay

8  in turning over documents and other evidence to Plaintiff is the reason that amendments

9  are being sought at this time. In other words, Defendants caused any delay that might

10  exist.

11  This case remains in its early stages as the status conference has not taken place

12  and no dates for discovery or trial have been set. None of the parties have served written

13  discovery or noticed depositions. Under Ninth Circuit precedent, there is no evidence of

14  prejudice in allowing leave to amend when the case is still at the discovery stage with no

15  trial date pending and no pretrial conference scheduled. *DCD Programs, Ltd. v.*

16  *Leighton*, 833 F.2d 183, 188 (9th Cir. 1987).

17  Conversely, Plaintiff would face significant prejudice if leave to amend were

18  denied. Plaintiff was not appointed as the Plan Fiduciary until plan confirmation, which

19  occurred less than four weeks before he had to file the Complaint to preserve claims.

20  Without leave to amend, Plaintiff will not have been given the opportunity to make

21  allegations and assert claims after a thorough review of the evidence, which was kept

22  from him by Defendants until recently. Thus, in light of Congress' direction that

23  amendment should be freely given (*see* Fed. R. Civ. P. 15(a)(2)) and the Ninth Circuit's

24  guidance that Rule 15 should be interpreted with "extreme liberality" (*see Webb*, 655

25  F.2d at 979), and based on the foregoing, leave to amend the Complaint in substantially

26  the same form as the Amended Complaint should be granted.

27  ///

28  ///

1

IV.

2

**CONCLUSION**

3     For the foregoing reasons, Plaintiff respectfully requests that the Court enter an

4   order granting this Motion and leave to amend the Complaint.

5

6   Dated:  January 22, 2026            **MARGULIES FAITH LLP**

7

8                                       By: */s/ Meghann A. Triplett*
                                           Meghann A. Triplett
9                                          Jonathan Serrano
                                        Attorneys for Plaintiff Jeremy W. Faith,
10                                      Chapter 11 Plan Fiduciary

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF MEGHANN A. TRIPLETT

I, Meghann A. Triplett, declare as follows:

1.      I am an attorney at law, duly qualified to practice before all courts of the State of California and before the United States Bankruptcy Court for the Central District of California ("Court"). I am a partner with the law firm of Margulies Faith LLP, counsel of record for Jeremy W. Faith ("Plaintiff"), the Plan Fiduciary for the bankruptcy estate of reorganized debtor National Association of Television Program Executives, Inc. (the "Debtor"). Unless stated otherwise, I have personal knowledge of the facts stated herein.

2.      I make this declaration in support of *Plaintiff's Notice of Motion and Motion for an Order Granting Leave to Amend the Complaint* (the "Motion") to which this declaration is affixed. Unless otherwise defined, capitalized terms herein have the same meanings ascribed to them in the Motion.

3.      A true and correct copy of the *First Amended Complaint for: (1) Breach of Fiduciary Duty; (2) Corporate Waste; (3) Negligence; (4) Void Contracts Due to Unlawful Purpose [Cal. Civ. Code §§ 1598, 1667, and 1668]; (5) Voidable Contract Under Cal. Corporations Code § 23304.1(a); (6) Fraud in the Inducement; (7) Avoidance, Recovery, and Preservation of Actual Fraudulent Transfers [11 U.S.C. §§ 548(a)(1)(A), 550, and 551]; (8) Avoidance, Recovery, and Preservation of Constructively Fraudulent Transfers [11 U.S.C. § 548(a)(1)(B), 550, and 551]; (9) Avoidance, Recovery, and Preservation of Preferential Transfers [11 U.S.C. §§ 547, 550, and 551]; (10) Avoidance, Recovery, and Preservation of Unauthorized Postpetition Transfers [11 U.S.C. §§ 549, 550, and 551]]; (11) Conversion; (12) Unjust Enrichment; and (13) Declaratory Relief* (the "Amended Complaint") is attached hereto as **Exhibit 1**.

4.      On September 17, 2024, the Court entered the *Order Confirming Second Amended Subchapter V Chapter 11 Plan, with Modifications [Case Dkt. 251]* [Bankr. Docket No. 258] (the "Confirmation Order"), thereby confirming the Debtor's plan of reorganization and approving the appointment of Plaintiff as the Plan Fiduciary of the Debtor's estate.

5. Just 24 days later, on October 11, 2024, on behalf of Plaintiff, I caused to be filed the *Complaint for: (1) Breach of Fiduciary Duty; (2) Aiding and Abetting Breach of Fiduciary Duty; (3) Corporate Waste; (4) Negligence; (5) Avoidance of Fraudulent Transfers with Actual Intent [11 U.S.C. § 548(a)(1)(A)]; (6) Avoidance of Constructively Fraudulent Transfers [11 U.S.C. § 548(a)(1)(B)]; (7) Avoidance of 1-Year Transfers [11 U.S.C. § 547]; (8) Avoidance of Unauthorized Postpetition Transfers [11 U.S.C. § 549]; (9) Conversion; (10) Recovery of Avoided Transfer [11 U.S.C. § 550]; (11) Unjust Enrichment; and (12) Disallowance of Proof of Claim [11 U.S.C. § 502(d)]* [Adv. Docket No. 1] (the "Complaint") based on the limited evidence Plaintiff and I had and to preserve claims against Defendants, as the two-year statute under 11 U.S.C. § 546(a) for the commencement of avoidance actions expired on October 11, 2024. A true and correct copy of the Complaint is attached hereto as **Exhibit 2**.

6. On March 11, 2025, Bommel filed *Jean Pierre Bommel's Answer to Complaint for: (1) Breach of Fiduciary Duty; (2) Aiding and Abetting Breach of Fiduciary Duty; (3) Corporate Waste; (4) Negligence; (5) Avoidance of Fraudulent Transfers with Actual Intent [11 U.S.C. § 548(a)(1)(A)]; (6) Avoidance of Constructively Fraudulent Transfers [11 U.S.C. § 548(a)(1)(B)]; (7) Avoidance of 1-Year Transfers [11 U.S.C. § 547]; (8) Avoidance of Unauthorized Postpetition Transfers [11 U.S.C. § 549]; (9) Conversion; (10) Recovery of Avoided Transfer [11 U.S.C. § 550]; (11) Unjust Enrichment; and (12) Disallowance of Proof of Claim [11 U.S.C. § 502(d)]* [Adv. Docket No. 22].

7. To date, Peter has not filed a response to the Complaint.

8. On December 10, 2025, the Court entered the *Order Approving Stipulation to Continue Status Conference Hearing and Set Deadlines for Plaintiff's First Amended Complaint and Motion for Leave to Amend* [Adv. Docket No. 51] (the "Order on Stipulation"). In the Order on Stipulation, the Court continued the status conference; ordered Plaintiff to circulate a draft of the Amended Complaint to Defendants no later than January 9, 2026; set January 22, 2026 as the deadline for Plaintiff to file this

Motion; and established February 12, 2026 at 1:30 p.m. as the time for the hearing on the Motion and the status conference to take place.

9.    On January 15, 2026, I circulated via email a draft of the Amended Complaint to Peter and counsel for Bommel.

10.    On January 22, 2024, both Peter and Bommel's counsel conveyed to me via email that they would not stipulate to amend the Complaint.

11.    To date, the status conference has not taken place and no dates for discovery or trial have been set in this adversary proceeding.

12.    After my failed efforts to obtain turnover of all of the Debtor's relevant documents and records, on behalf of Plaintiff, on June 26, 2025, I caused to be filed the (1) *Chapter 11 Plan Fiduciary's Motion for Turnover of Recorded Information Relating to The Debtor's Property or Financial Affairs in the Possession of its Former Directors* (the "Directors Turnover Motion") [Bankr. Docket No. 319] and (2) *Chapter 11 Plan Fiduciary's Motion for Turnover of Recorded Information Relating to The Debtor's Property or Financial Affairs in the Possession of Arnold Peter dba Peter Law Group* [Bankr. Docket No. 321] (the "Peter Turnover Motion" and, together with the Directors Turnover Motion, the "Turnover Motions"). Among other things, the Directors Turnover Motion details Bommel's failure to disclose and turn over the Debtor's documents and records. Similarly, the Peter Turnover Motion details Peter and his law firm's failure to turn over significant portions of the Debtor's documents and recorded information in its possession, including, among others, email communications. A true and correct copy of the Directors Turnover Motion is attached hereto as **Exhibit 3**, a true and correct copy of the Peter Turnover Motion is attached hereto as **Exhibit 4**, and both Turnover Motions are incorporated herein by this reference.

13.    Based on my review of the documents turned over by Bommel, prior to filing the Directors Turnover Motion, Bommel did not turn over all documents in his possession and the documents that he did produce were intentionally converted from their original format.

14.     Based on my review of the documents turned over by Peter prior to filing the Peter Turnover Motion, Peter failed to turn over significant portions of the Debtor's documents and recorded information in his possession, including, among others, email communications.

15.     As a result, neither Plaintiff nor I had the opportunity to review the documents and other evidence that support the proposed amendments to the Complaint until recently. Specifically, Bommel turned over documents and records to me as late as July 31, 2025, and Peter turned over documents and records to me as late as December 15, 2025. Not to mention, emails turned over by Peter and reviewed by me were not turned over in the form in which they were ordinarily maintained or in a format that reasonably maintains the usability of the information and preserves the integrity of the original data, as required by the *Order Granting Chapter 11 Plan Fiduciary's Motion for Turnover of Recorded Information Relating to the Debtor's Property, Including Its Client File, or Financial Affairs, in the Possession of Arnold P. Peter and Arnold P. Peter, APC dba Peter Law Group to Chapter 11 Plan Fiduciary* [Bankr. Docket No. 365].

16.     Since then and since filing the Complaint, I have reviewed additional evidence that I believe supports the majority of the existing claims as well as additional claims for (1) void contracts due to unlawful purpose under Cal. Civ. Code §§ 1598, 1667, and 1668; (2) voidable contract under Cal. Corp. Code § 23304.1(A); (3) fraud in the inducement; and (4) and declaratory relief.

17.     Peter never disclosed that his law firm, PLG, was a separate professional corporation and I was unable to find it as of the filing of the Complaint.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 22, 2026, at San Louis Obispo, California.

*/s/ Meghann A. Triplett*
Meghann A. Triplett

# EXHIBIT 1

1  MEGHANN A. TRIPLETT (SBN 268005)
   *Meghann@MarguliesFaithLaw.com*
2  JONATHAN SERRANO (SBN 333225)
   *Jonathan@MarguliesFaithLaw.com*
3  **MARGULIES FAITH LLP**
   16030 Ventura Boulevard, Suite 470
4  Encino, CA 91436
   Telephone: (818) 705-2777
5  Facsimile: (818) 705-3777

6  Attorneys for Plaintiff, Jeremy W. Faith,
   Chapter 11 Plan Fiduciary
7

8               **UNITED STATES BANKRUPTCY COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
9               **SAN FERNANDO VALLEY DIVISION**

10

11  In re:                          Case No.:  1:22-bk-11181-MB

12  NATIONAL ASSOCIATION OF          Chapter:    11 (Subchapter V)
    TELEVISION PROGRAM EXECUTIVES,
13  INC.,                            Adv. Case No.: 1:24-ap-01055-MB

14                      Debtor.      **FIRST AMENDED COMPLAINT FOR:**

15  JEREMY W. FAITH, Chapter 11 Plan  **(1) BREACH OF FIDUCIARY DUTY;**
    Fiduciary,
16                                    **(2) CORPORATE WASTE;**
                        Plaintiff,
17  v.                               **(3) NEGLIGENCE;**

18  JEAN PIERRE BOMMEL, an individual; **(4) VOID CONTRACTS DUE TO**
    ARNOLD P. PETER, an individual;        **UNLAWFUL PURPOSE [CAL. CIV.**
19  ARNOLD P. PETER, a professional        **CODE §§ 1598, 1667, AND 1668**
    corporation dba PETER LAW GROUP,
20  and DOES 1-50, inclusive,         **(5) VOIDABLE CONTRACT UNDER CAL.**
                                          **CORPORATIONS CODE § 23304.1(A)**
21                      Defendants.
                                      **(6) FRAUD IN THE INDUCEMENT;**
22
                                      **(7) AVOIDANCE, RECOVERY, AND**
23                                        **PRESERVATION OF ACTUAL**
                                          **FRAUDULENT TRANSFERS [11 U.S.C.**
24                                        **§§ 548(A)(1)(A), 550, AND 551];**

25                                    **(8) AVOIDANCE, RECOVERY, AND**
                                          **PRESERVATION OF**
26                                        **CONSTRUCTIVELY FRAUDULENT**
                                          **TRANSFERS [11 U.S.C. §§ 548(A)(1)(B),**
27                                        **550, AND 551];**

28                                    **(9) AVOIDANCE, RECOVERY AND**
                                          **PRESERVATION OF PREFERENTIAL**
                                          **TRANSFERS [11 U.S.C. §§ 547, 550,**
                                          **AND 551];**

Exhibit 1                                          Page 16

**(10) AVOIDANCE, RECOVERY, AND PRESERVATION OF UNAUTHORIZED POSTPETITION TRANSFERS [11 U.S.C. §§ 549, 550, AND 551];**

**(11) CONVERSION;**

**(12) UNJUST ENRICHMENT; AND**

**(13) DECLARATORY RELIEF**

Plaintiff Jeremy W. Faith ("Plaintiff"), the Chapter 11 Plan Fiduciary for the bankruptcy estate ("Estate") of the reorganized debtor National Association of Television Program Executives, Inc. (the "Debtor" or "NATPE"), brings this action to recover damages exceeding $4 million caused by Defendants' breaches of fiduciary duty, fraudulent transfers, preferential transfers, and other wrongful acts.  Defendants, including NATPE's former CEO and general counsel, engaged in a coordinated scheme to siphon funds from NATPE through unauthorized compensation increases, fraudulent bonus payments, and excessive professional fees, all to the detriment of creditors.

**I.**

**STATEMENT OF JURISDICTION, NATURE OF PROCEEDINGS, AND VENUE**

1.      The United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (the "Bankruptcy Court") has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334, because the claims asserted herein arise under title 11 of the United States Code and/or arise in or relate to the Chapter 11 case of the Debtor currently pending in the Bankruptcy Court, as *In re National Association of Television Program Executives, Inc.*, Case Number 1:22-bk-11181-MB (the "Bankruptcy Case"). The outcome of this adversary proceeding will have a significant effect on the Estate because it will impact the disposition of property of the Estate and the amount of money available for distribution to creditors. Certain of the claims for relief alleged in this

1

Exhibit 1                                    Page 17

1    Complaint constitute core proceedings under 28 U.S.C. § 157(b). Regardless of whether

2    this proceeding is a core proceeding, Plaintiff consents to the entry of a final order and

3    judgment by the Bankruptcy Court.  Defendants are hereby notified that Fed. R. Bankr. P.

4    7012(b) requires each defendant to plead whether consent is given to the entry of a final

5    order and judgment by the Bankruptcy Court.

6        2.      Venue is proper in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and

7    1409 because this proceeding is related to the Debtor's Bankruptcy Case pending in this

8    district and division. Pursuant to 28 U.S.C. § 1391, venue is also appropriate in this district

9    and division because each of the defendants either resides in or is authorized to and

10    regularly does carry out business in this district and many of their wrongful acts, omissions

11    and/or conduct as complained of in this Complaint took place within this district.

12    Accordingly, this Court also has personal jurisdiction over each of the defendants.

13                             **II.**

14                         <u>**PARTIES**</u>

15        3.      Plaintiff is the Chapter 11 Plan Fiduciary of the Debtor's Estate. Plaintiff

16    brings this adversary proceeding on behalf of the Estate pursuant to 11 U.S.C. §§

17    1123(b)(3)(B) and 1104(d) and the Bankruptcy Court's *Order Confirming Second*

18    *Amended Subchapter V Chapter 11 Plan with Modifications* (the "Confirmation Order")

19    [Bk. Dkt. 258] appointing Plaintiff as the Plan Fiduciary for the Estate.

20        4.      Defendant Jean Pierre Bommel ("Bommel") is a resident of the State of New

21    York. At all relevant times, Bommel served as President and Chief Executive Officer of

22    NATPE.

23        5.      Defendant Arnold P. Peter ("Peter") is a resident of Los Angeles County,

24    California.  At all relevant times, Peter served as general or special counsel to NATPE.

25        6.      Defendant Arnold P. Peter, APC dba Peter Law Group ("PLG") is a California

26    professional corporation formed under the laws of the State of California with its principal

27    place of business in Los Angeles, California. Peter is the President and sole shareholder

28    of PLG. At all relevant times, PLG provided legal services to NATPE as its general or

special counsel, creating a fiduciary relationship between Peter, PLG, and NATPE.

7. Defendants Bommel, Peter, PLG are Insiders of the Debtor as that term is defined under 11 U.S.C. § 101(31).

8. Defendants Does 1 through 50, inclusive, are sued herein under fictitious names because their true names and capacities are currently unknown to Plaintiff. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Each of the Doe defendants is an immediate or mediate transferee of the fraudulent, preferential, or other avoidable transfers alleged in this Complaint or of the proceeds of such fraudulent, preferential, or other avoidable transfers, and did not take such property for value, in good faith, and without knowledge of the avoidability of such transfers, or is otherwise liable along with the named defendants for the wrongful acts and omissions and damages alleged in this Complaint.

9. Bommel, Peter, PLG, and DOES 1 – 50, inclusive, may hereinafter be referred to collectively as the "Defendants."

10. As insiders of the Debtor, Defendants owed fiduciary duties to the Debtor and its creditors.

### III.

### **FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**

### A. **NATPE's Bankruptcy Case**

11. On October 11, 2022 (the "Petition Date"), NATPE filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case. NATPE elected to proceed as a Subchapter V debtor for the purpose of liquidating its assets on an expedited basis.

12. NATPE operated as a "debtor in possession," allowing Bommel as interim President and CEO to exercise substantially all rights of a trustee in the Bankruptcy Case.

13. On September 17, 2024, the Court entered the Confirmation Order, confirming the Debtor's *Second Amended Plan of Liquidation for Small Business Under Chapter 11* (the "Plan") [Bk. Dkt. 251] and approving the appointment of Plaintiff as the

1  Plan Fiduciary of the Estate, effective September 17, 2024.  Plaintiff was not appointed

2  until after the events giving rise to this action and, therefore, bases these allegations on

3  information and belief. *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017)

4  ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts

5  alleged upon information and belief where the facts are peculiarly within the possession

6  and control of the defendant or where the belief is based on factual information that makes

7  the inference of culpability plausible."); *See e.g., Mireskandari v. Daily Mail & General

8  Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, *4 (C.D. Cal. July 31,

9  2013) (holding that "information and belief" allegations are allowed if there is "a reasonable

10  basis" to believe that there will be evidentiary support for those allegations after further

11  investigation).

12       14.    All claims have been transferred to Plaintiff pursuant to the confirmed plan

13  and Plaintiff brings this action solely in his capacity as the Plan Fiduciary for the benefit of

14  Debtor's Estate and its creditors.

15       **B. NATPE's Corporate Status and Governance**

16       15.    NATPE is a Delaware non-profit corporation organized under Section

17  501(c)(6) of the Internal Revenue Code, operating as a global content association and

18  professional membership organization.

19       16.    NATPE's Articles of Incorporation prohibit net earnings from inuring to any

20  member, trustee, director, officer or private individual.  A true and correct copy of NATPE's

21  operative Articles of Incorporation, as amended is attached as Exhibit A, pp. 2-3.

22       17.    NATPE's corporate offices and headquarters were based in Los Angeles,

23  California.  The Board of Directors (the "Board") was comprised of executives from Netflix,

24  Lionsgate, Warner Brothers, Facebook, among others, who were elected under NATPE's

25  Bylaws.

26       18.    NATPE's Bylaws require a duly formed Executive Committee to include

27  individuals then serving in the offices of President and at least two Board-appointed

28  Directors. Bommel was never a Board member or Executive Committee member,

4

Exhibit 1                                                  Page 20

rendering the Executive Committee improperly formed during his tenure.  A true and correct copy of NATPE's operative Bylaws, as amended is attached as Exhibit B, Section 1, Article VII at pg. 9.

19.    Section 9 of Article VI of NATPE's Bylaws states that "[t]he salaries of the officers shall be fixed from time to time by the Board and no officer shall be prevented from receiving a salary by reason of the fact that the officer is also a Director." *Id*.

20.    Each of NATPE's Tax Returns from 2015 to 2022 represent that NATPE's executive compensation was reviewed and approved by NATPE's "Compensation Committee," which met and made recommendations for changes to the "compensation program…to the Executive Committee as appropriate."

### C. NATPE's Financial Decline and Mismanagement

21.    Andrew Kaplan ("Kaplan") was appointed as NATPE's Board Chairman in August 2015, followed by Bommel's hiring as Chief Operating Officer and Managing Director in September 2015.

22.    Under Bommel's leadership, from September of 2015 through March 2022, NAPTE never achieved a revenue surplus, systematically losing over $1 million each year on average, and depleting its reserves.  NATPE's Net assets declined from $9.4 million to $1 million as of March 2022, not including the liability of $3.4 million for Fontainebleau's Arbitration Claim (defined *infra*).  In effect Bommel depleted over $8 million in net assets while failing to take necessary actions to protect NATPE interests.

23.    9.    NATPE's Schwab and UBS investment accounts were drained at Bommel's direction, dwindling from approximately $7 million in March 2016 to just over $500,000 on the Petition Date.

### D. Event Cancellations and Resulting Liability

24.    NATPE's primary revenue source was its annual conference at the Fontainebleau Hotel in Miami Florida ("Fontainebleau").

25.    In October 2018, NATPE entered into contracts with Fontainebleau to host the NATPE Market & Conference 2021 (the "2021 Event") from January 14 to 27, 2021 (the

5

Exhibit 1                                    Page 21

"2021 Event Agreement") and the NATPE Market & Conference 2022 (the "2022 Event")
from January 13 to 26, 2022 (the "2022 Event Agreement").

26.     On January 8, 2021, Bommel and Kaplan caused NATPE to cancel the 2021
Event, citing COVID-19 and invoking *force majeure* (the "2021 Cancellation").
Fontainebleau disputed the applicability of the *force majeure* provision.   Fontainebleau
disputed the applicability of the *force majeure* provision.   The parties subsequently entered
into a settlement whereby NATPE agreed to pay Fontainebleau $100,000 in installments
and allowed retention of a $75,000 deposit (the "2021 Settlement Agreement").

27.     The 2021 Cancellation was a major blow to NATPE's already tenuous
financial condition as it headed into 2021.

28.     Based on Bommel's internal communications with the Board in October
2021, Bommel was aware that cancellation of the 2022 Event could lead to a cancellation
liability under the 2022 Event Agreement for NATPE of more than $3.4 million, and place
NATPE into insolvency.  Despite such knowledge, on January 8, 2022, Bommel and Kaplan
caused NATPE to cancel the 2022 Event, again invoking the *force majeure* provision (the
"2022 Cancellation") despite knowing that COVID-19 was no longer an unforeseeable
event and that performance was not impossible.

29.     Unsurprisingly, as a result of the 2022 Cancellation, on February 11, 2022,
Fontainebleau filed a demand for arbitration against NATPE seeking $3,389,618.69 in
cancellation damages under the 2022 Event Agreement and $25,000 owed pursuant to the
breach of the 2021 Settlement Agreement (the "Arbitration Claim").

**E.  The Coordinated Siphoning Scheme**

30.     Beginning in September 2020, Bommel, Peter, and PLG engaged in a
scheme to defraud NATPE and its creditors by siphoning funds from NATPE for their
personal enrichment (the "Siphoning Scheme").   The scheme involved: (a) conspiring to
enable pre and post-petition siphoning of funds for insider benefit; (b) concealing the
scheme through fraudulent representations to the Executive Committee, Board, and
Bankruptcy Court; and (c) post-confirmation efforts to obfuscate facts and conceal records.

6

Exhibit 1                                                    Page 22

31.     Despite NATPE's insolvency Bommel orchestrated modifications to his compensation that diverted substantial resources to himself and other insiders at creditors' expense. Peter and PLG assisted through salary manipulations while simultaneously draining NATPE's funds through excessive invoices that were not challenged by Bommel.

32.     NATPE's Form 990 federal income tax return for the fiscal year ending March 31, 2022 (the "3/31/22 Tax Return") provided a picture of NATPE the rapidly deteriorating financial condition. Program service revenue was reduced to $544,707, with contribution and grant revenue of $312,698, and investment income of $117,224, equaling total revenue of just $974,629. Total expenses for NATPE remained relatively the same at $3,020,885, resulting in negative income of $2,046,256.

33.     The balance sheet side of the 3/31/22 Tax Return was equally dire, though the situation was in fact much worse than what was reflected in the return. NATPE disclosed total assets in the 3/31/22 Tax Return of $2,616,816, and liabilities of $1,592,759, the majority of which liabilities consisted of funds collected for future events that had yet to be earned. This left an apparent net asset value of $1,024,057. However, the disclosed liabilities did not take into account the asserted FB Liquidated Damages $3,389,618.69, which if reflected would show a negative asset value of $2,365,561, placing NATPE deeply into insolvency.

34.     With obligations to creditors reaching over $4.9 million and available cash of approximately $1.4 million as of April 2022, Bommel in consultation with Peter and PLG had a fiduciary duty to manage the organizations scarce resources in a manner that did not place creditors at undue risk of non-payment through risky business ventures and self-dealing transactions that benefited themselves and other insiders. Unfortunately, this is precisely the direction adopted by Bommel with Peter's guidance.

35.     Instead of adopting a conservative approach that would preserve NATPE's assets and minimize the harm to its creditors, in the six months leading up to NATPE's bankruptcy filing, Bommel continued his self-dealing, deliberately squandered corporate assets, including substantial payments to himself and PLG, and actively drained over $1

7

Exhibit 1                                                                   Page 23

1   million of the Debtor's cash, thereby causing unreasonable and knowable losses to

2   NATPE where no businessperson of ordinary and sound judgment could conclude that

3   the corporation has received adequate consideration.

4        **F.   The Deferred Compensation Scheme**

5        36.    In September 2020, Bommel formulated a deferred bonus structure to

6   provide conditional bonuses for himself and three other NATPE executives—Wayneston

7   Harbeson ("Harbeson"), Charlie Weiss ("Weiss"), and Doug Finberg (together with

8   Bommel, the "Remaining Executives"), contingent on NATPE exceeding its 2022 fiscal

9   year projected net revenue by at least 3% (the "Conditional Bonuses").

10       37.    On or about October 1, 2020, Bommel sent Peter an email detailing

11  elements of the Deferred Compensation Scheme.

12       38.    Payment of the Conditional Bonuses was contingent on NATPE exceeding

13  2022 fiscal year projected net revenue by at least 3% (the "Condition Precedent").  Upon

14  meeting the Condition Precedent, each of the Remaining Executives would receive

15  payments equal to their annual salary reduction for a full year, through March 31, 2022,

16  have their salaries restored to original levels effective April 1, 2022, and Bommel would

17  receive a bonus of 10% to 30% of his pre-reduction base salary (the "Net-Income Bonus

18  Plan").[1]

19       39.    The central feature of this scheme was the concealment of the Conditional

20  Bonuses' contingent character.  Although initially drafted as a bonus program based on

21  predetermined metrics, it was later reframed as deferred compensation despite the

22  conditional nature of NATPE's obligation.

23       40.    For example, although Bommel and Peter drafted the initiative as a bonus

24  or profit-sharing program based on predetermined metrics (e.g., the company net revenue

25  targets) and referred to the financial compensation as "bonuses" in documents and emails

26  from October 2020 and early November 2020, it was later reframed as "deferred

27  compensation" despite the conditional nature of NATPE's obligation to make such

28

---

[1] Bommel's applicable pre-reduction base salary was $258,000, which would result in a
potential conditional bonus of $25,800 to $77,400.

8

Exhibit 1                                    Page 24

1   payments to the executives.

2       41.     On or about November 18, 2020, Kaplan sent the Executive Committee, a

3   letter with attachments proposing the Net-Income Bonus Plan (the "Proposal Letter").   In

4   the Proposal Letter, the Conditional Bonuses were described as "deferred salary

5   payments" and omitted the use of the words "bonus" and "bonuses."  Kaplan later informed

6   Bommel that the Executive Committee approved the Net-Income Bonus Plan.

7       42.     On January 17, 2022, Bommel caused NATPE to transfer $57,749.94 to

8   Harbeson as an unearned "Deferred Compensation Bonus Payment" despite the fact that

9   the Condition Precedent for the bonus had not been met (the "Harbeson Bonus").

10      43.     On March 8, 2022, Bommel emailed Peter about Bommel's "deferred

11  compensation" plan, specifically asking if they could "address the deferred compensation

12  plan approved by Andy [Kaplan] as it is due March 31st[?]"

13      44.     Bommel and Peter understood that Bommel was not entitled to the

14  Conditional Bonus because: (a) it was never authorized by contract; and (b) the Condition

15  Precedent was not met as NATPE's fiscal year 2022 net-revenue would not exceed 3% of

16  the projected net-revenue. Despite this, on o March 22, 2022, Bommel instructed Peter to

17  draft a memorandum to Kaplan justifying payment of the unearned Conditional Bonus.

18  Thereafter, Peter, drafted a memorandum to Kaplan regarding "Deferred Compensation

19  payments" (the "March 2022 Memorandum"). Attached as Exhibit C is a true and correct

20  copy of the March 2022 Memorandum and attachments.

21      45.     To legitimize payment of the unearned Conditional Bonus to Bommel, Peter

22  included a number of material misrepresentations March in the 2022 Memorandum, such

23  as: (a) Bommel's contract would expire on September 7, 2022, when it was in fact subject

24  to an automatic renewal provision; (b) Bommel's salary was $397,000 when it was actually

25  $297,000 after his June 2021 unauthorized raise; and (c) Bommel was entitled to the

26  deferred compensation obligations, omitting the failure to meet the Condition Precedent.

27      46.     On or about March 23, 2022, Peter sent Kaplan the March 2022

28  Memorandum.  Attached to the March 2022 Memorandum were copies of Bommel's 2015

9

Exhibit 1                                                   Page 25

1 Contract and the 2017 Amendment.

2    **G.  Unauthorized Salary Increases and Employment Contract Fraud**

3    47. Despite knowledge of NATPE's deteriorating financial condition, on or about

4 June 4, 2021, Bommel emailed Kaplan to inform him that he intended to unilaterally raise

5 his salary of approximately "$258,000 to $296,000 effective June 1st" (the "June 2021

6 Raise"). Bommel stated in the email that his raise would "reduce slightly the deferred

7 compensation planned for 2022." *Id*.

8    48. Kaplan responded to the June 2021 Raise Email and acknowledged

9 Bommel's unilateral pay raise.

10    49. Bommel unilaterally increased his salary from $258,000 to $296,000 in June

11 2021 without proper authorization.

12    50. Bommel's June 2021 Raise and Kaplan's subsequent acknowledgment was

13 *ultra vires* with respect to compensation adjustments.

14    51. In early May 2022, Bommel executed a new employment contract containing

15 material misrepresentations about his salary and contract expiration date, designed to

16 supersede his 2015 Employment Contract, as amended, making NATPE liable for the

17 Conditional Bonus by eliminating the Condition Precedent.  In other words, it was an

18 attempt to provide a legal pretext for NATPE to pay Bommel an unearned bonus.

19    52. On or about April 1, 2022, Kaplan sent an email to the Executive Committee

20 ("April 1 Email"), seeking the Executive Committee's approval to offer Bommel a new

21 employment contract. Among other things, the April 1 Email repeated Peter's

22 misrepresentations in the March 2022 Memorandum (*e.g*., Bommel was entitled to

23 Deferred Compensation Bonus and to a "10% minimum bonus" and that Bommel's

24 employment agreement would expire on September 7, 2022) and fraudulently omits that:

25 (1) the 3% net-revenue Condition Precedent was unmet; (2) Bommel had already received

26 an unauthorized salary increase in June 2021; and (3) NATPE faced a $3.4 million in

27 contingent liability as a result of the 2022 Cancellation.

28 / / /

53.     On April 2, 2022, Kaplan sent Bommel a text message stating "All are onboard. I'll send [Peter] a note", purportedly authorizing the terms for Bommel's new employment contract (defined *infra* as the "2022 Employment Contract").

54.     Significantly, Kaplan's vote solicitation to the Executive Committee did not comply with Article VII, Section 7 of NATPE's Bylaws, which provides that "[a]ny Committee action may be taken without a meeting if all members of such Committee consent in writing." *See* Exhibit B at pg. 9.

55.     On or about April 10, 2022, NATPE paid Bommel a $70,320.26 Conditional Bonus payment (the first of three), and his salary was increased to $397,451.34 annually.

56.     However, NATPE was not obligated to pay these funds, and as a nonprofit and under its Certificate of Incorporation, lacked the power to enter into the Net-Income Bonus Plan or issue the Conditional Bonuses because it would distribute net revenue to private individuals (*e.g.*, Bommel and Harbeson), rendering the Net-Income Bonus Plan *void ab initio* as an *ultra vires* act.

57.     In addition, even if NATPE were empowered to enter into the Net-Income Bonus Plan (a proposition not conceded here), it was not approved by either the Board or the Compensation Committee nor was it subsequently ratified pursuant to the formal procedures set forth under the Delaware General Corporation Law ("DGCL"). Furthermore, the Executive Committee could not approve it by virtue of the Board's delegation of its power under the Bylaws because the Executive Committee was not duly formed and because the Board did not subsequently ratify the Net-Income Bonus Plan pursuant to the formal procedures set forth under the DGCL.  Finally, even if the Board had attempted to ratify it, NATPE lacked the power to enter into the Net-Income Bonus Plan and, by extension, so did the Board.  Accordingly, such ratification procedures would have been null and void.

58.     On or about April 18, 2022, Peter and PLG drafted Bommel's new executive employment agreement with an effective date of April 1, 2022 (the "2022 Employment Contract").  The recital section includes substantively identical misrepresentations and

11

Exhibit 1                                                    Page 27

fraudulent omissions as the March 2022 Memorandum.  Among other things, these fraudulent misrepresentations and omissions included the claim that Bommel's employment would expire on September 7, 2022 and that Bommel was already entitled to receive deferred compensation and a bonus under the Net-Income Bonus Plan.  The contract also fraudulently omitted that Bommel was paid $70,320.26 on or about April 10, 2022. The omission was made by Peter and Bommel, and adopted by Kaplan, to conceal that Bommel had embezzled $70,320.26 because (a) Bommel was not entitled to it since the Condition Precedent in the Net-Income Bonus Plan was unsatisfied, and (b) Bommel's new employment contract was not yet executed and therefore was not capable of authorizing the $70,320.26 payment to Bommel.  Thus, the fraudulent omission was made with an intent to defraud NATPE.

59.    On or about May 2, 2022, Bommel and Kaplan, on behalf of NATPE, executed the May 2022 Employment Contract.  Neither the Executive Committee nor the Board were provided with either the written 2022 Employment Contract or Bommel's 2015 Employment Agreement, as amended.  Thus, neither the Executive Committee nor the Board voted or approved the written 2022 Employment Contract.  A true and correct copy of the 2022 Employment Contract is attached as Exhibit D.

60.    Furthermore, even if the Executive Committee were not unduly formed and had the proper authority and voted to approve the written 2022 Employment Contract, the approval would have been void because it was induced by the fraudulent misstatements and omissions cited above.

### H. Bommel's Second Net-Income Bonus Plan Payment and Charlie Weiss' Raise

61.    On or about July 3, 2022, NATPE paid Bommel the second Net-Income Bonus Plan payment (out of three) in the amount of $83,294.93, and despite NATPE's serious cash flow issues, Bommel authorized a salary increase for another executive employee from $125,000 to $150,000 without seeking authority from the Executive Committee or the Board.

12

Exhibit 1                                    Page 28

**I.    The July 28, 2022 Memorandum**

62.    On or about July 17, 2022, Bommel sent Sarah Jessup, of Pery Consulting Group (financial advisor/controller and CFO) a text message stating, "Just saw the cash flow report. I need to send it to Andy [Kaplan] as <u>we are at that breaking point</u>. Are you available to talk now or should I wait before we speak to send to Andy?"

63.    On or about July 21, 2022, Peter, Bommel, Kaplan, and Jessup had a conference regarding the financial condition of NATPE.  A billing invoice from PLG reflects that the purpose of this call was to discuss "alternatives and possible dissolution and bankruptcies."  That same day, Kaplan directed Bommel and Jessup to assist Peter with drafting a memorandum to disclose NATPE's contingent liability of $3,389,618.69 for the 2022 Cancelation, request an 11th hour bailout from the Executive Committee, and to setup an emergency Executive Committee Zoom Call (the "Emergency Zoom Call").

64.    On or around July 23, 2022, Peter created the first draft of the Memo To Exec Committee ("July 23 Draft Memo").  The July 23 Draft Memo contained the same misrepresentations and fraudulent omissions, which were made with the same fraudulent intent as his March 2022 Memorandum.  Additionally, the July 23 Draft Memo disclosed that NATPE had a monthly cash burn rate of $240,000.

65.    Peter subsequently contracted a partner at the law firm of Norton Rose Fulbright ("Norton Rose"), who agreed to provide legal consulting services to NATPE concerning NATPE's financial restructuring options.

66.    Sometime between July 23 and July 25, 2022, Peter emailed Norton Rose his July 23 Draft Memo.  Norton Rose revised the July 23 Draft Memo (the "July 25 Draft Memo") and then emailed it to Peter on or about July 25, 2022. Peter then forwarded the July 25 Draft Memo by email to Bommel and Jessup.

67.    Bommel responded to Peter by email on July 25, 2025, stating "I'm not sure I'm comfortable with mentioning my [2022 Employment Contract] in there as [the Executive Committee] voted on it and [is] aware of it."

/ / /

68.     On July 26, 2022, Bommel emailed Kaplan the final version of memorandum to the Executive Committee, dated July 28, 2022 (the "July 28 Memorandum"), which was subsequently approved by Kaplan. A true and correct copy of the July 28 Memorandum is attached as Exhibit E.

69.     On or about July 27, 2022, a day before the Emergency Committee Zoom call, Bommel emailed the Executive Committee, a copy of the July 28 Memorandum. Bommel also copied Peter and Jessup on this email.

70.     The July 28 Memorandum to the Executive Committee disclosed NATPE's dire financial condition while concealing that that the unauthorized and improper payments to Bommel and other insiders had accelerated the depletion of NATPE's dwindling cash reserves. Despite claiming "payments to executives have been discharged," Bommel received his final $83,290.93 payment on or about August 28, 2022. In addition, although the July 28 Memorandum informed the Executive Committee that filing for bankruptcy was a distinct possibility, it did not disclose that NATPE had retained Norton Rose to provide bankruptcy consulting services.

**J.    August 11, 2022 Special Board Meeting**

71.     On August 11, 2022, the Board of Directors held its Special Board Meeting. Kaplan and Bommel provided opening remarks. In his remarks, Bommel made several false and/or misleading statements to the Board, including, among other things:

> In 2022, right before we had to cancel Miami, we actually had the money in the bank showing a budget surplus for Fiscal 2022 of $80K – for the first time in many years.

> Unfortunately, Omnicron took that away from us and we had to cancel MIAMI, pay our clients back for most of it and pay our vendors at a huge cost....[2]

> [B]roadly [speaking], this drastic increase in costs related to a market decline, unrealized corporate sponsorship revenue, greater event costs, and residual costs for cancelling Miami.

72.     During this meeting, Peter, Bommel, or Kaplan also informed the Board, for the first time, that a "cancellation fee due of $3.2mm is being alleged" (*i.e.*, the Contingent

---

[2] This statement is in reference to the deferred vendor credit obligations and, therefore, untrue since NATPE did not refund most of the payments related to the 2022 Event.

14

Exhibit 1                          Page 30

Liability) by Fontainebleau.  Peter and Bommel did not inform the Board that NATPE had retained Norton Rose and received consulting services regarding the possibility of filing for bankruptcy.

73.    Defendants orchestrated fraudulent cancellations of the Miami 2021 and 2022 events using baseless *force majeure* claims, despite knowing that COVID-19 risks were foreseeable.  The cancellation of the 2022 Event allowed NATPE, at Bommel's direction, to avoid paying the liabilities associated with holding the 2022 Event, while retaining and spending over $1 million that had been paid to NATPE by sponsors and vendors in advance of Miami 2022.  NATPE later referred to these funds as "deferred credit" obligations.

### K.  Preparations for Filing for Bankruptcy

74.    In or about August-September 2022, Kaplan directed Bommel to stop paying NATPE's bills except payroll.

75.    NATPE retained bankruptcy counsel on September 12, 2022.

76.    On or about September 20, 2022, Bommel arranged for his own termination as well as the termination of other NATPE employees as part of a timeline created in contemplation of bankruptcy.

77.    On September 30, 2022, Bommel and Kaplan executed Bommel's "Separation Agreement and Release" (the "Termination Agreement") (drafted by Peter), entitling Bommel to substantial termination payments, severance, and vacation pay for himself totaling over $310,000, including a termination payment of $198,725.70 (the "Termination Payment"), severance of $54,004.97, and $57,687.78 in holiday and vacation pay.  These funds were paid to Bommel on or about October 9, 2022, just days before NATPE's bankruptcy filing.  A true and correct copy of the Termination Agreement is attached as Exhibit F.

78.    The Termination Agreement characterized the Termination Payment and severance as an ordinary course disbursement and beneficial settlement.  Contrary to this characterization, the timing and circumstances of the Termination Payment—specifically,

the payment being made on the eve of bankruptcy—show it was an extraordinary transaction designed to benefit an insider at the expense of unsecured creditors.

79.    On or about October 7, 2022, Bommel and Kaplan executed an Independent Contractor Agreement for Bommel to serve as NATPE's Interim President and Chief Executive Officer and have the same role as set forth in his 2022 Employment Contract, with a monthly flat fee of $15,000 paid in advance.   A true and correct copy of the Independent Contractor Agreement is attached as Exhibit G.

80.    Immediately prior to the Petition Date, NATPE terminated all of its employees effective October 14, 2022.  These terminations included severance packages (referred to herein as the "Termination Packages").

81.    The Termination Packages, including severance and Bommel's Termination Payment, created an unfair advantage for insiders or employees over unsecured creditors. Furthermore, the severance payments in the Termination Packages, including Bommel's Termination Payment failed to meet statutory requirements and amount to self-dealing by company executives and insiders.

82.    The restructuring of NATPE's employment relationships into independent contractor agreements with identical job duties was an attempt to circumvent the Bankruptcy Code's protections and was not in good faith.

**L.  NATPE's Chapter 11 Bankruptcy Filing**

83.    As of the Petition Date, NATPE was in the process of negotiating a sale of substantially all of its assets to Brunico Communications Ltd. ("Brunico") as well as shopping for other buyers seeking to liquidate on an extremely compressed timeline in the Bankruptcy Case.

84.    On or about November 18, 2022, on behalf of NATPE, Bommel signed and filed, under penalty of perjury, NATPE's Bankruptcy Schedules A-H, NATPE's Statement of Financial Affairs, and related bankruptcy documents in the Bankruptcy Case [Bk. Dkt. 27]. By his signature, Bommel declared under penalty of perjury that he had read the above-referenced documents, and that all information therein was true and correct.

Exhibit 1                                    Page 32

85.     According to NATPE's Schedules of Assets and Liabilities, as of the Petition Date, its assets totaled approximately $533,834.75 [Bk. Dkt. 27].    The Debtor was hopelessly insolvent and owed more than $1,000,000 in "deferred revenue" credit obligations to various vendors resulting from the cancellation of the 2022 Event which the Debtor spent pre-petition, as well as over $400,000 in other unsecured debt obligations. [Bk. Dkt. 40, p. 1, line 3b, pg. 96, line 5b] ("Schedules"). In addition, the Debtor was indebted to the Fontainebleau for $3,414,618.69, plus prejudgment interest and attorney's fees and costs.

86.     On November 9, 2022, the Debtor filed a Wage Motion seeking court approval to pay severance and priority pre-petition wages to certain employees as well as the payment of related taxes and tax deposits (the "Wage Motion,") [Bk. Dkt. 16]. The Wage Motion was opposed and ultimately withdrawn without Bankruptcy Court approval.    Despite this, pre-petition wages, vacation, holiday pay, and severance payments under NATPE's newly created Termination Packages, were paid immediately after the Petition Date, without Bankruptcy Court approval.

87.     On or about November 28, 2022, NATPE signed an Asset Purchase Agreement with Brunico for the sale of substantially all of its assets for $150,000 as well as the assumption of certain assumed deferred vendor credit liabilities of the Debtor through a Bankruptcy Court-approved sale (the "Asset Sale") [Bk. Dkt. 48].    The Bankruptcy Court approved the Asset Sale on January 6, 2023, and there were no further operations [Bk. Dkt. 59].

88.     The Debtor filed its liquidating Plan January 9, 2023 [Bk. Dkt. 61].

**M.** **Continued Financial Mismanagement**

89.     The continued erosion of the Debtor's cash continued in the Bankruptcy Case for nearly two years, leaving the Estate with less than $120,000 by the time Plaintiff was appointed.  The only apparent beneficiaries of the bankruptcy process were the Estate professionals and insiders. One of the professionals was Peter and his firm PLG, who continued to serve as counsel to the Debtor despite the clear claims the Estate had against

him for professional negligence when he failed to timely seek coverage under NATPE's insurance policy for the Fontainebleau Arbitration Claim, and thereafter negligently represented NATPE in the Coverage Litigation and failed to preserve NATPE's claims. The obvious strategy of Peter and PLG was to not only continue to use Estate resources to his own benefit, but to also try and run out the clock on the statutes of limitations that are now faced by Plaintiff.

90.     Estate assets were also dissipated through various "Independent Contractor" agreements drafted by Peter at the direction of Bommel shortly prior to the Petition Date.  Under these Independent Contract agreements, post-petition payments were made to various former employes as "consultants" without Bankruptcy Court approval, including $93,312.50 paid to Bommel.

91.     In addition to making unauthorized post-petition payments to NATPE's former pre-petition employees, NATPE also paid its financial consultants, Pery Consulting Group, LLC $87,500 in unauthorized post-petition consulting fees during the Bankruptcy Case from October 2022 to May after increasing their monthly fee from $7,000 to $12,500 in September 2022.

92.     Given that NATPE had effectively ceased operating by the Petition Date, and subsequently sold all of its assets by January of 2023, the Debtor was receiving little benefit from the type of services that Bommel and Pery Consulting was allegedly providing, showing continued financial mismanagement well after the filing of the Bankruptcy Case.

93.     NATPE did not require the "consulting" services of these individuals and companies and as such, these expenditures were just a further exercise in self-dealing by the NATPE executives and insiders.  To make matters worse, several executives, including Harbeson, Wiess, Mitchell and Lee, began working with competitors of NATPE prior to the close of the proposed sale its customer list, bringing into question the loyalties of these individuals who were continuing to receive consulting fees from NATPE at that time.

94.     Bommel made false declarations under penalty of perjury in Bankruptcy Court, including in NATPE's Statement of Financial Affairs filed on November 18, 2022, among other things, falsely stating that "TOTAL" compensation Bommel received during the year prior to filing to bankruptcy was only $449,195.96 when in fact Bommel received $846,081.90 in total compensation for year prior to filing to bankruptcy [Bk. Dkt. 27, SOFA, ¶30], and in declarations filed in the Bankruptcy Case, including the declarations filed on August 18, 2023 by Peter and Bommel containing multiple false statements about Bommel's compensation and the Net-Income Bonus Plan.

95.     Bommel transmitted misleading financial reports and in his board presentations, including in an October 19, 2021 email attaching a misleading financial presentation.

96.     During the period of 2020 to 2024, Defendants engaged in a pattern of self-dealing and mismanagement of the Debtor's business and assets.

97.     Bommel caused the Debtor to enter into transactions that benefited Defendants personally at the expense of the debtor and its creditors.

98.     Peter and PLG counseled in favor of these improper payments to Bommel and other insiders while knowing of NATPE's insolvency.

99.     As of September 2024, the Estate's assets were depleted to less than $120,000, leaving creditors with minimal recovery.

**N.  Defendants received Preferential, Actual and Constructive Fraudulent Transfers**

100.    Prior to the Petition Date, the Debtor made numerous transfers, as set forth in more detail in paragraphs 102 through 115 below, to Bommel, PLG, and Pery Consulting (each, a "Transfer," and, collectively, the "Transfers").

101.    At all relevant times herein, Bommel had access to, and exercised control over, all of NATPE's bank accounts.

102.    Each of the Transfers constitutes a "transfer," as that term is defined in 11 U.S.C. § 101(54), of an asset or interest in an asset of the Debtor.

19

Exhibit 1                                                   Page 35

103.   Beginning in at least 2021, NATPE experienced significant financial distress, which was known to all Defendants.

104.   NATPE was not paying its debts as they came due at the time of the Transfers.  The Debtor's financial statements show that it was deeply insolvent and had a negative asset value of $2,365,561 from at least March 31, 2022.

105.   These Transfers were outside of the ordinary course of business.  Moreover, to the extent that the subject transfers were made post-Petition Date, they were not authorized by the Bankruptcy Code or the Bankruptcy Court.

*(1) One-Year Pre-Petition Payments to Bommel*

106.   In the year prior to the bankruptcy filing, Bommel received payments of approximately $857,508.63 (the "Bommel 1-Year Transfers").  The known payments to Bommel that Bommel authorized or caused to be made from one or more of the Debtor's accounts, are those payments listed in Exhibit H.

107.   The Bommel 1-Year Transfers included conditional bonus payments totaling $236,906.12 despite the fact that the conditions precedent to receiving such bonuses had not been met, unauthorized raise payments, as well as over $310,000 in termination, severance and holiday/vacation pay.

108.   The Bommel 1-Year Transfers were unfairly discriminatory and inequitable. These transfers significantly reduced the Estate's resources available to other creditors and executed as part of a deliberate effort to shield payments from creditor scrutiny or to manipulate the bankruptcy process for Bommel's personal benefit.  The payments were made under contracts that served as vehicles for self-dealing and asset dissipation, violating public policy and non-profit law, to the detriment of creditors and in pursuit of objectives outside the legitimate scope of bankruptcy laws.

*(2) One-Year Pre-Petition Payments to Peter Law Group*

109.   PLG received transfers totaling at least $421,783 from NATPE within the one year prior to the Petition Date (the "PLG 1-Year Transfers"), with $221,410.50 paid within the 90 days prior to the Petition Date, including $165,952.25 paid in September

20

Exhibit 1                                    Page 36

2022 alone (the "PLG 90-Day Transfers") (together, the "PLG Transfers"). The known payments to PLG that Bommel authorized or caused to be made from one or more of the Debtor's accounts, are those payments listed in Exhibit I.

110.   These transfers were not disclosed in PLG's application for employment as special counsel filed in the Bankruptcy Case.  PLG further represented in its employment application that it did not hold a prepetition claim against NATPE.

111.   NATPE prioritized payment of PLG over other creditors and made payments outside of the ordinary course of business leading up to its bankruptcy filing.

112.   NATPE was insolvent at the time the PLG transfers were made.

**Q. Unauthorized Post-Petition Transfers Subject to Avoidance**

113.   Bommel received at least $200,015.00 in post-petition transfers from the Debtor without Bankruptcy Court authorization (the "Bommel Post-Petition Transfers"). The known post-petition payments to Bommel that Bommel authorized or caused to be made from one or more of the Debtor's accounts, are those payments listed in Exhibit J.

114.   Between January 6, 2023, and September 5, 2024, Bommel paid himself $54,843.50 in consulting fees, despite the cessation of NATPE's business operations.

115.   The Bommel Post-Petition Transfers were unauthorized and detrimental to the interests of the Estate and its creditors.

**R. Insurance Coverage Misrepresentations**

116.   In 2021, NATPE purchased a $1,000,000 Directors and Officers (D&O) insurance policy with Navigators Insurance Co. ("Navigators") with a policy period of October 31, 2021 to October 31, 2022, bearing policy number NY21DOLV03218NV (the "D&O Policy").  The D&O Policy required timely notice of claims as a condition precedent to coverage.

117.   NATPE, through its counsel Peter and PLG, failed to notify Navigators of Fontainebleau's Arbitration Claim in a timely manner, leading to a denial of coverage on September 9, 2022.

/ / /

118.   In June 2023, NATPE obtained Endorsement No. 10 to the D&O Policy, entitled, "Optional Discovery Period Endorsement," which was issued with an effective date of October 31, 2022.  The endorsement extended the claims reporting period from October 31, 2022 to October 31, 2023 for mismanagement acts made prior to October 31, 2022 and reported before October 31, 2023.

119.   NATPE's subsequent lawsuit against Navigators for coverage was dismissed with prejudice on July 28, 2023 (Case No. 2:23-cv-01805-RGK-AS) (the "Coverage Litigation").

120.   On or about October 27, 2023, NATPE, through its counsel Peter and PLG tendered a new coverage demand to Navigators, *inter alia*, for the claims asserted by Fontainebleau "on behalf of the bankruptcy estate, against alleged NATPE insiders" as a separate basis for coverage under the D&O Policy (the "BK Coverage Demand").  Peter further demanded that Navigators tender its policy limits for the benefit of NATPE's creditors in the Bankruptcy Case.

121.   On or about December 22, 2023, Navigators sent a letter to Peter and PLG denying the BK Coverage Demand.  The December 2023 denial of coverage by Navigators, combined with the District Court decision, effectively barred recovery from the insurer for claims against NATPE's former Directors and Officers.

122.   On April 3, 2024, counsel for Fontainebleau, Michael B. Lubic ("Lubic") sent Peter, among others, an email as they were negotiating the terms of prospective amended plan. Lubic represented in the email that counsel for Fontainebleau understood that Navigators had denied NATPE's request for coverage of the costs resulting from the Fontainebleau litigation. Lubic then clarified that "[t]he claims the Plan Fiduciary may bring are different claims that have not yet been asserted to the best of our knowledge." Lubic then asked Peter and Leslie Cohen, NATPE's general bankruptcy counsel, "Did NATPE make additional claims postpetition?"  This question was particularly salient because the availability of insurance proceeds to pay claims held by the Bankruptcy Estate was contingent upon those claims (or interrelated claims under the Policy) not having been

22

Exhibit 1                                    Page 38

1    already asserted and denied by Navigators.

2    123.   On April 5, 2024, Peter replied to Lubic's April 3 email. However, Peter's

3    April 5 email was nonresponsive to Lubic's question as to whether NATPE had made

4    additional claims post-petition.

5    124.   The confirmed Plan included a representation that the full amount of the

6    D&O Policy is available for claims. [Bk. Dkt. No. 251, at p. 2, ¶4].  The Plan further provides

7    that if this representation was inaccurate, the limitation on claims against directors and

8    officers would be lifted. *Id.*

9    125.   The availability of insurance coverage under the D&O Policy was a "key

10   term" of the settlement reached with Fontainebleau during the February 2024 mediation.

11   *Id.*, at p. 1, ¶A.

12   126.   This representation was false because as stated above, Navigators denied

13   coverage for claims against NATPE's former Directors and Officers in December 2023.

14   127.   Peter and Bommel knew Navigators had denied the insurance coverage

15   claim and no coverage was available but nevertheless represented that the full policy

16   amount was available. They made this misrepresentation intending to induce NATPE's

17   creditors, including Fontainebleau, to agree to the liability limitation in the Plan.

18   128.   NATPE's failure to disclose the December 2023 coverage denial to creditors

19   in the Plan constitutes suppression of truth under California Civil Code § 1572.

20   129.   NATPE's representations regarding the availability of insurance coverage

21   for claims against NATPE's former Directors and Officers were a material part of the Plan

22   and a "key" term of the settlement with Fontainebleau to limit recovery against NATPE's

23   directors and officers to the insurance proceeds.  To the extent these representations were

24   inaccurate, creditors were deceived.

25   130.   Plaintiff only learned of the December 2023 coverage denial around

26   September 17, 2024, after receiving a copy of the letter from Peter.

27   131.   NATPE's misrepresentation and suppression of material facts regarding the

28   availability of insurance coverage, voids the liability limitation clause in the Plan.

1

## **FIRST CLAIM FOR RELIEF**

2

### **(Breach of Fiduciary Duty Against all Defendants)**

3        132.    Plaintiff realleges and incorporates herein by reference each and every

4    allegation contained in all prior paragraphs of this Complaint.

5        133.    Because NATPE was incorporated in Delaware, Defendants each owed

6    fiduciary duties to NATPE and its creditors pursuant to Delaware law.

7        134.    Under Delaware law, directors and officers of nonprofit (or "non-stock")

8    corporations owe the same duties of loyalty and care as directors and officers of for-profit

9    corporations.  *Oberly v. Kirby*, 592 A.2d 445, 461 (Del. 1991); 8 Del. C. §§ 114, 141, 142;

10   *see also Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009) (holding officers owe the

11   same fiduciary duties as directors).

12       135.    Neither NATPE's Articles of Incorporation nor its Bylaws contain exculpation

13   provisions affecting officers.

14       136.    Article IV, Section 10 of NATPE's Bylaws state that officers are required to

15   be bound to the conflict of interest policy as a prerequisite of the officer's qualification for

16   the office. *See* Exhibit B at pg. 6.

17       137.    Under the section entitled "Duty of Care", NATPE's Conflict of Interest Policy

18   provides that "[i]n all matters affecting NATPE, the Directors and officers should act in

19   good faith and exercise best efforts in the performance of their duties."  Further, it states

20   that officers "should make decisions based on (a) factual data rather than unsubstantiated

21   opinions and (b) what is in the best interest of all members of NATPE rather than any one

22   group, individual or special interest." *Id.*

23       138.    Bommel, as President and CEO of NATPE, owed fiduciary duties of care

24   and loyalty to NATPE and its creditors.

25       139.    Peter and PLG, as general counsel to NATPE, owed fiduciary duties of care

26   and loyalty to NATPE and its creditors.

27       140.    Defendants also had a duty to act in good faith, avoid self-dealing, and to

28   act in furtherance of the NATPE's mission and purpose, as defined in its governing

1  documents.

2      141.    Defendants also owed a duty of care to act in good faith and with reasonably

3  diligence to ensure that NATPE was operated in accordance with the law, as well as a

4  duty of loyalty to avoid placing his own interests ahead of the NATPE's interests, which

5  prohibited them from undertaking or participating in activities adverse to the interests of

6  NATPE and its creditors and the duty to account to NATPE's Board to and keep it fully

7  informed as to all matters pertaining to its interests.

8      142.    Defendants owed the same fiduciary duties to the NATPE's creditors

9  because during the relevant period, NATPE was insolvent.

10      143.    The fiduciary duties of loyalty and good faith required that Defendants act in

11  the best interests of the Debtor and its creditors rather than their own self-interest, and to

12  correspondingly refrain from self-dealing, conflicts of interest, and prioritizing their own

13  personal gain or the enrichment of directors and officers at the expense of the Debtor.

14      144.    Defendants were also required to ensure that the Debtor's resources were

15  used for a public benefit and avoid acting for purposes other than advancing the Debtor

16  and its creditors' best interests and to avoid failing to act when he had a known duty to

17  act. Additionally, Defendants were required under the duties of loyalty and good faith to

18  exercise a level of diligence in operating the Debtor's business such that they did not act

19  grossly negligent or disregard corporate formalities and financial reality.

20      145.    Because Bommel was ultimately responsible for overseeing the day-to-day

21  business operations and financial performance of the Debtor and involved in supervising

22  all aspects of the Debtor's financial affairs, and because Peter and PLG served as

23  NATPE's general counsel for over a decade, including during the period leading up to and

24  during its bankruptcy proceedings, at all relevant times, they were well aware of the dire

25  financial condition and insolvency of the Debtor. Despite this knowledge, Defendants

26  failed to act in good faith and caused the Debtor to make the above-described distributions

27  to or for the benefit of Bommel, Peter, PLG, and other executives, including Harbeson and

28  Weiss, as well as preferring some creditors over other creditors while the Debtor was in

1   severe financial distress.

2        146.   Defendants breached their fiduciary duties to NATPE.

3        147.   Bommel, Peter and PLG breached their fiduciary duties by participating in a

4   deferred compensation scheme involving unilateral salary increases and attempts to

5   eliminate conditions precedent for bonus payments to Bommel.

6        148.   In the alternative, Defendants breached their fiduciary duty of care by

7   promoting and causing NATPE to enter into the Net-Income Bonus Plan without properly

8   considering whether it violated the prohibition against private inurement of net-income

9   pursuant to IRC section 501(c)(6) and NATPE's Bylaws." *Miniace v. Pac. Mar. Ass'n*, 2007

10  U.S. Dist. LEXIS 23495, at *20-21 (N.D. Cal. Mar. 30, 2007) (finding that the "tax exempt

11  status under Section 501(c)(6) of the Internal Revenue Code required careful attention to

12  the   inurement   rules   governing   executive   compensation;   excessive   executive

13  compensation could jeopardize [the non-profits'] tax exempt status.").

14       149.   Among   other   things,   Bommel's   conduct   constitutes   bad   faith,   *e.g.*,

15  "intentional dereliction of duty" and/or the "conscious disregard for his responsibilities" as

16  a corporate officer.   *See e.g., City of Pittsburgh Comprehensive Municipal Pension Trust*

17  *Fund v. William E. Conway, Jr.*, *et al.*, 2024 Del. Ch. LEXIS 129 (Del. Ch. April 24, 2024)

18  (finding that officer may breach fiduciary duty for having received compensation in violation

19  of the applicable compensation plan or agreement where the recipient knew or should

20  have known that such compensation violated the applicable plan or agreement).   The

21  terms of the Net-Income Bonus Plan were straightforward, providing for the payment of

22  the Conditional Bonuses only if the Condition Precedent was satisfied. In other words, the

23  terms of the Net-Income Bonus Plan are not susceptible to any reasonable interpretation

24  that could lead to the conclusion that Bommel or any of NATPE's agents had authority to

25  make the payment of the Conditional Bonuses over the express limitation found in Net-

26  Income Bonus Plan.   Thus, Bommel knew or should have known that the payments of the

27  Conditional   Bonuses   were   unauthorized   and   his   participation   in   the   deferred

28  compensation scheme, including his receipt of such payments, were in bad faith.

26

Exhibit 1                                           Page 42

150.   Consequently, Bommel is not protected by the Business Judgement Rule in carrying out the deferred compensation scheme because (1) Net-Income Bonus Plan involves clear limitations on authority to make the Conditional Bonuses payments; and (2) Bommel acted in bad faith by repeatedly and deliberately misreading the terms of the Net-Income Bonus Plan in order to justify the Conditional Bonuses payments.

151.   In addition, Bommel, Peter, and PLG breached their fiduciary duties by making material misrepresentations and omissions to induce NATPE to enter into the 2022 Employment Contract.

152.   In addition, Bommel breached his fiduciary duty by not disclosing to the Executive Committee or the Board of Directors the Siphoning Scheme and/or his receipt of the unauthorized April 2022 Conditional Bonus Payment.  *See Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1184 (Del. Ch. 2006) ("Under Delaware law, a director's fiduciary duty of loyalty includes a duty to disclose."); *Hoover Indus., Inc. v. Chase*, 1988 Del. Ch. LEXIS 98, 1988 WL 73758, at *338 (Del. Ch. July 13, 1988); (holding that the "intentional failure or refusal of a director to disclose to the board a defalcation or scheme to defraud the corporation of which he has learned" constitutes a breach of the duty to disclose).

153.   Bommel, Peter, and PLG breached their fiduciary duties by assisting in improper fund transfers to insiders while NATPE was insolvent, including the 2022 Employment Contract, and arranging for Bommel's Termination Payment, severance, and vacation pay just days before NATPE's bankruptcy filing.

154.   Bommel's substantial payments to himself leading up to the Petition Date, amounted to self-dealing, and included improperly authorizing a raise to himself in June 2021 and the unearned Conditional Bonus Payments.  By receiving these unauthorized payments that Bommel knew or should have known violated, respectively, his 2015 Employment Contract, as amended, as well as payments made pursuant to the 2022 Employment Contract, Termination Agreement, and Independent Contractor Agreement while the Debtor was insolvent in violation of Debtor's rights and obligations to its creditors.

Exhibit 1                                                    Page 43

1   In so doing, Bommel breached his fiduciary duties to Debtor.

2        155.   Peter and PLG failed to disclose conflicts of interest, including their adverse

3   interest in insurance coverage issues.

4        156.   Peter and PLG failed to disclose to NATPE that PLG had been suspended

5   by the California Franchise Tax Board since June 2017.

6        157.   Peter and PLG breached their fiduciary duties to NATPE by continuing to

7   perform legal services, entering into contracts with NATPE, and accepting payments while

8   knowing PLG was suspended under California law and legally disabled from practicing

9   law or entering into contracts.

10        158.   Additionally, Defendants committed numerous other acts and omissions in

11   blatant violation of law or policy giving rise to claims for breach of fiduciary duty, including,

12   but not limited to:

13        a.     Ignoring conflicts of interests;

14        b.     Allowing the Debtor to operate without observing the corporate formalities,

15   including keeping minutes;

16        c.     Failing to report and mishandling of insurance coverage issues;

17        d.     Mismanaging the Debtor's affairs for personal gain;

18        e.     Failing to act in the Debtor's best interests;

19        f.     Failing to ensure that the Debtor's resources were used to achieve its public

20   benefit purposes as a non-profit organization;

21        g.     Withholding knowable information material to the Debtor's Executive

22   Committee, Board, and its creditors;

23        h.     Transferring the Debtor's business operations (and employees) to

24   competitors;

25        159.   Consequently, per the allegations herein, Defendants breached their

26   fiduciary duties to the Debtor, and were a direct and proximate cause of, and a substantial

27   factor in causing damage to the Debtor and its creditors in the amount of the transfers

28   made by the Debtor to or for their own benefit and the benefit of the other insiders, and

preferring some creditors over other creditors, improperly authorizing deferred compensation and severance payments while the Debtor was in severe financial distress.

160.    NATPE suffered damages as a direct and proximate result of Defendants' breaches of fiduciary duty.

161.    As a direct and proximate result of Defendants' breaches of fiduciary duty, NATPE suffered damages including unauthorized Conditional Bonus payments totaling $236,906.12, inflated salary payments, and the Termination Payment of $198,725.70 plus Severance of $54,004.97, and $57,687.78 in holiday and vacation pay to Bommel on the eve of bankruptcy, as well as paying substantial fees to PLG for services that PLG was not legally authorized to provide, amounting to at least $421,783.15.

162.    These breaches of fiduciary duty directly contributed to the Debtor filing for bankruptcy and depleted the Estate's assets both pre- and post-petition, and thereby damaged NATPE in an amount to be proven at trial but currently estimated to be at least $4 million.

## SECOND CLAIM FOR RELIEF

### (Corporate Waste Against Defendant Bommel)

163.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

164.    An officer of an entity may be held liable where he causes the entity to enter into transactions in which no person of ordinary sound business judgment could view the benefits received in such transaction by the entity as a fair exchange for the consideration paid by the entity.

165.    Bommel caused NATPE to engage in exchanges that were so one-sided that no business person of ordinary, sound judgment could conclude that NATPE received adequate consideration.

166.    Bommel engaged in self-dealing, entering multiple transactions in the year preceding to NATPE's bankruptcy filing that benefited him personally at the expense of NATPE's creditors.

167.    Bommel authorized excessive compensation for himself, including his unilateral raise in June 2021, his 2022 Employment Contract, $236,906.12 in unearned Conditional Bonus payments, $310,418.45 paid pursuant to his Termination Agreement, and over $92,000 in unauthorized post-petition payments through the Independent Contractor Agreement signed September 30, 2022.

168.    Bommel authorized unearned bonus payments, such as the $57,749.94 transferred to Harbeson on January 17, 2022, despite the Condition Precedent for the bonus not being met.  Bommel also authorized a $25,000 increase to Weiss' salary in July 2022.

169.    These transactions occurred when NATPE was insolvent.

170.    Bommel knew of NATPE's insolvency yet continued to authorize these wasteful transactions.

171.    These transactions constituted a waste of corporate assets.

172.    As a direct and proximate result of Bommel's corporate waste, NATPE suffered damages in an amount to be determined at trial, but not less than $1 million.

**THIRD CLAIM FOR RELIEF**

**(Negligence – Legal Malpractice Against Peter and PLG)**

173.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint

174.    Peter and PLG had an attorney-client relationship with NATPE that established a duty of care.

175.    NATPE engaged Peter and PLG to serve as its general counsel for over a decade, and they were also retained as special counsel during NATPE's Bankruptcy Case.

176.    Peter and PLG breached their duty of care to NATPE by failing to use the skill, prudence, and diligence that lawyers of ordinary skill and capacity commonly possess and exercise.  This included a duty to avoid representation of interests adverse to the NATPE and withdraw from representation when a conflict of interest arose.

/ / /

30

Exhibit 1                                    Page 46

177.    Peter and PLG breached their professional duty to the Debtor by their ongoing mishandling of insurance coverage issues, including failing to timely notify NATPE's D&O insurer (Navigators) about the Arbitration Claim, resulting in denial of coverage, and mishandling the Coverage Litigation. As a direct result of these breaches, the Debtor suffered at least (i) the loss of coverage for its defense fees in Arbitration, which would have been covered had Peter and PLG timely tendered the claim to Navigators, which is no less than the amount paid to PLG for attorney's fees and costs related to the Arbitration Claim; (ii) the loss of potential coverage for Debtor's liabilities stemming from its disputes with Fontainebleau, including but not limited to the Arbitration Claim, and (iii) the fees and costs incurred in the Coverage Litigation against Navigators.

178.    Additionally, Peter and PLG breached their professional duty to the Debtor by, among other things:

a.    Disclosure failures and misrepresentations made by Peter in connection with PLG's Application for employment as Special Counsel in the Bankruptcy Case;

b.    Failing to disclose conflicts of interest issues given Peter and PLG's multiple roles representing NATPE in various matters while also potentially being subject to claims, including their adverse interest in coverage issues;

c.    PLG's post-petition billing of the Estate in connection with potential avoidance claims against PLG;

d.    Counseling in favor of payment of unearned Conditional Bonuses, Termination Pay, severance, and vacation pay to Debtor's Insiders and employees despite Debtor's insolvency or near insolvency;

e.    Counseling in favor of Debtor's cancellation of the 2022 Event;

f.    Counseling in favor of Debtor's breach of the 2021 Settlement Agreement for cancellation of the 2021 Event;

g.    Counseling and preparing the 2022 Employment Agreement for Bommel;

h.    Counseling in favor of other Transfers discussed above;

/ / /

31

Exhibit 1                                Page 47

i.    Counseling and preparing independent contractor agreements for Debtor's former employees who continued to perform in the same capacity as the Debtor in violation of California employment laws and possibly state and federal tax laws;

j.    Failing to advise the Debtor that its prepetition compensation to insiders was excessive and in breach of such insider's fiduciary duties to the Debtor, including failing to advise NATPE about the impropriety of the transfers to Bommel, Harbeson, and others.

k.    Participating in the preparation of materially false and incomplete declarations for Bankruptcy Court.

179.    Peter and PLG's negligence directly contributed to the Debtor filing for bankruptcy and depleted the Estate's assets both pre- and post-petition, and thereby damaged NATPE.

180.    Peter and PLG's breaches of their duty of care proximately caused damage to NATPE.

181.    NATPE suffered actual loss or damage as a direct result of Peter and PLG's negligence.

182.    NATPE's damages include the loss of funds through unauthorized transfers and excessive compensation that proper legal advice would have prevented.

183.    NATPE lost insurance coverage for defense costs (at least $218,410.50) and potential coverage for judgments or settlements in the Fontainebleau Arbitration Claim.

184.    NATPE's estate assets were depleted through improper transfers to insiders made on Peter and PLG's advice.

185.    NATPE incurred increased legal costs in the Bankruptcy Case due to Peter and PLG's negligence.

186.    The total damages to NATPE resulting from Peter and PLG's negligence are estimated at over $4 million.

/ / /

/ / /

32

Exhibit 1    Page 48

**FOURTH CLAIM FOR RELIEF**

**(Void of Contracts due to Unlawful Purpose Against Defendant Bommel)**

187.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

188.    Under California law, "[w]here a contract has but a single object, and such object is unlawful, whether in whole or in part… the entire contract is void". Cal. Civ. Code § 1598. The California Civil Code section 1667 provides that "unlawful" means "1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or, 3. Otherwise contrary to good morals." Cal. Civ. Code § 1667.

189.    In addition, Cal. Civ. Code § 1668 All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.

190.    Here, Bommel's 2022 Employment Contract was entered into pay Bommel to facilitate the Siphoning Scheme, including effectuating the unlawful payments of the unearned Deferred Compensation.  Kaplan's and Peter's fraudulent pretext for replacing the 2015 Employment Agreement, as amended, with the May 2022 Employment was that the former was due to expire on September 7, 2022, is established as false and intentionally and knowingly mislead above.  It was also made with the intent to defeat the provisions of the Bankruptcy Code.  Therefore, it is void.

191.    Here, NATPE's Termination Agreement, dated September 30, 2022 with Bommel was entered into to further the Siphoning Scheme, including providing Bommel with termination, vacation, and severance pay totaling $310,418.45 which was paid on October 9, 2022, two days before the Petition Date.  This contract was entered into to enrich Bommel at the expense of NATPE's creditors and to defeat the policy of the equitable distribution of the Estate's assets and to defeat the provisions of the Bankruptcy Code, including section 547. For example, the Termination Agreement provides that "[NATPE] represents that the termination payment is a disbursement in the ordinary

33

Exhibit 1                                              Page 49

course of business required under your employment agreement and constitutes a

settlement beneficial to the Company." Termination Agreement, pg. 1.  That provision is

clearly written to provide a § 547(c)(2) ordinary course defense under against a preference

action under § 547(b). Moreover, the Termination of the CEO in order to instantly rehire

the CEO as the interim CEO with the exact same duties and responsibilities and

simultaneously providing the fired and rehired CEO payments, including severance in

excess of $310,000 is not in the ordinary course.

192.    Therefore, Bommel entering into the Termination Agreement to defeat the

purpose of a cause of action under 547(b), and to defeat the Bankruptcy Code's policy of

equitable distribution, renders it void pursuant to Cal. Civ. Code §§ 1598(1), (2) and 1667.

## FIFTH CLAIM FOR RELIEF

**(Voidable Contract Under Cal. Corporations Code § 23304.1(A) Against Defendants**

**Peter and PLG)**

193.    Plaintiff realleges and incorporates herein by reference each and every

allegation contained in all prior paragraphs of this Complaint.

194.    PLG has been suspended by the State of California Franchise Tax Board

since June 1, 2017.

195.    PLG's suspended status continued through at least January 12, 2026, as

confirmed by an Entity Status Letter from the State of California Franchise Tax Board.

196.    Under California law, a suspended corporation is disabled from participating

in any litigation activities and from entering into contracts.

197.    Despite its suspended status, PLG continued to provide and accept payment

for legal services to NATPE and received over $600,000 in fees during the period of June

2017 through the Petition Date, including $421,783.15 paid during the 1-year pre-petition

period, and $75,520.00 paid after the Petition Date.

198.    Despite being suspended, PLG entered into new engagement agreements

with NATPE on October 10, 2022, for insurance coverage litigation and general counsel

services.

199.    At no time did Peter or PLG disclose to NATPE that PLG was suspended under California law.

200.    On March 16, 2023, NATPE filed an application to employ PLG as special counsel in its bankruptcy case.  The Bankruptcy Court approved the application on May 9, 2023, without knowledge of PLG's suspended status.

201.    Following court approval, PLG filed multiple fee applications seeking payment for services rendered to NATPE.

202.    PLG's first fee application sought approval of $30,725 in fees for the period of March 7, 2023, through May 21, 2023, on an interim basis.

203.    PLG's second fee application sought approval of $19,460 in fees for the period of May 22, 2023, through September 30, 2023, on an interim basis.

204.    PLG's third fee application sought approval of $28,305 in fees for the period of October 1, 2023, through April 30, 2024, on an interim basis.

205.    In total, PLG received at least $600,000 in fees for services provided to NATPE while PLG was suspended (period of June 1, 2017 to January 12, 2026).

206.    The invoices issued by PLG, engagement agreements, employment application, and fee applications reflect ongoing contractual relationships and compensation for services rendered to NATPE during the period of suspension.

207.    Plaintiff, as the Plan Fiduciary standing in the shoes of NATPE, is a party to the contracts other than the suspended corporation.

208.    Plaintiff has succeeded to all rights of NATPE, including the right to void contracts entered into with a suspended corporation.

209.    Pursuant to Cal Rev & Tax Code § 23304.1, the contracts between NATPE and PLG are voidable at the request of Plaintiff.

## SIXTH CLAIM FOR RELIEF

### (Fraud in the Inducement, Rendering Contracts Voidable Against Defendants Bommel, Peter, and PLG)

210.    Plaintiff realleges and incorporates herein by reference each and every

35

Exhibit 1                                    Page 51

allegation contained in all prior paragraphs of this Complaint.

211.    Defendants made material misrepresentations of fact and/or omitted material facts to NATPE.

212.    Defendants made material misrepresentations and omissions in the March 2022 Memorandum, and 2022 Employment Contract regarding Bommel's contract expiration date, Bommel's salary, and deferred compensation obligations.

213.    Specifically, defendants falsely claimed Bommel's contract would expire on September 7, 2022, while omitting the automatic renewal provision; claimed Bommel's salary was $397,000 when it was actually $297,000 after his June 2021 unauthorized raise; and omitted that the Condition Precedent for payment of the Conditional Bonuses had not been met.

214.    Defendants knew these representations were false when made.

215.    Peter and PLG prepared false information, used by Kaplan to persuade the Executive Committee to offer Bommel a new contract, including misrepresenting that Bommel's contract was set to expire on September 7, 2022.

216.    Bommel knew his actual salary was $297,000 (after his unauthorized June 2021 raise) and not $397,000 as represented in the March 2022 Memorandum.

217.    Peter and PLG, as NATPE's legal counsel, knew or should have known the true terms of Bommel's employment contract, including the Automatic Renewal Provision, yet drafted the March 2022 Memorandum containing these misrepresentations.

218.    Defendants intended for NATPE to rely on these misrepresentations.

219.    The March 2022 Memorandum was specifically drafted to justify the unearned payment of the Conditional Bonus and to induce NATPE to enter into the 2022 Employment Contract.

220.    The March 2022 Memorandum was sent to the Executive Committee with the intent to induce them to approve Bommel's new employment contract based on false information.

221.    NATPE justifiably relied on Defendants' misrepresentations.

36

Exhibit 1    Page 52

222.   NATPE's Executive Committee relied on the misrepresentations in the March 2022 Memorandum when approving Bommel's 2022 Employment Contract.

223.   The Executive Committee was not provided with either the written 2022 Employment Contract or Bommel's 2015 Employment Agreement, as amended, so they had no way to verify the false statements.

224.   NATPE suffered damages as a result of its reliance on Defendants' misrepresentations.

225.   As a direct and proximate result of Defendants' fraudulent misrepresentations and omissions, NATPE suffered damages by paying Bommel unearned bonuses totaling $236,906.12, an inflated salary, and a Termination Payment of $198,725.70 plus Severance of $54,004.97 and $57,687.78 in holiday and vacation pay just days before bankruptcy filing.

226.   The total damages suffered by NATPE as a result of Defendants' fraud amount to at least $489,000.00.

227.   The 2022 Employment Contract, the Net-Income Bonus Plan, the Conditional Bonuses, and Bommel's Termination Agreement were all induced by fraud and are therefore voidable.

## SEVENTH CLAIM FOR RELIEF

**(Avoidance, Recovery, and Preservation of Intentionally Fraudulent Transfers**

**Under 11 U.S.C. §§ 548(a)(1)(A), 550 and 551 Against Defendant Bommel)**

228.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

229.   The Bommel 1-Year Transfers occurred within 2 years before NATPE's bankruptcy petition on October 11, 2022.

230.   The Bommel 1-Year Transfers constituted an interest in property of the Debtor.

231.   The Bommel 1-Year Transfers were transfers that were made with actual intent to hinder, delay and defraud the creditors of the Debtor.

37

Exhibit 1                                    Page 53

232.    At the time the Bommel 1-Year Transfers were paid to Bommel, the Debtor was in serious financial distress and was not paying its debts as they came due and was facing substantial claims for its breach of the 2022 Event Agreement, breach of the 2021 Settlement Agreement, and was involved in Arbitration.

233.    The Bommel 1-Year Transfers included payments for substantial unlawful deferred compensation payments, unauthorized salary raises and bonus payments, contractual severance and vacation pay, and separate severance payouts, representing a clear depletion of Estate assets without corresponding benefit.

234.    Bommel did not seek authority from the Executive Committee or the Board prior to authorizing certain salary increases, demonstrating the unauthorized nature of these transfers. The transfers were made through deceptive means rather than legitimate business transactions that would provide value to NATPE.  Accordingly, any purported benefits to NATPE from Bommel's services were negated by the fraudulent means used to obtain the payments and the Debtor's deteriorating financial condition

235.    Alternatively, these transfers were made for less than reasonably equivalent value when NATPE was insolvent.

236.    NATPE was insolvent as of March 31, 2022, with negative assets of over $3 million, yet Defendants continued to transfer funds out of NATPE, including the Bommel 1-Year Transfers without receiving reasonably equivalent value in return.

237.    On September 30, 2022, Bommel executed a Termination Agreement and Release entitling him to a payment of $198,725.70 due by October 3, 2022, just days before NATPE's bankruptcy filing. The Termination Agreement also provided for a severance payment of $54,004.97 in exchange for a Settlement Agreement and Release of Claims.  Bommel also received $11,828.01 in holiday pay and $45,859.77 in vacation pay.  These payments were made when NATPE was on the verge of bankruptcy and represented a further depletion of estate assets without corresponding value.

238.    Bommel is the initial transferee of such transfers or the entity for whose benefit such transfers were made, or he is the immediate or mediate transferee of such

1   initial transferee.

2       239.   As a result of the forgoing, and in accordance with 11 U.S.C. §§ 550 and

3   551, Plaintiff is entitled to entitled to entry of judgment against Bommel: (a) avoiding and

4   preserving the above-described transfers, (b) directing that the transfers be set aside, and

5   (c) recovering the transfers, or the value thereof, from him for the benefit of the Debtor's

6   bankruptcy estate, in amounts to be determined by the Court.

7                    **EIGHTH CLAIM FOR RELIEF**

8   **(Avoidance, Recovery, and Preservation of Constructively Fraudulent Transfers**

9        **Under 11 U.S.C. §§ 548(a)(1)(B), 550, and 551 Against Defendant Bommel)**

10       240.   Plaintiff realleges and incorporates herein by reference each and every

11   allegation contained in all prior paragraphs of this Complaint.

12       241.   Within one year before the Petition Date, the Debtor made the Bommel 1-

13   Year Transfers to, or for the benefit of Bommel.

14       242.   The Bommel 1-Year Transfers were transfers of property in which the Debtor

15   had an interest.

16       243.   The Debtor did not receive reasonably equivalent value in exchange for any

17   of the Bommel 1-Year Transfers.

18       244.   At the time of the Bommel 1-Year Transfers the Debtor was insolvent or

19   became insolvent as a result thereof.

20       245.   At all relevant times within the one year prior to the Petition Date, the Debtor

21   (i) was insolvent, or became insolvent as a result of each such transfer; (ii) was engaged

22   in or was about to engage in a business or a transaction for which its remaining assets

23   were unreasonably small in relation to the business or transaction; or (iii) intended to incur,

24   or believed or reasonably should have believed that it would incur, debts beyond its ability

25   to pay as they became due.

26       246.   As a result of the forgoing, and in accordance with 11 U.S.C. §§ 550 and

27   551, Plaintiff is entitled to entitled to entry of judgment against Bommel: (a) avoiding and

28   preserving the above-described transfers, (b) directing that the transfers be set aside, and

Exhibit 1    Page 55

(c) recovering the transfers, or the value thereof, from him for the benefit of the Debtor's

bankruptcy estate, in amounts to be determined by the Court.

**<u>NINTH CLAIM FOR RELIEF</u>**

**(Avoidance, Recovery, and Preservation of Preferential Transfers Under 11 U.S.C.**

**§§ 547, 550, and 551 Against Defendants Bommel and PLG)**

247.   Plaintiff realleges and incorporates herein by reference each and every

allegation contained in all prior paragraphs of this Complaint.

248.   The Debtor had a property interest in the funds that made up each of the

Preferential Transfers as each of the Preferential Transfers were drawn against and

cleared one or more of the Debtor's bank accounts.

249.   The Preferential Transfers were made to Bommel and/or PLG and/or for the

benefit of Bommel, PLG.

250.   The Preferential Transfers were made to or for the benefit of Bommel and

PLG at a time in which they were creditors of the Debtor, as the term "creditor" is defined

by 11 U.S.C. § 101(10).

251.   Each of the Preferential Transfers were paid on account of an antecedent

debt owed by the Debtor to Bommel and PLG at the time the payments were made.

252.   Each of the Preferential Transfers were made while the Debtor was

insolvent.

253.   The Preferential Transfers enabled Bommel and PLG to receive more than

they would have received as a creditor if: (a) the Preferential Transfers had not been

made; and (b) Bommel and PLG received payment of the debts they were owed to the

extent provided under the Bankruptcy Code.

254.   Prior to commencing this action, Plaintiff performed reasonable due

diligence in the circumstances of Bommel and PLGs' known or reasonably knowable

affirmative defenses to the Preferential Transfers.  The due diligence was performed with

the assistance of Plaintiff's counsel and accountants by reviewing the Debtor's available

books and records, analyzing payments made by the Debtor to Bommel and PLG, and

40

Exhibit 1                                    Page 56

1  confirming associated information.

2      255.   Plaintiff is entitled to avoid and set aside the Preferential Transfers pursuant

3  to 11 U.S.C. § 547.

4      256.   Plaintiff is entitled to is entitled to recover the Preferential Transfers from the

5  Defendants for the benefit of the Debtor's bankruptcy estate under 11 U.S.C. §§ 550(a)

6  and 551.

7      257.   Interest on the Preferential Transfers has accrued and continues to accrue

8  at the maximum legal rate pursuant to 28 U.S.C. § 1961 from the time the Preferential

9  Transfers were made.

10  **<u>TENTH CLAIM FOR RELIEF</u>**

11  **(Avoidance, Recovery and Preservation of Post-Petition Transfers Under 11 U.S.C.**

12  **§§ 549, 550, and 551 Against Defendant Bommel)**

13      258.   Plaintiff realleges and incorporates herein by reference each and every

14  allegation contained in all prior paragraphs of this Complaint.

15      259.   The Bommel Post-Petition Transfers were transfers of property of the Estate.

16      260.   The Bommel Post-Petition Transfers occurred after NATPE's Bankruptcy

17  Case was filed on October 11, 2022.

18      261.   The Bommel Post-Petition Transfers were outside the ordinary course of

19  business and were not authorized by the Bankruptcy Code or the Bankruptcy Court.

20      262.   Plaintiff is entitled to avoid the Bommel Post-Petition Transfers pursuant to

21  11 U.S.C. § 549.

22      263.   Plaintiff is entitled to is entitled to recover the Bommel Post-Petition

23  Transfers for the benefit of the Debtor's bankruptcy estate under 11 U.S.C. §§ 550(a) and

24  551.

25  **<u>ELEVENTH CLAIM FOR RELIEF</u>**

26  **(Conversion Against Defendants Bommel, Peter, and PLG)**

27      264.   Plaintiff realleges and incorporates herein by reference each and every

28  allegation contained in all prior paragraphs of this Complaint.

Exhibit 1                                    Page 57

265.   NATPE owned or had the right to possess the funds wrongfully taken by Defendants.

266.   As a corporation, NATPE had the right to possess and control its financial assets, including the funds that were wrongfully taken by Defendants.

267.   Defendants wrongfully exercised dominion over NATPE's property interfering with NATPE's right of possession.

268.   As described above, the Debtor disposed of its assets to Defendants, certain executives, and others leading up, and subsequent, to this Bankruptcy Case, despite the Debtor's own dire financial circumstances.

269.   Defendants exerted control over the Debtor's assets, and knowingly participated in, or was negligent in the management and supervision of the Debtor's affairs causing or contributing to the Debtor's ultimate liquidation.

270.   Defendants exerted control over NATPE's assets by transferring them to themselves or entities they controlled.

271.   These transfers included unauthorized Conditional Bonuses, unauthorized raises to NATPE executives, inflated vendor payments, and other siphoned assets.

272.   Bommel with the assistance of Kaplan and Peter, wrongfully took possession of NATPE's funds through unauthorized bonus payments totaling $236,906.12 despite the Condition Precent not being met.

273.   Bommel wrongfully took possession of NATPE's funds through an unauthorized salary increase from $258,000 to $296,000 effective June 1, 2021.

274.   Bommel, with the assistance of Kaplan and Peter, wrongfully took possession of NATPE's funds through a Termination Payment of $198,725.70 and Severance of $54,004.97 made just days before NATPE's bankruptcy filing.

275.   NATPE suffered damages as a result of Defendants' wrongful exercise of dominion over its property.

276.   These assets are rightfully the property of the Estate, as they were transferred to the Debtor's insiders or entities controlled by the Debtor's insiders, who used

42

Exhibit 1                                    Page 58

the Debtor for their own convenience and benefit and disregarded the Debtor's public purpose as a non-profit organization.

277.   As a result of the foregoing harm, NATPE and its Estate have been harmed in amount to be proven at trial in accordance with California Civil Code section 3336, including but not limited to the value of the property at the time of conversion, with interest from that time and a fair compensation for the time and money properly expended in pursuit of the property.

278.   Defendants' acts were undertaken for improper purposes as alleged above and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of the Estate's creditors, and were designed and intended to cause and did, in fact, cause the Estate's creditors to suffer actual damages and therefore justify the awarding of exemplary and punitive damages.

## **TWELFTH CLAIM FOR RELIEF**

### **(Unjust Enrichment Against Defendant Bommel)**

279.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

280.   Bommel received benefits from NATPE.

281.   Bommel received unauthorized bonus payments totaling $236,906.12, an inflated salary, and a Termination Payment of $198,725.70 plus Severance of $54,004.97.

282.   These benefits were retained by Bommel at the expense of NATPE and its creditors.

283.   The unauthorized payments to Bommel depleted NATPE's assets when it was already in financial distress, directly harming NATPE and its creditors.

284.   The circumstances make it unjust for Bommel to retain these benefits.

285.   The benefits were obtained through fraudulent misrepresentations and omissions.

286.   The Conditional Bonuses were paid despite the Condition Precedent never being satisfied.

287.    The payments were made when NATPE was insolvent or on the verge of bankruptcy.

288.    The Termination Payment was made just days before NATPE's bankruptcy filing, designed to benefit an insider at the expense of unsecured creditors.

289.    It would be unjust and inequitable to permit Bommel to retain the benefits he received from NATPE under these circumstances.

290.    Plaintiff is entitled to restitution from Bommel in an amount subject to proof at trial.

## THIRTEENTH CLAIM FOR RELIEF

### (Declaratory Relief Based on Contractual Provision in Bankruptcy Plan Against all Defendants)

291.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

292.    There exists a written instrument or contract containing a provision regarding liability limitations.

293.    The confirmed Plan contains a provision stating that if the representation about D&O insurance availability is inaccurate, the limitation on claims against directors and officers shall be deemed lifted.  Specifically, the Plan provides: "If this is not accurate, the limitation on claims against directors and officers set forth in Ex. D shall be deemed lifted and shall not apply." [Bk. Dkt. 251 at p. 2, ¶2].

294.    An actual controversy exists regarding the legal rights and duties of the respective parties.

295.    NATPE represented that the full D&O insurance policy was available to pay claims in the Bankruptcy Case, but Navigators had denied coverage, making this representation inaccurate.

296.    This triggers the provision lifting the liability limitation, allowing claims against NATPE's directors and officers to proceed without limitation.

/ / /

44

Exhibit 1                        Page 60

297.    Defendants may assert that the liability limitation on claims related to breaches of fiduciary duties remains in effect, while Plaintiff contends that it has been lifted pursuant to the express terms of the Plan.

298.    This matter is a proper subject for declaratory relief.

299.    Under California Code of Civil Procedure § 1060, any person interested under a written instrument or contract may bring an action for a declaration of rights and duties.

300.    As the Chapter 11 Plan Fiduciary, Plaintiff has the authority to seek a declaration regarding the enforceability of provisions in the Plan.

301.    Plaintiff respectfully requests that this Court declare the recovery limitation clause in the Plan void and unenforceable, thereby exposing NATPE's directors and officers to full liability for breach of fiduciary claims instead of limiting recovery to unavailable insurance proceeds.

**IV.**

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays for a judgment against Defendants as follows:

**On the First and Second Claims for Relief (Breach of Fiduciary Duty and Corporate Waste):**

1.    Compensatory, special, and consequential damages in an amount to be determined at trial, but no less than $4 million.

2.    Disgorgement of all sums received by Defendants during the period of breach.

3.    Punitive damages for Defendants' fraudulent and malicious conduct, in an amount to be determined at trial.

**On the Third Claim for Relief (Professional Negligence):**

4.    Compensatory, special, and consequential damages, and punitive damages, all in an amount to be determined at trial;

45

Exhibit 1                    Page 61

**On the Fourth Claim for Relief (Unlawful Contracts under Cal Civ Code §§ 1598, 1667, and 1668):**

5.    A declaration that the Bommel 2022 Employment Contract, the Net-Income Bonus Plan, Conditional Bonuses, and Bommel's Termination Agreement are voidable due to unlawful purpose.

6.    Rescission of the Bommel 2022 Employment Contract, the Net-Income Bonus Plan, Conditional Bonuses, and Bommel's Termination Agreement.

7.    Restitution of all funds paid under the unlawful agreements, including unauthorized bonus payments totaling $236,906.12, the Termination Payment of $198,725.70, and Severance of $54,004.97, for a total of at least $489,638.79.

8.    Compensatory damages for all losses suffered by NATPE as a result of the unlawful, in an amount to be determined at trial but at least $489,638.79.

**On the Fifth Claim for Relief (Voidable Contracts under Cal Rev & Tax Code § 23304.1):**

9.    A declaration that all funds paid to PLG by NATPE, and contracts entered into between PLG and NATPE are voidable.

10.    Restitution of all funds paid to PLG by NATPE during its period of suspension from June 2017 through September 2024.

**On the Sixth Claim for Relief (Fraud in the Inducement):**

11.    A declaration that the Bommel 2022 Employment Contract, the Net-Income Bonus Plan, Conditional Bonuses, and Bommel's Termination Agreement are voidable due to fraud in the inducement.

12.    Rescission of the Bommel 2022 Employment Contract, the Net-Income Bonus Plan, Conditional Bonuses, and Bommel's Termination Agreement

13.    Restitution of all funds paid under the fraudulently induced agreements, including unauthorized bonus payments totaling $236,906.12, the Termination Payment of $198,725.70, and Severance of $54,004.97, for a total of at least $489,638.79.

/ / /

46

Exhibit 1                                    Page 62

14.     Compensatory damages against for all losses suffered by NATPE as a result of the fraudulently induced agreements, in an amount to be determined at trial but at least $489,638.79.

**On the Seventh, Eighth, Ninth and Tenth Claims for Relief (Avoidance, Recovery, and Preservation of Fraudulent and Preferential Transfers under 11 U.S.C. §§ 547, 548, 549, 550, and 551)::**

15.     Avoidance, recovery, and preservation of the subject Transfers, including the Bommel 1-Year Transfers and Post-Petition Transfers, for the benefit of the Debtor's bankruptcy estate.

16.     A declaration that the subject Transfers are voidable and directing that they be set aside.

17.     Recovery of the subject Transfers, or the value thereof, from Defendants, in an amount to be determined at trial, but believed to be in excess of $1.5 million.

18.     Pre-judgment interest on the avoided Transfers at the maximum legal rate pursuant to 28 USCS § 1961 from the time the Transfers were made.

**On the Eleventh Claim for Relief (Conversion):**

19.     Ordering turnover to Plaintiff of all unlawful and unearned funds obtained by Bommel from April 2022 to the present that have not already been remitted to Plaintiff.

20.     For attorney's fees and costs expended in pursuit of the property. Cal. Civil Code § 3336.

21.     For pre-judgment interest from the date of conversion. Cal. Civil Code § 3336.

**On the Twelfth Claim for Relief (Unjust Enrichment):**

22.     Restitution and disgorgement of all amounts unjustly held by the Defendants, the exact amount of which to be proved at trial.

/ / /

/ / /

/ / /

47

Exhibit 1                                    Page 63

**On the Thirteenth Claim for Relief (Declaratory Relief and Void of Liability Limitation Provision Under Cal Civ Code § 1668):**

23.     A declaration that the liability limitation provisions in the Plan are void and unenforceable to the extent they attempt to shield NATPE's directors and officers from liability for fraud, willful misconduct, or violations of law.

24.     An order enjoining the directors and officers from asserting or relying upon the liability limitation provisions in any proceedings or claims related to their conduct.

**On all Claims for Relief:**

25.     Punitive damages against all Defendants for their fraudulent and malicious conduct, in an amount to be determined at trial.

26.     Costs of suit and interest at the legal rate on all damages and sums awarded to Plaintiff, for the benefit of the Estate; and

27.     Such other and further relief as this Court deems just and proper.

DATED:  January 22, 2026                    **MARGULIES FAITH, LLP**

By: */s/ Meghann A. Triplett*
          Meghann A. Triplett
Attorneys for Plaintiff, Jeremy W. Faith,
Chapter 11 Plan Fiduciary

48

Exhibit 1                                              Page 64

# EXHIBIT A

Exhibit 1                                        Page 65

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE RESTATED CERTIFICATE OF "NATIONAL ASSOCIATION OF TELEVISION PROGRAM EXECUTIVES, INC.", FILED IN THIS OFFICE ON THE TWENTY-FIRST DAY OF FEBRUARY, A.D. 2013, AT 7:52 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

2139885  8100

130210805

You may verify this certificate online at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 0243729

DATE: 02-26-13

**EXHIBIT A**
Exhibit 1

**Page 49**
Page 66

State of Delaware
Secretary of State
Division of Corporations
Delivered 07:53 PM 02/21/2013
FILED 07:52 PM 02/21/2013
SRV 130210805 – 2139885 FILE

## THIRD AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

### OF

### NATIONAL ASSOCIATION OF TELEVISION

### PROGRAM EXECUTIVES, INC.

(Pursuant to Sections 242 and 245 of the Delaware General Corporation Law)

The undersigned, Rod Perth, hereby certifies that:

1.  The date of filing of the original Certificate of Incorporation of this corporation with the Secretary of State of the State of Delaware was October 5, 1987. A certificate of amendment to the Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on February 8, 1988. An Agreement and Plan of Merger was filed with the Secretary of State of the State of Delaware on June 16, 1988. A Restated Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on February 26, 1990. Certificates of Amendment were filed with the Secretary of State of the State of Delaware on April 2, 1993, April 3, 1995, April 16, 1997 and March 15, 1999. A Restated Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on March 3, 2000 (the "Certificate of Incorporation").

2.  He is the duly elected and acting President and Chief Executive Officer of National Association of Television Program Executives, Inc., a Delaware nonprofit, non-stock corporation (the "Association").

3.  This Third Amended and Restated Certificate of Incorporation amends, restates and supersedes the provisions of the Restated Certificate of Incorporation of the Association and has been duly adopted in accordance with the provisions of Sections 242 and 245 of the Delaware General Corporation Law (the "DGCL") by the written consent of the members entitled to vote thereon in accordance with the provisions of Section 242 of the DGCL.

RESOLVED, that the Certificate of Incorporation of the Association be amended and restated in its entirety to read as follows:

FIRST:    The name of the Association is National Association of Television Program Executives, Inc.

SECOND:    The address of the Association's registered agent in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

THIRD:    (a)    The Association is organized and shall be operated exclusively for one or more purposes as specified in Section 501(c)(6) of the Internal Revenue Code of 1986, as amended (the "Code"), or any successor statute thereto. In particular, the purposes of the

304138988.6

Association shall be to support, promote, advocate and advance the interests of businesses and other organizations that are engaged in the provision and support of television and digital content programming by:

(i)     Providing a forum for the discussion of ideas and the exchange of information relating to television and digital content programming, television and digital content production and related fields;

(ii)    Establishing, convening and sponsoring one or more annual conventions, marketplaces or other events for the Association's members, including workshops, lectures, and seminars in order to foster discussion relating to the purposes set forth in this Article THIRD, and the state of linear and digital content marketability, revenue potential, content and appeal and the needs fulfilled by such programming;

(iii)   Advising and making the Association's membership aware of television and digital content programming trends;

(iv)    Improving business relations between the Association's members and promoting the interests of the television and digital content programming industries generally within the United States;

(v)     Representing the Association's members before legislatures and appropriate regulatory agencies, so that the interests of the Association's members in the television and digital content programming industries shall be thoroughly and adequately considered and understood in relation to contemplated legislation and rules and regulations;

(vi)    Cooperating with other state and national associations representing the television and digital content programming industries; and

(vii)   Gathering and disseminating information that will improve the linear and digital content programming industries.

(b)     The Association may undertake all activities that its Board of Directors determines to be necessary or convenient to the accomplishment of the foregoing purposes, and consistent therewith, the Association may exercise all powers available to nonprofit, non-stock corporations organized under the DGCL, except as restricted herein or in the bylaws of the Association.

FOURTH:     The Association shall not have any capital stock, and the conditions of membership shall be stated in the bylaws. The voting rights of the Association's members shall be limited to those required by statute and as elsewhere provided in this Certificate and the Bylaws.

FIFTH:     Notwithstanding any other provision of this Certificate, the Association is organized exclusively for one or more of the purposes specified in Section 501(c)(6) of the Code.

SIXTH:      No part of the net earnings of the Association shall inure to the benefit of any member, trustee, director or officer of the Association, or any private individual (except that reasonable compensation may be paid for services rendered to or for the Association), and no member, trustee or director, officer of the Association or any private individual shall be entitled to share in the distribution of any of the Association assets on dissolution of the Association.

SEVENTH:    In the event of dissolution, all of the assets and property of the Association remaining after payment of its debts and obligations shall be distributed, as the Board of Directors shall determine in its discretion, to any entity (or entities) which qualifies under Sections 501(c)(6) or 501(c)(3) of the Code, provided that such distribution is consistent with the Association's status as an organization exempt from taxation under Section 501(c)(6) of the Code, and further, not in violation of any law or regulation applicable to such an organization.

EIGHTH:     In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, alter or repeal the bylaws of the Association, subject to any approval rights of the Association's members as set forth in this Certificate or the bylaws.

NINTH:      Elections of directors need not be by written ballot unless the bylaws of the Association shall so provide. Meetings of the Board of Directors may be held within or without the State of Delaware, as the bylaws may provide. The books of the Association may be kept (subject to any provision contained in the statutes) outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the bylaws of the Association.

TENTH:      A director of the Association shall not be personally liable to the Association for monetary damages for breach of fiduciary duty as a director except for liability (i) for any breach of the director's duty of loyalty to the Association, (ii) for acts or omissions not in good faith or which involve·intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL or (iv) for any transaction from which the director derived an improper personal benefit. If the DGCL is amended after the date hereof to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Association shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any repeal or modification of this Section shall not adversely affect any right or protection of a director of the Association at the time of such repeal or modification.

This Third Amended and Restated Certificate of Incorporation has been duly adopted by the Association's Board of Directors and members in accordance with the applicable provisions of Sections 242 and 245 of the DGCL.

[Remainder of page is left intentionally blank.]

**EXHIBIT A**
Exhibit 1

**Page 52**
Page 69

Executed at Los Angeles, California on February 21, 2013.

Rod Perth, President

# EXHIBIT B

Exhibit 1                                             Page 71

# THIRD AMENDED AND RESTATED

# BYLAWS

# OF

# NATIONAL ASSOCIATION OF TELEVISION

# PROGRAM EXECUTIVES, INC.

## ARTICLE I

## NAME AND OFFICES

Section 1.     <u>Name</u>. The name of the corporation is National Association of Television Program Executives, Inc. (the "Association").

Section 2.     <u>Offices</u>. The principal office of the Association is located at 5757 Wilshire Boulevard, Penthouse 10, Los Angeles, California 90036-3681.   The Association's registered agent in the State of Delaware is The Corporation Trust Company and the address of said registered agent is Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19810, County of New Castle.   The Board of Directors of the Association (the "Board" or the "Board of Directors") may from time to time change any address of the office of the Association.

## ARTICLE II

## PURPOSES

Section 1.     The Association is a nonprofit, non-stock Delaware corporation organized and operated exclusively for one or more purposes as specified in Section 501(c)(6) of the Internal Revenue Code of 1986, as amended (the "Code"), or any successor statute thereto.  The specific purposes of the Association are as set forth in its Third Amended and Restated Certificate of Incorporation, as the same may be amended from time to time (the "Certificate of Incorporation").

## ARTICLE III

## MEMBERS

Section 1.     <u>Members Generally</u>.   The Association shall be organized into a single class of voting members (the "Members").   All exhibitors and paying attendees at the Association's events (including, without limitation, the annual convention and marketplace) shall be eligible to join the Association as Members upon approval of the

Board and upon payment of dues in accordance with Section 2 below. The Board may establish, from time to time, such other qualifications for eligibility to join the Association as a Member, and such other classes of Members, as it determines is in the best interests of the Association.

Section 2.    Dues, Fees and Assessments; Good Standing.    The Board shall, from time to time, fix the amount of dues, fees and/or assessments to be paid by Members. The Board may, in its discretion, set different dues, fees and assessments for different classes of Members, but the dues, fees and assessments shall be equal for all Members of each class. Each Member must pay, within the time and on the conditions set by the Board, the dues, fees and/or assessments set by the Board pursuant to this Section 2 and subject to the approval of the Board, a Member may pay all or part of its dues, fees and/or assessments with property other than cash, including the provision to the Association of such Member's services at a discount. Those Members who have paid the required dues, fees, and/or assessments in accordance with these Second Amended and Restated Bylaws ("Bylaws") and whose Membership has not been terminated in accordance with the provisions of Section 3 hereof shall be Members in good standing.

Section 3.    Termination of Membership.    A Member's status as such shall terminate on the occurrence of any of the following events:

(a)    Resignation of the Member, upon written notice to the Association;

(b)    Expiration of the period of Membership, unless the same is renewed on the renewal terms fixed by the Board;

(c)    Failure of the Member to pay any and all dues, fees, or assessments, if any, as set by the Board within thirty (30) days after they become due and payable;

(d)    Occurrence of any event that renders the Member ineligible for Member status in accordance with the provisions of Section 1 hereof, or failure to satisfy qualifications for such; or

(e)    Expulsion of the Member, based on the good faith determination by the Board, or a Committee or person authorized by the Board to make such a determination, that the Member has failed in a material manner to observe the rules of conduct of the Association, or has engaged in conduct materially and adversely prejudicial to the purposes and interests of the Association.

Section 4.    Procedure for Expulsion.    If grounds appear to exist for expulsion of a Member under Section 3(e) of these Bylaws, the procedure set forth below shall be followed:

(a)    The Member shall be given fifteen (15) business days' prior written notice of the proposed expulsion and the reasons therefor. Any notice

-2-

given by mail shall be sent by certified or registered mail to the Member's last address as shown on the Association's records.

(b)     The Member shall be given an opportunity to be heard, either orally or in writing, at least five (5) business days before the effective date of the proposed expulsion.   The hearing shall be held, or the written statement considered, by the Board or by a committee or person authorized by the Board to determine whether the expulsion should take place.

(c)     The Board, committee, or person shall decide whether or not the Member should be expelled.   The deciding body may impose some lesser punishment, including suspension or some other sanction.   The decision of the Board, committee, or person shall be final.

(d)     Any action challenging an expulsion or some other sanction, including a claim alleging defective notice, must be commenced within one (1) year after the date of the expulsion or other sanction.

Section 5.     <u>Transfer of Memberships</u>. Membership may not be transferred.  In the case of a Member that is a corporation, limited liability company, partnership or other entity, all rights of Membership cease on the Member's dissolution.  Notwithstanding the foregoing, a Member that is a corporation, limited liability company, partnership or other entity may notify the Association in writing from time to time of the name of an employee or other individual associated with such entity who shall exercise the rights of Membership on behalf of such entity.

Section 6.     <u>Annual Meeting</u>. The Annual Meeting of the Members, if any, at the direction of the Board, shall be on a date fixed by the Board.  Notice of each Annual Meeting shall be mailed, electronically mailed, personally delivered or faxed to each Member at least twenty (20) days prior to the meeting to the Member' address (or fax number as applicable) on the books of the Association.  Voting by proxy shall not be permitted at any meeting.

Section 7.     <u>Special Meetings</u>. Special meetings may be held at any time upon call of the Chairperson(s) of the Board or by not less than ten percent (10%) of the Members.

Section 8.     <u>Quorum and Vote</u>.

(a)     More than twenty percent (20%) of the voting power of the Members shall constitute a quorum for the transaction of business at any meeting of the Members.

(b)     Except as otherwise required by Delaware General Corporation Law or by these Bylaws, approval of any matter before the Members by a

-3-

**EXHIBIT B**
Exhibit 1

majority of the Members present at the applicable meeting shall constitute approval of the applicable matter by the Members, <u>provided</u> that the affirmative vote of at least thirty percent (30%) of the Members shall be required to approve (i) any merger or consolidation of the Association or (ii) any sale, lease, or exchange of all or substantially all of the assets of the Association.

Section 5.    <u>Action by Members Without a Meeting</u>.  Any action which may be taken at a meeting of the Members may be taken without a meeting if consent in writing setting forth such action is signed by Members (or a class of Members, as the case may be) making up not less than that percentage of all Members (or a class of Members, as the case may be) as would be necessary to authorize or take such action at a meeting at which all Members  (or a class of Members, as the case may be) entitled to vote thereon were present and voted.  Such consent shall be filed in the minutes of the proceedings of the Members.

Section 6.    <u>Conduct of Meetings</u>.    Meetings of the Members shall be conducted in accordance with such rules as may be established by the Members.

Section 7.    <u>Waiver of Notice</u>.  Whenever any written notice is required to be given under the provisions of these Bylaws or Delaware General Corporation Law, such notice need not be given to any Member who submits a signed waiver of notice whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such Member.

## ARTICLE IV

## THE BOARD OF DIRECTORS

Section 1.    <u>Powers</u>.  All corporate powers of the Association shall be vested in and exercised by and under the authority of the Board, which shall have full charge, control and management of the property, affairs and funds of the Association.  The Board shall have full power to establish and direct the policies governing the business and affairs of the Association.   The Board shall generally coordinate the activities of the Association.

Section 2.    <u>Number, Election, and Term of Office</u>.  The Board shall be comprised of no less than seven (7) and no more than forty-five (45) Directors, excluding *ex officio* Directors, the specific number to be established from time to time by Board resolution.  The President shall be an *ex officio* voting Director.  Each Director shall have a three-year term, subject, however, to his or her earlier death, resignation, or removal.  At each Annual Meeting of the Board, the Boards shall elect Directors by a majority vote.  Any Director may be elected for unlimited successive terms.  Members with a change of employment during their current term need to notify the President and CEO of NATPE

-4-

who will inform the Governance committee accordingly to review their status as a member.

Section 3.    Chairperson of the Board.  The Chairperson of the Board shall be a Director elected by the Board to serve in that capacity, who by virtue of his or position as Chairperson, also shall preside as chairperson of the Executive Committee.  The Chairperson of the Board shall, if present, preside at all meetings of the Board of Directors and exercise and perform such other powers and duties as may from time to time be assigned by the Board of Directors.  The Board may appoint Co-Chairpersons, in which event the Co-Chairpersons shall exercise their powers and perform their duties jointly in accordance with this Section 3.  If the Chairperson of the Board is not present, the President shall chair the meetings of the Board.

Section 4.    Dues, Fees and Assessments.  The Board may, from time to time, fix the amount of dues, fees and assessments to be paid by Directors.  If the Board, in its discretion, set dues, fees and/or assessments for Directors, each Director must pay, within the time and on the conditions set by the Board, the dues, fees and/or assessments set by the Board pursuant to this Section 3 and subject to the approval of the Board, a Director may pay all or part of his or her dues, fees and/or assessments with property other than cash, including the provision to the Association of such Director's services at a discount.

Section 5.    Qualifications.  Each Director of the Association shall be a natural person of at least eighteen (18) years of age, of good moral character and who enjoys a good reputation in the community, and who, by his or her experience, community interest, or prior action, demonstrates a willingness to devote time and talent to the affairs of the Association and to exercise his or her judgment with undivided loyalty to the Association.  A majority of the Directors shall be individuals who do not have any economic or financial interest in or employment relationship with the Association.

Section 6.    Vacancies.  Vacancies howsoever arising may be filled by vote of at least a majority of the remaining Directors at any regular or special meeting of the Board.  Any Director elected pursuant to this Section shall serve until the next Annual Meeting of the Board and, in each case, until his or her successor shall have been elected and qualified, subject however, to such replacement Director's earlier death, resignation or removal.

Section 7.    Resignation.  Any Director may resign at any time by giving written notice thereof to the Chairperson of the Board or the Secretary of the Association.  Any such resignation shall take effect on the date of receipt of such notice by one of the above-specified officers, or at such later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

304287723.3

Section 8.    <u>Removal</u>.  A majority of the Board may remove any Director with or without cause.  Cause shall exist where any Director has failed, without good cause, to attend within a year at least 50% of the regular meetings of the Board or Committees of the Board on which he or she serves; or who is deemed, in the determination of the Board of Directors (a) to have violated the Director's fiduciary obligation to the Association, any written policy of the Association, or any applicable law, rule or regulation, (b) to have otherwise damaged the goodwill or reputation of the Association, or (c) to no longer satisfy the qualifications for a Director set forth and/or referred to in Section 4 of this Article IV.

Section 9.    <u>Compensation</u>.  No Director shall receive any compensation in his or her capacity as a Director. Directors who are also officers or employees of the Association may receive compensation in such capacity.

Section 10.    <u>Conflict of Interest</u>. Directors shall exercise good faith in all transactions touching upon their duties as to the Association and its property.  No Director shall use his or her position, or knowledge gained therefrom, in any way that might give rise to a conflict between the interest of the Association and that of the individual Director.  The Board shall adopt a conflict of interest policy, and each Director and officer of the Association shall agree in writing to be bound thereby as a prerequisite to his or her qualification as a Director or officer, as the case may be.

## ARTICLE V

## MEETINGS OF THE BOARD OF DIRECTORS

Section 1.    <u>Regular and Annual Meetings</u>. The Board of Directors shall hold regular meetings at such time and place as determined by the Board or the Chairperson of the Board; provided, however, that the Board shall meet not less than three (3) times per year.  The Annual Meeting of the Board of Directors shall be held within a reasonable period of time following the Annual Meeting of the Members.  Notice of each meeting shall be mailed, electronically mailed, personally delivered or faxed to each Director at least five (5) days prior to the meeting to the Director's address (e-mail or fax number, as applicable) on the books of the Association.  Voting by proxy shall not be permitted at any meeting.

Section 2.    <u>Special Meetings</u>.  Special meetings may be held at any time upon call of the Chairperson of the Board, or upon call by any Director after the Chairperson of the Board, President or Secretary has received a written request for such a meeting signed by at least three (3) Directors.

Section 3.    <u>Quorum and Vote</u>.

(a)    A majority of the Directors then in office shall constitute a quorum at any regular meeting. Once a quorum is established, subsequent withdrawal of

-6-

individuals to less than a quorum shall not affect the validity of any subsequent action taken at the meeting.

(b)     Except as otherwise required by Delaware General Corporation Law or by these Bylaws, approval of any matter before the Board of Directors by a majority of the Directors present at the applicable meeting shall constitute approval of the applicable matter by the Board, <u>provided</u> that the affirmative vote of at least two-thirds of the entire Board (including all vacancies) shall be required to approve (i) any merger, consolidation or dissolution of the Association or the (ii) any sale, lease, or exchange of all or substantially all of the assets of the Association.

Section 4.     <u>Action by Directors Without a Meeting</u>.  Any action which may be taken at a meeting of the Board may be taken without a meeting if consent in writing setting forth such action is signed by all of the Directors. Such consent shall be filed in the minutes of the proceedings of the Board.

Section 5.     <u>Conduct of Meetings</u>.  Meetings of the Board of Directors and Committees of the Board of Directors shall be conducted in accordance with such rules as may be established by the Board of Directors.

Section 6.     <u>Meeting By Conference Telephone</u>.  One or more Directors may participate in a meeting of the Board of Directors by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other.  Participation in a meeting pursuant to this subsection shall constitute presence in person at such meeting.

Section 7.     <u>Waiver of Notice</u>.  Whenever any written notice is required to be given under the provisions of these Bylaws or Delaware General Corporation Law, such notice need not be given to any Director who submits a signed waiver of notice whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such Director.

## ARTICLE VI

## OFFICERS

Section 1.     <u>Officers</u>.  The officers shall be a President, one or more Vice Presidents, a Secretary, and a Treasurer (Chief Financial Officer), and such other officers as the Board of Directors shall determine to appoint.  The President shall have authority to appoint one or more Assistant Treasurers and Assistant Secretaries or such other subordinate officers as the President may determine in his or her sole discretion.  The President, each Vice President, the Secretary and the Treasurer must be members of the Board.  Any two or more offices may be held by the same person, except the offices of President and Secretary.

-7-

**EXHIBIT B**
Exhibit 1

**Page 60**
Page 78

Section 2.    Election and Term of Office; Vacancies.    Except as otherwise provided in any written employment agreement between an officer and the Association, the President, Vice Presidents, Secretary, and Treasurer (Chief Financial Officer), and such other officers as the Board shall determine to appoint, shall be appointed by the Board at each Annual Meeting of the Board of Directors, and the Assistant Treasurers, Assistant Secretaries and other subordinate officers, if any, shall be appointed by the President at such time or times as the President determines.    The officers shall be appointed by the Board.  Each officer shall hold office for terms of two (2) years (or such shorter or longer period as may be specified in these Bylaws) and until his or her successor is duly appointed and qualified, except to the extent provided to the contrary in any contract of employment between such officer and the Association which was approved by the Board, and subject to each such officer's earlier death, resignation, or removal.  Vacancies howsoever arising in any office to be filled by the Board (including without limitation vacancies in newly established offices created by the Board) may be filled by vote of the Board, at any regular or special meeting of the Board, and vacancies howsoever arising in any officer to be filled by the President may be appointed by the President at any time.  Officers appointed to fill vacancies or otherwise appointed mid-year shall serve until the next annual meeting of the Board and the appointment of their successor, subject to each such officer's earlier death, resignation or removal.  Nothing contained herein shall be construed as prejudicing any officer's rights with respect to compensation under any written employment agreement with the Association.

Section 3.    President.    The President shall be the chief executive officer of the Association, an *ex officio* voting Director, and shall preside at all meetings of the Board in the absence of the Chairperson of the Board.  The President shall have all authority and responsibility necessary to operate the Association in all its activities, subject only to the policies and oversight of the Board.  The President shall perform such other duties as are customarily incident to the office, and such other authority and duties appropriate to such office as may be assigned by the Board.

Section 4.    Vice Presidents.    The Vice Presidents (when one or more such persons are in office), in the order of their standing, shall perform the duties of the President when for any reason the President is unable to perform the same.

Section 5.    Secretary.    The Secretary shall keep and properly record the minutes of the proceedings of the Board and all Committees; maintain a correct list of the names and addresses of the Association's Members; keep or cause to be kept at the principal office of the Association copies of the Association's Certificate of Incorporation and Bylaws, each as amended to date; notify officers of their election and Committee members of their appointment; attend all meetings of the Members and the Board; give notice of all meetings of the Members, the Board and the Committees; have custody of the corporate seal and of all books and papers pertaining to the office and shall perform all duties customarily incident to the office, and shall have such other authority and perform such other duties appropriate to such office as may be assigned by the Board.

-8-

Section 6.     Treasurer.  The Treasurer shall be the Chief Financial Officer and shall receive and have custody of all funds, money and income of the Association and not otherwise specifically provided for by the Board, and shall deposit same in such depository or depositories as the Board shall designate.  The Treasurer shall perform all duties, customarily incident to the office, and such other authority and duties appropriate to such office as may be assigned by the Board.

Section 7.     Resignation.  Any officer may resign at any time by giving written notice thereof to the President or the Secretary.  Any such resignation shall take effect on the date of receipt of such notice by one of the above-specified officers, or at such later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 8.     Removal.  Except as otherwise may be provided in a separate, written employment agreement, any officer of the Association may be removed, with or without cause, by the Board whenever in the judgment of the Board the best interests of the Association will be served thereby.  Nothing contained herein shall be construed as prejudicing any officer's rights with respect to compensation due under any written employment agreement with the Association.

Section 9.     Salaries.  The salaries of the officers shall be fixed from time to time by the Board and no officer shall be prevented from receiving a salary by reason of the fact that the officer is also a Director.

## ARTICLE VII

## COMMITTEES OF THE BOARD OF DIRECTORS

Section 1.     Executive Committee.  The Board shall maintain an Executive Committee consisting of individuals then serving in the offices of President, one or more Members appointed by the Board and at least two (2) Directors appointed by the Board, one of whom shall be the Chairperson of the Board.  The Executive Committee shall be a standing committee of the Board.  The Chairperson of the Board shall preside over all meetings of the Executive Committee.  Subject to the provisions of this Article, Delaware General Corporation Law and any express resolution of the Board, when the Board is not in session, the Executive Committee shall have and may exercise the authority of the Board permitted by these Bylaws in the management of the affairs of the Association.  The Executive Committee shall meet at such times as shall be determined by the Board.

Section 2.     Audit Committee. The Board shall maintain an Audit Committee consisting of at least three (3) Directors appointed by the Board.  The Audit Committee shall be a standing committee of the Board.  The Audit Committee shall cause to be audited the accounts of the Association at the close of each year prior to the annual meeting of the Association, shall render a full report to the Association at its annual

-9-

**EXHIBIT B**
Exhibit 1

**Page 62**
Page 80

meeting, and shall have such other responsibilities and authority as designated by the Board by resolution from time to time. The Audit Committee shall meet at such times as shall be determined by the Board.

Section 3.  <u>Governance Committee</u>.  The Board shall maintain a Governance Committee consisting of at least two (2) Directors appointed by the Board.  The Governance Committee shall be a standing committee of the Board.  The Governance Committee shall have all powers and authorities of the Board under Article IV to nominate persons for election as officers in the positions described in Article VI, and, bearing in mind the qualifications of Directors described in Article IV, to nominate persons for election to the Board at any regular, special or annual meeting.  The Governance Committee shall also consider and report periodically to the Board on all matters relating to the duties of Directors and the members of committees, and shall make recommendations to the Board concerning the size of the Board and structure of the committees of the Board.  The Governance Committee shall also assist the Board with oversight of corporate governance matters.  The Governance Committee shall meet at such times as shall be determined by the Board, and shall notify the Secretary of the names of candidates to be presented for election as officers or Directors in sufficient time for such names to be included in the notice of the applicable meeting.

Section 4.  <u>Advisory Committees</u>.  The Board may establish one or more advisory committees to the Board.  The members of any advisory committee may consist of Directors, Members, non-Directors or non-Members and may be appointed as the Board so determines.  Advisory committees may not exercise the authority of the Board to make decisions on behalf of the Association, but shall be restricted to making recommendations to the Board or Board Committees, and implementing Board or Board Committee decisions and policies under the supervision and control of the Board or Board Committees.

Section 5.  <u>Other Standing or Special Committees</u>.  Other standing or special Committees may be created by the Board as it may deem necessary each consisting of at least two (2) Directors, one of whom shall serve as the Chair of such Committee.  The other members and chairs of each committee shall be appointed by the Board from among the Directors, the Members and the officers, all of which shall serve at the pleasure of the Board.  Each Committee member shall serve until he or she is removed or his or her successor is appointed or the Committee is dissolved.

Section 6.  <u>Quorum</u>.  A majority of the members of a Committee then in office shall constitute a quorum for the transaction of business, except as otherwise provided by these Bylaws.  Once a quorum has been established, subsequent withdrawal of Committee members so as to reduce the number of members present to less than a quorum shall not affect the validity of any subsequent action taken at the meeting.

-10-

**EXHIBIT B**
Exhibit 1

Section 7.    <u>Action of the Committees</u>. The action of a majority of the members of a Committee present at any Committee meeting at which a quorum is present shall be the act of such Committee, except as otherwise provided by these Bylaws or as directed by the Board.  Any member of a Committee may participate in a meeting thereof by means of a conference telephone or similar device by which all persons can hear all other persons participating in the meeting at the same time.  Any Committee action may be taken without a meeting if all members of such Committee consent in writing.

Section 8.    <u>Procedures</u>.  Procedures of all Committees shall be governed by rules fixed by the Board.  All Committee members shall serve at the pleasure of the Board, subject to the provisions of Section 9 of this Article VII.

Section 9.    <u>Meetings</u>.  Committees shall function under the direction of the Board of Directors and except to the extent required to meet more frequently pursuant hereto shall meet as often as necessary to transact their business and shall make such reports as they may deem necessary or which may be specifically required of them.

Section 10.    <u>Resignation</u>.  Any Committee member may resign at any time by giving written notice thereof to the President or the Secretary of the Association.  Any such resignation shall take effect on the date of receipt of such notice by one of the above-specified officers, or at such later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 11.    <u>Removal</u>.  Any Committee member may be removed, with or without cause, by the Board whenever in the judgment of the Board of Directors the best interests of the Association will be served thereby.

Section 12.    <u>Vacancies</u>.  Vacancies in any Committee howsoever arising may be filled by vote of the Board at any regular or special meeting of the full Board, except as otherwise provided by these Bylaws.  Committee members appointed pursuant to this Section shall serve for the unexpired portion of the term of the Committee member whose death, resignation or removal gave rise to the applicable vacancy, and until his or her successor shall have been elected and qualified, subject however, to such replacement Committee member's earlier death, resignation or removal.

## ARTICLE VIII

## RESTRICTED FUNDS

Section 1.    The Association may accept funds that are given, granted, bequeathed or devised to or otherwise vested in the Association for a specific purpose. The Board shall apply all such funds only to such purposes as may be specified in the gift instrument and to the payment of the reasonable and proper expenses of the administration of such funds. The Board shall cause accurate accounts to be kept of such

-11-

funds separate and apart from the accounts of other assets of the Association.  Nothing in this Article VIII shall limit the provisions of Article VII, Section 1 of these Bylaws.

## ARTICLE IX

### FISCAL YEAR AND ANNUAL REPORT

Section 1.        <u>Fiscal Year</u>.  The Fiscal Year of the Association shall terminate on March 31 of each calendar year.

Section 2.        <u>Annual Report</u>. As soon as may be convenient following the close of the Fiscal Year, the Board may cause to be published for general distribution an Annual Report containing such information regarding the work and affairs of the Association and its affiliates for the preceding Fiscal Year as in its discretion may be deemed advisable.

## ARTICLE X

### SEAL

Section 1.        The Seal of the Association shall be selected by the Board and an impression of the same shall be made in the minute book immediately following the entry of this Article.

## ARTICLE XI

### LIABILITY OF DIRECTORS

Section 1.        <u>Standard of Care and Fiduciary Duty</u>.  Each Director shall stand in a fiduciary relation to this Association and shall perform his or her duties as a Director, including his or her duties as a member of any Committee of the Board upon which the Director may serve, in good faith, in a manner the Director reasonably believes to be in the best interests of the Association, and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. In performing his or her duties, each Director shall be entitled to rely in good faith on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following:

(a)        one or more officers or employees of the Association whom the Director reasonably believes to be reliable and competent in the matters presented;

-12-

(b)    counsel, public accountants or other persons as to matters which the Director reasonably believes to be within the professional or expert competence of such persons; and

(c)    a Committee of the Board of the Association upon which the Director does not serve, as to matters within its designated authority, which Committee the Director reasonably believes to merit confidence.

A Director shall not be considered to be acting in good faith if the Director has knowledge concerning the matter in question that would cause his reliance to be unwarranted. It shall not be a breach of fiduciary duty for a Director to have an interest in a business entity doing business with the Association provided that the standards set forth in Section 8 of Article IV and Section 1 of Article VIII are met.

Section 2.    Preservation of Rights.  Any repeal or modification of this Article by the Board shall not adversely affect any right or protection existing at the time of such repeal or modification to which any Director or former Director may be entitled under this Article. The rights conferred by this Article shall continue as to any person who has ceased to be a Director of the Association and shall inure to the benefit of the heirs, executors, and administrators of such person.

## ARTICLE XII

## INDEMNIFICATION

Section 1.    Right to Indemnification.  Each person who was or is a party or is threatened to be made a party to or is involved (as a party, witness, or otherwise), in any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative (hereinafter a "Proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a Director, officer, employee, or agent of the Association or is or was serving at the request of the Association as a director, officer, employee, or agent of another corporation or of a partnership, joint venture, trust, or other enterprise, including service with respect to employee benefit plans, whether the basis of the Proceeding is alleged action in an official capacity as a director, officer, employee, or agent or in any other capacity while serving as a director, officer, employee, or agent (hereafter an "Agent"), shall be indemnified and held harmless by the Association to the fullest extent authorized by Delaware General Corporation Law, as the same exists or may hereafter be amended or interpreted (but, in the case of any such amendment or interpretation, only to the extent that such amendment or interpretation permits the Association to provide broader indemnification rights than were permitted prior thereto) against all expenses, liability, and loss (including attorneys' fees, judgments, fines, excise taxes or penalties imposed under the Employee Retirement income Security Act of 1974, as amended, and amounts paid or to be paid in settlement, and any interest, assessments, or other charges imposed

-13-

thereon, and any federal, state, local, or foreign taxes imposed on any Agent as a result of the actual or deemed receipt of any payments under this Article) reasonably incurred or suffered by such person in connection with investigating, defending, being a witness in, or participating in (including on appeal), or preparing for any of the foregoing in, any Proceeding (hereinafter "Expenses"); provided, however, that the right to indemnification conferred in this Article shall be a contract right.

Section 2.    Authority to Advance Expenses.  Expenses incurred by an officer or Director (acting in his capacity as such) in defending a Proceeding shall be paid by the Association in advance of the final disposition of such Proceeding, provided, however, that if required by Delaware General Corporation Law, as amended, such Expenses shall be advanced only upon delivery to the Association of an undertaking by or on behalf of such Director or officer to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the Association as authorized in this Article or otherwise.  Expenses incurred by other Agents of the Association (or by the directors or officers not acting in their capacity as such, including service with respect to employee benefit plans) may be advanced upon such terms and conditions as the Board deems appropriate.  Any obligation to reimburse the Association for Expense advances shall be unsecured and no interest shall be charged thereon.

Section 3.    Right of Claimant to Bring Suit.  If a claim under Section 1 or 2 of this Article is not paid in full by the Association within ninety (90) days after a written claim has been received by the Association, the claimant may at any time thereafter bring suit against the Association to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall be entitled to be paid also the expense (including attorneys' fees) of prosecuting such claim.  It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending a Proceeding in advance of its final disposition where the required undertaking has been tendered to the Association) that the claimant has not met the standards of conduct that make it permissible under Delaware General Corporation Law for the Association to indemnify the claimant for the amount claimed.  The burden of proving such a defense shall be on the Association.  Neither the failure of the Association (including its Board of Directors or independent legal counsel) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper under the circumstances because he or she has met the applicable standard of conduct set forth in Delaware General Corporation Law, nor an actual determination by the Association (including its Board of Directors or independent legal counsel) that the claimant had not met such applicable standard of conduct, shall be a defense to the action or create a presumption that claimant has not met the applicable standard of conduct.

Section 4.    Provisions Nonexclusive.  The rights conferred on any person by this Article shall not be exclusive of any other rights that such person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, agreement, vote of disinterested directors, or otherwise, both as to action in an official

304287723.3

capacity and as to action in another capacity while holding such office.  To the extent that any provision of the Certificate, agreement, or vote of the disinterested directors is inconsistent with these Bylaws, the provision, agreement, or vote shall take precedence.

Section 5.    Authority to Insure.  The Association may purchase and maintain insurance to protect itself and any Agent against any Expense, whether or not the Association would have the power to indemnify the Agent against such Expense under applicable law or the provisions of this Article.

Section 6.    Survival of Rights.  The rights provided by this Article shall continue as to a person who has ceased to be an Agent and shall inure to the benefit of the heirs, executors, and administrators of such a person.

Section 7.    Settlement of Claims.  The Association shall not be liable to indemnify any Agent under this Article (a) for any amounts paid in settlement of any action or claim effected without the Association's written consent, which consent shall not be unreasonably withheld; or (b) for any judicial award if the Association was not given a reasonable and timely opportunity, at its expense, to participate in the defense of such action.

Section 8.    Effect of Amendment.  Any amendment, repeal, or modification of this Article shall not adversely affect any right or protection of any Agent existing at the time of such amendment, repeal, or modification.

Section 9.    Subrogation.  In the event of payment under this Article, the Association shall be subrogated to the extent of such payment to all of the rights of recovery of the Agent, who shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Association effectively to bring suit to enforce such rights.

Section 10.    No Duplication of Payments.  The Association shall not be liable under this Article to make any payment in connection with any claim made against the Agent to the extent the Agent has otherwise actually received payment (under any insurance policy, agreement, vote, or otherwise) of the amounts otherwise indemnifiable hereunder.

## ARTICLE XIII

## GENERAL PROVISIONS

Section 1.    Transactions with Interested Parties.  No transaction or agreement between the Association and one or more of the Directors, officers or Members, or between the Association and any corporation, partnership, limited liability company, association or other organization in which one or more of the Directors, officers or Members of the Association are directors or officers, or have a financial interest therein,

-15-

shall be void or voidable solely for this reason or solely because the Director, officer or Member is present or participates in the meeting of the Board or a committee of the Board which authorizes the transaction or agreement or solely because his or their votes are counted for such purpose, if:

      (a)    The material facts as to his or their relationship or interest and to the transaction or agreement are disclosed or are known to the Board or committee, and the Board or committee in good faith authorizes the transaction or agreement by the affirmative votes of a majority of the disinterested directors or committee members, even though the disinterested directors or committee members, together, may constitute less than a quorum;

      (b)    The material facts as to his or their relationship or interest and to the transaction or agreement are disclosed or are known to the Members entitled to vote thereon, and the transaction or agreement is disclosed or is known to the Members entitled to vote thereon, and the transaction or agreement is specifically approved in good faith by vote of the Members entitled to vote thereon; or

      (c)    The transaction or agreement is fair to the Association as of the time it is authorized, approved or ratified, by the Board, a committee of the Board or the Members.

Section 2.    <u>Severability</u>.  Any determination that any provision of these Bylaws is for any reason inapplicable, illegal or ineffective shall not affect or invalidate any other provision of these Bylaws.

Section 3.    <u>Effective Date</u>.  These Bylaws shall become effective immediately upon their adoption.  Amendments to these Bylaws shall become effective immediately upon adoption unless the Board is adopting them expressly to become effective at a later date.

Section 4.    <u>Laws</u>.  Notwithstanding anything contained in these Bylaws to the contrary, these Bylaws shall apply to the Members as shall be interpreted in a manner consistent with all federal and state laws and Delaware General Corporation Law.

Section 5.    <u>Inspection by Directors</u>.  Every Director shall have the absolute right at any reasonable time to inspect all books, records and documents of every kind and the physical properties of the Association.  This inspection by a Director may be made in person or by an agent or attorney, and the right of inspection includes the right to copy and make extracts of documents.

Section 6.    <u>Counsel</u>.  The Board shall be authorized to retain legal counsel for the Association.

-16-

Section 7.    Accounting Firm, Auditors.    The Board shall be authorized to retain an accounting firm and auditors for the Association.

Section 8.    Exempt Activities.    Notwithstanding anything to the contrary contained herein, no Director, officer, employee or agent of the Association shall take any action or carry on any activity by or on behalf of the Association not permitted to be taken or carried on by an organization exempt under Section 501(c)(6) of the Code, as it now exists or is hereafter amended.

## ARTICLE XIV

## REVIEW & AMENDMENTS

These Bylaws shall be reviewed at least annually.   These Bylaws and the Certificate of Incorporation may be amended or repealed and new Bylaws and a new Certificate of Incorporation adopted at any regular meeting of the Board or at any special meeting of the Board called for that purpose, provided that notice of any such proposed amendment, repeal or adoption of Bylaws or Certificate of Incorporation shall have been given to the Board at least twenty days prior to such regular or special meeting and that a copy of the proposed amendment or new Bylaws or new Certificate of Incorporation shall have been mailed to each Director with the notice of the meeting.

-17-

## CERTIFICATE OF SECRETARY

I, the undersigned, being the Secretary of National Association of Television Program Executives, Inc., hereby certify that the above Second Amended and Restated Bylaws were adopted as the Bylaws of this Association pursuant to the consent of the Members so required, effective June 14, 2018.  These Fourth Amended and Restated Bylaws are, as of the date of this certification, the duly adopted and existing Bylaws of this Association.

IN WITNESS WHEREOF, I have set my hand this August 10, 2020.

_____
JP Bommel, President & CEO

-18-

304287723.3

# EXHIBIT C

Exhibit 1                                                    Page 90

# PETER
# LAW
# GROUP

**270 Coral Circle**　　**(310) 277-0010 (Office)**
**El Segundo, California 90245**　　**(310) 432-0599 (FAX)**　　**www.peterlawgroup.com**

ARNOLD P. PETER
apeter@peterlawgroup.com
(310) 432-0500 (Direct)

### MEMORANDUM

### CONFIDENTIAL COMMUNICATION
### ATTORNEY/CLIENT PRIVILEGE AND
### ATTORNEY WORK PRODUCT DOCTRINE

DATE:        March 23, 2022

TO:          Andy Kaplan
             Chairman, Board of Directors
             National Association of Television Program Executives

SUBJECT:     *JP Bommel Employment Agreement and Deferred Compensation Payment*

## BACKGROUND

JP Bommel commenced his employment with NATPE as Managing Director and Chief Operating Officer (COO), effective August 11, 2015, pursuant to a written employment agreement ("Initial Agreement," attached hereto as Exhibit A). The Initial Agreement contained a two-year term, with a one-year option, exercisable at NATPE's discretion ("Option"). The Option contained an "evergreen" clause whereby the one-year extension was deemed exercised if NATPE did not inform JP of non-renewal at least 180 days prior to the end of the two-year contract term.

**EXHIBIT C**　　　　　　　　**Page 72**
Exhibit 1　　　　　　　　　　Page 91

Andy Kaplan
March 23, 2022
Page 2

By a written Amendment (Amendment), dated January 24, 2017, JP was promoted to NATPE's President and Chief Executive Officer. Under the Amendment, the evergreen Option provision was eliminated and replaced with a four-year term. The Amendment is attached hereto as Exhibit B.

Prior to the end of the four-year Amendment term, in June 2020, NATPE agreed that JP could relocate to New York for the final contract year (September 8, 2020, through September 7, 2021). In addition, JP and NATPE agreed that the contract term could be extended for an additional year (September 8, 2021, through September 7, 2022). This one-year option had to be exercised not later than 90 days before the start of the final contract year (September 8, 2021). It is my understanding that the one-year option was triggered because NATPE did not provide notice 90 days before September 8, 2021, because I have not seen any such renewal document. JP's contractual obligations to NATPE will end on September 7, 2022.

## COVID-RELATED RESTRUCTURING AND DEFERRED COMPENSATION

In light of the COVID shutdown and resulting decline in revenue, in November 2020, I worked with JP to implement an organizational restructuring that, along with outsourcing and/or eliminating various forms of overhead, included the elimination of the Chief Financial Officer position. In addition, JP implemented an aggressive salary decrease amounting to a cumulative salary reduction of 50.97% for the remaining top five NATPE executives (including JP). The individual salary reductions are described in Exhibits C and D hereto. The cumulative reduction is set forth in Exhibit D and delivered $570,439.13 in salary savings to NATPE.

Under the restructuring plan, the salaries would be restored to their original levels effective April 1, 2020, if NATPE exceeded its 2022 Fiscal Year projected net revenue by at least 3 percent. NATPE did not meet this benchmark. Therefore, all key executive salaries remain at the levels set forth in Exhibit D.

In addition to the salary reduction, JP implemented a plan to retain NATPE's four highest paid and key executives: JP, Wayneston Harbeson, Doug Finberg and Charlie Weiss. Without these executives, NATPE would have been unable to operate.

**EXHIBIT C**                                                    **Page 73**
Exhibit 1
Page 92

Andy Kaplan
March 23, 2022
Page 3

Under this retention program, NATPE agreed to provide an incentive in the form of a "Deferred Compensation" payment equal to the amount each executive would have received through March 31, 2022, if paid their original salaries.  The Deferred Compensation payments are set forth in Exhibit D and range from $57,749.88 for Wayneston Harbeson to $204,025.02 for JP.

Please note that JP's Deferred Compensation amount covers a 16-month period (December 1, 2021 through March 31, 2022), along with a mandatory contractual retention payment equal to 10% of JP's base salary. Along with the obligatory 10% retention payment, the Board may elect to pay a discretionary bonus equal to 30% of JP's base salary.

Payments to all executives covered by the Deferred Compensation program have been discharged, with the exception of JP.  Specifically, Wayneston was paid the amount due, JP negotiated and paid a different amount to Charlie (which addressed and included unpaid commissions), and Doug was not eligible to receive the payment as he is no longer with NATPE.


RECOMMENDATIONS

1.  NATPE is contractually bound to make the deferred compensation payment to JP in the amount of  $204,025.02.  Therefore, this payment should be made in the first payroll cycle of April 2022.

2.  The Board should make a determination whether JP will receive an additional discretionary bonus under the terms of his employment agreement.

3.  JP's agreement with NATPE as President and Chief Executive Officer will expire on September 7, 2022.  Therefore, the Board should determine whether to enter into a new agreement with JP that, for the sake of clarity, replaces the prior agreements and amendments.

**EXHIBIT C**          **Page 74**
Exhibit 1                Page 93

# EXHIBIT A

Initial Employment Agreement

August 11, 2015

**EXHIBIT C**                                    **Page 75**
Exhibit 1                                          Page 94



**CONTENT FIRST**

Dear JP                                                                August 14, 2015

Attached is our final term agreement that shall serve as your contract with
NATPE. Congratulations!

Rod Perth
President and CEO

JP Bommel - Offering Employment Letter & Term Sheet - August 11, 2015

**Responsibilities:**

- Effective start date is: September 8, 2015 for two years.

- Position title: Managing Director, Chief Operating Officer

- The Managing Director will oversee all day-to-day operations,
  management and strategic planning for the organization.

- The Managing Director will have full P & L responsibility for the
  organization under budgets approved by the Board of Directors in
  consultation with Mr. Bommel.

- The Managing Director will be responsible for managing costs and
  achieving or surpassing yearly revenue objectives as shall be determined
  by the Executive Committee and the COO.

- The Managing Director will oversee hiring and firing of personnel as well
  as managing all staff matters. In matters that may involve dismissing an
  employee, to minimize potential negative repercussions, Mr. Bommel is
  obligated to fully inform the board chair of those decisions.

**Rod Perth**
5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-1621
Fax 310-453-6019

**EXHIBIT C**                                    **Page 76**
Exhibit 1                                         Page 95

**natpe.**
**CONTENT FIRST**

- The Managing Director will report to the Board, on at least a quarterly basis

- The Managing Director will communicate more regularly with the Executive Committee of the Board and the various board committees, as is reasonably needed/requested.

- The Managing Director will be responsible for adhering to, and respecting all requirements of a non-profit as required by the by-laws.

- The Managing Director will, in coordination with the Board, oversee the development of a vision and strategic plan for the business as shall be mutually determined between them.

- The Managing Director will have direct responsibility - with the board of director's input – for final approval for the organization's annual markets and conferences.

- The Managing Director will oversee the development and implementation of other programs, events, etc., as he shall determine in collaboration with the board of directors, as part of his overall responsibilities.

- The Managing Director will to the best of his ability, inspire and manage the team by setting the example for high standards, customer service, and building morale and a positive culture.

- The Managing Director will develop a plan to grow NATPE's business through acquisitions or organic growth.

- The Managing Director will serve as the chief spokesperson for the organization, in consultation with the Executive Committee of the Board.

**EXHIBIT C**                    **Page 77**
Exhibit 1
Page 96



**CONTENT FIRST**

**Reporting Relationship:**

- After the management hand-off from Mr. Perth to Mr. Bommel (no later than May 8, 2016), Mr. Bommel will report to the Chair of the Board of Directors or a board member designee, the Executive Committee, and the full Board of Directors. Mr. Bommel's title will be effective upon his start date of September 8, 2015 (Mr. Perth will continue to be involved with NATPE as a board member, and most likely in some sort of ongoing "project/consulting" basis determined by the board's view of needs for those services).

- As agreed, the NATPE Board of Directors will consider adding him to the board in year two of his contract, subject to approval of the full board.

**Location:**

- Los Angeles, California. In connection with the move from New York to Los Angeles, NATPE will reimburse moving and legal expenses for furniture etc. (with receipts) up to $10,000.

**Terms:**

- Base salary: $350,000 per year.

- Discretionary bonus: up to 30% of base salary, based on achievement of yearly goals to be mutually determined by the COO and the Executive Committee. Bonus can potentially exceed 30% to a maximum of 50% with extraordinary circumstances and results. Objectives for bonus calculation to be mutually agreed upon between Executive Committee and JP Bommel within 90 days of start date and will include both measurable analytics and discretionary evaluation.

Rod Perth ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■
5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-1821
Fax 310-453-6019

**EXHIBIT C**                    **Page 78**
Exhibit 1                         Page 97



**CONTENT FIRST**

**Contract:**

- Two-year contract followed by a one-year option at the option of the Board of NATPE. If Mr. Bommel is not notified of non-renewal at least 180 days prior to the end of the two-year term, Mr. Bommel's third year option is automatically triggered.

- For every year after the second year, Mr. Bommel will be given at least 120 days notice of non-renewal absent which the contract will automatically renew for another year.

- Compensation Committee will determine a discretionary yearly increase based on performance, which increase shall not be less than 5% of Mr. Bommel's prior year's salary.

**Travel:**

- Business Class (or one class higher than coach) for all flights greater than 4 hours.

**Severance:**

- If terminated not "for cause," the balance of the term, but no less than 120 days. Mr. Bommel is not obligated to mitigate and no right to set off.

- NATPE will not cover costs of relocation in the case of termination

**Benefits:**

- Benefits will be commensurate with Mr. Bommel's level, which includes health and life insurance. The NATPE Benefits Plan and employee handbook will be supplied under separate cover.

- Mr. Bommel will have option to participate in the 401(k) plan subject to the rules of the plan, which has a six-month waiting period. Company contributions are capped at 4%.

**Rod Perth**
5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-1621
Fax 310-453-6019

**EXHIBIT C**                **Page 79**
Exhibit 1                      Page 98



**Vacation/Illness:**

- Three weeks of vacation in addition to all company holidays, and three weeks of medical, as needed.

On behalf of everyone on the board, congratulations and welcome to NATPE!

**Rod Perth**
5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-1621
Fax 310-453-6019

**EXHIBIT C**                    **Page 80**
Exhibit 1                         Page 99

Benefits:

- Benefits will be commensurate with Mr. Bommel's level, which includes health and life insurance. The NATPE Benefits Plan and employee handbook will be supplied under separate cover.

- Mr. Bommel will have option to participate in the 401(k) plan subject to the rules of the plan, which has a six-month waiting period. Company contributions are capped at 4%.

Vacation/Illness:

- Three weeks of vacation in addition to all company holidays, and three weeks of medical, as needed.

On behalf of everyone on the board, congratulations and welcome to NATPE!


_____      8/11/15
Rod Perth                            Date
President & CEO


_____      8-11-15
Andy Kaplan                          Date
Chairman of NATPE Board


_____      8/4/15
JP Bommel                            Date

BHP

4

**EXHIBIT C**                        **Page 81**
Exhibit 1                            Page 100

# EXHIBIT B

Amendment

January 24, 2017

**EXHIBIT C**
Exhibit 1



Dated as of January 24, 2017

JP Bommel
1430 N Harper Ave #407
Los Angeles, CA 90046

Dear Mr. Bommel:

Reference is made to that certain Letter Agreement between JP Bommel ("you") and NATPE ("NATPE") dated August 14, 2015, as said agreement may have been heretofore amended and/or modified and which agreement is in full force and effect as of the date hereof (the "Agreement").  Except as otherwise provided herein, all capitalized terms not specifically defined herein will have the same meanings ascribed to them in the Agreement.

Notwithstanding anything to the contrary contained in the Agreement, in consideration of the promises, covenants, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned hereby mutually agree that the Agreement shall be deemed to be amended effective as of the date first written above (the "Effective Date") as set forth below:

    1. The Responsibilities Section, Effective Start Date: is hereby amended by deleting "two years", and replacing it with four years.

    2. The Responsibilities Section, Position Title: is hereby amended by deleting "Chief Operating Officer" and replacing it with President and Chief Executive Officer.

    3.  The Contract Section: is hereby amended by deleting "Two-year contract followed by a one-year option of the Board of NATPE. If Mr. Bommel is not notified of non-renewal at least 180 days prior to the end of the two-year term, Mr. Bommel's third year option will automatically triggered", and replacing it with Four-year contract.

    4.  The Vacation/Illness Section is hereby amended by deleting "Three Weeks" and replacing it with Four weeks.

    5.  Except as expressly modified in this agreement, all other terms and conditions of the Agreement are hereby ratified and affirmed and will remain in full force and effect.

    6.  This amendment may be executed by the parties in one (1) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This amendment shall not be effective until the execution and delivery between the parties of at least one (1) set of the counterparts.  A signed copy of this amendment delivered by facsimile transmission or by electronic mail will be deemed to have the same legal effect as delivery of an original signed copy of this amendment and any such signature transmitted by means of facsimile or electronic mail file will be deemed an original and valid signature hereto.

ACCEPTED AND AGREED:                                          NATPE

_____                    _____
JP BOMMEL                                                    ANDY KAPLAN

5757 WILSHIRE BOULEVARD – PH 10 – LOS ANGELES  CA 90036

EXHIBIT C                    Page 83
Exhibit 1
Page 102

# EXHIBIT C

## Deferred Compensation #1

**EXHIBIT C**                    **Page 84**
Exhibit 1                    Page 103

# EXHIBIT D

## Deferred Compensation #2

**EXHIBIT C**
Exhibit 1

## Re: NATPE Restructuring

Andy Kaplan <andy@kaplanwright.com>
Wed 11/18/2020 5:16 PM
To: JP Bommel <jpbommel@natpeorg>

JP:

The Executive Committee has approved your plan. Thank you for continuing to make the tough choices.

Andy

> On Nov 16, 2020, at 11:24 AM, JP Bommel <jpbommel@natpe.org> wrote:
>
> Hi Andy,
> I hope you are well. I have been working with Arnold with the ultimate goal to reduce our payroll costs and ensure retention for some of our executive team members through a deferred compensation program. Attached is a memo that outlines the restructuring along with a cost-saving analysis spreadsheet.
>
> I am onboarding the Pery Group this afternoon as we are transitioning Jon's duties.
>
> Please let me know if you have any questions or concerns. As always I thank you for your support in these difficult times. I am confident it will position us best for a recovery in fiscal 2022.
>
> Sincerely,
>
> JPB
>
> JP Bommel
> President and CEO
> Direct: +1 (917) 602-2320
> New York | Los Angeles | Miami | London | Paris | Mumbai
> Email; jpbommel@natpe.org
> <image001.jpg>
> The contents of this e-mail message and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or phone and delete this message and its attachments, if any.
>
>
> <11-16-20 Memo to A Kaplan.docx><Deferred Executive Salary modeling 2021 - 2022.xlsx>

**EXHIBIT C**                    **Page 86**
Exhibit 1
Page 105

To:            Andy Kaplan

From:          JP Bommel

Subject:       Executive Salary Reductions

Date:          November 16th, 2020

Andy,

As we discussed, to address the significant downturn in revenue for NATPE due to the global COVID-19 pandemic, I am taking immediate steps to reduce our payroll costs.  First, I am eliminating the position of Chief Financial Officer effective November 13, 2020.  Second, effective December 1, 2020, I am implementing an aggregate salary reduction of 50.97% for the remaining top five NATPE executives (including myself).  The individual salary reductions are described in the attached.

If NATPE exceeds its 2022 Fiscal Year projected net revenue by at least 3 percent, I recommend a payment to each of the impacted executives equal to the amount of their salary reduction, through March 31, 2020.  These amounts which we are describing as "deferred salary payments" are also set out in the attached.  In addition, assuming we meet this target, we will restore each of these executives' salary to their original levels, effective April 1, 2020.

As I am the only executive under contract, if we meet the above target, I also request a guaranteed bonus of ten percent (10%) of my pre-reduction base salary which amount may be increased by the Board in its discretion to a maximum of thirty percent (30%).  This bonus would be payable no later than March 31, 2022.

Thank you for your continued support and let me know if you have any questions.

**EXHIBIT C**                    **Page 87**
Exhibit 1                       Page 106

**NATPE MODELING - DEC 1ST 2020 / MAR 31ST 2022**

Executive Manangement Compensation

| First | Last | Annual Salaries | Revised as of 12/1/2020 | Annual Reduction | Monthly Salary reduction amount | Deferred Comp at 3/31/2022 | Notes | Deferred comp calc for the period |
|---|---|---|---|---|---|---|---|---|
| JP | Bommel | 397,451.34 | $258,343.37 | 139,107.97 | $11,592.33 | $204,025.02 | Contract includes discretionary bonus at 30%. Req not lower than 10% | $204,025.02 |
| Wayneston | Harbeson | 164,999.90 | $107,249.94 | 57,749.97 | $4,812.49 | $57,749.88 | If fiscal 2022 exceeds by 3% | $76,999.96 |
| Doug | Finberg | 175,000.02 | $113,750.01 | 61,250.01 | $5,104.16 | $61,249.92 | If fiscal 2022 exceeds by 3% | $81,666.68 |
| Charlie | Weiss | 174,999.90 | $113,749.94 | 61,249.97 | $5,104.16 | $61,249.92 | If fiscal 2022 exceeds by 3% | $81,666.62 |
| TOTAL | | 912,451.16 | $593,093.25 | 319,357.91 | $26,613.14 | $384,274.74 | If fiscal 2022 exceeds by 3% | $444,358.28 |

| | | |
|---|---|---|
| Jon | 251,081.22 | |
| Previous Salary Total | 1,163,532.38 | Total annual savings | 570,439.13 | -50.97% |

**EXHIBIT C**
Exhibit 1

**Page 88**
Page 107

# EXHIBIT D

Exhibit 1                                          Page 108

EXECUTION VERSION

# EXECUTIVE EMPLOYMENT AGREEMENT

THIS EXECUTIVE EMPLOYMENT AGREEMENT ("Agreement") is made and entered intoas of 1st day of April 2022 (the "Effective Date"), by and among The National Association of Television Program Executives (NATPE) and JP Bommel ("Executive").

## RECITALS

WHEREAS, JP Bommel commenced his employment with NATPE as Managing Director and Chief Operating Officer, effective August 11, 2015, pursuant to a written employment agreement ("Initial Agreement," attached hereto as Exhibit A).

WHEREAS, the Initial Agreement contained a two-year term, with a one-year option, exercisable at NATPE's discretion ("Option").

WHEREAS, the Option contained an "evergreen" clause whereby the one-year extension was deemed exercised if NATPE did not inform Executive of non-renewal at least 180 days prior to the end of the two-year contract term.

WHEREAS, by a written Amendment (Amendment) attached hereto as Exhibit B, dated January 24, 2017, Executive was promoted to NATPE's President, Chief Executive Officer and Member of NATPE Board,

WHEREAS, under the Amendment, the evergreen provision was eliminated and replaced with a four-year term which ended on September 7, 2021.

WHEREAS, prior to the end of the four-year Amendment term, in June 2020, NATPE agreed that Executive could relocate to the City and State of New York for the final contract year (September 8, 2020, through September 7, 2021).

WHEREAS, the option to extend the term of the Amendment  had to be exercised not later than Ninety (90) days before the start of the final contract year.

Page 1 of 15

EXECUTION VERSION

WHEREAS, the one year option was triggered because NATPE elected to not provide notice Ninety (90) before September 8, 2021, thereby extending the term of the Amendment through September 7, 2022.

WHEREAS, absent this Agreement, Executive's contractual obligations to NATPE ends on September 7, 2022.

WHEREAS, in light of the COVID shutdown and resulting decline in revenue, in November 2020, Executive worked with counsel to implement an organizational restructuring that, along with outsourcing and/or eliminating various forms of overhead, included the elimination of the Chief Financial Officer position.

WHEREAS, Executive, with the approval of the Executive Committee, also implemented an aggressive salary decrease due to the COVID shutdown for the remaining top five NATPE executives (including Executive).

WHEREAS, Executive proposed a reduction of his own base salary from $397,451.34 to $258,343.37.

WHEREAS, under the COVID restructuring, NATPE implemented a retention program and agreed to provide an incentive in the form of a "Deferred Compensation" payment equal to the amount each executive would have received through March 31, 2022, if paid their original salaries.

WHEREAS, Executive is entitled, as approved by the Executive Committee, to a Deferred Compensation payment of $204,025.02 payable by March 31st, 2022.

WHEREAS, NATPE desires to retain Executive in his current position on the terms and conditions set forth herein

WHEREAS, Executive desires to accept such employment on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises made herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged and agreed to by the parties hereto, the parties hereto agree as follows:

Page 2 of 15

EXECUTION VERSION

1.      Employment. NATPE shall employ Executive in the capacity of President, Chief Executive Officer and Member of NATPE Board and Executive hereby accepts the employment, on the terms and conditions hereinafter set forth.

2.      Duties.

a)      Primary Duties. During the Term, Executive shall report to the Chairman of NATPE Board of Directors (Board). Executive shall render such administrative and management services for NATPE as are (i) currently rendered by Executive, (iii) consistent with the duties of a President and Chief Executive Officer, and/or (iv) delegated to Executive by the Executive Committee in its respective discretion.

b)      The Executive will oversee hiring and firing of personnel as well as managing all staff matters.

c)      The Executive will have full Profit and Loss responsibility for NATPE under budgets approved by the Board and/or the Executive Committee.

d)      The Executive will have direct responsibility, with the Board, for final approval for the organization's annual markets and conferences.

e)      The Executive will, in coordination with the Board, oversee the development of a vision and strategic plan for NATPE as shall be mutually determined between them.

f)      The Executive will oversee the development and implementation of other programs, events, and related programs, as he shall determine in collaboration with the Board, as part of his overall responsibilities.

g)      The Executive will serve as the chief spokesperson for the NATPE, in consultation with the Executive Committee.

Page 3 of 15

h)     Other Activities. Executive agrees to perform Executive's duties and responsibilities for NATPE and to devote his full-time work duties to the performance thereof. Nothing herein shall preclude Executive from (i) engaging in charitable activities and community affairs, and (ii) managing his passive, personal investments; provided, that the activities set forth in clauses (i) and (ii) shall not interfere, individually or in the aggregate, in any material respect, with the performance of Executive's duties and responsibilities hereunder.

i)     Location of Service. During the Term, Executive shall perform Executive's  duties primarily from his residence in the City and State of New York. Executive may be reasonably required to travel in connection with the performance of his duties.

3.     Term. The term of Executive's employment shall begin (and the Agreement between Executive and NATPE shall terminate) on the Effective Date and shall expire on September 7, 2023 ("Term"), unless terminated earlier pursuant to paragraph 5 of this Agreement. Upon expiration of the Term, Executive's employment will terminate.

4.     Salary and Other Benefits.  During the Term, as compensation for the services to be rendered by Executive to NATPE pursuant to this Agreement, Executive shall be paid compensation and benefits, described herein,

a)     Base Salary. Commencing on the Effective Date, NATPE will pay Executive a base salary at the annual rate of Three Hundred Ninety-Seven Thousand, Four Hundred and Fifty-One Dollars and Thirty-Four Cents ($397,451.34), less all applicable taxes and withholdings ("Base Salary"), payable in accordance with NATPE's regular payroll policies.

b)     Discretionary Bonus. Executive will be eligible to receive an annual bonus in the discretion of NATPE with a target of thirty (30%) of Executive's Base Salary, payable within thirty (30) days after the end of NATPE's current fiscal year. The bonus may potentially exceed 30% to a maximum of 50% based on extraordinary circumstances and results. The objectives for bonus calculation shall be mutually agreed upon between NATPE's Executive Committee and Executive within 90 days of the Effective Date and will include both measurable analytics and discretionary evaluation.  Executive must remain employed by NATPE through the end of the Term,

Page 4 of 15

EXECUTION VERSION

in order to receive such bonus. Should Executive's employment be terminated prior to the end of the fiscal year, Executive will be eligible to receive a discretionary pro-rated bonus with a target of thirty (30%) of Executive's base salary payable within thirty (30) days after the end of NATPE's current fiscal year.

c)   <u>Deferred Compensation Payment</u>.  Executive shall receive a Deferred Compensation payment in the amount of Two Hundred Four Thousand And Twenty-Five Dollars and Two Cents $204,025.02, payable in three equal payments not later than the following dates:  first installment not later than five (5) days after execution of this Agreement, second installment not later than July 15, 2022, and third installment not later than September 15, 2022.

d)   <u>Expenses</u>. The Executive shall timely submit and NATPE will reimburse Executive for all reasonable and necessary business expenses in accordance with NATPE's policies as in effect from time to time. Executive shall be permitted to travel in business class on international and transcontinental flights and coach class on any other flights.

e)   <u>Participation in Health and Welfare Benefits</u>. Executive shall be entitled to participate in any plan (including disability, life, health, vision and dental insurance) that NATPE maintains for the benefit of its employees similarly situated to the extent such participation is permitted under the terms of such plans, programs and practices. NATPE reserves the right from time to time to modify, amend and/or terminate its benefit plans, programs and practices as it deems necessary or advisable.

f)   <u>Paid Time Off</u>. Executive shall be entitled to paid time off for all NATPE holidays, Four (4) weeks of annual vacation and Four (4) weeks of sick leave.  NATPE shall pay Employee for unused vacation and sick leave at the end of the Term.  In addition to the foregoing, all accrued and unused leave, vacation, sick days and other employee benefits received by Executive under the prior agreement and its amendment shall be extended and incorporated into this Agreement.

g)   <u>Insurance</u>. NATPE shall use commercially reasonable efforts to obtain, and renew on an annual basis, director and officer liability and professional liability (errors and omissions) insurance with the terms and conditions of such insurance, including the amount of coverage, as determined by NATPE in its reasonable discretion.  Executive shall be included as an insured under said insurance policies.

Page **5** of **15**

h)      Executive will have the opportunity to participate in the NATPE 401(k) plan, subject to the rules of the plan.

5.      <u>Termination</u>. Executive's employment under this Agreement will commence on the Effective Date and shall continue until the earlier of: the expiration of the Term; or the occurrence of any of the following:

a)      <u>Death</u>. If Executive dies during the Term, this Agreement and Executive's employment with NATPE shall terminate automatically on the date of Executive's death.

b)      <u>Disability</u>. If Executive becomes Disabled (as hereinafter defined) during the Term, NATPE shall have the right to terminate this Agreement and Executive's employment with NATPE. For purposes of this Agreement, Executive shall be deemed "Disabled" if Executive is unable, as a result of any medically determinable physical or mental disease or impairment, to discharge the essential functions of Executive's job for a period of (one hundred and eighty) 180 days or (one hundred and twenty) 120 consecutive days) during any 12-month period.

c)      <u>For Cause</u>. NATPE may terminate Executive's employment for "Cause" immediately upon written notice by NATPE to Executive. For purposes of this Agreement, "Cause" shall mean that one of the following events shall have occurred and, in the case of the events in clauses (3), (4) or (6) shall not have been cured by Executive within thirty (30) days after receipt of written notice from NATPE of the occurrence of such event, which written notice must be delivered to Executive within ninety (90) days of the occurrence of such event:

1)      Executive has committed an act of fraud, embezzlement, misappropriation or theft involving NATPE or its businesses, assets or employees.

2)      Executive has been convicted by a court of competent jurisdiction of, or pleaded guilty or nolo contendere to any felony or any crime of moral turpitude.

3)      Executive has refused to perform in any material respect specific, reasonable directives of the Board (other than a failure as a result of Executive's death or Disability).

Page **6** of 15

EXECUTION VERSION

4)      Executive commits gross negligence, willful misconduct or a breach of fiduciary duty in the course of Executive's employment hereunder.

5)      Executive participates in any unauthorized disclosure of any Proprietary Rights or Inventions of NATPE in violation of this Agreement.

6)      Executive shall have breached any provision of this Agreement in any material respect.

7)      Executive's use of illegal drugs, on NATPE time or at NATPE facilities or that otherwise impacts Executive's ability to perform Executive's duties provided for in this Agreement.

d)      <u>Termination without Good Reason</u>. Executive may terminate his employment without Good Reason at any time; provided, however, that such termination shall not be effective until sixty (60) days after written notice of such termination is provided to NATPE by Executive.

e)      <u>Termination without Cause</u>. NATPE may terminate Executive's employment without Cause at any time and such termination shall be effective immediately upon written notice of such termination to Executive by NATPE.  NATPE shall pay to Executive severance pay in an amount equal to the base salary that would be payable to Executive over the period commencing on the date of termination and ending at the end of the Term of this Agreement but no less than an amount equal to Four (4) months of Executive's Base Salary, less applicable taxes and withholding and all other Accrued Obligations due to Executive on the date of termination.  The term "Accrued Obligations" as used in this Agreement, shall mean: (i) any unpaid Base Salary then earned by and owed to Executive, (ii) reimbursement for  all expenses incurred in accordance with of this Agreement, and (iii) any other obligation due under the terms of this Agreement, at the time then owed to Executive.

f)      <u>Termination by Executive for Good Reason</u>. Executive may terminate his employment for "Good Reason" and NATPE shall pay to Executive severance pay in an amount equal to the base salary that would be payable to Executive over the period commencing on the date of termination and ending at the end of the Term of this Agreement but no less than an amount equal to Four (4) months of Executive's Base Salary, less applicable taxes and withholding and all other Accrued Obligations due to

Page **7** of **15**

Executive on the date of termination by Executive. For purposes of this Agreement, "Good Reason" shall mean that one of the following events shall have occurred and shall not have been cured by NATPE within thirty (30) days after receipt of written notice from Executive of the occurrence of such event, which written notice must be delivered to NATPE within ninety (90) days of the occurrence of such event:

1)    NATPE shall have breached any provision of this Agreement in any material respect including, without limitation, a material change in Executive's reporting relationship, compensation or work location; or

2)    NATPE shall have engaged in illegal conduct affecting Executive.

g)    <u>No Mitigation</u>. If Executive is terminated without "Cause," Executive is not obligated to mitigate, and NATPE shall have no right to a set off for any payment due to Executive.

6.    <u>Rights and Remedies on Termination</u>.

a)    <u>Expiration Of Term</u>. Upon the expiration of the Term, Executive's employment will terminate and NATPE shall have no further obligation to Executive except as provided for under this Agreement.

b)    <u>Death</u>. If Executive's employment hereunder is terminated prior to the end of the Term as a result of Executive's death, Executive shall be entitled to payment of Accrued Obligations owed to Executive at the time of his death incurred prior to the Executive's death.

c)    <u>Disability</u>. If Executive's employment hereunder is terminated prior to the end of the Term based on Executive being Disabled (as defined above), Executive shall be entitled to receive the Accrued Obligations due to Executive on the date of his disability.

d)    <u>Termination For Cause/Termination Without Good Reason</u>. If Executive's employment hereunder is terminated for Cause prior to the end of the Term, or if Executive terminates his employment without Good Reason prior to the end of the Term, Executive shall be entitled to receive the Accrued Obligations due to Executive on the date of termination without Cause or Good Reason.

Page 8 of 15

e)    Termination Without Cause/Termination for Good Reason. If Executive's employment hereunder is terminated by NATPE without Cause, or if Executive terminates his employment hereunder for Good Reason, Executive shall be entitled to Accrued Obligations to Executive on the date of notice of termination without Cause or for Good Reason by NATPE.

7.    Return of NATPE Documents. When Executive leaves the employ of NATPE or at any other time upon the written request of NATPE, Executive will deliver to NATPE all drawings, notes, memoranda, plans, specifications, devices, formulas and documents, together with all copies thereof, and any other material containing or disclosing any inventions, third party information or proprietary information and Executive agrees that he will conduct a diligent search for such items in connection with complying with the same.

8.    Arbitration. Any dispute or controversy arising out of or relating to any interpretation, construction, performance, termination or breach of this Agreement, will be governed by the Federal Arbitration Act, 9 U.S.C §§ 1 et seq. and will be settled by final binding arbitration by a single arbitrator to be held in Los Angeles County, Los Angeles, in accordance with the JAMS rules for resolution of employment disputes then in effect, except as provided herein. The rules can be found online at http://www.jamsadr.com/rules-employment-arbitration/#one.  The arbitrator selected shall have the authority to grant any party all remedies otherwise available at law and in equity, including injunctions, but shall not have the power to grant any remedy that would not be available in a state or federal court in California . The arbitrator shall be bound by and shall strictly enforce the terms of this Section and may not limit, expand or otherwise modify its terms. The arbitrator shall make a good faith effort to apply the substantive law (and the law of remedies, if applicable) of the state of California, or federal law, or both, as applicable, without reference to its conflicts of law provisions, but an arbitration decision shall not be subject to review because of errors of law. The arbitrator is without jurisdiction to apply any different substantive law. The arbitrator shall have the authority to hear and rule on dispositive motions (such as motions for summary adjudication or summary judgment). The arbitrator shall have the powers granted by California law and the rules of JAMS which conducts the arbitration, except as modified or limited herein. Notwithstanding anything to the contrary in the rules of JAMS, the arbitration shall provide (i) for written discovery and depositions as provided under California law, and (ii) for a written decision by the arbitrator that

Page **9** of **15**

includes the essential findings and conclusions upon which the decision is based which shall be issued no later than thirty (30) days after a dispositive motion is heard and/or an arbitration hearing has completed. Executive and NATPE shall have the same amount of time to file any claim against any other party as such party would have if such a claim had been filed in state or federal court. In conducting the arbitration, the arbitrator shall follow the rules of evidence of the State of California (including but not limited to all applicable privileges), and the award of the arbitrator must follow California and/or federal law, as applicable.   The arbitrator shall be selected by the mutual agreement of the parties. If the parties cannot agree on an arbitrator, the parties shall alternately strike names from a list provided by JAMS until only one name remains. The decision of the arbitrator will be final, conclusive, and binding on the parties to the arbitration absent manifest error or disregard of the law. The prevailing party in the arbitration, as determined by the arbitrator, shall be entitled to recover his or its reasonable attorneys' fees and costs, including the costs or fees charged by the arbitrator and JAMS to the extent allowed by statute. Judgment may be entered on the arbitrator's decision in any court having jurisdiction.

9.    Miscellaneous.

a)    Waiver. A party's failure to insist on compliance with or enforcement of any provision of this Agreement, shall not affect the validity or enforceability or constitute a waiver of future enforcement of that provision or of any other provision of this Agreement by that party or any other party.

b)    Governing Law. This Agreement shall in all respects be subject to, and governed by, the laws of the State of California without regard to the principles of conflict of laws.

c)    Severability. The invalidity or unenforceability of any provision in this Agreement (including without limitation any provision regarding arbitration) shall not in any way affect the validity or enforceability of any other provision and this Agreement shall be construed in all respects as if such invalid or unenforceable provision had never been in the Agreement.

d)    Notice. Notices provided for herein shall be in writing and shall be deemed to have been duly given when delivered by overnight courier with a receipt obtained therefor or when received by United States registered or certified mail, return receipt

Page 10 of 15

requested, postage prepaid, addressed, to NATPE at the address set forth below
NATPE's signature on this Agreement and to Executive at the address set forth below
Executive's signature on this Agreement or such other address(es) as it or he may
provide to each other in accordance with the provision.

c)   Amendments. This Agreement may be amended at any time by mutual
consent of the parties hereto, with any such amendment to be invalid unless in writing,
signed by NATPE and Executive.

f)   Burden and Benefit. This Agreement, together with any amendments
hereto, shall be binding upon and shall inure to the benefit of the parties hereto and
their respective successors, assigns, heirs and personal representatives, except that the
rights and benefits of Executive under this Agreement may not be assigned (other than
to Executive's heirs and/or personal representatives in the event of Executive's death or
disability) without the prior written consent of NATPE.

g)   Withholding of Taxes. NATPE may withhold from any compensation,
benefits or other amounts payable under this Agreement all federal, state, city and
other taxes as shall be required pursuant to any law or governmental regulation or
ruling.

h)   References to Gender and Number Terms. In construing this Agreement,
feminine pronouns shall be substituted for those masculine in form and vice versa, and
plural terms shall be substituted for singular and singular for plural in any place in
which the context so requires.

i)   Headings.    The various headings in this Agreement are inserted for
convenience only and are not part of the Agreement.

j)   Ambiguity. Executive acknowledges that Executive has had an
opportunity to review and revise the Agreement and have it reviewed by legal counsel,
if desired, and, therefore, the normal rule of construction to the effect that any
ambiguities are to be resolved against the drafting party shall not be employed in the
interpretation of this Agreement.

k)   Counterparts. This Agreement may be executed in one or more
counterparts, each of which shall be deemed an original, and all of which shall

Page 11 of 15

constitute one and the same instrument. Executed copies of the signature pages of this Agreement sent by facsimile or transmitted electronically in either Tagged Image Format Files ("TIFF") or Portable Document Format ("PDF") shall be treated as originals, fully binding and with full legal force and effect, and the parties waive any rights they may have to object to such treatment. Any party delivering an executed counterpart of this Agreement by facsimile, TIFF or PDF also shall deliver a manually executed counterpart of this Agreement but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

l)      <u>Entire Agreement</u>. This Agreement contains the entire agreement and understanding by and between Executive and NATPE with respect to the employment of Executive, supersedes any prior agreements and no representations, promises, agreement, or understanding, written or oral, relating to the employment of Executive by NATPE not contained herein shall be of any force or effect.

m)      <u>Representation By Counsel</u>.  NATPE and Executive represent and agree with each other that they have been represented by or had the opportunity to be represented by, independent counsel of their own choosing, and that they have had the full right and opportunity to consult with its respective attorney(s), that to the extent, if any, that they desired, they availed themselves of this right and opportunity, that they or their authorized officers (as the case may be) have carefully read and fully understand this Agreement in its entirety and have had it fully explained to them by such party's respective counsel, that each is fully aware of the contents thereof and its meaning, intent and legal effect, and that it or its authorized officer (as the case may be) is competent to execute this Agreement and has executed this Agreement free from coercion.

[Remainder of the Page Intentionally left Blank]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first hereinabove written.

EXECUTIVE

By: _____ *JP Bommel* _____

JP BOMMEL
720 Greenwich Street, 2D
New York, NY 10014

National Association of Television Program Executives

By: _____

ANDY KAPLAN
Chairman, Board of Directors
3940 Laurel Canyon Blvd, Suite # 324
Studio City, CA 91604

EXECUTION VERSION

# EXHIBIT A
# Initial Agreement

Page 14 of 15



Dear JP                                          August 14, 2015

Attached is our final term agreement that shall serve as your contract with
NATPE. Congratulations!

Rod Perth
President and CEO

JP Bommel - Offering Employment Letter & Term Sheet - August 11, 2015

**Responsibilities:**

* Effective start date is: September 8, 2015 for two years.

* Position title: Managing Director, Chief Operating Officer

* The Managing Director will oversee all day-to-day operations,
  management and strategic planning for the organization.

* The Managing Director will have full P & L responsibility for the
  organization under budgets approved by the Board of Directors in
  consultation with Mr. Bommel.

* The Managing Director will be responsible for managing costs and
  achieving or surpassing yearly revenue objectives as shall be determined
  by the Executive Committee and the COO.

* The Managing Director will oversee hiring and firing of personnel as well
  as managing all staff matters. In matters that may involve dismissing an
  employee, to minimize potential negative repercussions, Mr. Bommel is
  obligated to fully inform the board chair of those decisions.

Rod Perth
5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-1621
Fax 310-453-6019



- The Managing Director will report to the Board, on at least a quarterly basis

- The Managing Director will communicate more regularly with the Executive Committee of the Board and the various board committees, as is reasonably needed/requested.

- The Managing Director will be responsible for adhering to, and respecting all requirements of a non-profit as required by the by-laws.

- The Managing Director will, in coordination with the Board, oversee the development of a vision and strategic plan for the business as shall be mutually determined between them.

- The Managing Director will have direct responsibility - with the board of director's input – for final approval for the organization's annual markets and conferences.

- The Managing Director will oversee the development and implementation of other programs, events, etc., as he shall determine in collaboration with the board of directors, as part of his overall responsibilities.

- The Managing Director will to the best of his ability, inspire and manage the team by setting the example for high standards, customer service, and building morale and a positive culture.

- The Managing Director will develop a plan to grow NATPE's business through acquisitions or organic growth.

- The Managing Director will serve as the chief spokesperson for the organization, in consultation with the Executive Committee of the Board.

Rod Perth
5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-162
Fax 310-463-6919



**Reporting Relationship:**

- After the management hand-off from Mr. Perth to Mr. Bommel (no later than May 8, 2016), Mr. Bommel will report to the Chair of the Board of Directors or a board member designee, the Executive Committee, and the full Board of Directors. Mr. Bommel's title will be effective upon his start date of September 8, 2015 (Mr. Perth will continue to be involved with NATPE as a board member, and most likely in some sort of ongoing "project/consulting" basis determined by the board's view of needs for those services).

- As agreed, the NATPE Board of Directors will consider adding him to the board in year two of his contract, subject to approval of the full board.

**Location:**

- Los Angeles, California. In connection with the move from New York to Los Angeles, NATPE will reimburse moving and legal expenses for furniture etc. (with receipts) up to $10,000.

**Terms:**

- Base salary: $350,000 per year.

- Discretionary bonus: up to 30% of base salary, based on achievement of yearly goals to be mutually determined by the COO and the Executive Committee. Bonus can potentially exceed 30% to a maximum of 50% with extraordinary circumstances and results. Objectives for bonus calculation to be mutually agreed upon between Executive Committee and JP Bommel within 90 days of start date and will include both measurable analytics and discretionary evaluation.

Rod Perth ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-957-1621
Fax 310-453-6019



CONTENT FIRST

### Contract:

- Two-year contract followed by a one-year option at the option of the Board of NATPE. If Mr. Bommel is not notified of non-renewal at least 180 days prior to the end of the two-year term, Mr. Bommel's third year option is automatically triggered.

- For every year after the second year, Mr. Bommel will be given at least 120 days notice of non-renewal absent which the contract will automatically renew for another year.

- Compensation Committee will determine a discretionary yearly increase based on performance, which increase shall not be less than 5% of Mr. Bommel's prior year's salary.

### Travel:

- Business Class (or one class higher than coach) for all flights greater than 4 hours.

### Severance:

- If terminated not "for cause," the balance of the term, but no less than 120 days. Mr. Bommel is not obligated to mitigate and no right to set off.

- NATPE will not cover costs of relocation in the case of termination

### Benefits:

- Benefits will be commensurate with Mr. Bommel's level, which includes health and life insurance. The NATPE Benefits Plan and employee handbook will be supplied under separate cover.

- Mr. Bommel will have option to participate in the 401(k) plan subject to the rules of the plan, which has a six-month waiting period. Company contributions are capped at 4%.



**CONTENT FIRST**

### Vacation/Illness:

- Three weeks of vacation in addition to all company holidays, and three weeks of medical, as needed.

On behalf of everyone on the board, congratulations and welcome to NATPE!

**Rod Perth**
5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-1621
Fax 310-453-6010

**Benefits:**

- Benefits will be commensurate with Mr. Bommel's level, which includes health and life insurance. The NATPE Benefits Plan and employee handbook will be supplied under separate cover.

- Mr. Bommel will have option to participate in the 401(k) plan subject to the rules of the plan, which has a six-month waiting period. Company contributions are capped at 4%.

**Vacation/Illness:**

- Three weeks of vacation in addition to all company holidays, and three weeks of medical, as needed.

On behalf of everyone on the board, congratulations and welcome to NATPE!

_____   8/11/15
Rod Perth                          Date
President & CEO

_____   8-11-15
Andy Kaplan                        Date
Chairman of NATPE Board

_____   8/4/15
JP Bommel                          Date

BHP

4

EXECUTION VERSION

# EXHIBIT B
# AMENDMENT

**Page 15 of 15**



Dated as of January 24, 2017

JP Bommel
1430 N Harper Ave #407
Los Angeles, CA 90046

Dear Mr. Bommel:

Reference is made to that certain Letter Agreement between JP Bommel ("you") and NATPE ("NATPE") dated August 14, 2015, as said agreement may have been heretofore amended and/or modified and which agreement is in full force and effect as of the date hereof (the "Agreement"). Except as otherwise provided herein, all capitalized terms not specifically defined herein will have the same meanings ascribed to them in the Agreement.

Notwithstanding anything to the contrary contained in the Agreement, in consideration of the promises, covenants, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned hereby mutually agree that the Agreement shall be deemed to be amended effective as of the date first written above (the "Effective Date") as set forth below:

    1. The Responsibilities Section, Effective Start Date: is hereby amended by deleting "two years", and replacing it with four years.

    2. The Responsibilities Section, Position Title: is hereby amended by deleting "Chief Operating Officer" and replacing it with President and Chief Executive Officer.

    3. The Contract Section: is hereby amended by deleting "Two-year contract followed by a one-year option of the Board of NATPE. If Mr. Bommel is not notified of non-renewal at least 180 days prior to the end of the two-year term, Mr. Bommel's third year option will automatically triggered", and replacing it with Four-year contract.

    4. The Vacation/Illness Section is hereby amended by deleting "Three Weeks" and replacing it with Four weeks.

    5. Except as expressly modified in this agreement, all other terms and conditions of the Agreement are hereby ratified and affirmed and will remain in full force and effect.

    6. This amendment may be executed by the parties in one (1) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This amendment shall not be effective until the execution and delivery between the parties of at least one (1) set of the counterparts. A signed copy of this amendment delivered by facsimile transmission or by electronic mail will be deemed to have the same legal effect as delivery of an original signed copy of this amendment and any such signature transmitted by means of facsimile or electronic mail file will be deemed an original and valid signature hereto.

**ACCEPTED AND AGREED:**                                    **NATPE**

JP BOMMEL                                    **ANDY KAPLAN**

5757 WILSHIRE BOULEVARD – PH 10 – LOS ANGELES  CA 90036

# EXHIBIT E

Exhibit 1                                    Page 131

# <u>MEMORANDUM</u>

## <u>CONFIDENTIAL COMMUNICATION</u><br><u>ATTORNEY/CLIENT PRIVILEGE AND</u><br><u>ATTORNEY WORK PRODUCT DOCTRINE</u>

DATE:             July 26, 2022

TO:               Executive Committee
                  National Association of Television Program Executives

CC:               Arnold Peter, Legal Counsel

SUBJECT:          NATPE's Current Financial Position, Potential Liabilities, and
                  Projections Through January 2023

# CONTENTS

I.   CURRENT FINANCIAL POSITION ..................................................... 3

II.  EXISTING CONTINGENT LIABILITIES ........................................... 3

     A. JP Bommel Employment Agreement ......................................... 3

     B. Fontainebleau Litigation .............................................................. 3

          i   Summary Of Claim And Defenses......................................... 3

          ii.  Potential Insurance Coverage ........................................... 4

          iii. Settlement Discussions....................................................... 4

     C. Professional Fees....................................................................... 4

II.    NATPE's DISSOLUTION/LIQUIDATION PLANS ........................................... 4

A  Summary Of Post-Covid Liabilities.................................................. 4

     i.    NATPE COVID Related Financial Restructuring ............................ 4

     ii   NATPE Has Limited Operating Liabilities5

B  NATPE Assets ..................................................................... 5

C  Options For Dissolution/Reorganization/Liquidation................................... 6

     i  Winding Up Operations If There Is A Shortfall Prior To A
     Fontainebleau Arbitration Award ........................................... 6

     ii  Options To Address An Adverse Fontainebleau Arbitration Award . 6

     iii  Timing Of Dissolution/Bankruptcy .................................... 8

III.    RECOMMENDATION.......................................................... 8

## I.   CURRENT FINANCIAL POSITION

Available Funds

|  |  |
|---|---|
| Bank Operating Account | $200,000 |
| Investments | $1,500,000 |
| TOTAL ACCESSIBLE FUNDS | **$1,700,000** |
| Monthly Burn Rate* | $240,000 |
| Expected Withdrawals Through January 2023 (6.5 mos) | **($1,560,000)** |

NATPE had budgeted a cumulative net event revenue of $467,000 for the remainder of 2022. However, in light of the current cancellation credits, anemic interest in non-event sponsorship, and change in NATPE's flagship event location to Baha Mar, Bahamas, the net revenue projection has decreased and now assumes that events for the remainder of the fiscal year break-even at best. Because there is no prior year comparison data, it is difficult to predict the amount of revenue the Baha Mar event will generate. Further, even if the event produces a net profit, NATPE will only see the benefit once the event is over (given the up-front costs a new venue and locale will require).

Simply put, to support NATPE to Baha Mar (at end of January 2023), NATPE will need total operating funds of $1,560,000, but current projections show that NATPE will run out of cash in early January 2023. And because we have no idea what kind of net revenue Baha Mar will yield, even if we are able to get to Baha Mar, we must assume that unless we have other sources of financial support, NATPE we will continue to operate from a place of financial instability, post Baha Mar and for the foreseeable future.

## II.   EXISTING CONTINGENT LIABILITIES

### A.  JP Bommel Employment Agreement

NATPE entered into an employment agreement with JP with an effective date of April 1, 2022. JP's base salary under the agreement is $397,451.34 ($33,120.95 per month). The term of the agreement extends through September 7, 2023. If his employment is terminated without cause, JP is entitled to a severance payment equal to the greater of four (4) JP's base salary or base salary through the date of termination and September 7, 2023.

### B.  Fontainebleau Litigation

#### i.   Summary Of Claim And Defenses

The Fontainebleau Hotel has filed an arbitration claim, alleging that it is entitled to a cancellation fee of $3,389,618.69. NATPE has filed an answer asserting defenses

---

* As discussed below, the current burn rate does not include increased professional fees as the parties get closer to a November hearing date for an arbitration demand filed by the Fontainebleau hotel.

based on a *force majeure* provision in the event agreement, along with the legal doctrines of impossibility and frustration of purpose.  NATPE argues that, under the terms of the hotel agreement, the national spike in active COVID-19 cases in January 2022 constitute an act of God, disaster, and/or an emergency making it illegal or impossible to hold the event, all of which constitute reasons that excuse further performance by NATPE.  In addition, the agreement allowed NATPE to cancel the event without further liability if there was a curtailment of transportation facilities (preventing at least 25% or more of NATPE's attendees from attending).  The arbitration of the Fontainebleau claim is scheduled for November 8-11, 2022.  Should the arbitration result in an award adverse to NATPE, then Fontainebleau will go to court and ask that the award be converted to a court enforceable judgment.

ii.  Potential Insurance Coverage

NATPE has filed a claim under its Officers and Directors policy and is awaiting a decision.  However, the policy limit is $1,000,000, which would not cover the entire amount of a judgment should the Fontainebleau prevail in full on its claim.  NATPE recently increased its coverage to $2,000,000.  However, this increase applies prospectively and will not cover the claim asserted by the Fontainebleau in connection with the cancelled22022 Miami Event.

iii.  Settlement Discussions

NATPE and the Fontainebleau engaged in preliminary settlement discussions.  NATPE's last offer to settle the arbitration was $175,000 and the Fontainebleau's last proposal was $1,500,000, payable in equal installments over three (3) years.  Should NATPE's insurance claim be accepted, NATPE intends to engage the carrier to contribute a substantial amount of the $1,000,000 policy limits towards a settlement and reimbursement of its legal fees incurred in defense of the arbitration.

C.  Professional Fees

NATPE has thus expended approximately $100,000 in legal and arbitration fees for the Fontainebleau litigation.  Absent a settlement, NATPE anticipates that its expenditure for legal and arbitration fees and costs will grow to $50-70,000 per month through the hearing date in November.  This increase in professional fees will increase the monthly burn rate through the November hearing date.

II.    NATPE's DISSOLUTION/LIQUIDATION PLANS
   A.  Summary Of Post-Covid Liabilities
      i.  NATPE COVID Related Financial Restructuring

In light of the COVID shutdown and resulting decline in revenue, in November 2020, NATPE implemented an organizational restructuring that, along with outsourcing and/or eliminating various forms of overhead, included the elimination of the Chief Financial Officer position.  In addition, NATPE imposed an aggressive salary decrease amounting to a cumulative salary reduction of 50.97% for the

remaining top five NATPE executives (including JP). The cumulative reduction delivered $570,439.13 in salary savings to NATPE.

Under the restructuring plan, the salaries would be restored to their original levels effective April 1, 2022, if NATPE exceeded its 2022 Fiscal Year projected net revenue by at least 3 percent. NATPE did not meet this benchmark. Therefore, all key executive salaries remained at the reduced levels.

In addition to the salary reduction, NATPE implemented a plan to retain NATPE's four highest paid and key executives: JP, Wayneston Harbeson, Doug Finberg and Charlie Weiss. Without these executives, NATPE would have been unable to operate. Under this retention program, NATPE agreed to provide an incentive in the form of a "Deferred Compensation" payment equal to the amount each executive would have received through March 31, 2022, if paid their original salaries. The Deferred Compensation payments ranged from $57,749.88 for Wayneston Harbeson to $204,025.02 for JP.

JP's Deferred Compensation amount covered a 16-month period (December 1, 2021 through March 31, 2022), along with a mandatory contractual retention payment equal to 10% of JP's base salary. Payments to all executives covered by the Deferred Compensation program have been discharged.

NATPE has been operating virtually, with all employees working remotely from their homes after NATPE negotiated a release from a lease for its office space. Therefore, other than JP's severance payment, the potential judgment to the Fontainebleau and ongoing professional fees, NATPE has no other significant liabilities that are not being paid in the ordinary course of business.

ii.   NATPE Has Limited Operating Liabilities

NATPE has been following all applicable wage and hour laws. Further, all of NATPE's payroll tax withholding obligations and workers' compensation obligations, such as health care/savings plan obligations are paid and up to date.

NATPE management has negotiated cancellation provisions for both the pending Baha Mar 2023 and Budapest 2023 events. The Baha Mar event can be cancelled without any further liability by November 4, 2022 and the Budapest event can be cancelled by July 31, 2022. NATPE has asked the Budapest hotel for an extension of this cancellation deadline to January 31, 2023, and is awaiting a decision. If the hotel has either not responded or refuses the extension, NATPE intends to cancel the Budapest event by this Friday, January 29 and look for other options.

B.   NATPE Assets

NATPE has no marketable assets other than its mailing list and the goodwill associated with its name and brand. These assets are of minimal value because the mailing list could be easily recreated with AI resources, and the goodwill associated with NATPE's brand is unique to NATPE and has limited appeal to another organization.

C.  Options For Dissolution/Reorganization/Liquidation
  i.  Winding Up Operations If There Is A Shortfall Prior To A
      Fontainebleau Arbitration Award

Should NATPE determine that it does not have sufficient funds to maintain operations prior to imposition of an arbitration award by the Fontainebleau, nonprofit public benefit corporations (which include both the operating company and the NATPE Foundation) are permitted to end their legal existence upon the completion of the dissolution procedures.  Traditionally, this requires the Board of Directors to vote to dissolve the corporation, and cease all activities other than those activities needed to wind up and dissolve the corporation (although the law gives the Board latitude to maintain the day-to-day operations needed to preserve corporate good will or the value of remaining assets).

Notice of the dissolution must be given to a variety of parties, including the California Attorney General and all known creditors and claimants.  A deadline must be set for the submission of claims, and then all debts and liabilities must be paid or otherwise "adequately provided" for by depositing cash with certain parties in an amount the Board in good faith at the time of the transfer believes to be adequate.

After paying or adequately providing for claims, all remaining assets must be disposed in conformity with NATPE's articles of incorporation and bylaws, and is subject to the Attorney General's oversight, particularly if assets remain after all liabilities are settled.  The process can take significant time (four to five months if not more in light of COVID), so it is important to ensure that NATPE has sufficient liquidity available to go through the process.

It also should be noted that nonprofit corporations do at times elect to wind up operations in a far more informal fashion (without legal dissolution) by shutting down operations, terminating employees, paying all known creditors, and then simply allowing the corporation to go into suspense with the California state taxing authorities.  While as a general rule, nonprofit directors do not face personal liability for the acts of the nonprofit (except for wage and hour violations), this approach should not be taken lightly, particularly in the face of a pending Fontainebleau award, as it provides little protection against further litigation or harassing creditors.

  ii.  Options To Address An Adverse Fontainebleau Arbitration
       Award

The types of bankruptcies most applicable to NATPE's situation are:  (a) a case under Chapter 7 of the Bankruptcy Code where NATPE ceases all operations and files for bankruptcy to liquidate its assets, and (b) a case under Chapter 11 of the Bankruptcy Code where NATPE remains in operation and restructures its assets and liabilities.  If NATPE's liabilities remain under $7.5 million (which they almost certainly will), NATPE should be able to take advantage of a new part of Chapter 11

called "Subchapter V," which offers small businesses an expedited process of reorganization.  Both options are described below.

Chapter 7:  Chapter 7 bankruptcy provides a procedure for the orderly liquidation of the assets of the debtor and the ultimate payment of creditors in the order of priority set forth in the Bankruptcy Code.  Upon the filing of a chapter 7 petition, a trustee is appointed who is charged with marshalling all of NATPE's assets, liquidating them, and eventually distributing the proceeds of the liquidation to creditors.

The main benefit of a Chapter 7 proceeding is that all litigation against NATPE would cease (absent further court order).  Additionally, unsecured creditors quickly realize that their ability to receive a meaningful distribution on account of their claims is significantly reduced.  The main detriment to a Chapter 7 proceeding is that the trustee takes over all control of NATPE's assets, including claims against officers, directors, employees and creditors.  Since trustees are primarily paid from assets recovered on behalf of the estate, they are motivated to dig into past transactions and distributions and look for allegedly improper actions to prosecute or undo in order to maximize assets for creditors and pay for their services.

Chapter 11 and "Subchapter V:"  Chapter 11 of the Bankruptcy Code provides a framework for a formal, court-supervised business reorganization.  The goal is to put the company back on the path to solvency and rehabilitation, while ensuring equity of treatment of creditors holding claims of the same priority.  Unfortunately, it is a very complex process (and thus is long and expensive).

Subchapter V, however, is a fairly new, debtor-friendly process within Chapter 11, meant to streamline and expedite the reorganization process and thus give small business debtors a better opportunity to succeed.  A trustee is appointed (as in a Chapter 7 proceeding), but is focused on the administration of the case, with an eye towards encouraging the confirmation of a consensual plan of reorganization and handling the distributions due creditors once the plan is confirmed.

The benefits of Subchapter V (as compared to a traditional Chapter 11) are numerous—only the debtor can propose a plan (and no one else can propose a competing plan).  The debtor need not obtain the acceptance of an impaired class of creditors to get court approval (or "confirmation") of its plan.  NATPE can continue to own and manage their business even where all creditors vote *against* the plan and object to confirmation, so long as the corporation can demonstrate that, among other things, the plan pays unsecured creditors all of the debtor's "disposable income" for a period of three to five years.  "Disposable income" excludes income that is reasonably necessary for expenditures to continue, preserve or operate the business.  This gives a debtor significant latitude when putting together its plan of reorganization, and if the debtor needs most of its income for operations, it is not unusual for a court to approve a Subchapter V plan that only pays unsecured creditors cents on the dollar.  This would be far less than what Fontainebleau is

currently demanding, and could be significant leverage to use against Fontainebleau in settlement negotiations, so long as NATPE puts sufficient funds aside to fund a case and complete the process.

### iii. Timing Of Dissolution/Bankruptcy

At this stage, the soonest NATPE would be obligated to dissolve and wind-up its affairs is early January 2023. However, without immediate funding, it would be prudent to explore whether this decision should be made and implemented sooner.

The earliest that NATPE would be forced to place the corporation into a bankruptcy is when a court converts an arbitration award into an enforceable judgment. This is likely to take 2-3 months after an arbitration award. With an arbitration hearing date in early November, therefore, the Fontainebleau can likely secure an enforceable judgment in February 2023. However, legal counsel's recommendation would be to immediately place the corporation into bankruptcy as soon as an arbitration going against NATPE is issued. This, of course, is all contingent upon NATPE's insurance carrier either refusing to extend coverage and/or not settling with the Fontainebleau and the Fontainebleau subsequently securing an arbitration award in its favor. In other words, this is NATPE's worst-case scenario,

As discussed below, NATPE management is recommending that the NATPE Board secures an immediate cash infusion of $1 million. If the NATPE Board is unable to secure this funding, legal counsel recommends that NATPE immediately commence either dissolution or a bankruptcy filing while it has sufficient funds to pay for professional fees and to handle any operating liabilities such as payroll and vendor payments during the winding up process.

## III.   RECOMMENDATION

NATPE was formed in 1963 and served as the premier organization for content creators and distributors during the 1980-1990 during the period of television program syndication. In 2010 NATPE re-branded itself as NATPE Content First, and expanded into actively pursuing new media and technology speakers, exhibitors, and attendees in addition to their customary television members. This effort has allowed NATPE to re-grow and expand much of its membership base. As an added link between the television industry, the academic community, the NATPE Educational Foundation, was formed in 1978, underwritten by membership fees and the support of sponsors and special endowments, provides a number of annual internships, fellowship, and grants to the academic community and students.

Like many trade associations that rely on live events to sustain their operations, NATPE has been adversely impacted by the COVID-19 pandemic. NATPE has undertaken difficult reductions in its operations and headcount to remain viable and solvent.

Andy Kaplan and Executive Committee
Page 9

NATPE's survival is contingent, at the very least, on a successful Baha Mar event. In order to maintain a margin of financial security to stage the Baha Mar event, it is essential that NATPE obtain an immediate infusion of financial support.  NATPE management requests a minimum of $1,000,000, which would likely allow it to meet existing overhead obligations and maintain an appropriate cushion to address any emergency events and contingencies up to the Baha Mar event, and would help sustain it post event as NATPE evaluates its future.  NATPE management seeks guidance from the Executive Committee and Board for the requested funding of $1,000,000.



# EXHIBIT F

Exhibit 1                                              Page 141

# NATIONAL ASSOCIATION OF TELEVISION PROGRAM EXECUTIVES, INC.

### 3940 Laurel Canyon Blvd, Suite # 324
### Studio City, CA 91604

### September 30, 2022

Dear JP:

As you are aware, NATPE has experienced significant financial difficulties due to the impact of the COVID pandemic on events and operations. The NATPE Board explored many options, but has concluded that filing for court supervised reorganization is NATPE's best option. Therefore, the Board has authorized, and our bankruptcy counsel has been directed to file a petition for reorganization.

In light of this decision, it is with deep regret and sadness, that I have the responsibility to advise you that NATPE is terminating the employment of all NATPE employees. Therefore, your employment with NATPE will be terminated without cause and your last date of employment will be October 3, 2022, at 12:00 midnight (PST).

You entered into an employment agreement with NATPE with an effective date of April 1, 2022. Your base salary under the agreement is $397,451.34 per annum ($33,120.95 per month). The term of the agreement extends through September 7, 2023.

Pursuant to your current employment agreement, if terminated without cause, you are entitled to a termination payment in an amount equal to four (4) months of your base salary or an amount equal to your base salary through April 1, 2022 and September 7, 2023, whichever amount is greater. Therefore, you are entitled to a severance payment equal to the salary you would have earned between September 30, 2022, and September 7, 2023, equaling almost 11 months of base salary. However, you have graciously agreed to accept compensation that is lower than what is due to you under your employment agreement, by accepting a payment equal to six (6) months of your base salary which totals $198,725.70, which shall be paid by NAPTE to you on or before October 3, 2022, at 12:00 midnight (PST). In addition, you have agreed to provide services to NATPE in support of its anticipated bankruptcy petition, commencing effective October 5, 2022, 12:01 am (PST). The terms of that engagement are set forth in a separate independent contractor agreement. You will receive your final paycheck on or before October 3, 2022, which will include a payment for any remaining paid time off. The Company represents that the termination payment is a disbursement in the ordinary course of business required under your employment agreement and constitutes a settlement beneficial to the Company.

In addition, with gratitude and as a recognition of your contributions to NAPTE, the Board has authorized a severance payment equal to one week of your current base salary for each year of employment, which amount will be prorated for any period that is less than a full calendar year. Based on your period of employment, we have calculated your severance payment in the amount of $54,004.97. In order to receive this payment, you must sign and return the Settlement Agreement and Release of Claims, attached below.

Our HR administrator Tri-Net will contact you directly with information regarding your COBRA benefits, if you currently receive health benefits. Meanwhile if you have any questions about the continuation of your benefits please contact NATPE's Human Resources Administrator Tri-Net at employees@trinet.com or 800-638-0461.

On behalf of the NATPE Board of Directors and myself personally, I want to thank you for your dedicated service to NATPE. I wish you the very best in your future personal and professional endeavors.

Sincerely,

Andy Kaplan
Chairman, Board of Directors
National Association of Television Program Executives

THE ABOVE IS AGREED TO AND ACCEPTED

JP Bommel
JP Bommel
Dated:      Friday, September 30th, 2022

## SEPARATION AGREEMENT AND RELEASE

**THIS SEPARATION AGREEMENT** ("Agreement") is made and entered into by and between [Name of Employee] ("Employee"), and NATIONAL ASSOCIATION OF TELEVISION PROGRAM EXECUTIVES, INC. ("Company").

A.    Employee's employment with the Company will terminate effective at the close of business October 3, 2022, 12:00 midnight (PST).

B.    The parties desire to resolve all issues and disputes between them and have agreed to a full settlement of such issues.

**NOW, THEREFORE,** in consideration of the mutual promises and provisions contained in the Agreement, the parties, intending to be legally bound, agree as follows:

## AGREEMENTS

1. **Termination of Employment.** Employee confirms the termination of employment with the Company and any affiliates is effective on October 3, 2022, 12:00 midnight (PST). ("Termination Date"). Employee will be paid the base salary due through the Termination Date, in accordance with the regular payroll practices of the Company.

2. **Separation Benefits.** In consideration for Employee's execution and compliance with this Agreement, including the waiver and release of claims included herein, the Company will pay to Employee as severance pay an amount equal to one week of regular salary for each full year of employment which amount will be prorated for periods of less than one full calendar year, less all applicable state and federal withholding taxes and any other deductions the Company is required by law to make, in accordance with the Company's regular payroll practices. This severance pay will be paid to Employee in one lump sum with the payment to be made on within seven (7) business days after the Effective Date. Based on Employee's period of employment, Company has calculated this severance payment as the amount of $54,004.97 and Employee agrees to accept this payment as full payment in consideration for execution of this Agreement.

Employee understands and acknowledges that this severance payment is in addition to anything of value that Employee would be entitled to receive from the Company if Employee did not sign the Agreement. Nothing in this Agreement shall be deemed or construed as an express or implied policy or

practice of the Company to provide these or other benefits to any individuals other than the Employee.

3. **Release by Employee.**

A. Employee's General Release.

Except with respect to Company's obligations pursuant to (i) this Agreement, and (ii) the letter from Company to Employee terminating Employee's employment, Employee and Employee's heirs, legal representatives, successors, and assigns (collectively, the "Releasors") hereby forever irrevocably and unconditionally release and forever discharge the Company and its subsidiaries, successors, affiliates, and assigns, and its current and former Employees, officers, directors, shareholders, attorneys, plans, insurers, fiduciaries, and agents (the "Company Releasees") from any claims, causes of actions, suits, debts, complaints, or demands of any nature whatsoever, arising out of any acts or omissions by any of the Company Releasees up to and including the date of this Agreement, including, without limitation, any claims under any federal, state, local, or foreign law, that Releasors may have, have ever had, or may in the future have arising out of, or in any way related to the Employee's hire, benefits, employment, termination, or separation from employment with the Company any acts or omissions which relate to Employee's work or employment with the Company or any of its affiliates, whether such claims are past or present, known, suspected, or unknown, and any actual or alleged act, omission, transaction, practice, conduct, occurrence, or other matter, including, but not limited to:

    i. Claims for violations of Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Family Medical Leave Act (with respect to existing but not prospective claims), the Equal Pay Act, the Employee Retirement Income Security Act (with respect to unvested benefits), the Fair Labor Standards Act, the Civil Rights Act of 1991, Section 1981 of U.S.C. Title 42, all including any amendments and their respective implementing regulations, any other federal, state, local, or foreign employment laws based on race, gender, or age or any other protected class status, and any other federal, state, local, or foreign law (statutory, regulatory, or otherwise) that may be legally waived and released;

    ii. Claims for violations of the California Family Rights Act and any other state or local law or ordinance;

  iii. Any and all claims arising under tort, contract, and quasi-contract law, including but not limited to claims of breach of an express or implied contract, tortious interference with contract or prospective business advantage, breach of the covenant of good faith and fair dealing, fraud, misrepresentation, promissory estoppel, detrimental reliance, invasion of privacy, negligence or other breach of duty, nonphysical injury, personal injury or sickness or any other harm, wrongful or retaliatory discharge, fraud, defamation, slander, libel, false imprisonment, and negligent or intentional infliction of emotional distress, retaliation, harassment, and any other claims for any other unlawful employment practices, whether legal or equitable;

  iv. Any and all claims for compensation of any type whatsoever, including but not limited to claims for salary, wages, bonuses, commissions, incentive compensation, vacation, and severance that may be legally waived and released; and,

  v. Any and all claims for monetary or equitable relief, including but not limited to attorneys' fees, back pay, front pay, reinstatement, experts' fees, medical fees or expenses, costs, and disbursements.

These releases cover both claims that Employee knows about or may not know about or expect to exist, at the time of the signing of the Agreement.

B. <u>Acknowledgment of Waiver of Claims under ADEA.</u>

Employee acknowledges that Employee is waiving and releasing any rights Employee may have under the Age Discrimination in Employment Act of 1967 ("ADEA"), and that this waiver and release is knowing and voluntary. Employee agrees that this waiver and release does not apply to any rights or claims that may arise under the ADEA after the Supplemental Release Effective Date. Employee acknowledges that the consideration given for this waiver and release is in addition to anything of value to which Employee was already entitled. Employee further acknowledges that Employee has been advised by this writing that: (a) Employee should consult with an attorney prior to executing this Supplemental Release; (b) Employee has had twenty-one (21) days within which to consider this Supplemental Release; (c) Employee has seven (7) days following Employee's execution of this Supplemental Release to revoke it; (d) this Supplemental Release shall not be effective until after the revocation period has expired; and (e) nothing in this Supplemental Release prevents or precludes Employee from challenging or seeking a determination in good faith of the validity of this waiver under the ADEA, nor does it impose any condition precedent, penalties, or costs for doing so, unless specifically authorized by federal law. In the event Employee signs this Supplemental Release and returns it to the Company in less than the 21-day period identified above, Employee hereby acknowledges that Employee has knowingly and voluntarily chosen to

waive the time period allotted for considering this Supplemental Release. Employee acknowledges and understands that revocation must be accomplished by a written notification to the undersigned Company representative that is received prior to the Supplemental Release Effective Date. The Parties agree that changes, whether material or immaterial, do not restart the running of the 21-day period.

C.  California Civil Code Section 1542.

Employee acknowledges that Employee has been advised to consult with legal counsel and is familiar with the provisions of California Civil Code Section 1542, a statute that otherwise prohibits the release of unknown claims, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Employee, being aware of said code section, agrees to expressly waive any rights Employee may have thereunder, as well as under any other statute or common law principles of similar effect.

D.  Indemnification of Employee.

Company shall, to the maximum extent permitted by law, indemnify and hold Employee harmless for any acts or decisions made in good faith while performing services for the Company. To the same extent, the Company will pay, and subject to any legal limitations, advance all expenses, including reasonable attorneys' fees and costs of court-approved settlements, actually and necessarily incurred by Employee in connection with the defense of any action, suit or proceeding and in connection with any appeal, which has been brought against Employee by reason of his service as an officer or agent of the Company.

4.  **Claims Not Released.** Notwithstanding anything in this Agreement, Employee is not waiving any right that cannot by law be waived.  Nothing in this Agreement shall interfere with the right of Employee to file a charge with the Equal Employment Opportunity Commission ("EEOC"), or other similar federal or state administrative agencies, or to participate in an EEOC investigation or proceeding although, under this Agreement, Employee has waived any right to recover individual relief or money damages which may be awarded on account of such a charge.  This waiver and release is not effective to waive the right of

Employee to enforce the terms of this Agreement or to assert claims that are based on events that happen after this Agreement becomes effective.

5. **Effective Date**.  This Agreement shall not become effective, until the day the Employee and the Employer execute this Agreement. This date shall be the "Effective Date" of this Agreement. No payments due to the Employee under this Agreement shall be made or begin before the Effective Date.

6. **Documents and Property**.  Employee acknowledges and agrees that Employee has returned to the Company all records, documents, computer disks, or files of any type which were in Employee's possession, together with all copies thereof. Employee also acknowledges and agrees that Employee has returned all keys, computers, credit cards, or other property of the Company or any of its subsidiaries or affiliates in Employee's possession.

7. **Confidential Information.**  Employee acknowledges that during the time Employee was employed by the Company, Employee had access to confidential and proprietary information of the Company, and its subsidiaries and affiliates. Employee agrees that Employee shall not at any time disclose any confidential information obtained during the course of Employee's association with the foregoing to any person, firm, corporation, association, or other entity for any purpose or reason whatsoever, unless otherwise required to do so by law or unless such information has become public other than through disclosure by Employee. Employee acknowledges that any breach of the provisions of this section 7 will be considered a material breach of the Agreement and will entitle the Company or its affiliates to pursue all legal and equitable remedies and will entitle the Company to recover the full amount of the payments made to Employee under the Agreement.

8. **Full Compensation**.  Employee understands that consideration provided by the Company under (i) the Agreement, and (ii) the letter from Company to Employee terminating Employee's employment entered into between Company and Employee will fully compensate Employee for and extinguish any and all of the potential claims Employee is releasing herein, including without limitation, any claims for attorneys' fees and costs, and any and all claims for any type of legal or equitable relief.

9. **No Admission of Wrongdoing**.  Employee agrees that the Agreement does not constitute an admission that the Company has violated any local ordinance, state or federal statute, or principle of common law, or that the Company has engaged in any unlawful or improper conduct towards Employee or others.

10. **Legal Representation**.  Employee acknowledges that Employee has been advised by the Company to consult with Employee's own attorney before

executing this Agreement, that Employee has had a full opportunity to consider the Agreement, that Employee has had a full opportunity to ask any questions that Employee may have concerning the Agreement, the release contained herein, or the settlement of Employee's potential claims against the Company, and that Employee has not relied upon any statements or representations made by the Company or its attorneys, written or oral, other than the statements and representations that are explicitly set forth in the Agreement and any qualified Employee benefit plans sponsored by the Company in which Employee is a participant.

11. **Successors and Assigns**.  The Company may freely assign this Agreement at any time. This Agreement shall inure to the benefit of the Company and its successors and assigns. The Employee may not assign this Agreement in whole or in part. Any purported assignment by the Employee shall be null and void from the initial date of the purported assignment.

12. **Governing Law, Jurisdiction, and Venue**. This Agreement and all matters arising out of or relating to this Agreement, whether sounding contract, tort, or statute, for all purposes shall be governed by and construed in accordance with the laws of California (including its statutes of limitations) without regard to any conflicts of laws principles that would require the laws of any other jurisdiction to apply. Any action or proceeding by either of the Parties to enforce this Agreement shall be brought in any state or federal court located in the state of California, County of Los Angeles.  The Parties hereby irrevocably submit to the exclusive jurisdiction of these courts and waive the defense of inconvenient forum to the maintenance of any action or proceeding in these venues.

13. **Entire Agreement**.  This Agreement is intended to define the full extent of the legally enforceable undertakings of the parties, and no promises or representations, written or oral, that are not set forth explicitly in the Agreement, or any of the aforementioned plans sponsored by the Company in which Employee is a participant are intended by either party to be legally binding.  All other agreements and understandings between the parties are hereby cancelled, terminated, and superseded.

14. **Captions**. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

15. **Modification and Waiver**. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the Employee and President and Chief Executive Officer of the Company. No waiver by either Party of any breach by the other party of any condition or provision of this Agreement to be performed by the other party shall

be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the Parties in exercising any right, power, or privilege under this Agreement operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

16. **Confidentiality of Agreement**. Employee agrees not to disclose, publicize, or allow or cause to be publicized or disclosed any of the terms of this Agreement, except as necessary to Employee's legal and tax advisors, or as required by law, court order or to enforce this Agreement.  Should Employee disclose to Employee's legal or tax advisors or spouse any of the terms of this Agreement, Employee must first advise them of the confidential nature of the disclosure and that they under the same obligation of confidentiality.

17. **Remedies**. In the event of a breach or threatened breach by the Employee of any of the provisions of this Agreement, the Employee hereby consents and agrees that the Company shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. Any equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available relief.

If the Employee fails to comply with any of the terms of this Agreement or post-termination obligations contained in it, the Company may, in addition to any other remedies it may have, reclaim any amounts paid to the Employee under the provisions of this Agreement or terminate any benefits or payments that are later due under this Agreement, without waiving the releases provided in it.

The Parties mutually agree that this Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

18. **Counterparts**.  This Agreement may be executed simultaneously in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by facsimile, email in portable document format (.pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document has the same effect as delivery of an executed original of this Agreement.

**IN WITNESS WHEREOF,** the parties have executed the Agreement as set forth in the dates below:

Dated: Friday September 30th, 2022. _____ *JP Bommel* _____

[Employee Signature]

JP Bommel
_____

[Employee Printed Name]


NATIONAL       ASSOCIATION       OF
TELEVISION   PROGRAM   EXECUTIVES,
INC.


Dated: ___*Sept 30*___, 2022. _____

Andy Kaplan
Chairman
Board of Directors

# EXHIBIT G

Exhibit 1                                    Page 152

## Independent Contractor Agreement

This agreement (the "Agreement") between the NATIONAL ASSOCIATION OF TELEVISION PROGRAM EXECUTIVES, INC. (the "Company")  and JP Bommel, hereinafter called Contractor," reflects the agreement between the Company and Contractor, who intend to be legally bound by the following conditions:

Company hereby engages Contractor to render administrative and business operation services to Company both before and after its anticipated bankruptcy petition for reorganization under Chapter 11 and/or liquidation under Chapter 7 of the United States Bankruptcy Code.  This agreement shall be effective on September 30, 2022, 12:00 midnight (PST), your title will be Interim President and Chief Executive Officer, and you will have the same role as set forth in the Executive Employment Agreement between Contractor and Company, dated April 1, 2022.

Contractor accepts such engagement upon the terms herein specified. In consideration for the services to be performed by Contractor, Company agrees to pay Contractor the flat fee sum of $15,000 dollars per month, in advance of the work to be performed for each month.  Said amount will be prorated for any partial periods of time.

Contractor represents that Contractor has the skills, resources, expertise, and experience necessary and appropriate to provide the services and perform all of obligations under this Agreement in a prompt, competent, efficient, and effective manner.

This Agreement may be terminated at any time by Company or Contractor with or without cause upon 30 days' notice.  In the event of termination, Company agrees to pay Contractor for all work performed pursuant to this Agreement through the date of termination.

THIS AGREEMENT IS AN AGREEMENT FOR THE SERVICES OF AN INDEPENDENT CONTRACTOR.  IT IS NOT UNDER ANY CIRCUMSTANCES A CONTRACT FOR EMPLOYMENT OR BETWEEN AN EMPLOYER AND AN EMPLOYEE.  CONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR ANY WORKERS' WAGES, SOCIAL SECURITY AND MEDICARE CONTRIBUTIONS, AND SIMILAR WITHHOLDINGS, DEDUCTIONS, AND PAYMENTS WHICH MAY BE REQUIRED BY FEDERAL, STATE, OR LOCAL LAW WITH RESPECT TO SUMS PAID TO CONTRACTOR HEREUNDER AND CONTRACTOR'S EMPLOYEES, SUBCONTRACTORS, AND VENDORS, AND CONTRACTOR'S EMPLOYEES SHALL LOOK SOLELY TO CONTRACTOR IN CONNECTION THEREWITH. CONTRACTOR IS NOT COMPANY'S EMPLOYEE HEREUNDER FOR PURPOSES OF COMPANY'S EMPLOYEE BENEFITS OR ANY OTHER SUCH PURPOSES.

1

Contractor understands this is the sole agreement and no other agreement whether verbal or written has been understood or undertaken in this matter. This is the final agreement; no further negotiation will be taken into consideration by either Company or Contractor. Any termination of this Agreement, for any reason, shall not affect any accrued rights or liabilities of Company agreed upon herein.

COMPENSATION: Company shall report payments made pursuant to this Agreement on IRS Form 1099. It will be the sole responsibility of Contractor to pay all applicable taxes on all compensation paid by Company. None of Contractor's compensation will be subject to withholding by Company for the payment of any social security, federal, state or any other employee payroll taxes. Contractor nor Contractor's employees, subcontractors, and vendors may not and shall not claim unemployment compensation or any other severance or benefits from Company.

OWNERSHIP OF WORK PERFORMED: All of Contractor's services and the results and proceeds thereof (including any physical materials created by Contractor) (collectively, the "Work Products") are considered a "work made for hire." As such, Company is the sole and exclusive author and Company of all Work Products and all rights therein, whether now or hereafter known, in perpetuity, for all purposes, throughout the universe. Contractor waives any and all so called "moral rights" and any personal or other proprietary rights in and to all of the Work Products. To the extent any Work Products are ever determined not to be a "work made for hire", Contractor hereby grants to Company all right, title and interest (including the copyright) in and to any such Work Products. Contractor shall sign and deliver to Company any and all such documents as are necessary in the sole opinion of Company to execute a full and complete assignment from Contractor to Company of all right, title and interest in and to the Work Products and the Program and the above-described project.

CONFIDENTIALITY

(a) Definition. "Confidential Information" means all information of either party which (i) by virtue of the circumstances surrounding the disclosures, in good faith ought to be treated as proprietary or confidential, and (ii) is furnished or otherwise disclosed in any form (e.g., in writing, orally or in any other format, electronic or otherwise) by such party or its employees or authorized representatives, before, on or after the date of this Agreement, related to any aspect of such party's operations. The presence of a copyright notice on any Confidential Information shall not constitute publication or otherwise impair the confidential nature thereof.

(b) Obligations. Each party and its employees shall use the Confidential Information solely for the purposes of performing its obligations under this

2

## Independent Contractor Agreement

Agreement. Each party shall exercise at least the same degree of care to
carry out its obligations under this paragraph and to protect the
confidentiality of the Confidential Information which it exercises to protect
the confidentiality of its own similar confidential information, but in no event
less than reasonable care. Neither party shall remove any confidentiality,
copyright, or similar notices or legends from the Confidential Information,
and shall implement such safeguards and controls as may be necessary or
appropriate to protect against unauthorized uses or disclosures of the
Confidential Information.

(c) Restrictions. Neither party shall disclose the other party's Confidential
Information, except to its employees, consultants or any third party having a
legitimate business purpose with respect to this Agreement and having a
need to know such Confidential Information. Prior to permitting access to the
Confidential Information, each party shall inform such employees,
consultants or any third party of the confidential nature of the Confidential
Information and shall execute written agreements with its consultants or
other third parties in form and substance reasonably satisfactory to the other
party sufficient to enable each party to comply with all the provisions of this
paragraph.

(d) Breach of Confidentiality. If any employee, officer, director, consultant, or
agent of either party violates or threatens to violate the provisions of this
paragraph or if any third party obtains any Confidential Information through
either party's breach of its obligations under this paragraph, then the party
in breach shall take commercially reasonable steps to remedy such violation.
Each party acknowledges that the Confidential Information contains
valuable trade secrets and proprietary information, that any actual or
threatened breach of this paragraph may constitute immediate, irreparable
harm to the party whose Confidential Information is wrongfully disclosed for
which monetary damages would be an inadequate remedy, and that
injunctive relief is an appropriate remedy for such breach. Therefore, each
party agrees that, in the event of any actual or threatened violations or
breaches of this paragraph, the other party shall have the right to seek and to
obtain equitable relief, including obtaining an injunction or specific
performance, from any court of competent jurisdiction, without the necessity
of posting a bond (or other security) and without the necessity of showing
actual damages or that monetary damages would not afford an adequate
remedy, without prejudice to and in addition to any other rights and
remedies it may have.

3

Independent Contractor Name:    JP BOMMEL

Independent Contractor Address:  ~~720 Greenwich Street, 2D~~

New York, NY 10014

Tax ID:

Company's Signature:

By:  Andy Kaplan

Date: Oct 7, 2022

4

# EXHIBIT H

Exhibit 1                                    Page 157

**National Association of Television Program Executives, Inc.**
**1 Year Payments - Jean-Pierre Bommel**
Source: DS1 Payroll Register's from TriNet

| | | | | *Gross Pay Breakdown* | | | | |
|---|---|---|---|---|---|---|---|---|
| Paycheck Date | TriNet Invoice No. | Gross Pay | Regular Earnings | Deferred Compensation | Termination Pay | Severance Pay | Holiday Pay | Vacation Pay |
| 10/15/2021 | 5555437 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 10/29/2021 | 5571566 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 11/12/2021 | 5585135 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 11/24/2021 | 5601620 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 12/10/2021 | 5621555 | 11,426.73 | 9,141.38 | - | - | - | 2,285.35 | - |
| 12/23/2021 | 5639035 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 01/07/2022 | 5657167 | 11,426.73 | 9,141.38 | - | - | - | 2,285.35 | - |
| 01/21/2022 | 5674538 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 02/04/2022 | 5690668 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 02/18/2022 | 5708611 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 03/04/2022 | 5725042 | 11,426.73 | 10,284.06 | - | - | - | 1,142.67 | - |
| 03/18/2022 | 5743574 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 04/01/2022 | 5759823 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 04/14/2022 | 5769050 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 04/14/2022 | 5769547 | 70,320.26 | - | 70,320.26 | - | - | - | - |
| 04/29/2022 | 5789216 | 15,286.59 | 13,757.93 | - | - | - | 1,528.66 | - |
| 05/13/2022 | 5806424 | 15,286.59 | 15,286.59 | - | - | - | - | - |
| 05/27/2022 | 5821038 | 15,286.59 | 15,286.59 | - | - | - | - | - |
| 06/10/2022 | 5838718 | 15,286.59 | 13,757.93 | - | - | - | 1,528.66 | - |
| 06/24/2022 | 5855259 | 15,286.59 | 15,286.59 | - | - | - | - | - |
| 07/08/2022 | 5872974 | 83,294.93 | 15,286.59 | 68,008.34 | - | - | - | - |
| 07/22/2022 | 5889879 | 15,286.59 | 13,757.93 | - | - | - | 1,528.66 | - |
| 08/05/2022 | 5907571 | 15,286.59 | 15,286.59 | - | - | - | - | - |
| 08/19/2022 | 5924276 | 15,286.59 | 15,286.59 | - | - | - | - | - |
| 09/02/2022 | 5941982 | 83,290.93 | 15,282.59 | 68,008.34 | - | - | - | - |
| 09/16/2022 | 5958485 | 15,286.59 | 13,757.93 | - | - | - | 1,528.66 | - |
| 09/30/2022 | 8206529 | 15,286.59 | 15,286.59 | - | - | - | - | - |
| 10/04/2022 | 8215256 | 253,757.42 | 9,171.95 | - | 198,725.70 | - | - | 45,859.77 |
| 10/12/2022 | 8227989 | 54,004.97 | - | - | - | 54,004.97 | - | - |
| | **Total** | **857,508.63** | **340,753.24** | **206,336.94** | **198,725.70** | **54,004.97** | **11,828.01** | **45,859.77** |

# EXHIBIT I

Exhibit 1    Page 159

**National Association of Television Program Executives, Inc.**
**1 Year Payment and Post Petition Payment Analysis - Arnold P. Peter DBA Peter Law Group**
**Adv. # 1:24-ap-01055-MB**

| | | Bank Detail | | | | Invoice Detail | | |
|---|---|---|---|---|---|---|---|---|
| **Type** | **Bank Clear Date** | **Account** | **Payee** | **Amount** | **Invoice #** | | **Invoice Date** | **Invoice Amount** |
| | | | | | 423 | | 08/02/2023 | 13,940.00 |
| Bill.com | 08/18/2022 | FRB #7987 | Arnold Peter, APC | 13,940.00 | | | | **13,940.00** |
| | | | | | | | | |
| | | | | | 455 | | 09/01/2022 | 6,325.00 |
| | | | | | 456 | | 09/01/2022 | 3,135.00 |
| Bill.com | 09/07/2022 | FRB #7987 | Arnold Peter, APC | 41,518.25 | 457 | | 09/01/2022 | 48,675.00 |
| Bill.com | 09/15/2022 | FRB #7987 | Arnold Peter, APC | 44,791.75 | 458 | | 09/01/2022 | 28,175.00 |
| | | | | **86,310.00** | | | | **86,310.00** |
| | | | | | | | | |
| | | | | | 459 | | 09/28/2022 | 41,009.00 |
| | | | | | 460 | | 09/28/2022 | 7,025.00 |
| | | | | | 461 | | 09/28/2022 | 8,913.25 |
| | | | | | 462 | | 09/28/2022 | 22,695.00 |
| ACH/Wire | 09/29/2022 | FRB #7987 | Arnold Peter, APC | 79,642.25 | | | | **79,642.25** |
| | | | **Total 1 Year Payments** | **421,783.15** | | | | |
| ACH/Wire | 06/30/2023 | AXOS #0568 | Arnold Peter, APC | 30,725.00 | | | *See fee application* | |
| ACH/Wire | 11/08/2023 | AXOS #0568 | Arnold Peter, APC | 19,460.00 | | | *See fee application* | |
| Bill.com | 07/18/2024 | AXOS #0568 | Arnold Peter, APC | 25,335.00 | | | *See fee application* | |
| | | | **Total Post Petition Payments** | **75,520.00** | | | | |

**EXHIBIT I**                    **Page 135**
Exhibit 1

# EXHIBIT J

Exhibit 1                                    Page 161

**National Association of Television Program Executives, Inc.**
**Post Petition Payments - Jean-Pierre Bommel**

| Type | Bank Clear Date | Bank Detail Account | Payee | Amount | Invoice Detail Invoice # | Invoice Date | Invoice Amount |
|------|-----------------|---------------------|-------|--------|--------------------------|--------------|----------------|
| | | | | | 100122 | 10/07/2022 | 15,000.00 |
| Bill.com | 10/11/2022 | FRB #7987 | Jean-Pierre Bommel | 15,000.00 | | | **15,000.00** |
| | | | | | 100123 | 10/31/2022 | 15,000.00 |
| Bill.com | 11/09/2022 | AXOS #0568 | Jean-Pierre Bommel | 15,000.00 | | | **15,000.00** |
| Bill.com | 12/02/2022 | AXOS #0568 | Jean-Pierre Bommel | 15,000.00 | N/A | N/A | N/A |
| Bill.com | 01/05/2023 | AXOS #0568 | Jean-Pierre Bommel | 15,000.00 | N/A | N/A | N/A |
| Bill.com | 02/03/2023 | AXOS #0568 | Jean-Pierre Bommel | 15,000.00 | N/A | N/A | N/A |
| Bill.com | 03/02/2023 | AXOS #0568 | Jean-Pierre Bommel | 15,000.00 | N/A | N/A | N/A |
| Bill.com | 04/06/2023 | AXOS #0568 | Jean-Pierre Bommel | 15,000.00 | N/A | N/A | N/A |
| Bill.com | 06/13/2023 | AXOS #0568 | Jean-Pierre Bommel | 1,202.50 | N/A | N/A | N/A |
| | | | | | 5312024 | 06/30/2023 | 1,110.00 |
| Bill.com | 07/05/2023 | AXOS #0568 | Jean-Pierre Bommel | 1,110.00 | | | **1,110.00** |
| Bill.com | 02/23/2024 | AXOS #0568 | Jean-Pierre Bommel | 5,550.00 | N/A | N/A | N/A |
| Bill.com | 04/02/2024 | AXOS #0568 | Jean-Pierre Bommel | 701.25 | N/A | N/A | N/A |
| Bill.com | 05/30/2024 | AXOS #0568 | Jean-Pierre Bommel | 413.50 | N/A | N/A | N/A |
| Bill.com | 07/02/2024 | AXOS #0568 | Jean-Pierre Bommel | 412.50 | N/A | N/A | N/A |
| | | | | | 5312030 | 07/26/2024 | 453.75 |
| Bill.com | 08/06/2024 | AXOS #0568 | Jean-Pierre Bommel | 453.75 | | | **453.75** |
| | | | **Total Post Petition Payments** | **114,843.50** | | | |

# EXHIBIT 2

3:20 pm

**FILED**

OCT 11 2024

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                    Deputy Clerk

1   MEGHANN A. TRIPLETT (SBN 268005)
    *Meghann@MarguliesFaithLaw.com*
2   SAMUEL M. BOYAMIAN (SBN 316877)
    *Samuel@MarguliesFaithLaw.com*
3   **MARGULIES FAITH LLP**
    16030 Ventura Boulevard, Suite 470
4   Encino, CA 91436
    Telephone: (818) 705-2777
5   Facsimile: (818) 705-3777

6   Attorneys for Plaintiff, Jeremy W. Faith,
    Chapter 11 Plan Fiduciary
7

8            **UNITED STATES BANKRUPTCY COURT**
                 **CENTRAL DISTRICT OF CALIFORNIA**
9              **SAN FERNANDO VALLEY DIVISION**

10

11  In re:                              Case No.: 1:22-bk-11181-MB

12  NATIONAL ASSOCIATION OF             Chapter:   11 (Subchapter V)
    TELEVISION PROGRAM EXECUTIVES,
13  INC.,                               Adv. Case No.:

14                          Debtor.     **COMPLAINT FOR:**

15  JEREMY W. FAITH, Chapter 11 Plan    **(1) BREACH OF FIDUCIARY DUTY;**
    Fiduciary,
16                                      **(2) AIDING AND ABETTING BREACH OF**
                         Plaintiff,        **FIDUCIARY DUTY**
17  v.
                                        **(3) CORPORATE WASTE;**
18  JEAN PIERRE BOMMEL, an individual;
    ARNOLD P. PETER, an individual d/b/a **(4) NEGLIGENCE;**
19  PETER LAW GROUP, and DOES 1-50,
    inclusive,                          **(5) AVOIDANCE OF FRAUDULENT**
20                                         **TRANSFERS WITH ACTUAL INTENT**
                                           **[11 U.S.C. § 548(A)(1)(A)];**
21                       Defendants.
                                        **(6) AVOIDANCE OF CONSTRUCTIVELY**
22                                         **FRAUDULENT TRANSFERS [11 U.S.C.**
                                           **§ 548(A)(1)(B)];**
23
                                        **(7) AVOIDANCE OF 1-YEAR TRANSFERS**
24                                         **[11 U.S.C. § 547];**

25                                      **(8) AVOIDANCE OF UNAUTHORIZED**
                                           **POSTPETITION TRANSFERS [11 U.S.C.**
26                                         **§ 549];**

27                                      **(9) CONVERSION;**

28                                      **(10)RECOVERY OF AVOIDED TRANSFER**
                                           **[11 U.S.C. § 550];**

                                        **(11)UNJUST ENRICHMENT; AND**

                                        **(12)DISALLOWANCE OF PROOF OF**
                                           **CLAIM [11 U.S.C. § 502(d)]**

1      Plaintiff Jeremy W. Faith ("Plaintiff"), the chapter 11 Plan Fiduciary for the chapter

2  11 bankruptcy estate ("Estate") of reorganized debtor National Association of Television

3  Program Executives, Inc., (the "Debtor" or "NATPE"). Plaintiff brings this adversary

4  proceeding on behalf of the Estate pursuant to 11 U.S.C. §§ 1123(b)(3)(B) and 1104(d)

5  and this Court's *Order Confirming Second Amended Subchapter V Chapter 11 Plan with*

6  *Modifications* appointing Plaintiff as the Plan Fiduciary for the Estate (Dkt. No. 258). As

7  Plaintiff was not appointed until after NATPE filed bankruptcy, Plaintiff does not have

8  personal knowledge of the facts alleged in this Compliant and therefore alleges those facts

9  on information and belief.

10                    **JURISDICTION AND VENUE**

11      1.     In accordance with the requirements of Local Bankruptcy Rule 7008-1, the

12  San Fernando Valley Division of the United States Bankruptcy Court for the Central District

13  of California (the "Bankruptcy Court") has jurisdiction over this adversary proceeding under

14  28 U.S.C. § 1334, because the claims asserted herein arise under title 11 of the United

15  States Code or arise in or relate to the Chapter 11 case of the Debtor currently pending in

16  the United States Bankruptcy Court for the Central District of California, as *In re National*

17  *Association of Television Program Executives, Inc.*, Case Number 1:22-bk-11181-MB (the

18  "Bankruptcy Case"). The outcome of this adversary proceeding will have a significant

19  effect on the Estate because it will impact the disposition property of the Estate and the

20  amount of money available for distribution to creditors. Certain of the claims for relief

21  alleged in this Complaint constitute core proceedings under 28 U.S.C. § 157(b).

22  Regardless of whether this proceeding is a core proceeding, consent is given to the entry

23  of a final orders and judgment by the Bankruptcy Court. Each defendant is hereby notified

24  that hat Fed. R. Bankr. P. 7008(a) requires each defendant to plead whether the claims

25  for relief alleged against such defendant are core or non-core and, if non-core, whether

26  consent is given to the entry of final orders and judgment by the Bankruptcy Court. Certain

27  of the claims for relief alleged in this Complaint constitute core proceedings under 28

28  U.S.C. § 157(b). Regardless of whether this proceeding is a core proceeding, consent is

1   given to the entry of a final orders and judgment by the Bankruptcy Court.  Each defendant

2   is hereby notified that that Fed. R. Bankr. P. 7008(a) requires each defendant to plead

3   whether the claims for relief alleged against such defendant are core or non-core and, if

4   non-core, whether consent is given to the entry of final orders and judgment by the

5   Bankruptcy Court.

6           2.      Venue is proper in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408

7   and 1409 because the Bankruptcy Case is pending in this district and division.  Pursuant

8   to 28 U.S.C. § 1391, venue is also appropriate in this district and division because each

9   of the defendants either resides in or is authorized to and regularly does carry out

10  business in this district and many of their wrongful acts, omissions and/or conduct as

11  complained of in this Complaint took place within this district.  Accordingly, this Court

12  also has personal jurisdiction over each of the defendants.

13                                **PARTIES**

14          3.      Plaintiff Jeremy W. Faith ("Plaintiff") is the Chapter 11 Plan Fiduciary of the

15  Debtor's Estate and brings this action solely in his capacity as the chapter 11 Plan

16  Fiduciary for the debtor's Estate.

17          4.      Plaintiff is informed and believes that at all relevant times herein, Defendant

18  Jean Pierre Bommel ("Bommel") is the former President and CEO of the Debtor and is

19  subject to the jurisdiction of this Court.

20          5.      Plaintiff is informed and believes that Bommel is an insider of the Debtor as

21  that term is defined under 11 U.S.C. § 101(31).

22          6.      Plaintiff is informed and believes that at all relevant times herein, Defendant

23  Arnold P. Peter, doing business as Peter Law Group ("Peter") is the former outside general

24  counsel for NATPE and subject to the jurisdiction of this Court.  (Bommel and Peter are

25  collectively referred to herein as the "Defendants").

26          7.      Plaintiff is informed and believes that Peter is an insider of the Debtor as that

27  term is defined under 11 U.S.C. § 101(31).

28          8.      Defendants Does 1 through 50, inclusive, are individually and/or jointly liable

1  to the Estate for the conduct alleged below. The true names and capacities, whether
2  individual, corporate, associate or otherwise, of those Doe defendants are currently
3  unknown to Plaintiff. Accordingly, Plaintiff sues defendants Does 1 through 50, inclusive,
4  by said fictitious names and will amend this Complaint to allege their true names and
5  capacities when ascertained with certainty. Each of the Doe defendants is an immediate
6  or mediate transferee of the fraudulent, preferential, or other avoidable transfers alleged
7  in this Complaint or of the proceeds of such fraudulent, preferential, or other avoidable
8  transfers, and did not take such property for value, in good faith, and without knowledge
9  of the avoidability of such transfers, or is otherwise liable along with the named defendants
10  for the wrongful acts and omissions and damages alleged in this Complaint.

11  **GENERAL ALLEGATIONS**

12       9.     NATPE is a non-profit corporation organized under the laws of the State of
13  Delaware. Until shortly after its bankruptcy filing, the company was operating as a global
14  content association and professional membership organization consisting of television,
15  media executives and other members of the content business. NATPE's main source of
16  revenue was its annual conference and market.

17       10.    From at least 2020, Bommel was the President and CEO of the Debtor who
18  was ultimately responsible for overseeing the day-to-day business operations and
19  financial performance of NATPE and involved in supervising all aspects of NATPE's
20  financial affairs. Other high-level executives with NATPE in the years leading up to the
21  Bankruptcy Case were Charlie Weiss, Senior Vice President of Sales, Marketing, and
22  Content, Wayneston Harbeson, Senior Vice President of Event and Operations, Gary
23  Mitchell, European Business Development Executive, and Mingfen Lee, Director of
24  Business Development and Client Relations (collectively with Bommel, the "Executive
25  Team").

26       11.    In the years leading up to the Bankruptcy Case and after, Bommel, the
27  Executive Team and the Board of Directors were advised by Peter as their primary outside
28  general counsel. Plaintiff is informed and believes that Peter served in the role as general

3

1  outside counsel for NATPE for more than 10 years. In the months leading up to the filing

2  of the Bankruptcy Case, Peter was working on multiple matters for NATPE, billing the

3  organization for several hundred thousand dollars in legal fees.

4        12.    At all relevant times herein, NAPTE's primary revenue source was derived

5  from various income streams associated with the production of industry related

6  conferences, with additional income derived from grants, contributions and investment

7  income. NATPE's Form 990 federal income tax return for the fiscal year ending March 31,

8  2020 (the "3/31/20 Tax Return") reflected program service revenue of $6,333,273,

9  contributions and grants of $567,788, investment revenue of $90,100, and other revenue

10  of $82,406, for total revenue of $7,073,567. Total expenses for the fiscal year were

11  $7,621,288, which generated a loss of $547,721. On the balance sheet side of the 3/31/20

12  Tax Return, NATPE showed total assets of $6,381,734, and liabilities of $2,471,930,

13  leaving a net asset balance of $3,909,804.

14        13.    On or around October 24, 2018, NATPE entered into two contracts with

15  Fontainebleau Florida Hotel, LLC d/b/a Fontainebleau Miami Beach Hotel

16  ("Fontainebleau") for the hosting of NATPE's two large annual conferences at

17  Fontainebleau's hotel property in Miami, Florida. The first contract was for the NATPE

18  Market & Conference 2021 (the "2021 Event"), to be held on January 14 to January 27,

19  2021 (the "2021 Event Agreement"). The second contract related to the NATPE Market &

20  Conference 2022 (the "2022 Event"), to be held on January 13 to January 26, 2022 (the

21  "2022 Event Agreement").

22        14.    On October 16, 2020, NATPE cancelled the 2021 Event. NATPE identified

23  the rise of COVID-19 as its basis for cancellation and asserted the *force majeure* provision

24  under the 2021 Event Agreement as grounds for the cancellation.  Fontainebleau disputed

25  the applicability of the *force majeure* provision. The parties ultimately agreed to settle the

26  dispute over the cancellation of the 2021 Event Agreement and entered into a Settlement

27  Agreement dated May 24, 2021 (the "Settlement Agreement").

28        15.    Pursuant to the Settlement Agreement, NATPE agreed to pay Fontainebleau

1   a total of $100,000.00 as "Cancellation Damages" for the 2021 Event, to be paid in four

2   equal installments of $25,000.00 as well as Fontainebleau's retention of the $75,000.00

3   deposit paid by NATPE in connection with the 2021 Event Agreement. The last installment

4   payment under the Settlement Payment was due on or after January 31, 2022.

5        16.     NATPE's cancellation of the 2021 Event had a dramatic impact on the

6   organization's finances. Pursuant to NATPE's Form 990 federal income tax return for the

7   fiscal year ending March 31, 2021 (the "3/31/21 Tax Return"), NATPE had program service

8   revenue of only $1,127,425, contributions and grants of $305,679, and investment income

9   of $67,341, coming to a total revenue figure of $1,500,445 – a 78% drop from the prior

10  fiscal year. The balance sheet portion of the 3/31/21 Tax Return reflected assets of

11  $3,714,252 and liabilities of $679,570, leaving a net asset value of $3,034,682. These

12  figures reflected an erosion of the gross asset value of NATPE of $2,667,482.

13       17.     NATPE remained in operation throughout 2021 and was promoting the 2022

14  Event at the Fontainebleau, with the organization counting on the event as an important

15  step towards NATPE's financial recovery and stability. However, after internal

16  deliberations by and amongst certain members of the Executive Team and Peter, NATPE

17  elected to cancel the 2022 Event, informing Fontainebleau of such cancellation on January

18  8, 2022 - just 5 days before the 2022 Event was set to start. As it did when cancelling the

19  2021 Event, NATPE through Bommel and under the legal guidance of Peter sought to

20  invoke the *force majeure* provision of the 2022 Event Agreement as grounds for

21  termination of the contract.

22       18.     Fontainebleau swiftly and vigorously disputed the basis for NATPE's

23  cancellation and asserted that NATPE was liable for cancellation damages amounting to

24  $3,389,618.69 pursuant to the "Cancellation Schedule" agreed to by the parties in the

25  2022 Agreement (the "FB Liquidated Damages"). Furthermore, Bommel directed NATPE

26  to breach the Settlement Agreement by not making the final $25,000.00 payment owed to

27  Fontainebleau under the Settlement Agreement. Plaintiff is informed and believes that

28  such decision was made in consultation with members of the Executive Team and Peter.

19.     On February 11, 2022, the Fontainebleau filed a demand for arbitration with the Judicial Arbitration and Mediation Service ("JAMS"), which instituted the arbitration action entitled *Fontainebleau Florida Hotel, LLC vs. National Association of Television Programming Executives*, JAMS case no. 5460000066, JAMS Resolution Center, Miami, Florida (the "Arbitration").

20.     At the time the Arbitration was instituted, NATPE had a liability insurance policy with Navigators Insurance Co. ("Navigators") entitled "Not-For-Profit InNAVation Policy" (the "Policy"). Plaintiff is informed and believes that the Policy could have provided coverage for the allegations in the Arbitration provided a timely claim was made by NATPE against the Policy. For reasons unknown, Defendants failed to make a claim on the Policy at the time the Arbitration was instituted.

21.     In May of 2022, an attorney for Fontainebleau sent a letter to Peter that raised potential claims against the officers and directors of NATPE for their actions in connection with the cancellation of the 2022 Event.  On or about June 16, 2022, Peter sent a letter to Navigators tending the Arbitration under the Policy.  Navigators responded by denying coverage due to the failure of NATPE to make a timely claim on the Policy as required by its terms within 90 days of NATPE's learning of the Arbitration.

22.     Peter contested on NATPE's behalf Navigators' denial of coverage through litigation in State Court which was removed to Federal Court.  However, Peter lost the litigation and Navigators was not required to cover the damages and fees associated with the Arbitration.

23.     Plaintiff is informed and believes that Bommel and Peter were aware of the Policy at the time of the serving of the demand for arbitration.  However, it was not until the directors and officers were directly threatened with litigation that Bommel and Peter sought the protections of the Policy, by which time it was too late. This was another example of Bommel and Peter prioritizing the interests of the executives of NATPE over the organization itself.

24.     The financial impact from the cancellation of the 2022 Event was profound,

1   a fact that was communicated to Bommel, the Executive Team and the NATPE Board of

2   Directors in March of 2022 through internal company communications.

3       25.    NATPE's Form 990 federal income tax return for the fiscal year ending

4   March 31, 2022 (the "3/31/22 Tax Return") provided a picture of NATPE the rapidly

5   deteriorating financial condition. Program service revenue was reduced to $544,707, with

6   contribution and grant revenue of $312,698, and investment income of $117,224, equaling

7   total revenue of just $974,629. Total expenses for NATPE remained relatively the same

8   at $3,020,885, resulting in negative income of $2,046,256.

9       26.    The balance sheet side of the 3/31/22 Tax Return was equally dire, though

10   the situation was in fact much worse than what was reflected in the return. NATPE

11   disclosed total assets in the 3/31/22 Tax Return of $2,616,816, and liabilities of

12   $1,592,759, the majority of which liabilities consisted of funds collected for future events

13   that had yet to be earned. This left an apparent net asset value of $1,024,057. However,

14   the disclosed liabilities did not take into account the asserted FB Liquidated Damages

15   $3,389,618.69, which if reflected would show a negative asset value of $2,365,561,

16   placing NATPE deeply into insolvency.

17       27.    With obligations to creditors reaching over $4.9 million and available cash of

18   approximately $2.6 million as of March of 2022, NATPE's Board of Directors and Executive

19   Team in consultation with Peter had a fiduciary duty to manage the organizations scarce

20   resources in a manner that did not place creditors at undue risk of non-payment through

21   risky business ventures and self-dealing transactions that benefited themselves and other

22   insiders. Unfortunately, this is precisely the direction adopted by Bommel and the

23   Executive Team with Peter's guidance. Instead of adopting a conservative approach that

24   would preserve NATPE's assets and minimize the harm to its creditors, Bommel, the

25   Executive Team and Peter spent over $1 million of the organization's funds on themselves.

26       28.    In April of 2022, at a point when NATPE's financial condition was in free-fall,

27   Bommel and NATPE's compensation committee decided to authorize Bommel to received

28   deferred compensation and entered into a new employment contract with him that

1  provided for a generous severance payment.  At the same time, Peter was doing more

2  and more work for NATPE, billing the organization on multiple matters related to the

3  Arbitration, employment issues, contract issue, and eventually consulting on bankruptcy

4  issues.

5       29.    In the weeks and days leading up to the filing of the Bankruptcy Case, at

6  which point Bommel and Peter were actively involved in attempting to sell NATPE's

7  business, Peter assisted Bommel with the preparation of various termination agreements

8  for the Executive Team, which included generous severance payments which clearly

9  harmed NATPE's creditors by continuing to drain NATPE of cash while it had ceased to

10  conduct business.  All of these actions were taken by Bommel while, as set forth below,

11  NATPE was undercapitalized, insolvent, and unable to pay its debts as they became due

12  in the ordinary course of business.

13       30.    From the January 8, 2022, the date on which NATPE cancelled the 2022

14  Event, to the Petition Date – at Bommel's direction, NATPE paid the following amounts to

15  Bommel, members of the Executive Team and Peter's law firm –

16      -    Bommel = $450,000.  This included substantial deferred compensation,

17          contractual severance and vacation pay, and a separate employee

18          severance payout.  This included approximately $150,000 in severance

19          and vacation "buyout".

20      -    The Peter Law Group = $221,410.50

21      -    Charlie Weiss $53,461.53

22      -    Wayneston Harbeson $56,538.50

23      -    Gary Mitchell = $65,243.94

24      -    The Lippin Group, Inc. a Public Relations firm controlled by NATPE director

25          and board member Richard B. Lippin = $125,000

26       31.    NATPE paid over $825,000 to creditors during the 90 days before the

27  Petition Date, the bulk of which went to Bommel, Peter's law firm, and the Executive

28  Team.

32.     Even after the Bankruptcy Case was filed, Bommel, the Executive Team and Peter managed to continue their pattern of expending NATPE's dwindling cash reserves on themselves.

33.     Immediately prior to the Petition Date, NATPE terminated all of its employees effective October 14, 2022. These terminations included severance packages.

34.     NATPE filed for bankruptcy protection on October 11, 2022 (the "Petition Date"). NATPE elected to proceed as a Supchapter V debtor for the purpose of liquidating the Debtor's assets. According to NATPE's Schedules of Assets and Liabilities [Docket No. 40 (the "Schedules")], as of the Petition Date, its assets totaled approximately $533,834.75.

35.     On November 9, 2022, the Debtor filed a motion seeking a Bankruptcy Court order authorizing it to pay commissions, employee benefits and payment of related taxes and tax deposits, as well as approval of severance plans for its "critical" employees (the "Wage Motion," Dkt. No. 16).

36.     The Wage Motion sought Bankruptcy Court approval to pay the following individuals and amounts:

- Wayneston Harbeson: Severance $39,487.70; proposed priority wage payment of $15,150;

- Charlie Weiss: Severance $10,930.36 as priority wages;

- Stephanie Berlhinque: Severance $3,597.70; commissions $7,580.00, total as proposed priority wages of $11,177.70;

- Rebecca Shotland: Severance $3,522.46; commissions $7,375.00, total as proposed priority wages of $10,897.46; and

- Sylvia Jagheshar: Severance $22,784.25; proposed priority wage payment of $15,150.00.

37.     Fontainbleau filed an opposition to the Wage Motion on November 16, 2022 (Dkt. No. 24). On November 22, 2022, the Debtor voluntarily dismissed the Wage Motion and never obtained Bankruptcy Court approval for payment of any of the pre-petition

1 | wages (Dkt. No. 32). However, what NATPE failed to mention in the Wage Motion was

2 | that the payment of the pre-petition wages – even the amounts that exceeded the priority

3 | wage maximum, were already paid by the Debtor in the days immediately after the Petition

4 | Date as reflected in the Debtor's first Monthly Operating Report for the period October 11,

5 | 2022 through October 31, 2022 (Dkt. No. 34).

6 |      38.     Estate assets were further dissipated by Bommel post-petition through

7 | various "Independent Contractor" agreements which are believed to have been drafted

8 | by Peter. Under these Independent Contract agreements, Bommel, Mitchell, Harbeson,

9 | and Lee continued to receive payments from the Debtor as consultants as opposed to

10 | employees. Plaintiff is informed and believes each of these individuals received at least

11 | the following amounts post-petition:

12 |     -   Bommel, Executive Consulting Agreement = $92,312.50

13 |     -   Edward Jones, Asset Management Agreement = $3,870.00

14 |     -   Gary Mitchell, International Sales Rep Agreement = $2,015

15 |     -   Ming-Fen Lee, International Sales Rep Agreement = $4,029.31

16 |     -   The Lippin Group, Inc., PR Service contract =$5,000

17 |      39.     In addition to making post-petition payments to NATPE's former pre-petition

18 | employees, Bommel continued to pay Pery Consulting Group, LLC ("PCG"), for outside

19 | professional services including CFO, Controller and Accounting Manager pursuant to a

20 | Vendor Agreement between NATPE and PCG dated November 16, 2020 (the "PCG

21 | Agreement"). The PCG Agreement provided for a monthly fee of $7,000, which NATPE

22 | regularly paid through July of 2022. However, in or around September of 2022, there was

23 | a modification of the PCG Agreement, and the monthly fee increased to $12,500. As a

24 | result, PCG continued to receive post-petition consulting fees during the Bankruptcy Case

25 | from October of 2022 through May of 2022 which totaled $87,500. Given that NATPE had

26 | effectively ceased operating by the Petition Date, and subsequently sold all of its assets

27 | by January of 2023, the Debtor was receiving little benefit from the type of services that

28 | PCG was allegedly providing, showing continued financial mismanagement well after the

1  filing of the Bankruptcy Case.

2     40.    Immediately after the Petition Date, the Debtor sought to liquidate on an

3  extremely compressed timeline in the Bankruptcy Case.  NATPE did not require the

4  "consulting" services of these individuals and companies and as such, these expenditures

5  were just a further exercise in self-dealing by the NATPE executives and insiders.  To

6  make matters worse, several members of the Executive Team, including Harbeson,

7  Wiess, Mitchell and Lee, began working with competitors of NATPE prior to the close of

8  the proposed sale its customer list, bringing into question the loyalties of these individuals

9  who were continuing to receive consulting fees from NATPE at that time. This was another

10  example of the NATPE executives placing their own self interests over those of the Estate,

11  as had been the pattern prior to the Petition Date.

12     41.    The continued erosion of the Debtor's cash continued in the Bankruptcy

13  Case for nearly two years, leaving the Estate with less than $120,000 by the time Plaintiff

14  was appointed.  The only apparent beneficiaries of the bankruptcy process were the Estate

15  professionals and insiders. One of the professionals was Peter, who continued to serve

16  as counsel to the Debtor despite the clear claims the Estate had against him for

17  professional negligence when he failed to timely seek coverage under NATPE's insurance

18  policy for the Arbitration.  The obvious strategy of Peter was to not only continue to use

19  Estate resources to his own benefit, but to also try and run out the clock on the statutes of

20  limitations that are now faced by Plaintiff.

21     42.    Shortly after the Petition Date, NATPE sold substantially all of its assets for

22  $150,000 as well as the assumption of certain assumed deferred revenue liabilities of the

23  Debtor through a Court-approved sale (the "Asset Sale," Dkt. No. 48).  The Court approved

24  the Asset Sale on January 6, 2023, and there were no further operations (Dkt. No. 59).

25     43.    The Debtor filed its liquidating plan January 9, 2023 (Dkt. No. 61).

26     44.    On September 17, 2024, Plaintiff was appointed as the Plan Fiduciary to

27  administer the Debtor's Estate in which capacity he continues to serve.

28     45.    As of the Petition Date, the Debtor was indebted to Fontainebleau Florida

Hotel, LLC dba Fontainebleau Florida LLC d/b/a Fontainebleau Miami Beach Hotel ("Fontainebleau") in the amount of no less than $3,414,618.69, plus prejudgment interest and attorney's fees and costs.

46.    Plaintiff is informed and believes that within the one year prior to the Petition Date, Bommel received the transfers from the Debtor totaling in excess of $450,000 (the "Bommel 1-Year Transfers").

47.    Plaintiff is informed and believes that the Bommel 1-Year Transfers included substantial deferred compensation, contractual severance and vacation pay, and a separate severance payout.  This included approximately $150,000 in severance and vacation "buyout."

48.    Plaintiff is informed and believes that Bommel's employment contract creating the severance obligation was entered into on April 1, 2022, while Debtor was engaged in Arbitration with Fontainebleau.

49.    Plaintiff is informed and believes that within the one year prior to the Petition Date, Peter received the transfers from the Debtor totaling in excess of $421,783, of this amount, $221,410.50 was paid within the 90 days prior to the Petition Date, including a single payment of $76,642.25 on September 26, 2022 (the "Peter Pre-Petition Transfers," and collectively referred to herein with the Bommel 1-Year Transfers as the Preferential Transfers).

50.    Plaintiff is informed and believes that the Debtor had a property interest in the funds that made up each of the Preferential Transfers as each of the Preferential Transfers were drawn against and cleared one or more of the Debtor's bank accounts.

51.    Plaintiff is informed and believes that each of the Preferential Transfers was paid on account of outstanding debt(s) owed by the Debtor to Defendants at the time the payments were made.

52.    Plaintiff is informed and believes that the Debtor did not receive reasonably equivalent value in exchange for the severance and deferred compensation payments to Bommel, including the Bommel 1 Year Transfers, and these payments were fraudulent.

53.     Prior to commencing this action, Plaintiff performed reasonable due diligence regarding Defendants' potential affirmative defenses to the claims asserted herein. The due diligence was performed with the assistance of Plaintiff's counsel and accountants by reviewing the Debtor's books and records, analyzing payments made by the Debtor to Defendants, and confirming associated information regarding Defendants' invoices to the Debtor.

54.     Plaintiff is informed and believes that after the Petition Date, Bommel received at least $200,015.00 from the Debtor (the "Post-Petition Transfers").

55.     Plaintiff is informed and believes that the Debtor had a property interest in the funds that made up each of the Post-Petition Transfers which were drawn against and cleared one or more of the Debtor's bank accounts.

56.     Plaintiff is informed and believes, that at all relevant times herein, Bommel had access to, and exercised control over, all of NATPE's bank accounts.

## FIRST CLAIM FOR RELIEF

### (Breach of Fiduciary Duty – against Bommel)

57.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

58.     During the relevant period, Bommel was an officer and/or director of the Debtor, and as such, owed fiduciary duties of care and loyalty to the Debtor and owed a duty not to engage in self-dealing conduct that could harm the Debtor. Moreover, these duties were heightened because the Debtor was a non-profit organization.

59.     In addition, Bommel also owed a duty of care to act with minimal competency to ensure that the Debtor was operated in accordance with the law, as well as a duty of loyalty to avoid placing his own interests ahead of the Debtor's interests, which prohibited him from undertaking or participating in activities adverse to the interests of the Debtor and its creditors and the duty to account to the Debtor to and keep it fully informed as to all matters pertaining to its interests.

60.     Moreover, Bommel owed the same fiduciary duties to the Debtor's creditors

1  because the Debtor was insolvent.

2        61.    The fiduciary duties of loyalty and good faith required that Bommel act in the

3  best interests of the Debtor and its creditors rather than his own self-interest, and to

4  correspondingly refrain from self-dealing, conflicts of interest, and prioritizing his own

5  personal gain or the enrichment of directors and officers at the expense of the Debtor.

6  Bommel was also required to ensure that the Debtor's resources were used for a pubic

7  benefit and avoid acting for purposes other than advancing the Debtor and its creditors'

8  best interests and to avoid failing to act when he had a known duty to act. Additionally,

9  Bommel was required under the duties of loyalty and good faith to exercise a level of

10  diligence in operating the Debtor's business such that he did not act grossly negligent or

11  disregard corporate formalities and financial reality.

12        62.    Because Bommel was ultimately responsible for overseeing the day-to-day

13  business operations and financial performance of the Debtor and involved in supervising

14  all aspects of the Debtor's financial affairs, at all relevant times, he was well aware of the

15  dire financial condition and insolvency of the Debtor. Despite this knowledge, Bommel

16  failed to act in good faith, and caused the Debtor to make the above-described distributions

17  to or for himself, Peter, the Executive Team and the others, as well as preferring some

18  creditors over other creditors while the Debtor was in severe financial distress. Bommel's

19  substantial payments to himself amounted to self-dealing, and included improperly

20  authorizing his severance and deferred compensation package while the Debtor was

21  insolvent in violation of Debtor's rights and obligations to its creditors. In so doing, Bommel

22  breached his fiduciary duties to Debtor.

23        63.    Additionally, Bommel committed numerous other acts and omissions in

24  blatant violation of law or policy giving rise to claims for breach of fiduciary duty, including,

25  but not limited to:

26      a. Ignoring conflicts of interests;

27      b. Failing to report and mishandling of insurance coverage issues;

28      c. Mismanaging the Debtor's affairs for personal gain or failing to act in the Debtor's

1   best interests;

2   d.  Failing to ensure that the Debtor's resources were used to achieve its public benefit

3       purposes as a non-profit organization;

4   e.  Withholding knowable information material to the Debtor's board and creditors;

5   f.  Transferring the Debtor's business operations (and employees) to competitors;

6   g.  Authorizing substantial severance and deferred compensations packages to

7       employees while the Debtor was insolvent.

8       64.    Consequently, per the allegations herein, Bommel breached his fiduciary

9   duties as an officer and director of the Debtor, and was a direct and proximate cause of,

10  and a substantial factor in causing damage to the Debtor and its creditors in the amount

11  of the transfers made by the Debtor to or for his own benefit and the benefit of the other

12  insiders, and preferring some creditors over other creditors, improperly authorizing

13  deferred compensation and severance payments while the Debtor was in severe financial

14  distress.

15      65.    These breaches of fiduciary duty directly contributed to the Debtor filing for

16  bankruptcy and depleted the Estate's assets both pre- and post-petition, and thereby

17  damaged NATPE in an amount to be proven at trial, but currently estimated to be at least

18  $4 million.

19                          **SECOND CLAIM FOR RELIEF**

20          **(Aiding and Abetting Breach of Fiduciary Duty – against Peter)**

21      66.    Plaintiff realleges and incorporates herein by reference each and every

22  allegation contained in all prior paragraphs of this Complaint.

23      67.    Peter was aware Bommel owed fiduciary duties to the Debtor.

24      68.    Peter knowingly, recklessly, and /or negligently engaged in conduct to aid

25  and abet Bommel's breaches of fiduciary duty described above.

26      69.    As a direct and proximate result of Peter aiding and abetting Bommel's

27  breaches of fiduciary duty, the Debtor has been damaged in an amount subject to proof at

28  trial, which sum is believed to be in excess of $4 million.

### THIRD CLAIM FOR RELIEF

### (Corporate Waste – against Bommel)

70.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

71.    An officer of an entity may be held liable where he causes the entity to enter into transactions in which no person of ordinary sound business judgment could view the benefits received in such transaction by the entity as a fair exchange for the consideration paid by the entity.

72.    Bommel caused Debtor to enter into numerous transactions for which it received very little or no consideration without limitation, Bommel made payments, to himself, Peters, various insiders out of the Bank Accounts and for which NATPE received very little or nothing in return.

73.    In addition, Bommel actively mismanaged and failed adequately oversee the Debtor's finances and continued to engage in self-dealing, irrationally squandered corporate assets, and actively drained the Debtor's cash in the months leading up to NAPE's bankruptcy filing, thereby causing unreasonable and knowable losses to NATPE where no businessperson of ordinary and sound judgment could conclude that the corporation has received adequate consideration.

74.    Bommel's actions were egregious or irrational and were not based on a valid assessment of NATPE's best interests and amounted to Corporate Waste.

75.    As a direct and proximate result of Bommel's conduct, the Debtor has been damaged in an amount subject to proof at trial, which sum is believed to be in excess of $4 million.

### FOURTH CLAIM FOR RELIEF

### (Negligence – Legal Malpractice Against – Peter)

76.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

77.    Peter acted as general counsel for the Debtor from at least 2010 until 2024.

16

1    During this time, the Peter represented the Debtor in multiple different capacities.

2    78.    In representing the Debtor, Peter owed a professional duty to use such skill,

3    prudence and diligence as other members of his profession commonly possess and

4    exercise under the circumstances in the performance of the tasks which they undertake.

5    This included a duty to avoid representation of interests adverse to the Debtor and withdraw

6    from representation when a conflict of interest arose.

7    79.    Peter breached his professional duty to the Debtor by his ongoing

8    mishandling of insurance coverage issues. The Debtor suffered at least (i) the loss of

9    coverage for its defense fees in Arbitration, which would have been covered had Peter

10   timely tendered the claim to Debtor's liability insurance carrier Navigators Insurance Co.

11   ("Navigators"), which is no less than $218,410.50, the amount paid to Peter during the 90-

12   day preference period; (ii) the loss of potential coverage for Debtor's liabilities stemming

13   from its disputes with Fontainebleau, including but not limited to the Arbitration, and (iii) the

14   fees and costs incurred in the coverage litigation against Navigators.

15   80.    Additionally, Peter breached his professional duty to the Debtor by, among

16   other things:

17       a.    Disclosure failures and misrepresentations in connection with Peter's

18             Application for employment as Special Counsel in the Bankruptcy Case.

19       b.    Peter failed to disclose his adverse interests to the Estate with respect to

20             its post-petition billing of the Estate in connection with potential fraudulent

21             transfer claims against Peter;

22       c.    Counseling in favor of payment of deferred compensation, severance, and

23             vacation pay to Debtor's Insiders and employees despite Debtor's

24             insolvency or near insolvency;

25       d.    Counseling in favor of Debtor's cancellation of the 2021 Agreement;

26       e.    Counseling in favor of Debtor's cancellation of the 2022 Agreement;

27       f.    Counseling in favor of Debtor's breach of the 2021 Settlement Agreement;

28       g.    Counseling in favor of other fraudulent transfers discussed above;

17

h.    Failing to disclose conflicts of interest and/or recuse Peter from

employment following ;

i.    Counseling and preparing independent contractor agreements for Debtor's

former employees who continued to perform in the same capacity as the

Debtor in violation of California employment laws and possibly state and

federal tax laws;

j.    Failing to advise the Debtor that its prepetition compensation to insiders

was excessive and in breach of such insider's fiduciary duties to the

Debtor.

81.    Peter's negligence directly contributed to the Debtor filing for bankruptcy and depleted the Estate's assets both pre- and post-petition, and thereby damaged NATPE.

82.    As a direct and proximate result of Peter's breaches, the Debtor has been damaged in an amount subject to proof at trial, which sum is believed to be in excess of $4 million.

## FIFTH CLAIM FOR RELIEF

**(Avoidance of Intentionally Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(A) –**

**against Bommel)**

83.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

84.    Plaintiff is informed and believes that within two years of the Petition Date, the Debtor made certain transfers to, or for the benefit of Bommel totaling at least $450,000 (the "2-Year Transfers").

85.    Plaintiff is informed and believes that the 2-Year Transfers constituted an interest in property of the Debtor.

86.    Plaintiff is informed and believes and thereupon alleges that the 2-Year Transfers were transfers that were made with the actual intent to hinder, delay and defraud the creditors of the Debtor.

87.    Plaintiff is informed and believes that at the time the 2-Year Transfers were