MEGHANN A. TRIPLETT (SBN 268005)
*Meghann@MarguliesFaithLaw.com*
JONATHAN SERRANO (SBN 333225)
*Jonathan@MarguliesFaithLaw.com*
**MARGULIES FAITH LLP**
16030 Ventura Boulevard, Suite 470
Encino, CA 91436
Telephone: (818) 705-2777
Facsimile: (818) 705-3777

Attorneys for Plaintiff, Jeremy W. Faith,
Chapter 11 Plan Fiduciary

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>NATIONAL ASSOCIATION OF TELEVISION PROGRAM EXECUTIVES, INC.,<br><br>Debtor. | Case No.:  1:22-bk-11181-MB<br><br>Chapter:    11 (Subchapter V)<br><br>Adv. Case No.: 1:24-ap-01055-MB |
| JEREMY W. FAITH, Chapter 11 Plan Fiduciary,<br><br>Plaintiff,<br><br>v.<br><br>JEAN PIERRE BOMMEL, an individual; ARNOLD P. PETER, an individual; ARNOLD P. PETER, a professional corporation dba PETER LAW GROUP, and DOES 1-50, inclusive,<br><br>Defendants. | **FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) BREACH OF FIDUCIARY DUTY;**<br><br>**(2) CORPORATE WASTE;**<br><br>**(3) NEGLIGENCE;**<br><br>**(4) VOID CONTRACTS DUE TO UNLAWFUL PURPOSE [CAL. CIV. CODE §§ 1598, 1667, AND 1668**<br><br>**(5) VOIDABLE CONTRACT UNDER CAL. CORPORATIONS CODE § 23304.1(A)**<br><br>**(6) FRAUD IN THE INDUCEMENT;**<br><br>**(7) AVOIDANCE, RECOVERY, AND PRESERVATION OF ACTUAL FRAUDULENT TRANSFERS [11 U.S.C. §§ 548(A)(1)(A), 550, AND 551];**<br><br>**(8) AVOIDANCE, RECOVERY, AND PRESERVATION OF CONSTRUCTIVELY FRAUDULENT TRANSFERS [11 U.S.C. §§ 548(A)(1)(B), 550, AND 551];**<br><br>**(9) AVOIDANCE, RECOVERY AND PRESERVATION OF PREFERENTIAL TRANSFERS [11 U.S.C. §§ 547, 550, AND 551];** |



**(10) AVOIDANCE, RECOVERY, AND PRESERVATION OF UNAUTHORIZED POSTPETITION TRANSFERS [11 U.S.C. §§ 549, 550, AND 551];**

**(11) CONVERSION;**

**(12) UNJUST ENRICHMENT; AND**

**(13) DECLARATORY RELIEF**

Plaintiff Jeremy W. Faith ("Plaintiff"), the Chapter 11 Plan Fiduciary for the bankruptcy estate ("Estate") of the reorganized debtor National Association of Television Program Executives, Inc. (the "Debtor" or "NATPE"), brings this action to recover more than $4 million in damages caused by defendants' misconduct. Defendants breached fiduciary duties and carried out fraudulent and preferential transfers, among other wrongful acts, causing harm to NATPE and its creditors. Defendants, including NATPE's former CEO and general counsel, used unauthorized compensation increases, improper bonus payments, and unlawful professional fees to siphon money from NATPE and reduce recoveries available to creditors.

**I.**

**STATEMENT OF JURISDICTION, NATURE OF PROCEEDINGS, AND VENUE**

1.      The United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (the "Bankruptcy Court") has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334, because the claims asserted herein arise under title 11 of the United States Code and/or arise in or relate to the chapter 11 case of the Debtor currently pending in the Bankruptcy Court as *In re National Association of Television Program Executives, Inc.*, Case Number 1:22-bk-11181-MB (the "Bankruptcy Case"). The outcome of this adversary proceeding will have a significant effect on the Estate because it will impact the disposition of property of the Estate and the amount of

1    money available for distribution to creditors. Certain of the claims for relief alleged in this

2    First Amended Complaint constitute core proceedings under 28 U.S.C. § 157(b).

3    Regardless of whether this proceeding is a core proceeding, Plaintiff consents to the entry

4    of a final order and judgment by the Bankruptcy Court.  Defendants are hereby notified

5    that Fed. R. Bankr. P. 7012(b) requires each defendant to plead whether consent is given

6    to the entry of a final order and judgment by the Bankruptcy Court.

7         2.    This adversary proceeding is commenced pursuant to Rule 7001, *et seq.* of

8    the Federal Rules of Bankruptcy Procedure; 11 U.S.C. §§ 544, 547, 548, 549 and 550,

9    and applicable state law claims.

10        3.    Venue is proper in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and

11   1409 because this proceeding is related to the Bankruptcy Case pending in this district

12   and division. Pursuant to 28 U.S.C. § 1391, venue is also appropriate in this district and

13   division because each of the defendants either resides in or is authorized to and regularly

14   does carry out business in this district and many of their wrongful acts, omissions and/or

15   conduct as complained of in this First Amended Complaint took place within this district.

16   Accordingly, this Court also has personal jurisdiction over each of the defendants.

**II.**

**PARTIES**

19        4.    Plaintiff is the Chapter 11 Plan Fiduciary of the Estate and brings this

20   adversary proceeding on behalf of the Estate pursuant to 11 U.S.C. §§ 1123(b)(3)(B) and

21   1104(d), the confirmed plan, and the Bankruptcy Court's *Order Confirming Second*

22   *Amended Subchapter V Chapter 11 Plan with Modifications* (the "Confirmation Order")

23   [Bk. Dkt. 258].

24        5.    Defendant Jean Pierre Bommel ("Bommel") is a resident of the State of New

25   York and served as President and Chief Executive Officer of NATPE during the relevant

26   period.

27        6.    Defendant Arnold P. Peter ("Peter") is a resident of Los Angeles County,

28   California, and served as NATPE's general or special counsel during the relevant period.

7.     Defendant Arnold P. Peter, APC dba Peter Law Group ("PLG") is a California professional corporation with its principal place of business in Los Angeles, California. Peter is the President and sole shareholder of PLG. During the relevant period, PLG provided legal services to NATPE, which gave rise to duties owed to NATPE in connection with that attorney-client relationship.

8.     Defendants are Insiders of the Debtor as that term is defined under 11 U.S.C. § 101(31).

9.     Defendants Does 1 through 50, inclusive, are sued herein under fictitious names because their true names and capacities are currently unknown to Plaintiff.  Plaintiff will amend this First Amended Complaint to allege their true names and capacities when ascertained.  Each of the Doe defendants is an immediate or mediate transferee of the fraudulent, preferential, or other avoidable transfers alleged in this First Amended Complaint or of the proceeds of such fraudulent, preferential, or other avoidable transfers, and did not take such property for value, in good faith, and without knowledge of the avoidability of such transfers, or is otherwise liable along with the named defendants for the wrongful acts and omissions and damages alleged in this First Amended Complaint.

10.     Collectively, Bommel, Peter, PLG, and DOES 1 – 50, are referred to as "Defendants."

### III.

### PROCEDURAL BACKGROUND

11.     On August 22, 2024, the Debtor filed its second amended *Plan of Liquidation for Small Business Under Chapter 11* (the "Plan") [Bk. Dkt. 251]*, which, among other things, proposed the appointment of Plaintiff as the Plan Fiduciary of the Estate.

12.     On September 17, 2024, the Court entered an order confirming the Plan, as modified (the "Confirmation Order") [Bk. Dkt. 258] and appointed Plaintiff as the Plan Fiduciary of the Estate, effective the same date.

13.     All claims have been transferred to Plaintiff pursuant to the confirmed plan and Plaintiff has "succeed[ed] to any and all claims, defenses, powers and interests held

by the Debtor … and the Plan expressly reserves all such claims, defenses, powers and interests to the Plan Fiduciary, including, without limitation, rights to … avoid transfers of property or interests in property of the Debtor, and seek recovery of property, damages, or equitable relief." Confirmation Order at ¶ K, pgs. 6-7.

14.    The Plan is binding under section 1141 of the Bankruptcy Code and the Court retained jurisdiction to adjudicate adversary proceedings and litigated matters instituted during the Bankruptcy Case whether before, on, or after the effective date of the Plan.  Plaintiff was appointed after the events giving rise to this action and bases these allegations on information and belief, as permitted under applicable law.

15.    Plaintiff brings this action solely in his capacity as the Plan Fiduciary for the benefit of the Estate and its creditors.

**IV.**

**FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**

**A.  NATPE's Corporate Status and Governance**

16.    NATPE is a Delaware non-profit corporation organized under Section 501(c)(6) of the Internal Revenue Code. It operated as a global content association and professional membership organization.

17.    NATPE's Certificate of Incorporation prohibits its net earnings from inuring to the benefit of any member, trustee, director, officer or private individual.  A true and correct copy of NATPE's operative Certificate of Incorporation, as amended, is attached as Exhibit A, pp. 2-3.

18.    NATPE's corporate offices and headquarters were based in Los Angeles, California.

19.    NATPE was governed by a Board of Directors (the "Board") that included executives from Netflix, Lionsgate, Warner Brothers, Facebook, among others, who were elected under NATPE's Bylaws.

20.    NATPE's Bylaws required a duly formed Executive Committee that included individuals then serving in the offices of President and at least two Board-appointed

1    Directors.

2        21.    Bommel was never a Board member or an Executive Committee member.

3        22.    As a result, the Executive Committee was not properly formed during his

4    tenure.  A true and correct copy of NATPE's operative Bylaws, as amended is attached

5    as Exhibit B, Section 1, Article VII at pg. 9.

6        23.    NATPE's Bylaws also states that "[t]he salaries of the officers shall be fixed

7    from time to time by the Board and no officer shall be prevented from receiving a salary

8    by reason of the fact that the officer is also a Director." *Id.* at Section 9 of Article VI.

9        24.    From 2015 to 2022, NATPE's Tax Returns reported that NATPE's executive

10    compensation was reviewed and approved by NATPE's "Compensation Committee,"

11    through a compensation-review process. That process included a committee that met and

12    made recommendations regarding the compensation program to the Executive

13    Committee.

14        **B. NATPE's Financial Decline**

15        25.    Andrew Kaplan ("Kaplan") was appointed as NATPE's Board Chairman in

16    August 2015.

17        26.    Bommel was hired as Chief Operating Officer and Managing Director in

18    September 2015.

19        27.    Under Bommel's leadership, NATPE's investment accounts declined from

20    approximately $7 million in March 2016 to just over $500,000 by the October 11, 2022

21    bankruptcy petition date, a loss of over 6.5 million in liquid assets.

22        28.    NATPE did not achieve a revenue surplus from September of 2015 through

23    March 2022. Over that period, NAPTE lost more than $1 million annually on average, and

24    depleted its reserves.

25        29.    NATPE's net assets declined from $9.4 million to $1 million as of March

26    2022. This figure does not include the separate $3.4 million liability asserted in the

27    Fontainebleau Arbitration Claim (defined *infra*).

28    / / /

5

30.     During his tenure, Bommel depleted more than $8 million in net assets.

31.     Bommel also failed to take actions necessary to protect NATPE interests. For example, between April 2017 and March 2020, Bommel authorized NATPE to transfer approximately $597,885 to NATPE's Education Foundation, even though NATPE was operating at a structural deficit.

**C. Event Cancellations and Resulting Insolvency**

32.     NATPE's primary revenue source was its annual conference at the Fontainebleau Hotel in Miami Florida ("Fontainebleau").

33.     In October 2018, NATPE entered into agreements with Fontainebleau to host the NATPE Market & Conference 2021 (the "2021 Event") from January 14 to 27, 2021 and the NATPE Market & Conference 2022 (the "2022 Miami Event") from January 13 to 26, 2022 (the "2022 Event Agreement").

34.     On January 8, 2021, Bommel and Chairman Kaplan cancelled the 2021 Event. They cited COVID-19 and invoked *force majeure* (the "2021 Cancellation").

35.     Fontainebleau disputed whether the *force majeure* provision applied.  The parties later entered into a settlement that required NATPE to pay $100,000 and forfeit a $75,000 deposit (the "2021 Settlement Agreement").

36.     The 2021 Cancellation further harmed NATPE's already weak financial condition as it headed into 2021.

37.     In October 2021, Bommel's internal communications to the Board reflected that he understood cancelling the 2022 Miami Event could trigger more than $3.4 million in cancellation liability. Those communications also reflected that Bommel understood such liability could render NATPE insolvent.

38.     Around January 6, 2022, Peter provided Bommel a legal analysis of NATPE's asserted right to cancel the 2022 Miami Event.  That analysis was one-sided and omitted adverse legal authority, including *In re Cinemex USA Real Est. Holdings, Inc.*, 627 B.R. 693 (Bankr. S.D. Fla. Jan. 26, 2021), a bankruptcy decision addressing similar

1  issues.[1]

2         39.    Peter and PLG had a duty to disclose those risks because NATPE relied on

3  counsel for accurate disclosure of legal risk and counsel undertook to advise on the legality

4  and structure of the transaction. Further, by providing a partial analysis, Peter and PLG

5  created a misleading half-truth by omitting material risk information.

6         40.    Bommel and Kaplan cancelled the 2022 Miami Event on January 8, 2022

7  (the "2022 Cancellation"). They again invoked *force majeure* (the "2022 Cancellation")

8  notwithstanding their knowledge that COVID-19 was no longer unforeseeable and that

9  performance was not impossible.

10        41.    The 2022 Cancellation resulted in Fontainebleau filing an arbitration demand

11 seeking $3,389,618.69 in damages under the 2022 Event Agreement and $25,000 owed

12 pursuant to the breach of the 2021 Settlement Agreement (the "Arbitration Claim").

13        42.    The Arbitration Claim created insolvency exceeding $2.3 million as of

14 March 31, 2022.

15        **D. <u>The Siphoning Scheme</u>**

16        43.    Beginning in September 2020, Defendants implemented a scheme to siphon

17 funds from NATPE through unauthorized compensation increases not approved by

18 documented Board or duly authorized committee action and not supported by

19 contemporaneous governance records, fraudulent bonus payments, and unlawful

20 attorneys' fees (the "Siphoning Scheme").

21        44.    The scheme involved: (a) conspiring to enable pre and post-petition fund

22 transfers to insiders by and through false or misleading misrepresentations to the Executive

23 Committee, Board, and Bankruptcy Court; (b) causing NATPE to, in fact, make such

24 transfers; and (c) concealing the existence of the scheme through additional fraudulent

25 representations or omissions to the Executive Committee, Board, and Bankruptcy Court;

26

27 [1] The bankruptcy court in *In re Cinemex* found that only a total lockdown imposed by the government in response to COVID would render performance impossible. *Id.* at 699-700.

28 In that case, the court opined that because the state of Florida reopened, allowing for 50% capacity in June 2020, payment of rent under a lease was no longer impossible and performance was therefore not excused under such conditions. *Id.*

1  and (d) post-confirmation obfuscation efforts, including the withholding of recorded

2  information related to NATPE's property or financial affairs.

3      45.    Undeterred by NATPE's insolvency, Bommel orchestrated a series of

4  transactions and occurrences that diverted substantial resources to himself and other

5  insiders while Peter and PLG assisted through salary manipulations and fraudulent

6  invoicing.

7      46.    NATPE's Form 990 federal income tax return for the fiscal year ending

8  March 31, 2022 (the "3/31/22 Tax Return") provided a picture of NATPE the rapidly

9  deteriorating financial condition. Program service revenue was reduced to $544,707, with

10  contribution and grant revenue of $312,698, and investment income of $117,224, equaling

11  total revenue of just $974,629. Total expenses for NATPE remained relatively the same

12  at $3,020,885, resulting in negative income of $2,046,256.

13     47.    The balance sheet side of the 3/31/22 Tax Return was equally dire, though

14  the situation was in fact much worse than what was reflected in the return. NATPE

15  disclosed total assets in the 3/31/22 Tax Return of $2,616,816, and liabilities of

16  $1,592,759, the majority of which liabilities consisted of funds collected for future events

17  that had yet to be earned. This left an apparent net asset value of $1,024,057. However,

18  the disclosed liabilities did not take into account the asserted FB Liquidated Damages

19  $3,389,618.69, which if reflected would show a negative asset value of $2,365,561,

20  placing NATPE deeply into insolvency.

21     48.    NATPE's financial condition during this period was not merely a temporary

22  timing issue; it reflected a continuing inability to meet vendor and other creditor obligations

23  while insiders continued to receive enhanced compensation and/or benefits.

24     49.    With obligations to creditors reaching over $4.9 million and available cash of

25  approximately $1.4 million as of April 2022, Bommel in consultation with Peter and PLG

26  had a fiduciary duty to manage the organizations scarce resources in a manner that did

27  not place creditors at undue risk of non-payment through risky business ventures and self-

28  dealing transactions that benefited themselves and other insiders.

50.     Bommel adopted an approach that depleted corporate assets through self-dealing transactions with Peter's guidance. In the six months leading up to NATPE's bankruptcy filing, Bommel actively drained over $1 million of the Debtor's cash, thereby causing unreasonable and knowable losses to NATPE where no businessperson of ordinary and sound judgment could conclude that the corporation has received adequate consideration.

51.     In this context, each dollar transferred to or for the benefit of insiders reduced funds available for operations and creditor payment, increased the ultimate deficiency to creditors, and diminished the value of the Estate available for distribution.

**E.  The Deferred Compensation Scheme**

52.     In September 2020, Bommel formulated a deferred bonus structure providing conditional bonuses for himself and three other NATPE executives—Wayneston Harbeson ("Harbeson"), Charlie Weiss ("Weiss"), and Doug Finberg (together with Bommel, the "Remaining Executives"), contingent on NATPE exceeding its 2022 fiscal year projected net revenue by at least 3% (the "Conditional Bonuses").

53.     On or about October 1, 2020, Bommel sent Peter an email detailing the elements of the Deferred Compensation Scheme.

54.     Payment of the Conditional Bonuses was contingent on NATPE exceeding 2022 fiscal year projected net revenue by at least 3% (the "Condition Precedent").  Upon meeting the Condition Precedent, each of the Remaining Executives would receive payments equal to their annual salary reduction for a full year, through March 31, 2022, have their salaries restored to original levels effective April 1, 2022, and Bommel would receive a bonus of 10% to 30% of his pre-reduction base salary (the "Net-Income Bonus Plan").[2]

55.     The central feature of this scheme was the concealment of the Conditional Bonuses' contingent character.  Although initially drafted as a bonus program based on predetermined metrics, it was later reframed as deferred compensation despite the

---

[2] Bommel's applicable pre-reduction base salary was $258,000, which would result in a potential conditional bonus of $25,800 to $77,400.

1    conditional nature of NATPE's obligation.

2          56.    For example, although Bommel and Peter drafted the initiative as a bonus

3    or profit-sharing program based on predetermined metrics (e.g., the company net revenue

4    targets) and referred to the financial compensation as "bonuses" in documents and emails

5    from October 2020 and early November 2020, it was later reframed as "deferred

6    compensation" despite the conditional nature of NATPE's obligation to make such

7    payments to the executives.

8          57.    On or about November 18, 2020, Kaplan sent the Executive Committee, a

9    proposal describing the Net-Income Bonus Plan payments as "deferred salary payments"

10    and    omitting    "bonus"    terminology.    The    Executive    Committee    approved    this

11    mischaracterized plan.

12          **F. <u>Unauthorized Salary Increases and Fraudulent Payments</u>**

13          58.    Notwithstanding NATPE's deteriorating financial condition, on June 4, 2021,

14    Bommel emailed Kaplan to inform him that he intended to unilaterally raise his salary of

15    approximately "$258,000 to $296,000 effective June 1st" (the "June 2021 Raise"). Bommel

16    stated in the email that his raise would "reduce slightly the deferred compensation planned

17    for 2022." *Id.*

18          59.    Kaplan responded to the June 2021 Raise Email and acknowledged

19    Bommel's unilateral raise.

20          60.    Bommel unilaterally increased his salary from $258,000 to $296,000 in June

21    2021. This raise was not approved by documented Board or duly authorized committee

22    action and not supported by contemporaneous governance records.

23          61.    Bommel's June 2021 Raise and Kaplan's subsequent acknowledgment was

24    *ultra vires* with respect to compensation adjustments and was not approved by

25    documented    Board    or    duly    authorized    committee    action    and    not    supported    by

26    contemporaneous governance records.

27          62.    On January 17, 2022, Bommel caused NATPE to transfer $57,749.94 to

28    Harbeson as an unearned "Deferred Compensation Bonus Payment" despite the unmet

1  Condition Precedent.

2        63.    On March 8, 2022, Bommel emailed Peter about Bommel's "deferred

3  compensation" plan, specifically asking if they could "address the deferred compensation

4  plan approved by Andy [Kaplan] as it is due March 31st[?]"

5        64.    Bommel and Peter, acting for PLG, understood that Bommel was not entitled

6  to the Conditional Bonuses because: (a) it was never authorized by contract; and (b) the

7  Condition Precedent was not met as NATPE's fiscal year 2022 net-revenue would not

8  exceed 3% of the projected net-revenue. Despite this, on or about March 22, 2022,

9  Bommel instructed Peter to draft a memorandum to Kaplan justifying payment of the

10  unearned Conditional Bonuses.

11        65.    On or about March 22, 2022, Peter, acting for PLG, drafted a memorandum

12  to Kaplan regarding "Deferred Compensation payments" benefiting insiders, representing

13  in substance that the arrangements were permissible for NATPE to adopt and implement,

14  while omitting material legal risks and constraints that would have been critical to the

15  Executive Committee's decision making (the "March 2022 Memorandum"). Attached as

16  Exhibit C is a true and correct copy of the March 2022 Memorandum and attachments.

17        66.    To legitimize payment of the unearned Conditional Bonus to Bommel, Peter

18  included a number of material misrepresentations March in the 2022 Memorandum, such

19  as: (a) Bommel's contract would expire on September 7, 2022, when it contained an

20  automatic renewal provision; (b) Bommel's salary was $397,000 when it was actually

21  $297,000 after an unauthorized June 2021 raise; and (c) Bommel was entitled to the

22  deferred compensation obligations, omitting the failed Condition Precedent.

23        67.    The March 2022 Memorandum was drafted by Peter to sanction the

24  unearned payment of the Conditional Bonus and to induce NATPE to offer Bommel a new

25  employment contract. In other words, it was an attempt to provide a legal pretext for

26  NATPE to pay Bommel an unearned bonus.

27        68.    On or about March 23, 2022, Peter sent Kaplan the March 2022

28  Memorandum.  Attached to the March 2022 Memorandum were copies of Bommel's 2015

Contract and the 2017 Amendment.

### G.  The Fraudulent 2022 Employment Contract

69.     On or about April 1, 2022, Kaplan emailed the Executive Committee to seek approval to offer Bommel a new employment contract ("April 1 Email"). That email repeated the March 2022 Memorandum statements that Bommel was entitled to deferred compensation, and a 10% minimum bonus, and it stated that Bommel's existing employment agreement would expire on September 7, 2022.  The April 1 Email did not disclose that the net-revenue Condition Precedent had not been satisfied, that Bommel had already received an unauthorized salary increases or that NATPE faced substantial contingent exposure arising from the cancellation of the 2022 Miami Event.

70.     The Executive Committee did not receive Bommel's prior employment agreement, as amended.  As a result, the committee could not independently verify the statements presented in the April 1 Email.

71.     When the misrepresentations were made, there were no obvious warning signs that would have prompted NATPE's decision makers to question Defendants' statements. The March 2022 Memorandum and related communications appeared to be routine governance matters presented by trusted fiduciaries. NATPE's Executive Committee members were sophisticated business executives and had no reason to suspect that NATPE's long-standing counsel and CEO were providing false information.

72.     Accordingly, NATPE's reliance on Defendants was reasonable. Defendants' positions of trust, their control of information, the lack of red flags, and concealment of material facts make reliance the expected result of the fiduciary relationship. Under those circumstances, NATPE was not required to conduct an independent investigation before relying on its fiduciaries' representations to approve moving forward with a new agreement for Bommel.

73.     On April 2, 2022, Kaplan texted Bommel that the committee was "onboard," implying approval of the proposed terms for Bommel's new employment contract (defined *infra* as the "2022 Employment Contract").

74.    The vote solicitation for the 2022 Employment Contract did not follow NATPE's bylaw procedure for an action without a meeting, which required unanimous written consent. *See* Exhibit B at pg. 9. For that reason, the approval process was defective.

**H.  Unauthorized Transfers Accelerate**

75.    On or about April 10, 2022, NATPE paid Bommel $70,320.26 as the first Conditional Bonus payment (of three), and his salary was increased to $397,451.34. These transfers occurred without documented Board or duly authorized committee action and were not supported by contemporaneous governance records.

76.    NATPE had no obligation to make these payments. As a nonprofit and under its governing documents, NATPE lacked power to implement a plan that distributed net revenue to private individuals (*e.g.*, Bommel and Harbeson), making the Net-Income Bonus Plan void from its inception as an *ultra vires* act. *See* Exhibit A, NATPE's Certificate of Incorporation, pg. 3, "SIXTH" recital.

77.    Even if NATPE could have adopted such a plan (a proposition not conceded here), it was not approved by either the Board or the Compensation Committee with authority over executive pay, and it was not later ratified through the required procedures set forth under the Delaware General Corporation Law § 141C ("DGCL").

78.    The Executive Committee also lacked authority to approve the Net-Income Bonus Plan through delegated Board power because the committee was not duly constituted and the Board did not later ratify the Net-Income Bonus Plan through required formalities.  Any attempted ratification would have been ineffective because NATPE lacked corporate power to enter the arrangement in the first place.

79.    On April 4, 2022, Bommel asked Peter to backdate the new employment contract to April 1, 2022, to help validate the payments that were already underway. Peter responded that he would begin drafting.  Backdating the contract created the appearance that the first Conditional Bonus payment (scheduled for April 10, 2022) was contract-authorized before it was made, even though the contract was not executed at that time.

13

80.     On or about April 18, 2022, Peter and PLG drafted Bommel's new executive employment agreement with an effective date of April 1, 2022 (the "2022 Employment Contract").  The contract repeated key misstatements and omissions from the March 2022 Memorandum, including statements about Bommel's salary and contract term. It was structured to supersede Bommel's existing employment agreement, as amended and remove the Condition Precedent, thereby creating a legal pretext for paying an unearned bonus.

81.     The contract also omitted that Bommel had already received the $70,320.26 April 10, bonus payment. That omission concealed that Bommel was not entitled to the payment because the Condition Precedent was not met and Bommel's new employment agreement had not been executed when the payment was made. These omissions were made to mislead NATPE about the legitimacy of the transfer.

82.     On or about May 2, 2022, Bommel and Kaplan, on behalf of NATPE, executed the 2022 Employment Contract.  The executed agreement contained the same core misstatements and functioned to shift NATPE into liability for the Conditional Bonuses by eliminating the Condition Precedent.

83.     Neither the Executive Committee nor the Board received a copy of the written 2022 Employment Contract or Bommel's prior employment agreement, as amended.  As a result, neither body voted nor approved the written 2022 Employment Contract itself.  A true and correct copy of the 2022 Employment Contract is attached as Exhibit D.

84.     Even if the Executive Committee had proper authority and approved the written 2022 Employment Contract, the approval would be void because it was procured through material misrepresentations and omissions.

85.     On or about July 3, 2022, despite serious cash-flow strain, NATPE paid Bommel $83,294.93 as the second Conditional Bonus payment (out of three). Around the same time, Bommel authorized a $25,000 salary increase for another executive without documented Board or duly authorized committee action and not supported by

14

contemporaneous governance records.

I. **NATPE's Financial Distress and Imminent Knowledge of Bankruptcy Filing**

86.     By July 2022, Defendants were evaluating restructuring options and the possibility of a bankruptcy filing, and NATPE was experiencing severe liquidity constraints affecting routine vendor payments.

87.     In July 2022, Bommel acknowledged that NATPE had reached a financial breaking point.  Despite that knowledge, Defendants continued to authorize payments to insiders.

88.     On or about July 17, 2022, Bommel communicated with NATPE's financial advisor/controller and CFO about cash flow concerns and the need to escalate the issue to Kaplan.

89.     On or about July 21, 2022, Peter, Bommel, Kaplan, and the financial advisor/controller/CFO held a conference about NATPE's financial condition.  A billing invoice from PLG reflects that the purpose of this call was to discuss "alternatives and possible dissolution and bankruptcies."

90.     That same day, Kaplan directed Bommel and the financial advisor/controller/CFO to assist Peter with drafting a memorandum for the Executive Committee.  The memorandum was intended to disclose NATPE's contingent liability of $3,389,618.69 tied to the cancelation of the 2022 Miami Event, request an emergency bailout from the Executive Committee, and set up an emergency Executive Committee meeting.

91.     On or around July 23, 2022, Peter prepared an initial draft of the memorandum to the Executive Committee.  The draft reflected a $240,000 monthly cash burn and repeated the same intentional misrepresentations and fraudulent omissions, as his March 2022 Memorandum.

92.     After that draft was prepared, Peter engaged the law firm of Norton Rose Fulbright ("Norton Rose"), as outside restructuring counsel to advise NATPE about

financial restructuring options. Between July 23 and July 25, 2022, Peter shared the draft with outside counsel who revised it and returned the revised version. Peter then circulated the revised version to Bommel and NATPE's financial advisor/controller/CFO.

93.    In response, Bommel expressed concern about including his 2022 Employment Contract terms in the memorandum because the Executive Committee had voted on it and was aware of it.

94.    On July 26, 2022, Bommel emailed Kaplan the final version of memorandum to the Executive Committee, dated July 28, 2022 (the "July 28 Memorandum"). Kaplan approved the final version. A true and correct copy of the July 28 Memorandum is attached as Exhibit E.

95.    On or about July 27, 2022, one day before the Emergency Executive Committee meeting, Bommel distributed the July 28 Memorandum to the Executive Committee members via email and copied Peter and the financial advisor/controller/CFO.

96.    The July 28 Memorandum described NATPE's dire financial condition while failing to disclose that insider payments not approved by documented Board or duly authorized committee action and not supported by contemporaneous governance records had accelerated the depletion of NATPE's cash reserves.

97.    Although the July 28 Memorandum represented that "payments to executives have been discharged," Bommel later received a final $83,290.93 Conditional Bonus payment on or about August 28, 2022.

98.    The July 28 Memorandum also stated that a bankruptcy filing was a distinct possibility but did not disclose that NATPE had retained Norton Rose as outside counsel for bankruptcy-related consulting services.

99.    On August 11, 2022, the Board of Directors held a special meeting.  Kaplan and Bommel gave opening remarks.  In his remarks, Bommel made false or misleading statements to the Board, including:

> In 2022, right before we had to cancel Miami, we actually had the money in the bank showing a budget surplus for Fiscal 2022 of $80K – for the first time in many years.

16

Unfortunately, Omicron took that away from us and we had to cancel MIAMI, <u>pay our clients back for most of it</u> and pay our vendors at a huge cost….[3]

[B]roadly [speaking], this drastic increase in costs related to a market decline, unrealized corporate sponsorship revenue, greater event costs, and residual costs for cancelling Miami.

100.   During the same meeting, Defendants informed the Board, for the first time, that a cancellation fee in excess of $3.2 million was being alleged by Fontainebleau.

101.   Defendants orchestrated the cancellations of the Miami 2021 and 2022 Events using baseless *force majeure* claims, despite the foreseeability of COVID-19 risks. The cancellation of the 2022 Event allowed NATPE, under Bommel's direction, to avoid paying event liabilities, while retaining and spending more than $1 million in sponsor and vendor funds that had been paid in advance.  NATPE later referred to these funds as "deferred credit" obligations.

102.   Defendants had superior access to NATPE's financial information, cash position, budget forecasts, and creditor obligations through their executive and professional roles, and participated in discussions and decisions concerning expense reductions, creditor-facing obligations, and restructuring options.

103.   Despite that access and participation, Defendants acted to preserve and enhance insider compensation and severance outcomes while NATPE's creditor obligations remained unpaid or underpaid, reflecting disloyal self-interest and/or knowing disregard of foreseeable harm to NATPE and the creditor body.

104.   Defendants' positions also gave them control over the flow of information to directors and over transaction execution, enabling insider-preferential payments to be implemented quickly and with limited internal checks during a period of distress.

**J.  Pre-Bankruptcy Maneuvering and Termination**

105.   In or about August-early September 2022, Kaplan directed Bommel to stop paying NATPE's bills except payroll. Shortly thereafter, NATPE management instructed personnel responsible for accounts payable to stop paying bills or materially restrict

---

[3] This statement is in reference to the deferred vendor credit obligations and, therefore, untrue since NATPE did not refund most of the payments related to the 2022 Event.

1   disbursements to preserve cash.

2        106.   NATPE retained bankruptcy counsel on September 12, 2022.

3        107.   On or about September 20, 2022, Bommel arranged for his own termination

4   as well as the termination of other NATPE employees.

5        108.   Bommel created the termination timeline below in contemplation of

6   bankruptcy and emailed the same to Peter and NATPE's financial advisor/controller/CFO

7   to implement. The timeline included steps for his own termination, a severance agreement,

8   and scheduled payouts.

| Date | Action | Responsibility | Notes |
|------|--------|----------------|-------|
| 9/23/2022 | Letter to JP terminating contract for no cause + Severance agreement | Arnold Peter | Will trigger contract payout for monies due (contract payout, PTO, severance) payable Oct. 3rd |
| 10/3/2022 | PTO and last check to employees | Sarah Jessup | As per LA labor law |
| 10/3/2022 | JP's termination payment, PTO and severance payment | Sarah Jessup | JP would have been notified of contract |
| 10/10/2022 | Severance payments to all qualified employees | Sarah Jessup | Pending on Signed releases |

16        109.   On September 30, 2022, Bommel and Kaplan executed a "Separation

17   Agreement and Release" (the "Termination Agreement") (drafted by Peter), that entitled

18   Bommel to termination related payments exceeding $310,000, including a large

19   termination payment of $198,725.70, severance of $54,004.97, and $57,687.78 in holiday

20   and vacation pay (collectively the "Termination Payments").  These amounts were paid to

21   Bommel on or about October 9, 2022, two days before NATPE's bankruptcy filing.

22        110.   In addition, the Termination Arrangement included a broad release by

23   NATPE of claims against Bommel (the "Release"). The Release had economic value

24   because it eliminated NATPE's potential claims related to compensation overpayments

25   and alleged self-dealing and other misconduct, and it therefore functioned as a transfer of

26   value from NATPE to Bommel within the meaning of 11 U.S.C. § 101(54)(D) (the

27   "Releases"). A true and correct copy of the Termination Agreement is attached as

28   Exhibit F.

1   111.   NATPE received little or no value in exchange for the Releases. NATPE

2   obtained only a covenant by Bommel not to sue, which did not provide value reasonably

3   comparable to the claims NATPE surrendered, especially given NATPE's financial

4   condition and the lack of viable claims by Bommel against the insolvent organization.

5   112.   The Termination Agreement was negotiated and executed in anticipation of

6   bankruptcy while NATPE was deeply insolvent.

7   113.   The Termination Agreement was not properly reviewed or approved by

8   NATPE's Board or Executive Committee.

9   114.   The Termination Agreement characterized the Releases and Termination

10   Payments as ordinary course and beneficial.  Contrary to this characterization, the timing

11   and circumstances of the transaction was extraordinary and designed to benefit an insider

12   at the expense of unsecured creditors.

13   115.   Immediately after his termination, Bommel was rehired as Interim President

14   and CEO under an independent contractor agreement and performed the same duties as

15   before.

16   116.   On or about October 7, 2022, Bommel and Kaplan executed an Independent

17   Contractor Agreement that paid Bommel a monthly flat fee of $15,000 paid in advance for

18   the same role described in his employment contract.  A true and correct copy of the

19   Independent Contractor Agreement is attached as Exhibit G.

20   117.   Immediately before the bankruptcy petition date, NATPE terminated all its

21   employees effective October 14, 2022.  These terminations included severance packages

22   (referred to herein as the "Termination Packages").

23   118.   The Termination Packages, including severance and Bommel's Termination

24   Payments, gave insiders an unfair advantage over unsecured creditors.  Furthermore, the

25   severance payments in the Termination Packages, including Bommel's Termination

26   Payments, failed to meet applicable legal requirements and amounted to self-dealing by

27   company executives and insiders.

28   / / /

119. In at least one executive separation, NATPE issued a written termination/severance communication reflecting that severance was treated as a Board-authorized obligation calculated by reference to years of service, demonstrating that severance decisions were expected to be handled through identifiable governance steps when properly authorized.

120. The absence of comparable governance documentation for the challenged insider payments supports the inference that those transfers were not properly approved and were instead procured or implemented through insider control and non-disclosure.

121. Defendants' conversion of employment relationships into independent contractor agreements with identical job duties was an attempt to circumvent the Bankruptcy Code's protections and was not in good faith.

**K.  NATPE's Chapter 11 Bankruptcy Filing**

122. On October 11, 2022 (the "Petition Date"), NATPE filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), commencing the Bankruptcy Case.  NATPE elected to proceed as a Subchapter V debtor. At the time of the filing, NATPE was negotiating a sale of substantially all assets to Brunico Communications Ltd. ("Brunico") and exploring other buyers on a compressed timeline.

123. After the Petition Date, NATPE operated as a debtor in possession, and its Interim President and CEO, Bommel exercised the authority typically assigned to a trustee in the case.

124. On or about November 18, 2022, on behalf of NATPE, Bommel signed and filed, under penalty of perjury, NATPE's Bankruptcy Schedules A-H, NATPE's Statement of Financial Affairs, and related documents in the Bankruptcy Case [Bk. Dkt. 27]. By his signature, Bommel declared under penalty of perjury that he had read the above-referenced documents, and that all information therein was true and correct.

125. NATPE's Schedules of Assets and Liabilities reflect that as of the Petition Date, NATPE had limited assets of approximately $533,834.75 and substantial liabilities, including more than $1 million tied to deferred vendor credits, as well as over $400,000 in

other unsecured debt obligations. [Bk. Dkt. 40, p. 1, line 3b, pg. 96, line 5b] ("Schedules").

NATPE also faced the Fontainebleau's claim for $3,414,618.69, plus prejudgment interest

and attorney's fees and costs.

126.   In early November 2022, the Debtor sought approval to pay certain pre-

petition wage and severance amounts through a wage approval motion (the "Wage

Motion,") [Bk. Dkt. 16]. The Wage Motion was opposed and later withdrawn without

Bankruptcy Court approval.  Despite the lack of approval, NATPE made post-petition

payments for pre-petition wages, vacation, holiday pay, and severance payments under

NATPE's newly created Termination Packages.

127.   Later in November 2022, NATPE entered into an Asset Purchase

Agreement with Brunico for the sale of substantially all assets for a $150,000 purchaes

price and the assumption of certain vendor credit liabilities through a Bankruptcy Court-

approved sale (the "Asset Sale") [Bk. Dkt. 48].  The Bankruptcy Court approved the Asset

Sale in early January 2023, and NATPE ceased operations thereafter. [Bk. Dkt. 59].

NATPE filed its liquidating Plan shortly after the sale approval [Bk. Dkt. 61].

**L.  Continued Financial Mismanagement**

128.   After the asset sale closed and business operations ended, NATPE's

remaining cash continued to decline due to unauthorized transfers and disbursements that

were not authorized by the Bankruptcy Court and were outside ordinary course of

business. Bommel approved more than $400,008.878 in additional disbursements over

the period following the closing of the Asset Sale through September 2024.[4] By the time

Plaintiff was appointed, the Estate had less than $120,000 remaining.

129.   The only apparent beneficiaries of the bankruptcy process were the Estate

professionals and insiders. One of the professionals was Peter and his firm PLG, who

continued to serve as counsel to the Debtor despite the clear claims the Estate had against

him for professional negligence when he failed to timely seek coverage under NATPE's

insurance policy for the Fontainebleau Arbitration Claim, and thereafter negligently

---

[4] This amount includes approved professional fees in the amount of $156,352.42 paid to
Leslie Cohen Law on a final basis and $75,520.00 paid to PLG on an interim basis.

represented NATPE in the Coverage Litigation and failed to preserve NATPE's claims. The obvious strategy of Peter and PLG was to not only continue to use Estate resources to his own benefit, but to also try and run out the clock on the statutes of limitations that are now faced by Plaintiff.

130.   Estate assets were systematically dissipated through various independent contractor agreements drafted by Peter, on behalf of PLG at the direction of Bommel shortly before the Petition Date.   These agreements were used to route post-petition payments to former employes as "consultants," including payments to Bommel without the approval required for non-ordinary course transactions.

131.   In addition, NATPE paid its financial consultants and CFO more than $87,500 in consulting fees during the Bankruptcy Case, including after an increase in the monthly fee from $7,000 to $12,500 in September 2022.

132.   These post-petition payments were not authorized by the Bankruptcy Court and served no legitimate bankruptcy purpose given the lack of meaningful operations and functioned instead as disguised insider distributions that impaired creditor interests.

133.   To make matters worse, several executives began working with NATPE competitors before the sale of NATPE's customer list and assets closed, bringing into question the loyalties of these individuals, and creating conflicts while continuing to receive consulting fees from NATPE. These conflicts of interest and competing loyalties further demonstrate the unauthorized and improper nature of the post-petition payments, which served the personal interests of insiders rather than the legitimate needs of the Estate.

134.   Bommel made false declarations under penalty of perjury in Bankruptcy Court, including in NATPE's Statement of Financial Affairs filed on November 18, 2022, among other things, falsely stating that "TOTAL" compensation Bommel received during the year prior to filing to bankruptcy was only $449,195.96 when in fact Bommel received $846,081.90 in total compensation for year prior to filing to bankruptcy [Bk. Dkt. 27, SOFA, ¶30].

/ / /

135.   Defendants made false and misleading representations to the Bankruptcy Court, and in pleadings and in declarations filed in the Bankruptcy Case, including the declarations filed on August 18, 2023 by Peter and Bommel containing a false narrative about cost savings and the reasons for Bommel's employment arrangements, while omitting or downplaying severance and total compensation paid.

136.   Defendants falsely represented that NATPE's termination of employees and executives pre-petition resulted in cost savings, omitting the substantial severance payments made to Bommel and others. Bommel also constructed a false narrative regarding the circumstances of his new 2022 Employment Contract—by stating that the new contract was to prevent him from retiring. However, there is no evidence in the communications to the Executive Committee or otherwise, that points to Bommel's alleged imminent departure from NATPE as a rationale for the 2022 Employment Contract.

137.   Bommel transmitted misleading financial reports and in his board presentations, including in an October 19, 2021 email attaching a misleading financial presentation.

138.   Defendants engaged in a multi-year pattern of self-dealing and dissipation of NATPE's business and assets, including transactions that benefited Defendants personally at the expense of the Debtor and its creditors, and advise that supported such payments despite knowledge of NATPE's insolvency. As of September 2024, the Estate's assets were depleted to less than $120,000, leaving creditors with minimal recovery for creditors.

**M. Defendants Received Preferential, Actual and/or Constructive Fraudulent Transfers**

139.   Prior to the Petition Date, NATPE made multiple transfers to Defendants (each, a "Transfer," and, collectively, the "Transfers"), as set forth in more detail in paragraphs 140 through 155 below.

140.   At all relevant times herein, Bommel had access to, and exercised control over, all of NATPE's bank accounts.

141.    Each of the Transfers constitutes a "transfer," as that term is defined in 11 U.S.C. § 101(54), of an asset or interest in an asset of the Debtor.

142.    Beginning in at least 2021, NATPE was in significant financial distress, and Defendants knew of that distress.

143.    NATPE made the Transfers while it lacked adequate capital for its operations and while it intended to incur debts it could not pay as they came due. NATPE also was not paying its debts as they came due, its financial statements reflected deep insolvency and a substantial <u>negative</u> net asset position by at least March 2022.

144.    The Transfers were outside NATPE's ordinary course of business.  To the extent that any of the challenged transfers occurred after the Petition Date, they were not authorized by the Bankruptcy Code or the Bankruptcy Court.

*(1) <u>One-Year Pre-Petition Transfers to Bommel</u>*

145.    Within one year prior to the Petition Date, Bommel received approximately $<u>857,508.63</u> in payments from NATPE (the "Bommel 1-Year Payments, and the Releases in the Termination Agreement (together, with the Bommel 1-Year Payments, the "Bommel 1-Year Transfers").  The known payments to Bommel that Bommel authorized or caused to be made from one or more of the Debtor's accounts, are those payments listed in <u>Exhibit H</u>.

146.    The Bommel 1-Year Transfers included $236,906.12 in bonus payments that remained subject to unmet conditions, compensation increases that were not authorized, and more than $310,000 in termination, severance, and holiday or vacation pay. In addition, Bommel received broad Releases from NATPE. In exchange for the Releases, NATPE obtained only a covenant by Bommel not to sue, which did not provide value reasonably comparable to the claims NATPE surrendered, especially given NATPE's financial condition and the lack of viable claims by Bommel against the insolvent organization.

147.    The Bommel 1-Year Transfers reduced resources available to creditors, disproportionately benefitted Bommel and did not provide reasonably equivalent value to

1  the Estate.

2  148.   The timing and structure of Bommel's employment and termination

3  arrangements were tied to NATPE's impending wind-down and the contemplated

4  bankruptcy filing and show an intent to shield payments from creditor scrutiny for

5  Bommel's personal benefit.  The challenged transfers were made under contracts that

6  served as vehicles for self-dealing and asset dissipation, violated public policy and non-

7  profit law, to the detriment of creditors and in pursuit of objectives outside the legitimate

8  scope of bankruptcy laws.

9  *(2) One-Year Pre-Petition Transfers to Peter Law Group*

10  149.   Within one year prior to the Petition Date, PLG received approximately

11  $421,783 from NATPE (the "PLG 1-Year Transfers"). Of this amount, approximately

12  $221,410.50 was paid within the 90 days prior to the Petition Date, including substantial

13  payments concentrated in September 2022 (the "PLG 90-Day Transfers," and together

14  with the PLG-1 Year Transfers, the "PLG Transfers"). The known payments to PLG that

15  Bommel authorized or caused to be made from one or more of the Debtor's accounts, are

16  those payments listed in Exhibit I.

17  150.   PLG was the entity that issued invoices, demanded payment, and received

18  the PLG Transfers.  Those payments were made on account of invoices for ongoing legal

19  services and were submitted under PLG's firm name and billing identifiers.

20  151.   The PLG Transfers were not disclosed in PLG's application for employment

21  as special counsel filed in the Bankruptcy Case, despite the requirement that such

22  applications disclose relevant payment history and potential conflicts. Peter, acting

23  individually and through PLG, communicated that PLG would serve as NATPE's counsel

24  for corporate and governance matters and would bill NATPE for that work. Peter also did

25  not disclose that PLG's corporate privileges were suspended during the relevant period,

26  which affected PLG's ability to sue, enforce contracts, and otherwise act as a compliant

27  business entity under applicable law.

28  / / /

1      152.   NATPE prioritized payment of PLG over other creditors as the bankruptcy

2 filing approached and made payments outside of the ordinary invoicing practices. Shortly

3 before the Petition Date, Peter requested immediate payment and Peter requested

4 immediate payment of a large outstanding balance on an expedited basis. Peter also

5 communicated with NATPE decisionmakers about PLG's continued engagement,

6 invoicing, and payment timing, and he requested or caused NATPE to make prioritized

7 payments in the run- up to the bankruptcy filing to ensure that all of PLG's pre-petition fees

8 were paid prior to the Petition Date.

9       **N. Unauthorized Post-Petition Transfers Subject to Avoidance**

10       153.   After the petition date, Bommel received at least $200,015.00 in post-petition

11 transfers from the Debtor without Bankruptcy Court authorization (the "Bommel Post-

12 Petition Transfers").   The known post-petition payments to Bommel that Bommel

13 authorized or caused to be made from one or more of the Debtor's accounts, are those

14 payments listed in Exhibit J.

15       154.   After NATPE ceased meaningful business operations, Bommel continued to

16 pay himself consulting fees between January 2023, and September 2024.

17       155.   The Bommel Post-Petition Transfers were unauthorized and detrimental to

18 the interests of the Estate and its creditors.

19       **O. Insurance Coverage Misrepresentations**

20       156.   In about 2021, NATPE purchased a $1,000,000 Directors and Officers

21 (D&O) insurance policy from Navigators Insurance Co. ("Navigators") for the policy period

22 of   October   31,   2021   through   October   31,   2022,   bearing   policy   number

23 NY21DOLV03218NV (the "D&O Policy").  The D&O Policy required timely claim notice as

24 a condition precedent to coverage.

25       157.   NATPE, acting through Peter and PLG, did not give timely notice of

26 Fontainebleau's Arbitration Claim. Navigators denied coverage on September 9, 2022

27 based on late notice.

28 / / /

158.    In June 2023, NATPE obtained an endorsement to the D&O Policy that extended the time to report certain claims.  The endorsement applied retroactively to October 31, 2022 and extended the claims reporting period from October 31, 2022 to October 31, 2023 for acts of coverage occurring before October 31, 2022 and reported before October 31, 2023.

159.    NATPE later sued Navigators seeking coverage. That case was dismissed with prejudice on July 28, 2023 (Case No. 2:23-cv-01805-RGK-AS) (the "Coverage Litigation").

160.    On or about October 27, 2023, NATPE, through its counsel Peter and PLG submitted a new coverage demand to Navigators. NATPE framed the demand as seeking coverage for claims asserted by Fontainebleau "on behalf of the bankruptcy estate, against alleged NATPE insiders" as a separate basis for coverage under the D&O Policy (the "BK Coverage Demand").  Peter also demanded that Navigators pay policy limits for the benefit of NATPE's creditors in the Bankruptcy Case.

161.    On or about December 22, 2023, Navigators denied the BK Coverage Demand by letter to Peter and PLG.  Together with the prior dismissal of the Coverage Litigation, the December 2023 denial left NATPE without insurance proceeds for claims against NATPE's former Directors and Officers.

162.    On April 3, 2024, Fontainebleau's counsel emailed Peter during negotiations over plan terms. Counsel stated their understanding that Navigators had denied coverage for costs tied to the Fontainebleau litigation. Counsel also noted that potential Plan Fiduciary claims were different claims that had not yet been asserted and asked whether NATPE make additional claims after the bankruptcy filing.

163.    On April 5, 2024, Peter responded, but did not answer whether NATPE had made additional claims post-petition claims.

164.    The confirmed Plan represented that the full amount of the D&O Policy was available for claims. [Bk. Dkt. No. 251, at p. 2, ¶4].  The Plan also provided that, if the representation was inaccurate, the Plan's limitation on claims against directors and

27

officers would be lifted. *Id.*

165.   The availability of D&O insurance coverage was a key settlement term in the mediation with Fontainebleau. *Id.*, at p. 1, ¶A.

166.   The Plan's representation was false because Navigators had denied coverage in December 2023 for claims against NATPE's former directors and officers.

167.   Peter and Bommel knew of the December 2023 denial of the BK Coverage Demand but still but still represented that the full policy amount was available. They made the representation to induce creditors, including Fontainebleau, to agree to the Plan's liability limitation.

168.   Defendants were in a fiduciary or trust-based relationship and had a duty to disclose the December 2023 BK Coverage denial as a material fact. The suppression of this material fact constitutes actionable fraud under California Civil Code § 1572.

169.   The insurance-availability representation was material to the Plan and the settlement because it limited recovery against directors and officers to available insurance proceeds.  If the representation was inaccurate, creditors were misled about the practical value of the limitation.

170.   Plaintiff did not learn of the December 2023 coverage denial until about September 17, 2024, after receiving a copy of the denial letter from Peter.

171.   The Plan's liability limitation was procured by misrepresentation or concealment regarding the availability of insurance coverage and is unenforceable.

## FIRST CLAIM FOR RELIEF

### (Breach of Fiduciary Duty Against all Defendants)

172.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this First Amended Complaint.

173.   Because NATPE was incorporated in Delaware, Defendants each owed fiduciary duties to NATPE and its creditors pursuant to Delaware law.

174.   Under Delaware law, directors and officers of nonprofit (or "non-stock") corporations owe the same duties of loyalty and care as directors and officers of for-profit

1  corporations. *Oberly v. Kirby*, 592 A.2d 445, 461 (Del. 1991); 8 Del. C. §§ 114, 141, 142;

2  *see also Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009) (holding officers owe the

3  same fiduciary duties as directors).

4      175.   Neither NATPE's Certificate of Incorporation nor its Bylaws contain

5  exculpation provisions affecting officers.

6      176.   NATPE's Bylaws required officers to comply with NATPE's conflict of interest

7  policy as a condition of serving as an officer. <u>Exhibit B,</u> Article IV, Section 10, at pg. 6.

8      177.   NATPE's Conflict of Interest Policy required directors and officers to act in

9  good faith, use best efforts, and make decisions based on factual data information in the

10 best interest of all members of NATPE as a whole. *Id.*

11     **A.  <u>Defendants' Fiduciary Relationships and Duties</u>**

12     178.   Bommel served as NATPE's President and CEO.

13     179.   Peter and PLG served as NATPE's general counsel for more than a decade.

14     180.   Because of their roles, each Defendant owed duties of care and loyalty to

15 NATPE and its creditors. They also had a duty to act in good faith, avoid self-dealing,

16 avoid conflicts of interest.

17     181.   Defendants knew NATPE was in severe financial distress and was insolvent

18 by March 2022.

19     182.   During insolvency, Defendants had to consider NATPE's creditors when

20 making decisions for the organization.

21     183.   Defendants were required to use the Debtor's resources for the

22 organization's purposes and not for personal gain. They also had to follow basic corporate

23 governance and respond when they had a known duty to act. Additionally, Defendants

24 were required under the duties of loyalty and good faith to exercise a level of diligence in

25 operating the Debtor's business such that they did not act grossly negligent or disregard

26 corporate formalities and financial reality.

27     184.   The challenged conduct is not protected as a good-faith exercise of business

28 judgment because it involves self-interested insider benefits, lack of disinterested and

1    informed approval, and material non-disclosure concerning NATPE's financial condition

2    and creditor impact.

3          **B. <u>Specific Breaches by Defendant Bommel</u>**

4          185.    Bommel breached the duty of loyalty by causing, approving, directing, and/or

5    receiving insider compensation and benefits that were not properly authorized, were not

6    the product of an informed and disinterested approval process, and provided Bommel with

7    personal financial benefit while NATPE was unable to satisfy creditor obligations.

8          186.    Bommel further breached fiduciary duties by failing to disclose material facts

9    to NATPE's directors and decisionmakers regarding NATPE's liquidity constraints, inability

10   to pay creditors as they came due, and the foreseeable effect of insider payments on

11   creditor recoveries, thereby preventing informed decision making and enabling insider

12   extraction.

13         187.    Bommel acted without adequate deliberation and in a manner no loyal

14   fiduciary would, by prioritizing insider payments over creditor-facing obligations, during

15   sustained financial distress.

16         188.    Bommel increased his salary in June 2021 without proper approval.

17         189.    Bommel participated in a deferred compensation plan that sought to pay

18   bonuses even though the required performance conditions were not met.

19         190.    Bommel acted in bad faith by consciously disregarding his obligations as an

20   officer.

21         191.    Bommel also breached the duty of care by causing NATPE to adopt the Net-

22   Income Bonus Plan without adequate consideration of whether the plan complied with

23   restrictions applicable to nonprofit organizations, including limits on private inurement.

24   *Miniace v. Pac. Mar. Ass'n*, 2007 U.S. Dist. LEXIS 23495, at *20-21 (N.D. Cal. Mar. 30,

25   2007) (finding that the "tax exempt status under Section 501(c)(6) of the Internal Revenue

26   Code required careful attention to the inurement rules governing executive compensation;"

27   because noncompliance, "could jeopardize [the non-profits'] tax exempt status.").

28   / / /

30

192.   Among other things, Bommel acted in bad faith by consciously disregarding his obligations as an officer. *e.g.*, "intentional dereliction of duty" and/or the "conscious disregard for his responsibilities" as a corporate officer.   *See e.g., City of Pittsburgh Comprehensive Mun. Pension Tr. Fund v. Conway*, 2024 Del. Ch. LEXIS 129, 2024 WL 1752419 (Del. Ch. April 24, 2024) (finding that officer may breach fiduciary duty for having received compensation in violation of the applicable compensation plan or agreement where the recipient knew or should have known that such compensation violated the applicable plan or agreement).

193.   Bommel failed to disclose material information to NATPE's Executive Committee or Board regarding the terms of the Net-Income Bonus Plan and the unmet Condition Precedent, and his receipt of a $70,320.26 bonus payment in April 2022, before his new employment contract was executed.

194.   The terms of the Net-Income Bonus Plan were not susceptible to any reasonable interpretation that could lead to the conclusion that Bommel or any of NATPE's agents had authority to make the payment of the Conditional Bonuses over the express limitation found in Net-Income Bonus Plan.   Thus, Bommel knew or should have known that the payments of the Conditional Bonuses were unauthorized and his participation in the deferred compensation scheme, including his receipt of such payments, were in bad faith.

195.   Bommel is not protected by the Business Judgement Rule where the challenged conduct involves bad faith or knowing violations of clear limitations on authority. Accordingly, Bommel is not protected by carrying out the deferred compensation scheme because (1) Net-Income Bonus Plan involves clear limitations on authority to make the Conditional Bonuses payments; and (2) Bommel acted in bad faith by repeatedly and deliberately misreading the terms of the Net-Income Bonus Plan in order to justify the Conditional Bonuses payments.

196.   Bommel also made material misrepresentations and omitted material facts to induce NATPE to enter into the 2022 Employment Contract.

1    197.   Bommel committed additional breaches by ignoring conflicts of interest,

2  failing to observe corporate formalities, and withholding material information from

3  NATPE's decision makers, and transferring NATPE's business operations and employees

4  to competitors. *See Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169,

5  1184 (Del. Ch. 2006) ("Under Delaware law, a director's fiduciary duty of loyalty includes

6  a duty to disclose."); *Hoover Indus., Inc. v. Chase*, 1988 Del. Ch. LEXIS 98, 1988 WL

7  73758, at *338 (Del. Ch. July 13, 1988); (holding that the "intentional failure or refusal of a

8  director to disclose to the board a defalcation or scheme to defraud the corporation of

9  which he has learned" constitutes a breach of the duty to disclose).

10    **C. <u>Specific Breaches by Defendants Peter and PLG</u>**

11    198.   Peter and PLG, while acting as NATPE's counsel, participated in and

12  facilitated transactions and payment decisions that advantaged insiders, including by

13  advising on, drafting, implementing, and/or papering actions that resulted in transfer of

14  NATPE value to insiders during financial distress.

15    199.   Peter and PLG breached duties owed to NATPE by failing to provide candid,

16  competent advice concerning the legal risks and fiduciary consequences of insider

17  compensation and severance decisions under insolvency conditions, and/or by placing

18  insider interests ahead of NATPE's interests in connection with those transactions.

19    200.   To the extent Peter and PLG had divided loyalties or conflicts, they failed to

20  ensure NATPE's decisionmakers received full, accurate, and timely disclosure of conflicts,

21  risks, and material facts necessary for informed approval, thereby enabling improper

22  insider benefit.

23    201.   Peter and PLG assisted Bommel's deferred compensation scheme by

24  preparing memoranda and contract documents that contained material inaccuracies.

25    202.   Peter and PLG advised in favor of insider transfers while NATPE was

26  insolvent, including the 2022 Employment Contract, and arranging for Bommel's

27  Termination Agreement and Termination Payments, days before NATPE's bankruptcy

28  filing.

203.   Peter and PLG failed to disclose conflicts of interest tied to insurance coverage issues, even though those issues created adversity between NATPE and counsel.

204.   Peter and PLG failed to disclose that PLG had been suspended since June 2017. By billing under the firm identify and accepting payment, Peter and PLG conveyed that PLG was authorized to provide the services billed, making the nondisclosure misleading.

205.   NATPE relied on those representations when it approved and paid PLG's invoices.

206.   Peter and PLG also breached the duty of care by advising on compensation-related payments without adequate analysis of nonprofit restrictions and NATPE's governing documents.

207.   Peter and PLG further breached the duty of care by providing legal analysis that was one-sided, omitted adverse authority, and failed to address the limited application of *force majeure* agreements under the relevant circumstances.

208.   Peter and PLG committed additional breaches including allowing NATPE to disregard corporate formalities and by withholding material information from NATPE's leadership and creditors.

**D. Causation and Damages**

209.   As a direct and proximate result of Defendants' breaches of fiduciary duty, NATPE transferred cash and value to insiders that otherwise would have remained available to fund operations and satisfy creditor obligations and later would have been property of the Estate available for distribution, thereby diminishing the Estate.

210.   The injury is not limited to NATPE's broader distress; rather, the specific insider payments and associated transaction/professional costs increased the shortfall to creditors, reduced liquidity, and reduced ultimate recoveries under the Plan.

211.   Defendants' breaches were a substantial factor in causing harm to NATPE and its creditors.

33

212.    NATPE suffered damages as a direct and proximate result of the unauthorized and improper Transfers. The damages include at least: (1) $236,906.12 in inflated salary payments; (2) $294,656.06 in bonus payments made despite unmet performance conditions; $310,418.45 in Termination Payments; (4) more than $600,000 in attorneys' fees paid to PLG while suspended; and (5) substantial post-petition transfers made without court approval.  These damages represent a direct diminution of estate assets available for creditor distribution and constitute recoverable harm under Delaware fiduciary duty law.

213.    Plaintiff seeks damages in an amount to be proven at trial, including recovery of all damages proximately caused by Defendants' breaches, including disgorgement and associated costs attributable to the disloyal and/or bad faith conduct alleged, together with equitable relief to prevent unjust enrichment.

214.    NATPE's total damages are estimated to be at least $4 million.

**SECOND CLAIM FOR RELIEF**

**(Corporate Waste Against Defendant Bommel)**

215.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this First Amended Complaint.

216.    An officer may be held personally liable when he causes the entity to enter into a transaction that no person of ordinary sound business judgment could view the benefits received in such transaction by the entity as a fair exchange for the consideration the entity paid.

217.    Bommel caused NATPE to enter transactions that were so one-sided that no reasonable businessperson could conclude that NATPE received adequate consideration.

218.    In the year before NATPE filed for bankruptcy, Bommel engaged in self-dealing, entering multiple transactions in the year preceding to NATPE's bankruptcy filing that benefited him personally and harmed NATPE and its creditors.

/ / /

219.   NATPE was insolvent when Bommel caused it to pay him compensation not approved by documented Board or duly authorized committee action and not supported by contemporaneous governance records. This compensation included a unilateral raise in June 2021, a 2022 Employment Contract, $236,906.12 in unearned Conditional Bonus payments, $310,418.45 in Termination Payments and broad Releases of claims under a Termination Agreement, and more than $92,000 in unauthorized post-petition transfers under an Independent Contractor Agreement dated September 30, 2022.

220.   Bommel also directed NATPE's CFO contractor to process unearned bonus payments. For example, on January 17, 2022, $57,749.94 was transferred to Harbeson even though the Condition Precedent for the bonus was unmet.  In July 2022, Bommel directed NATPE's CFO contractor to implement a $25,000 salary increase for Weiss as purported deferred compensation.

221.   These transactions occurred when NATPE was insolvent.

222.   Bommel knew NATPE was insolvent and still approved these payments and transactions.

223.   Bommel's conduct constituted a waste of NATPE's assets.

224.   As a direct and proximate result of Bommel's corporate waste, NATPE suffered damages in an amount to be determined at trial, and in an amount not less than $1 million.

### THIRD CLAIM FOR RELIEF

### (Negligence – Legal Malpractice Against Peter and PLG)

225.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this First Amended Complaint

226.   Peter and PLG had an attorney-client relationship with NATPE. That relationship created a duty of care.

227.   NATPE retained Peter and PLG to serve as its general counsel for more than a decade. NATPE also retained them as special counsel during NATPE's Bankruptcy Case.

228. PLG invoiced NATPE for the legal fees and costs. NATPE paid those invoices.

229. Peter directed, supervised, and performed the work billed by PLG. Peter also communicated with NATPE about payment and continued representation.

230. Peter and PLG breached the applicable standard of care. The breaches include the following:

a. They failed to give timely notice of the Arbitration Claim to NATPE's directors-and-officers insurer. This failure led to a coverage denial, and the loss of up to $1 million in potential insurance proceeds and the loss of coverage for its attorney's fees and costs related to the Arbitration Claim.

b. They provided deficient legal analysis of the *force majeure* defenses. The analysis omitted controlling and adverse authority and failed to adequately advise NATPE of the risks and financial consequences of cancelling the 2022 Miami Event.

c. They advised NATPE to enter compensation arrangements that exceeded corporate authority and were prohibited under applicable nonprofit law.

d. They continued to bill for legal services and enter contracts while PLG was suspended by the California Franchise Tax Board.

231. Peter and PLG owed duties to the Debtor during the Bankruptcy Case. They mishandled the insurance-coverage dispute and failed to preserve the Debtor's rights. Their communications and conduct left NATPE exposed to a known and material late notice coverage-risk. NATPE paid for coverage "handling" that did not deliver the promised benefit.

232. Some of PLG services focused on structuring, implementing, or defending compensation, termination, and release arrangements that favored insiders while NATPE was insolvent or near insolvent. Those services primary benefitted insiders and/or reduced counsel's exposure, rather than for the benefiting NATPE.

233. Peter and PLG also breached their professional duties through additional acts and omissions. These acts and omissions include:

a.      Making disclosure failures and misrepresentations made by Peter in connection with PLG's Application to be employed as Special Counsel in the Bankruptcy Case;

b.      Failing to disclose conflicts of interest issues arising from representing NATPE in multiple matters while also facing potential claims, including adverse interests related to coverage issues, and potential avoidance claims against PLG;

c.      Billing the Estate post-petition in connection with potential avoidance claims against PLG;

d.      Counseling in favor of payment of unearned Conditional Bonuses, Termination Pay, severance, and vacation pay to Insiders and employees despite Debtor's insolvency or near insolvency;

e.      Counseling in favor of Debtor's cancellation of the 2022 Miami Event;

f.      Counseling and facilitating Debtor's breach of the 2021 Settlement Agreement for cancellation of the 2022 Miami Event;

g.      Counseling and preparing the 2022 Employment Agreement for Bommel;

h.      Counseling in favor of other Transfers discussed above;

i.      Counseling and preparing independent contractor agreements for Debtor's former employees who continued to perform in the same capacity as the Debtor in violation of California employment laws and possibly state and federal tax laws;

j.      Failing to advise that prepetition insider compensation was unlawful and in breach of such insider's fiduciary duties, including failing to advise regarding the transfers to Bommel, Harbeson, and others; and

k.      Participating in the preparation of declarations filed in Bankruptcy Court that were materially false or incomplete.

234.   Peter and PLG's negligence directly contributed to the Debtor filing for bankruptcy and depleted the Estate's assets both pre- and post-petition, and thereby damaged NATPE.

235.   Peter and PLG's breaches were a proximate cause of NATPE's damages.

236.   NATPE suffered actual loss or damage as a direct result of Peter and PLG's negligence.

237.   NATPE's damages include losses from unauthorized transfers and unlawful compensation that competent legal advice would have prevented.

238.   NATPE lost insurance coverage for defense costs (at least $218,410.50).

239.   NATPE also lost up to $1 million in potential insurance proceeds for judgments or settlements in the Fontainebleau Arbitration Claim.

240.   NATPE lost up to $1 million in potential insurance proceeds for judgments or settlements related to the BK Coverage claims tendered by Peter and PLG under the policy endorsement.

241.   NATPE's estate assets were depleted through improper insider transfers made on Peter and PLG's advice.

242.   NATPE incurred increased legal costs in the Bankruptcy Case because of Peter and PLG's negligence.

243.   NATPE's total damages resulting from Peter and PLG's negligence are estimated to exceed $4 million.

## <u>FOURTH CLAIM FOR RELIEF</u>

**(Voiding of Contracts due to Unlawful Purpose Against Defendant Bommel)**

244.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this First Amended Complaint.

245.   California Civil Code section 1598 renders void any contract with an unlawful object.  Section 1667 provides that "unlawful" means "1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or, 3. Otherwise contrary to good morals."  Cal. Civ. Code § 1667.

246.   Cal. Civ. Code § 1668 voids all contracts that exempt parties from responsibility for fraud or willful injury.

247.   Bommel's 2022 Employment Contract and Termination Agreement are void

1   under these provisions because they were designed to advance an unlawful purpose and

2   to shield Bommel from liability for intentional misconduct. These agreements were part of

3   a broader scheme to extract value from the company while it was insolvent and to frustrate

4   the Bankruptcy Code's equitable distribution policies

5       248.   Bommel's 2022 Employment Contract is void because it was requested,

6   structured, and implemented as part of the same integrated course of insider self-dealing

7   and asset extraction. This conduct included creating purported deferred compensation

8   and bonus rights not tied to the stated triggering condition, seeking retroactive effective

9   date and backdating to justify payments already made, and increasing compensation

10   without proper corporate authorization.

11      249.   The Termination Agreement was structured to make disputed payments

12   appear routine so Bommel could argue they were protected from later claw back efforts in

13   bankruptcy. The characterization of these payments as ordinary course disbursements

14   was not genuine because the company terminated Bommel's employment as CEO and

15   then immediately rehired him as the interim CEO with the same duties, while also providing

16   termination and severance related pay exceeding $310,000. Those steps are inconsistent

17   with ordinary course compensation practices.

18      250.   The Termination Agreement is also void because it was entered into to

19   defeat potential avoidance claims and circumvent the provisions of the Bankruptcy Code,

20   including section 547. For example, the Termination Agreement provides that "[NATPE]

21   represents that the termination payment is a disbursement in the ordinary course of

22   business required under your employment agreement and constitutes a settlement

23   beneficial to the Company." Termination Agreement, pg. 1.  That provision is clearly written

24   to provide a § 547(c)(2) ordinary course defense under against a preference action under

25   § 547(b).

26      251.   Based on the foregoing, the Termination Agreement and the 2022

27   Employment Contract are void under Cal. Civ. Code §§ 1598(1), (2), 1667, and 1668.

28   / / /

1

### FIFTH CLAIM FOR RELIEF

2

### (Voidable Contract Under Cal. Rev. & Tax. Code § 23304.1(a) for Suspended

3

### Corporation Contracts Against Defendants Peter and PLG)

4       252.    Plaintiff realleges and incorporates herein by reference each and every

5   allegation contained in all prior paragraphs of this First Amended Complaint.

6       253.    The California Franchise Tax Board suspended or forfeited PLG's corporate

7   powers effective June 1, 2017.

8       254.    PLG has remained delinquent in its corporate filings through at least

9   February 26, 2026.

10      255.    PLG's suspended status continued through at least that date, as reflected in

11  official status documentation.

12      256.    A corporation that is suspended for noncompliance with franchise tax

13  obligations generally lacks capacity to do business, to litigate and enter enforceable

14  contracts. Cal. Rev. & Tax. Code § 23301; *Reed v. Norman*, 48 Cal.2d 338, 342 (1957).

15      257.    Contracts made during the suspension period are voidable at the option of

16  the non-suspended contracting party, and that right is not eliminated by a later corporate

17  revival. Cal. Rev. & Tax. Code §§ 23304.5 and 23305a.

18      258.    Despite the suspension, PLG continued to provide legal services to NATPE

19  and continued to accept payment for those services. PLG received more than $600,000

20  in fees on invoices issued during the suspension period, including $421,783.15 paid during

21  the 1-year pre-petition period, and an additional $75,520.00 paid after the Petition Date.

22      259.    During the suspension, PLG entered into new engagement agreements with

23  NATPE on October 10, 2022, for insurance coverage litigation and general counsel

24  services.

25      260.    Neither Peter nor PLG disclosed PLG's suspended status to NATPE.

26      261.    NATPE later sought Bankruptcy Court approval to employ PLG as special

27  counsel, and the court approved the application without being informed of PLG's

28  suspension.

1    262.    After approval, PLG filed multiple fee applications seeking compensation for

2    work performed for NATPE.

3    263.    The invoices, engagement agreements, employment application, and fee

4    applications reflect ongoing contractual relationships and compensation for services

5    rendered to NATPE by PLG during the suspension period.

6    264.    Plaintiff, as the Plan Fiduciary standing in NATPE's shoes, holds NATPE's

7    rights as the non-suspended contracting party, including the right to void contracts entered

8    into during PLG's suspension.

9    265.    Payments made under contracts that are voidable on this basis are subject

10   to avoidance and restitution.

11   266.    Accordingly, Plaintiff seeks an order declaring the NATPE-PLG contracts

12   entered into and performed during PLG's suspension voidable at Plaintiff's election and

13   awarding appropriate restitutionary relief for payments made under those contracts,

14   including disgorgement of fees.

15                          **SIXTH CLAIM FOR RELIEF**

16   **(Fraud in the Inducement, Rendering Contracts Voidable Against All Defendants)**

17   267.    Plaintiff realleges and incorporates herein by reference each and every

18   allegation contained in all prior paragraphs of this First Amended Complaint.

19   268.    Defendants made or caused NATPE to receive material misrepresentations

20   of fact and/or omitted material facts to NATPE.

21   269.    Defendants acted knowingly and intended to deceive NATPE's Executive

22   Committee and Board. Defendants' misrepresentations and omissions included the

23   following:

24          a.    Peter, acting for himself and through PLG, sent Chairman Kaplan the

25   March 2022 Memorandum. In that memorandum, Peter stated that Bommel's contract

26   would end on September 7, 2022. Peter knew the contract included an automatic renewal

27   provision;

28   / / /

b. Peter stated Bommel's salary was $397,000. In fact, Bommel's salary was $297,000 after an unauthorized June 2021 raise; and

c. Peter did not disclose that a condition required for bonus payments under the Net-Income Bonus Plan had not been met.

270. Defendants knew these representations were false when made.

271. On or about April 4, 2022, Bommel asked Peter to backdate the 2022 Employment Contract to April 1, 2022. Peter responded that he would begin drafting the contract. This created the false appearance that bonus payments to Bommel in early April 2022 were authorized before they were made.

272. Defendants knew or should have known the true terms of Bommel's employment contract, including the Automatic Renewal Provision, yet drafted the March 2022 Memorandum containing these misrepresentations.

273. Defendants intended NATPE to rely on these misrepresentations and omissions.

274. The March 2022 Memorandum was specifically drafted to justify the unearned payment of the Conditional Bonus and to induce NATPE to enter into the 2022 Employment Contract.

275. The March 2022 Memorandum was sent to the Executive Committee with the intent to induce them to approve Bommel's new employment contract based on false information.

276. NATPE justifiably relied on Defendants' misrepresentations and omissions.

277. NATPE's Executive Committee relied on the misrepresentations in the March 2022 Memorandum when approving Bommel's 2022 Employment Contract.

278. The Executive Committee was not provided with either the written 2022 Employment Contract or Bommel's prior employment agreements, as amended, so they had no way to independently verify the false statements.

279. NATPE relied on Defendants' misrepresentations and omissions and suffered damages as a result.

42

280.    As a direct and proximate result of the fraud, NATPE paid Bommel amounts it did not owe, including unearned bonuses totaling $236,906.12, an inflated salary, more than $310,000 in Termination Payments just days before bankruptcy filing.

281.    NATPE's damages from Defendants' fraud are at least $489,000.00.

282.    The 2022 Employment Contract, the Conditional Bonuses paid under the Net-Income Bonus Plan, and Bommel's Termination Agreement were induced by fraud and are therefore voidable.

## SEVENTH CLAIM FOR RELIEF

**(Avoidance, Recovery, and Preservation of Intentionally Fraudulent Transfers**

**Under 11 U.S.C. §§ 548(a)(1)(A), 550 and 551 Against Defendant Bommel)**

283.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this First Amended Complaint.

284.    The Bommel 1-Year Transfers occurred within 2 years before NATPE's bankruptcy petition on October 11, 2022.

285.    The Bommel 1-Year Transfers constituted an interest in property of the Debtor.

286.    The Bommel 1-Year Transfers were transfers that were made with actual intent to hinder, delay and defraud the creditors of the Debtor.

287.    At the time the Bommel 1-Year Transfers were paid to Bommel, the Debtor was in serious financial distress and was not paying its debts as they came due and was facing substantial claims for its breach of the 2022 Event Agreement, breach of the 2021 Settlement Agreement, and was involved in Arbitration.

288.    The Bommel 1-Year Transfers included payments for substantial unlawful deferred compensation payments, unauthorized salary raises and bonus payments, contractual severance and vacation pay, and separate severance payouts, representing a clear depletion of Estate assets without corresponding benefit.

289.    Bommel caused or approved certain compensation increases and the Termination Agreement without required internal authority. NATPE made the Bommel 1-

43

1   Year transfers through misleading or deceptive means rather than legitimate, value-

2   producing business transactions. Any benefit claimed from Bommel's services was offset

3   by the circumstances in which the payments were obtained and the Debtor's deteriorating

4   financial condition.

5        290.   NATPE made the Bommel 1-Year Transfers with actual intent to hinder,

6   delay, or defraud creditors. That intent is shown by the following badges of fraud

7   recognized under Ninth Circuit law, including: (1) Bommel's insider status as NATPE's

8   CEO and President; (2) the timing of transfers shortly before bankruptcy; (3) the absence

9   of reasonably equivalent value; (4) NATPE's insolvency at the time of transfers; (5) the

10  concealment or mischaracterization of the transfers as ordinary course disbursements or

11  beneficial settlements; and (6) Bommel's continued control or continued role through

12  immediate re-engagement in substantially the same leadership capacity under a

13  contractor arrangement.

14       291.   Bommel was the direct recipient and beneficiary of the Bommel 1-Year

15  Transfers identified in Exhibit H. Bommel negotiated for, accepted, and retained those

16  transfers at a time when NATPE was insolvent and limiting payments to other creditors.

17       292.   Bommel was the initial transferee of the Bommel 1-Year Transfers or the

18  entity for whose benefit such transfers were made. To the extent Bommel is alleged to be

19  an immediate or mediate transferee of such initial transferee, he did not take such

20  transfers for value, in good faith, and without knowledge of avoidability.

21       293.   As a result of the forgoing, and in accordance with 11 U.S.C. §§ 550 and

22  551, Plaintiff is entitled to entry of judgment against Bommel: (a) avoiding and preserving

23  the above-described transfers, (b) directing that the transfers be set aside, and (c)

24  recovering the transfers, or the value thereof, from him for the benefit of the Debtor's

25  bankruptcy estate, in amounts to be determined by the Court.

26  / / /

27  / / /

28  / / /

## EIGHTH CLAIM FOR RELIEF

**(Avoidance, Recovery, and Preservation of Constructively Fraudulent Transfers**

**Under 11 U.S.C. §§ 548(a)(1)(B), 550, and 551 Against Defendant Bommel)**

294.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this First Amended Complaint.

295.    Within one year before the Petition Date, the Debtor made the Bommel 1-Year Transfers to, or for the benefit of Bommel.

296.    The Bommel 1-Year Transfers were transfers of property in which the Debtor had an interest.

297.    The Debtor did not receive reasonably equivalent value in exchange for any of the Bommel 1-Year Transfers because the alleged consideration was illusory, duplicated pre-existing duties, or primarily benefited Bommel rather than the Debtor.

298.    The Bommel 1-Year Transfers were made to or for the benefit of an insider, or the Debtor incurred such obligation to or for the benefit of an insider, under an employment contract not in the ordinary course of business.

299.    At the time of each Bommel 1-Year Transfer, the Debtor (i) was insolvent, or became insolvent as a result of each such transfer; (ii) was engaged in or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

300.    Bommel was the initial transferee of the Bommel 1-Year Transfers or the entity for whose benefit such transfers were made. To the extent Bommel is alleged to be an immediate or mediate transferee of such initial transferee, he did not take such transfers for value, in good faith, and without knowledge of avoidability.

301.    As a result of the forgoing, and in accordance with 11 U.S.C. §§ 548(a)(1)(B), 550 and 551, Plaintiff is entitled to entry of judgment against Bommel: (a) avoiding and preserving the above-described transfers, (b) directing that the transfers be set aside, and

(c) recovering the transfers, or the value thereof, from him for the benefit of the Debtor's

bankruptcy estate, in amounts to be determined by the Court.

### NINTH CLAIM FOR RELIEF

**(Avoidance, Recovery, and Preservation of Preferential Transfers Under 11 U.S.C.**

**§§ 547, 550, and 551 Against All Defendants)**

302.    Plaintiff realleges and incorporates herein by reference each and every

allegation contained in all prior paragraphs of this First Amended Complaint.

303.    Plaintiff pleads this claim in the alternative and, where appropriate,

cumulatively with other claims because the transfers may be avoidable under different

legal theories depending on facts developed in discovery and at trial. Plaintiff seeks a

single satisfaction for the value of the challenged transfers and does not seek a double

recovery.

304.    At all relevant times, each Defendant was an insider of the Debtor.

305.    Within one year prior to the Petition Date, the Debtor transferred transfers

totaling at least $857,508.63 to or for the benefit of Bommel and $421,783 to or for the

benefit of PLG and Peter (collectively, the "Preferential Transfers").

306.    The Debtor had a property interest in the funds that made up each of the

Preferential Transfers as each of the Preferential Transfers were drawn against and

cleared one or more of the Debtor's bank accounts.

307.    The Preferential Transfers were made to Bommel and/or PLG and/or for the

benefit of Bommel, PLG.

308.    The Preferential Transfers were made to or for the benefit of Bommel and

PLG at a time in which they were creditors of the Debtor, as the term "creditor" is defined

by 11 U.S.C. § 101(10).

309.    To the extent any Preferential Transfer paid an obligation owed by the

Debtor to any Defendant, that obligation was incurred before the transfer and therefore

constituted an antecedent debt at the time the payments were made.

/ / /

310. The Debtor was insolvent at the time the Preferential Transfers were made.

311. Each Preferential Transfer enabled the applicable Defendant to receive more than the Defendant would have received as a creditor if: (a) the transfers had not been made; and (b) Defendants received payment of the debts they were owed to the extent provided under the Bankruptcy Code.

312. Prior to commencing this action, Plaintiff performed reasonable due diligence in the circumstances of Defendants' known or reasonably knowable affirmative defenses to avoidance. Plaintiff with the assistance of counsel and accountants, reviewed the Debtor's available books and records, analyzed payments to Defendants, and confirmed associated information.

313. Bommel was the initial transferee of the Bommel 1-Year Transfers or the entity for whose benefit such transfers were made. To the extent Bommel is alleged to be an immediate or mediate transferee of such initial transferee, he did not take such transfers for value, in good faith, and without knowledge of avoidability.

314. Peter and PLG were initial transferees of such transfers or the entities for whose benefit such transfers were made. To the extent Peter and/or PLG are alleged to be immediate or mediate transferees of an initial transferee, they did not take such transfers for value, in good faith, and without knowledge of avoidability.

315. As a result of the forgoing, and in accordance with 11 U.S.C. §§ 547, 550 and 551, Plaintiff is entitled to is entitled to entry of a judgment against each Defendant: (a) avoiding and preserving the above-described transfers, (b) directing that the transfers be set aside, and (c) recovering the transfers, or the value thereof, from him for the benefit of the Debtor's bankruptcy estate, in amounts to be determined by the Court.

316. Interest on the Preferential Transfers has accrued and continues to accrue at the maximum legal rate pursuant to 28 U.S.C. § 1961 from the time the Preferential Transfers were made.

/ / /

/ / /

1

### TENTH CLAIM FOR RELIEF

2

**(Avoidance, Recovery and Preservation of Post-Petition Transfers Under 11 U.S.C.**

3

**§§ 549, 550, and 551 Against Defendant Bommel)**

4      317.   Plaintiff realleges and incorporates herein by reference each and every

5   allegation contained in all prior paragraphs of this First Amended Complaint.

6      318.   The Bommel Post-Petition Transfers were transfers of property of the Estate.

7      319.   The Bommel Post-Petition Transfers occurred after NATPE's Bankruptcy

8   Case was filed on October 11, 2022.

9      320.   The Bommel Post-Petition Transfers were not authorized by the Bankruptcy

10   Code or the Bankruptcy Court.

11      321.   The Bommel Post-Petition Transfers were outside the ordinary course of

12   business.

13      322.   Bommel was the initial transferee of the Bommel 1-Year Transfers or the

14   entity for whose benefit such transfers were made. To the extent Bommel is alleged to be

15   an immediate or mediate transferee of such initial transferee, he did not take such

16   transfers for value, in good faith, and without knowledge of avoidability.

17      323.   As a result of the forgoing, and in accordance with 11 U.S.C. §§ 549, 550

18   and 551, Plaintiff is entitled to entry of judgment against Bommel: (a) avoiding and

19   preserving the above-described transfers, (b) directing that the transfers be set aside, and

20   (c) recovering the transfers, or the value thereof, from him for the benefit of the Debtor's

21   bankruptcy estate, in amounts to be determined by the Court.

22

### ELEVENTH CLAIM FOR RELIEF

23

**(Conversion Against All Defendants)**

24      324.   Plaintiff realleges and incorporates herein by reference each and every

25   allegation contained in all prior paragraphs of this First Amended Complaint.

26      325.   NATPE owned or had the right to possess the funds taken by Defendants.

27      326.   NATPE had the right to possess and control its financial assets, including

28   the funds that were wrongfully taken by Defendants.

327.   Defendants wrongfully exercised dominion or control over NATPE's property and thereby interfered with NATPE's right of possession.

328.   In the period leading up to, and subsequent, to this Bankruptcy Case, NATPE's assets were transferred to Defendants, certain executives, and others, despite NATPE's deteriorating financial condition.

329.   Defendants exerted control over the Debtor's assets, and participated in, or failed to prevent improper management and supervision that caused or contributed to the Debtor's ultimate liquidation.

330.   Defendants exerted control over NATPE's assets by transferring funds to themselves or entities they controlled.

331.   These transfers included unauthorized Conditional Bonuses, executive pay increases not approved by documented Board or duly authorized committee action and not supported by contemporaneous governance records, inflated vendor payments, and other diverted assets.

332.   Bommel with the assistance of Kaplan and Peter, obtained NATPE's funds through bonus payments totaling $236,906.12 even through the stated Condition Precent not satisfied.

333.   Bommel obtained NATPE's funds through an unauthorized salary increase from $258,000 to $296,000 effective June 1, 2021.

334.   In addition, Bommel, with the assistance of Kaplan and Peter, obtained NATPE's funds through Termination Payments totaling over $310,000 made just days before NATPE's bankruptcy filing.

335.   PLG obtained NATPE's funds by continuing to provide legal services, enter new contacts, and accepting payment for those services while PLG was suspended. PLG received more than $600,000 in fees on invoices issued during the suspension period, including $421,783.15 paid during the 1-year pre-petition period, and an additional $75,520.00 paid after the Petition Date.

/ / /

336.   NATPE and the Estate were damaged as a result of Defendants' wrongful dominion and control over its property.

337.   The funds transferred are property of the Estate because they were diverted to insiders or insider-controlled entities for personal benefit, rather than NATPE's non-profit purpose.

338.   As a result of the foregoing harm, NATPE and its Estate have been harmed in amount to be proven at trial in accordance with California Civil Code section 3336, including but not limited to the value of the property at the time of conversion, with interest from that time and a fair compensation for the time and money properly expended in pursuit of the property.

339.   Defendants' acts were undertaken for improper purposes as alleged above and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of the Estate's creditors, and were designed and intended to cause and did, in fact, cause the Estate's creditors to suffer actual damages and therefore justify the awarding of exemplary and punitive damages.

### TWELFTH CLAIM FOR RELIEF

**(Unjust Enrichment Against Defendant Bommel)**

340.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this First Amended Complaint.

341.   Within one year before the Petition Date, Bommel received and retained benefits from NATPE in the form of payments or other transfers of value, including the challenged Bommel 1-Year Transfers.

342.   These benefits arose from the challenged agreements and/or compensation arrangements described above, and/or from payments that were not properly authorized under NATPE's governance and approval process

343.   NATPE made these payments while it was in financial distress, which depleted NATPE's assets and harmed NATPE and its creditors.

344.   The circumstances make it unjust for Bommel to retain these benefits.

345.   Bommel obtained and retained the benefits through fraudulent misrepresentations and omissions, including omissions concerning required approvals and the basis for payment.

346.   NATPE paid the Conditional Bonuses even though the applicable Condition Precedent was not satisfied.

347.   NATPE made some or all of the payments when it was insolvent or on the verge of bankruptcy.

348.   NATPE made the Termination Payments to Bommel just days before NATPE's bankruptcy filing, which was structured to benefit an insider at the expense of unsecured creditors.

349.   It would be unjust and inequitable to permit Bommel to retain the benefits he received from NATPE under these circumstances.

350.   Plaintiff pleads this unjust enrichment claim as an alternative theory based on the same nucleus of facts and the same challenged transfers as Plaintiff's avoidance, fiduciary-duty, and contract-based claims, because the evidence and claims legal characterization of the payments and agreements may show that equitable restitution or disgorgement is an appropriate means to restore value to the Estate consistent with the Plan's limitations.

## THIRTEENTH CLAIM FOR RELIEF

### (Declaratory Relief Based on Contractual Limitation in Confirmed Plan

### Against Defendant Bommel)

351.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this First Amended Complaint.

352.   The confirmed chapter 11 plan is a written instrument that includes a contractual limitation on claims against certain directors and officers.

353.   The confirmed Plan also contains an express condition that lifts that limitation if the representation about the availability of D&O insurance coverage is not accurate.  Specifically, the Plan provides: "If this is not accurate, the limitation on claims

against directors and officers set forth in Ex. D shall be deemed lifted and shall not apply."
[Bk. Dkt. 251 at p. 2, ¶2].

354.   The Plan and Confirmation Order further provide that this Court retains jurisdiction, to the extent legally permissible to resolve disputes regarding the operation and interpretation of the Plan and Confirmation Order and construe and enforce the Plan and Confirmation Order.

355.   An actual, present controversy exists regarding the parties' rights and obligations under the Plan, and declaratory relief is necessary to resolve that controversy.

356.   During the Bankruptcy Case, NATPE represented that the full D&O insurance policy was available to pay claims in the Bankruptcy Case.

357.   Navigators denied coverage, and as a result, the representation regarding the availability of D&O insurance was inaccurate.

358.   Because the representation was inaccurate, the Plan's condition was satisfied and the limitation on claims against NATPE's directors and officers is lifted under the Plan's plain language.

359.   Defendants contend that the limitation remains enforceable and continues to restrict recovery against the Debtor's former directors and officers.

360.   Plaintiff contends the limitation no longer applies; Plaintiff is entitled to pursue claims against NATPE's directors and officers without the plan's recovery cap or claims limitation.

361.   Declaratory relief is appropriate to determine the parties' rights and obligations under the Plan and to clarify whether the limitation provision is enforceable in light of the insurance-availability condition.

362.   Plaintiff brings this claim in his capacity as the plan fiduciary and seeks to enforce of the confirmed Plan's terms.

363.   Plaintiff respectfully requests entry of a declaratory judgment that, due to the failure of the insurance-availability condition, the Plan's claims and recovery-limitation clause is lifted and is not enforceable to restrict Plaintiff's prosecution or recovery of Estate

1  claims against NATPE's former directors and officers.

2                                    **V.**

3                         **PRAYER FOR RELIEF**

4      **WHEREFORE**, Plaintiff respectfully prays for a judgment against Defendants as

5  follows:

6      **On the First and Second Claims for Relief (Breach of Fiduciary Duty and**

7  **Corporate Waste):**

8      1.    Compensatory, special, and consequential damages in an amount to be

9  determined at trial, but no less than $4 million.

10     2.    Disgorgement of all sums received by Defendants during the period of

11 breach.

12     3.    Punitive damages for Defendants' fraudulent and malicious conduct, in an

13 amount to be determined at trial.

14     **On the Third Claim for Relief (Professional Negligence):**

15     4.    Compensatory, special, and consequential damages, and punitive

16 damages, all in an amount to be determined at trial;

17     **On the Fourth Claim for Relief (Unlawful Contracts under Cal Civ Code §§**

18 **1598, 1667, and 1668):**

19     5.    A declaration that the Bommel 2022 Employment Contract, the Net-Income

20 Bonus Plan, Conditional Bonuses, and Bommel's Termination Agreement are voidable

21 due to unlawful purpose.

22     6.    Rescission of the Bommel 2022 Employment Contract, the Net-Income

23 Bonus Plan, Conditional Bonuses, and Bommel's Termination Agreement.

24     7.    Restitution of all funds paid under the unlawful agreements, including

25 unlawful compensation increases, bonus payments totaling $236,906.12, and the

26 Termination Payments of approximately $310,418.45, for a total of at least $546,906.12.

27     8.    Compensatory damages for all losses suffered by NATPE as a result of the

28 unlawful, in an amount to be determined at trial but at least $546,906.12.

**On the Fifth Claim for Relief (Voidable Contracts under Cal Rev & Tax. Code § 23304.1):**

9.     A declaration that all funds paid to PLG by NATPE, and contracts entered into between PLG and NATPE during its period of suspension are void.

10.     Restitution of all funds paid to PLG by NATPE during its period of suspension from June 2017 through September 2024.

**On the Sixth Claim for Relief (Fraud in the Inducement):**

11.     A declaration that the Bommel 2022 Employment Contract, the Net-Income Bonus Plan, Conditional Bonuses, and Bommel's Termination Agreement are void due to fraud in the inducement.

12.     Rescission of the Bommel 2022 Employment Contract, the Net-Income Bonus Plan, Conditional Bonuses, and Bommel's Termination Agreement

13.     Restitution of all funds paid under the fraudulently induced agreements, including unauthorized bonus payments totaling $236,906.12, the Termination Payment of $198,725.70, and Severance of $54,004.97, for a total of at least $489,638.79.

14.     Compensatory damages against for all losses suffered by NATPE as a result of the fraudulently induced agreements, in an amount to be determined at trial but at least $489,638.79.

**On the Seventh, Eighth, Ninth and Tenth Claims for Relief (Avoidance, Recovery, and Preservation of Fraudulent, Preferential, and Unauthorized Post-Petition Transfers under 11 U.S.C. §§ 547, 548, 549, 550, and 551):**

15.     Avoidance, recovery, and preservation of the subject Transfers, including the Bommel 1-Year Transfers, the PLG Transfers, the Preferential Transfers, and the Post-Petition Transfers, for the benefit of the Debtor's bankruptcy estate.

16.     A declaration that the subject Transfers are voidable and directing that they be set aside.

17.     Recovery of the subject Transfers, or the value thereof, from Defendants, in an amount to be determined at trial, but believed to be in excess of $1.5 million.

18.     Pre-judgment interest on the avoided Transfers at the maximum legal rate pursuant to 28 U.S.C. § 1961 from the time the Transfers were made.

**On the Eleventh Claim for Relief (Conversion):**

19.     Ordering turnover to Plaintiff of all unlawful and unearned funds obtained by Bommel from April 2022 to the present that have not already been remitted to Plaintiff.

20.     For attorney's fees and costs expended in pursuit of the property. Cal. Civil Code § 3336.

21.     For pre-judgment interest from the date of conversion. Cal. Civil Code § 3336.

**On the Twelfth Claim for Relief (Unjust Enrichment):**

22.     Restitution and disgorgement of all amounts unjustly held by the Defendants, the exact amount of which to be proved at trial.

**On the Thirteenth Claim for Relief (Declaratory Relief and Void of Liability Limitation Provision Under Cal Civ Code § 1668):**

23.     Entry of a declaratory judgment that, due to the failure of the insurance-availability condition, the Plan's claim and recovery-limitation clauses are lifted and are not enforceable to restrict Plaintiff's prosecution or recovery of Estate claims against NATPE's former directors and officers.

24.     An order enjoining the directors and officers from asserting or relying upon the claims and/or liability limitation provisions in any proceedings or claims related to their conduct.

**On all Claims for Relief:**

25.     Plaintiff seeks a single satisfaction for the same alleged transfer value and pleads overlapping remedies in the alternative. Plaintiff requests that any judgment be structured to prevent duplicative recovery for the same transfer value.

26.     Punitive damages against all Defendants for their fraudulent and malicious conduct, in an amount to be determined at trial.

/ / /

55

1    27.    Costs of suit and interest at the legal rate on all damages and sums awarded

2  to Plaintiff, for the benefit of the Estate; and

3    28.    Such other and further relief as this Court deems just and proper.

4

5  DATED:  March 2, 2026                              **MARGULIES FAITH, LLP**

6

7                                                     By: */s/ Meghann A. Triplett*
                                                          Meghann A. Triplett
8                                                     Attorneys for Plaintiff, Jeremy W. Faith,
                                                      Chapter 11 Plan Fiduciary

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# *Delaware*

PAGE  1

### *The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE RESTATED CERTIFICATE OF "NATIONAL ASSOCIATION OF
TELEVISION PROGRAM EXECUTIVES, INC.", FILED IN THIS OFFICE ON
THE TWENTY-FIRST DAY OF FEBRUARY, A.D. 2013, AT 7:52 O'CLOCK
P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE
NEW CASTLE COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 0243729

DATE: 02-26-13

2139885  8100

130210805

You may verify this certificate online
at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 07:53 PM 02/21/2013
FILED 07:52 PM 02/21/2013
SRV 130210805 - 2139885 FILE

**THIRD AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

OF

**NATIONAL ASSOCIATION OF TELEVISION**

**PROGRAM EXECUTIVES, INC.**

(Pursuant to Sections 242 and 245 of the Delaware General Corporation Law)

The undersigned, Rod Perth, hereby certifies that:

1.      The date of filing of the original Certificate of Incorporation of this corporation with the Secretary of State of the State of Delaware was October 5, 1987. A certificate of amendment to the Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on February 8, 1988. An Agreement and Plan of Merger was filed with the Secretary of State of the State of Delaware on June 16, 1988. A Restated Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on February 26, 1990. Certificates of Amendment were filed with the Secretary of State of the State of Delaware on April 2, 1993, April 3, 1995, April 16, 1997 and March 15, 1999. A Restated Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on March 3, 2000 (the "Certificate of Incorporation").

2.      He is the duly elected and acting President and Chief Executive Officer of National Association of Television Program Executives, Inc., a Delaware nonprofit, non-stock corporation (the "Association").

3.      This Third Amended and Restated Certificate of Incorporation amends, restates and supersedes the provisions of the Restated Certificate of Incorporation of the Association and has been duly adopted in accordance with the provisions of Sections 242 and 245 of the Delaware General Corporation Law (the "DGCL") by the written consent of the members entitled to vote thereon in accordance with the provisions of Section 242 of the DGCL.

RESOLVED, that the Certificate of Incorporation of the Association be amended and restated in its entirety to read as follows:

FIRST:      The name of the Association is National Association of Television Program Executives, Inc.

SECOND:      The address of the Association's registered agent in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

THIRD:      (a)      The Association is organized and shall be operated exclusively for one or more purposes as specified in Section 501(c)(6) of the Internal Revenue Code of 1986, as amended (the "Code"), or any successor statute thereto. In particular, the purposes of the

304138988.6

Association shall be to support, promote, advocate and advance the interests of businesses and other organizations that are engaged in the provision and support of television and digital content programming by:

          (i)     Providing a forum for the discussion of ideas and the exchange of information relating to television and digital content programming, television and digital content production and related fields;

          (ii)     Establishing, convening and sponsoring one or more annual conventions, marketplaces or other events for the Association's members, including workshops, lectures, and seminars in order to foster discussion relating to the purposes set forth in this Article THIRD, and the state of linear and digital content marketability, revenue potential, content and appeal and the needs fulfilled by such programming;

          (iii)     Advising and making the Association's membership aware of television and digital content programming trends;

          (iv)     Improving business relations between the Association's members and promoting the interests of the television and digital content programming industries generally within the United States;

          (v)     Representing the Association's members before legislatures and appropriate regulatory agencies, so that the interests of the Association's members in the television and digital content programming industries shall be thoroughly and adequately considered and understood in relation to contemplated legislation and rules and regulations;

          (vi)     Cooperating with other state and national associations representing the television and digital content programming industries; and

          (vii)     Gathering and disseminating information that will improve the linear and digital content programming industries.

          (b)     The Association may undertake all activities that its Board of Directors determines to be necessary or convenient to the accomplishment of the foregoing purposes, and consistent therewith, the Association may exercise all powers available to nonprofit, non-stock corporations organized under the DGCL, except as restricted herein or in the bylaws of the Association.

       FOURTH:     The Association shall not have any capital stock, and the conditions of membership shall be stated in the bylaws. The voting rights of the Association's members shall be limited to those required by statute and as elsewhere provided in this Certificate and the Bylaws.

       FIFTH:     Notwithstanding any other provision of this Certificate, the Association is organized exclusively for one or more of the purposes specified in Section 501(c)(6) of the Code.

SIXTH:    No part of the net earnings of the Association shall inure to the benefit of any member, trustee, director or officer of the Association, or any private individual (except that reasonable compensation may be paid for services rendered to or for the Association), and no member, trustee or director, officer of the Association or any private individual shall be entitled to share in the distribution of any of the Association assets on dissolution of the Association.

SEVENTH:    In the event of dissolution, all of the assets and property of the Association remaining after payment of its debts and obligations shall be distributed, as the Board of Directors shall determine in its discretion, to any entity (or entities) which qualifies under Sections 501(c)(6) or 501(c)(3) of the Code, provided that such distribution is consistent with the Association's status as an organization exempt from taxation under Section 501(c)(6) of the Code, and further, not in violation of any law or regulation applicable to such an organization.

EIGHTH:    In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, alter or repeal the bylaws of the Association, subject to any approval rights of the Association's members as set forth in this Certificate or the bylaws.

NINTH:    Elections of directors need not be by written ballot unless the bylaws of the Association shall so provide.  Meetings of the Board of Directors may be held within or without the State of Delaware, as the bylaws may provide.  The books of the Association may be kept (subject to any provision contained in the statutes) outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the bylaws of the Association.

TENTH:    A director of the Association shall not be personally liable to the Association for monetary damages for breach of fiduciary duty as a director except for liability (i) for any breach of the director's duty of loyalty to the Association, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL or (iv) for any transaction from which the director derived an improper personal benefit.  If the DGCL is amended after the date hereof to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Association shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended.  Any repeal or modification of this Section shall not adversely affect any right or protection of a director of the Association at the time of such repeal or modification.

This Third Amended and Restated Certificate of Incorporation has been duly adopted by the Association's Board of Directors and members in accordance with the applicable provisions of Sections 242 and 245 of the DGCL.

[Remainder of page is left intentionally blank.]

304138988.6

3

Executed at Los Angeles, California on February 21, 2013.

Rod Perth, President

# EXHIBIT B

**THIRD AMENDED AND RESTATED**

**BYLAWS**

**OF**

**NATIONAL ASSOCIATION OF TELEVISION**

**PROGRAM EXECUTIVES, INC.**

## ARTICLE I

### NAME AND OFFICES

Section 1.     <u>Name</u>. The name of the corporation is National Association of Television Program Executives, Inc. (the "Association").

Section 2.     <u>Offices</u>. The principal office of the Association is located at 5757 Wilshire Boulevard, Penthouse 10, Los Angeles, California 90036-3681. The Association's registered agent in the State of Delaware is The Corporation Trust Company and the address of said registered agent is Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19810, County of New Castle. The Board of Directors of the Association (the "Board" or the "Board of Directors") may from time to time change any address of the office of the Association.

## ARTICLE II

### PURPOSES

Section 1.     The Association is a nonprofit, non-stock Delaware corporation organized and operated exclusively for one or more purposes as specified in Section 501(c)(6) of the Internal Revenue Code of 1986, as amended (the "Code"), or any successor statute thereto. The specific purposes of the Association are as set forth in its Third Amended and Restated Certificate of Incorporation, as the same may be amended from time to time (the "Certificate of Incorporation").

## ARTICLE III

### MEMBERS

Section 1.     <u>Members Generally</u>. The Association shall be organized into a single class of voting members (the "Members"). All exhibitors and paying attendees at the Association's events (including, without limitation, the annual convention and marketplace) shall be eligible to join the Association as Members upon approval of the

Board and upon payment of dues in accordance with Section 2 below. The Board may establish, from time to time, such other qualifications for eligibility to join the Association as a Member, and such other classes of Members, as it determines is in the best interests of the Association.

Section 2.    Dues, Fees and Assessments; Good Standing.    The Board shall, from time to time, fix the amount of dues, fees and/or assessments to be paid by Members. The Board may, in its discretion, set different dues, fees and assessments for different classes of Members, but the dues, fees and assessments shall be equal for all Members of each class. Each Member must pay, within the time and on the conditions set by the Board, the dues, fees and/or assessments set by the Board pursuant to this Section 2 and subject to the approval of the Board, a Member may pay all or part of its dues, fees and/or assessments with property other than cash, including the provision to the Association of such Member's services at a discount. Those Members who have paid the required dues, fees, and/or assessments in accordance with these Second Amended and Restated Bylaws ("Bylaws") and whose Membership has not been terminated in accordance with the provisions of Section 3 hereof shall be Members in good standing.

Section 3.    Termination of Membership.    A Member's status as such shall terminate on the occurrence of any of the following events:

(a)    Resignation of the Member, upon written notice to the Association;

(b)    Expiration of the period of Membership, unless the same is renewed on the renewal terms fixed by the Board;

(c)    Failure of the Member to pay any and all dues, fees, or assessments, if any, as set by the Board within thirty (30) days after they become due and payable;

(d)    Occurrence of any event that renders the Member ineligible for Member status in accordance with the provisions of Section 1 hereof, or failure to satisfy qualifications for such; or

(e)    Expulsion of the Member, based on the good faith determination by the Board, or a Committee or person authorized by the Board to make such a determination, that the Member has failed in a material manner to observe the rules of conduct of the Association, or has engaged in conduct materially and adversely prejudicial to the purposes and interests of the Association.

Section 4.    Procedure for Expulsion.    If grounds appear to exist for expulsion of a Member under Section 3(e) of these Bylaws, the procedure set forth below shall be followed:

(a)    The Member shall be given fifteen (15) business days' prior written notice of the proposed expulsion and the reasons therefor. Any notice

-2-

given by mail shall be sent by certified or registered mail to the Member's last address as shown on the Association's records.

(b)    The Member shall be given an opportunity to be heard, either orally or in writing, at least five (5) business days before the effective date of the proposed expulsion.    The hearing shall be held, or the written statement considered, by the Board or by a committee or person authorized by the Board to determine whether the expulsion should take place.

(c)    The Board, committee, or person shall decide whether or not the Member should be expelled.    The deciding body may impose some lesser punishment, including suspension or some other sanction.    The decision of the Board, committee, or person shall be final.

(d)    Any action challenging an expulsion or some other sanction, including a claim alleging defective notice, must be commenced within one (1) year after the date of the expulsion or other sanction.

Section 5.    Transfer of Memberships.  Membership may not be transferred.  In the case of a Member that is a corporation, limited liability company, partnership or other entity, all rights of Membership cease on the Member's dissolution.  Notwithstanding the foregoing, a Member that is a corporation, limited liability company, partnership or other entity may notify the Association in writing from time to time of the name of an employee or other individual associated with such entity who shall exercise the rights of Membership on behalf of such entity.

Section 6.    Annual Meeting.  The Annual Meeting of the Members, if any, at the direction of the Board, shall be on a date fixed by the Board.  Notice of each Annual Meeting shall be mailed, electronically mailed, personally delivered or faxed to each Member at least twenty (20) days prior to the meeting to the Member' address (or fax number as applicable) on the books of the Association.  Voting by proxy shall not be permitted at any meeting.

Section 7.    Special Meetings.  Special meetings may be held at any time upon call of the Chairperson(s) of the Board or by not less than ten percent (10%) of the Members.

Section 8.    Quorum and Vote.

(a)    More than twenty percent (20%) of the voting power of the Members shall constitute a quorum for the transaction of business at any meeting of the Members.

(b)    Except as otherwise required by Delaware General Corporation Law or by these Bylaws, approval of any matter before the Members by a

-3-

majority of the Members present at the applicable meeting shall constitute approval of the applicable matter by the Members, provided that the affirmative vote of at least thirty percent (30%) of the Members shall be required to approve (i) any merger or consolidation of the Association or (ii) any sale, lease, or exchange of all or substantially all of the assets of the Association.

Section 5.    Action by Members Without a Meeting.  Any action which may be taken at a meeting of the Members may be taken without a meeting if consent in writing setting forth such action is signed by Members (or a class of Members, as the case may be) making up not less than that percentage of all Members (or a class of Members, as the case may be) as would be necessary to authorize or take such action at a meeting at which all Members  (or a class of Members, as the case may be) entitled to vote thereon were present and voted.  Such consent shall be filed in the minutes of the proceedings of the Members.

Section 6.    Conduct of Meetings.   Meetings of the Members shall be conducted in accordance with such rules as may be established by the Members.

Section 7.    Waiver of Notice.  Whenever any written notice is required to be given under the provisions of these Bylaws or Delaware General Corporation Law, such notice need not be given to any Member who submits a signed waiver of notice whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such Member.

## ARTICLE IV

## THE BOARD OF DIRECTORS

Section 1.    Powers.  All corporate powers of the Association shall be vested in and exercised by and under the authority of the Board, which shall have full charge, control and management of the property, affairs and funds of the Association.  The Board shall have full power to establish and direct the policies governing the business and affairs of the Association.  The Board shall generally coordinate the activities of the Association.

Section 2.    Number, Election, and Term of Office.  The Board shall be comprised of no less than seven (7) and no more than forty-five (45) Directors, excluding *ex officio* Directors, the specific number to be established from time to time by Board resolution.  The President shall be an *ex officio* voting Director.  Each Director shall have a three-year term, subject, however, to his or her earlier death, resignation, or removal.  At each Annual Meeting of the Board, the Boards shall elect Directors by a majority vote.  Any Director may be elected for unlimited successive terms.  Members with a change of employment during their current term need to notify the President and CEO of NATPE

-4-

who will inform the Governance committee accordingly to review their status as a member.

Section 3.  Chairperson of the Board.  The Chairperson of the Board shall be a Director elected by the Board to serve in that capacity, who by virtue of his or position as Chairperson, also shall preside as chairperson of the Executive Committee.  The Chairperson of the Board shall, if present, preside at all meetings of the Board of Directors and exercise and perform such other powers and duties as may from time to time be assigned by the Board of Directors.  The Board may appoint Co-Chairpersons, in which event the Co-Chairpersons shall exercise their powers and perform their duties jointly in accordance with this Section 3.  If the Chairperson of the Board is not present, the President shall chair the meetings of the Board.

Section 4.  Dues, Fees and Assessments.  The Board may, from time to time, fix the amount of dues, fees and assessments to be paid by Directors.  If the Board, in its discretion, set dues, fees and/or assessments for Directors, each Director must pay, within the time and on the conditions set by the Board, the dues, fees and/or assessments set by the Board pursuant to this Section 3 and subject to the approval of the Board, a Director may pay all or part of his or her dues, fees and/or assessments with property other than cash, including the provision to the Association of such Director's services at a discount.

Section 5.  Qualifications. Each Director of the Association shall be a natural person of at least eighteen (18) years of age, of good moral character and who enjoys a good reputation in the community, and who, by his or her experience, community interest, or prior action, demonstrates a willingness to devote time and talent to the affairs of the Association and to exercise his or her judgment with undivided loyalty to the Association.  A majority of the Directors shall be individuals who do not have any economic or financial interest in or employment relationship with the Association.

Section 6.  Vacancies.  Vacancies howsoever arising may be filled by vote of at least a majority of the remaining Directors at any regular or special meeting of the Board.  Any Director elected pursuant to this Section shall serve until the next Annual Meeting of the Board and, in each case, until his or her successor shall have been elected and qualified, subject however, to such replacement Director's earlier death, resignation or removal.

Section 7.  Resignation. Any Director may resign at any time by giving written notice thereof to the Chairperson of the Board or the Secretary of the Association. Any such resignation shall take effect on the date of receipt of such notice by one of the above-specified officers, or at such later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

-5-

Section 8.    <u>Removal</u>.  A majority of the Board may remove any Director with or without cause.  Cause shall exist where any Director has failed, without good cause, to attend within a year at least 50% of the regular meetings of the Board or Committees of the Board on which he or she serves; or who is deemed, in the determination of the Board of Directors (a) to have violated the Director's fiduciary obligation to the Association, any written policy of the Association, or any applicable law, rule or regulation, (b) to have otherwise damaged the goodwill or reputation of the Association, or (c) to no longer satisfy the qualifications for a Director set forth and/or referred to in Section 4 of this Article IV.

Section 9.    <u>Compensation</u>.  No Director shall receive any compensation in his or her capacity as a Director. Directors who are also officers or employees of the Association may receive compensation in such capacity.

Section 10.    <u>Conflict of Interest</u>. Directors shall exercise good faith in all transactions touching upon their duties as to the Association and its property.  No Director shall use his or her position, or knowledge gained therefrom, in any way that might give rise to a conflict between the interest of the Association and that of the individual Director.  The Board shall adopt a conflict of interest policy, and each Director and officer of the Association shall agree in writing to be bound thereby as a prerequisite to his or her qualification as a Director or officer, as the case may be.

## ARTICLE V

## MEETINGS OF THE BOARD OF DIRECTORS

Section 1.    <u>Regular and Annual Meetings</u>. The Board of Directors shall hold regular meetings at such time and place as determined by the Board or the Chairperson of the Board; provided, however, that the Board shall meet not less than three (3) times per year.  The Annual Meeting of the Board of Directors shall be held within a reasonable period of time following the Annual Meeting of the Members.  Notice of each meeting shall be mailed, electronically mailed, personally delivered or faxed to each Director at least five (5) days prior to the meeting to the Director's address (e-mail or fax number, as applicable) on the books of the Association.  Voting by proxy shall not be permitted at any meeting.

Section 2.    <u>Special Meetings</u>.  Special meetings may be held at any time upon call of the Chairperson of the Board, or upon call by any Director after the Chairperson of the Board, President or Secretary has received a written request for such a meeting signed by at least three (3) Directors.

Section 3.    <u>Quorum and Vote</u>.

(a)    A majority of the Directors then in office shall constitute a quorum at any regular meeting. Once a quorum is established, subsequent withdrawal of

-6-

individuals to less than a quorum shall not affect the validity of any subsequent action taken at the meeting.

(b)    Except as otherwise required by Delaware General Corporation Law or by these Bylaws, approval of any matter before the Board of Directors by a majority of the Directors present at the applicable meeting shall constitute approval of the applicable matter by the Board, provided that the affirmative vote of at least two-thirds of the entire Board (including all vacancies) shall be required to approve (i) any merger, consolidation or dissolution of the Association or the (ii) any sale, lease, or exchange of all or substantially all of the assets of the Association.

Section 4.    Action by Directors Without a Meeting.  Any action which may be taken at a meeting of the Board may be taken without a meeting if consent in writing setting forth such action is signed by all of the Directors. Such consent shall be filed in the minutes of the proceedings of the Board.

Section 5.    Conduct of Meetings.  Meetings of the Board of Directors and Committees of the Board of Directors shall be conducted in accordance with such rules as may be established by the Board of Directors.

Section 6.    Meeting By Conference Telephone.  One or more Directors may participate in a meeting of the Board of Directors by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other.  Participation in a meeting pursuant to this subsection shall constitute presence in person at such meeting.

Section 7.    Waiver of Notice.  Whenever any written notice is required to be given under the provisions of these Bylaws or Delaware General Corporation Law, such notice need not be given to any Director who submits a signed waiver of notice whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such Director.

## ARTICLE VI

## OFFICERS

Section 1.    Officers.  The officers shall be a President, one or more Vice Presidents, a Secretary, and a Treasurer (Chief Financial Officer), and such other officers as the Board of Directors shall determine to appoint.  The President shall have authority to appoint one or more Assistant Treasurers and Assistant Secretaries or such other subordinate officers as the President may determine in his or her sole discretion.  The President, each Vice President, the Secretary and the Treasurer must be members of the Board.  Any two or more offices may be held by the same person, except the offices of President and Secretary.

-7-

Section 2.      Election and Term of Office; Vacancies.    Except as otherwise provided in any written employment agreement between an officer and the Association, the President, Vice Presidents, Secretary, and Treasurer (Chief Financial Officer), and such other officers as the Board shall determine to appoint, shall be appointed by the Board at each Annual Meeting of the Board of Directors, and the Assistant Treasurers, Assistant Secretaries and other subordinate officers, if any, shall be appointed by the President at such time or times as the President determines.    The officers shall be appointed by the Board.  Each officer shall hold office for terms of two (2) years (or such shorter or longer period as may be specified in these Bylaws) and until his or her successor is duly appointed and qualified, except to the extent provided to the contrary in any contract of employment between such officer and the Association which was approved by the Board, and subject to each such officer's earlier death, resignation, or removal.  Vacancies howsoever arising in any office to be filled by the Board (including without limitation vacancies in newly established offices created by the Board) may be filled by vote of the Board, at any regular or special meeting of the Board, and vacancies howsoever arising in any officer to be filled by the President may be appointed by the President at any time.  Officers appointed to fill vacancies or otherwise appointed mid-year shall serve until the next annual meeting of the Board and the appointment of their successor, subject to each such officer's earlier death, resignation or removal.  Nothing contained herein shall be construed as prejudicing any officer's rights with respect to compensation under any written employment agreement with the Association.

Section 3.      President.  The President shall be the chief executive officer of the Association, an *ex officio* voting Director, and shall preside at all meetings of the Board in the absence of the Chairperson of the Board.  The President shall have all authority and responsibility necessary to operate the Association in all its activities, subject only to the policies and oversight of the Board.  The President shall perform such other duties as are customarily incident to the office, and such other authority and duties appropriate to such office as may be assigned by the Board.

Section 4.      Vice Presidents.  The Vice Presidents (when one or more such persons are in office), in the order of their standing, shall perform the duties of the President when for any reason the President is unable to perform the same.

Section 5.      Secretary.  The Secretary shall keep and properly record the minutes of the proceedings of the Board and all Committees; maintain a correct list of the names and addresses of the Association's Members; keep or cause to be kept at the principal office of the Association copies of the Association's Certificate of Incorporation and Bylaws, each as amended to date; notify officers of their election and Committee members of their appointment; attend all meetings of the Members and the Board; give notice of all meetings of the Members, the Board and the Committees; have custody of the corporate seal and of all books and papers pertaining to the office and shall perform all duties customarily incident to the office, and shall have such other authority and perform such other duties appropriate to such office as may be assigned by the Board.

-8-

Section 6.    <u>Treasurer</u>.  The Treasurer shall be the Chief Financial Officer and shall receive and have custody of all funds, money and income of the Association and not otherwise specifically provided for by the Board, and shall deposit same in such depository or depositories as the Board shall designate.  The Treasurer shall perform all duties, customarily incident to the office, and such other authority and duties appropriate to such office as may be assigned by the Board.

Section 7.    <u>Resignation</u>.  Any officer may resign at any time by giving written notice thereof to the President or the Secretary.  Any such resignation shall take effect on the date of receipt of such notice by one of the above-specified officers, or at such later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 8.    <u>Removal</u>.  Except as otherwise may be provided in a separate, written employment agreement, any officer of the Association may be removed, with or without cause, by the Board whenever in the judgment of the Board the best interests of the Association will be served thereby.  Nothing contained herein shall be construed as prejudicing any officer's rights with respect to compensation due under any written employment agreement with the Association.

Section 9.    <u>Salaries</u>.  The salaries of the officers shall be fixed from time to time by the Board and no officer shall be prevented from receiving a salary by reason of the fact that the officer is also a Director.

## ARTICLE VII

## COMMITTEES OF THE BOARD OF DIRECTORS

Section 1.    <u>Executive Committee</u>.  The Board shall maintain an Executive Committee consisting of individuals then serving in the offices of President, one or more Members appointed by the Board and at least two (2) Directors appointed by the Board, one of whom shall be the Chairperson of the Board.  The Executive Committee shall be a standing committee of the Board.  The Chairperson of the Board shall preside over all meetings of the Executive Committee.  Subject to the provisions of this Article, Delaware General Corporation Law and any express resolution of the Board, when the Board is not in session, the Executive Committee shall have and may exercise the authority of the Board permitted by these Bylaws in the management of the affairs of the Association. The Executive Committee shall meet at such times as shall be determined by the Board.

Section 2.    <u>Audit Committee</u>. The Board shall maintain an Audit Committee consisting of at least three (3) Directors appointed by the Board.  The Audit Committee shall be a standing committee of the Board.  The Audit Committee shall cause to be audited the accounts of the Association at the close of each year prior to the annual meeting of the Association, shall render a full report to the Association at its annual

-9-

meeting, and shall have such other responsibilities and authority as designated by the Board by resolution from time to time. The Audit Committee shall meet at such times as shall be determined by the Board.

Section 3.    <u>Governance Committee</u>. The Board shall maintain a Governance Committee consisting of at least two (2) Directors appointed by the Board. The Governance Committee shall be a standing committee of the Board. The Governance Committee shall have all powers and authorities of the Board under Article IV to nominate persons for election as officers in the positions described in Article VI, and, bearing in mind the qualifications of Directors described in Article IV, to nominate persons for election to the Board at any regular, special or annual meeting. The Governance Committee shall also consider and report periodically to the Board on all matters relating to the duties of Directors and the members of committees, and shall make recommendations to the Board concerning the size of the Board and structure of the committees of the Board. The Governance Committee shall also assist the Board with oversight of corporate governance matters. The Governance Committee shall meet at such times as shall be determined by the Board, and shall notify the Secretary of the names of candidates to be presented for election as officers or Directors in sufficient time for such names to be included in the notice of the applicable meeting.

Section 4.    <u>Advisory Committees</u>. The Board may establish one or more advisory committees to the Board. The members of any advisory committee may consist of Directors, Members, non-Directors or non-Members and may be appointed as the Board so determines. Advisory committees may not exercise the authority of the Board to make decisions on behalf of the Association, but shall be restricted to making recommendations to the Board or Board Committees, and implementing Board or Board Committee decisions and policies under the supervision and control of the Board or Board Committees.

Section 5.    <u>Other Standing or Special Committees</u>. Other standing or special Committees may be created by the Board as it may deem necessary each consisting of at least two (2) Directors, one of whom shall serve as the Chair of such Committee. The other members and chairs of each committee shall be appointed by the Board from among the Directors, the Members and the officers, all of which shall serve at the pleasure of the Board. Each Committee member shall serve until he or she is removed or his or her successor is appointed or the Committee is dissolved.

Section 6.    <u>Quorum</u>. A majority of the members of a Committee then in office shall constitute a quorum for the transaction of business, except as otherwise provided by these Bylaws. Once a quorum has been established, subsequent withdrawal of Committee members so as to reduce the number of members present to less than a quorum shall not affect the validity of any subsequent action taken at the meeting.

-10-

Section 7.    Action of the Committees. The action of a majority of the members of a Committee present at any Committee meeting at which a quorum is present shall be the act of such Committee, except as otherwise provided by these Bylaws or as directed by the Board.  Any member of a Committee may participate in a meeting thereof by means of a conference telephone or similar device by which all persons can hear all other persons participating in the meeting at the same time.  Any Committee action may be taken without a meeting if all members of such Committee consent in writing.

Section 8.    Procedures.  Procedures of all Committees shall be governed by rules fixed by the Board.  All Committee members shall serve at the pleasure of the Board, subject to the provisions of Section 9 of this Article VII.

Section 9.    Meetings.  Committees shall function under the direction of the Board of Directors and except to the extent required to meet more frequently pursuant hereto shall meet as often as necessary to transact their business and shall make such reports as they may deem necessary or which may be specifically required of them.

Section 10.    Resignation.  Any Committee member may resign at any time by giving written notice thereof to the President or the Secretary of the Association.  Any such resignation shall take effect on the date of receipt of such notice by one of the above-specified officers, or at such later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 11.    Removal.  Any Committee member may be removed, with or without cause, by the Board whenever in the judgment of the Board of Directors the best interests of the Association will be served thereby.

Section 12.    Vacancies.  Vacancies in any Committee howsoever arising may be filled by vote of the Board at any regular or special meeting of the full Board, except as otherwise provided by these Bylaws.  Committee members appointed pursuant to this Section shall serve for the unexpired portion of the term of the Committee member whose death, resignation or removal gave rise to the applicable vacancy, and until his or her successor shall have been elected and qualified, subject however, to such replacement Committee member's earlier death, resignation or removal.

## ARTICLE VIII

## RESTRICTED FUNDS

Section 1.    The Association may accept funds that are given, granted, bequeathed or devised to or otherwise vested in the Association for a specific purpose. The Board shall apply all such funds only to such purposes as may be specified in the gift instrument and to the payment of the reasonable and proper expenses of the administration of such funds. The Board shall cause accurate accounts to be kept of such

-11-

funds separate and apart from the accounts of other assets of the Association.  Nothing in this Article VIII shall limit the provisions of Article VII, Section 1 of these Bylaws.

## ARTICLE IX

## FISCAL YEAR AND ANNUAL REPORT

Section 1.      Fiscal Year.  The Fiscal Year of the Association shall terminate on March 31 of each calendar year.

Section 2.      Annual Report. As soon as may be convenient following the close of the Fiscal Year, the Board may cause to be published for general distribution an Annual Report containing such information regarding the work and affairs of the Association and its affiliates for the preceding Fiscal Year as in its discretion may be deemed advisable.

## ARTICLE X

## SEAL

Section 1.      The Seal of the Association shall be selected by the Board and an impression of the same shall be made in the minute book immediately following the entry of this Article.

## ARTICLE XI

## LIABILITY OF DIRECTORS

Section 1.      Standard of Care and Fiduciary Duty.  Each Director shall stand in a fiduciary relation to this Association and shall perform his or her duties as a Director, including his or her duties as a member of any Committee of the Board upon which the Director may serve, in good faith, in a manner the Director reasonably believes to be in the best interests of the Association, and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. In performing his or her duties, each Director shall be entitled to rely in good faith on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following:

(a)      one or more officers or employees of the Association whom the Director reasonably believes to be reliable and competent in the matters presented;

-12-

(b)    counsel, public accountants or other persons as to matters which the Director reasonably believes to be within the professional or expert competence of such persons; and

(c)    a Committee of the Board of the Association upon which the Director does not serve, as to matters within its designated authority, which Committee the Director reasonably believes to merit confidence.

A Director shall not be considered to be acting in good faith if the Director has knowledge concerning the matter in question that would cause his reliance to be unwarranted.  It shall not be a breach of fiduciary duty for a Director to have an interest in a business entity doing business with the Association provided that the standards set forth in Section 8 of Article IV and Section 1 of Article VIII are met.

Section 2.    Preservation of Rights.  Any repeal or modification of this Article by the Board shall not adversely affect any right or protection existing at the time of such repeal or modification to which any Director or former Director may be entitled under this Article. The rights conferred by this Article shall continue as to any person who has ceased to be a Director of the Association and shall inure to the benefit of the heirs, executors, and administrators of such person.

## ARTICLE XII

## INDEMNIFICATION

Section 1.    Right to Indemnification.  Each person who was or is a party or is threatened to be made a party to or is involved (as a party, witness, or otherwise), in any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative (hereinafter a "Proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a Director, officer, employee, or agent of the Association or is or was serving at the request of the Association as a director, officer, employee, or agent of another corporation or of a partnership, joint venture, trust, or other enterprise, including service with respect to employee benefit plans, whether the basis of the Proceeding is alleged action in an official capacity as a director, officer, employee, or agent or in any other capacity while serving as a director, officer, employee, or agent (hereafter an "Agent"), shall be indemnified and held harmless by the Association to the fullest extent authorized by Delaware General Corporation Law, as the same exists or may hereafter be amended or interpreted (but, in the case of any such amendment or interpretation, only to the extent that such amendment or interpretation permits the Association to provide broader indemnification rights than were permitted prior thereto) against all expenses, liability, and loss (including attorneys' fees, judgments, fines, excise taxes or penalties imposed under the Employee Retirement income Security Act of 1974, as amended, and amounts paid or to be paid in settlement, and any interest, assessments, or other charges imposed

-13-

thereon, and any federal, state, local, or foreign taxes imposed on any Agent as a result of the actual or deemed receipt of any payments under this Article) reasonably incurred or suffered by such person in connection with investigating, defending, being a witness in, or participating in (including on appeal), or preparing for any of the foregoing in, any Proceeding (hereinafter "Expenses"); provided, however, that the right to indemnification conferred in this Article shall be a contract right.

Section 2.    Authority to Advance Expenses.  Expenses incurred by an officer or Director (acting in his capacity as such) in defending a Proceeding shall be paid by the Association in advance of the final disposition of such Proceeding, provided, however, that if required by Delaware General Corporation Law, as amended, such Expenses shall be advanced only upon delivery to the Association of an undertaking by or on behalf of such Director or officer to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the Association as authorized in this Article or otherwise.  Expenses incurred by other Agents of the Association (or by the directors or officers not acting in their capacity as such, including service with respect to employee benefit plans) may be advanced upon such terms and conditions as the Board deems appropriate.  Any obligation to reimburse the Association for Expense advances shall be unsecured and no interest shall be charged thereon.

Section 3.    Right of Claimant to Bring Suit.  If a claim under Section 1 or 2 of this Article is not paid in full by the Association within ninety (90) days after a written claim has been received by the Association, the claimant may at any time thereafter bring suit against the Association to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall be entitled to be paid also the expense (including attorneys' fees) of prosecuting such claim.  It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending a Proceeding in advance of its final disposition where the required undertaking has been tendered to the Association) that the claimant has not met the standards of conduct that make it permissible under Delaware General Corporation Law for the Association to indemnify the claimant for the amount claimed.  The burden of proving such a defense shall be on the Association.  Neither the failure of the Association (including its Board of Directors or independent legal counsel) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper under the circumstances because he or she has met the applicable standard of conduct set forth in Delaware General Corporation Law, nor an actual determination by the Association (including its Board of Directors or independent legal counsel) that the claimant had not met such applicable standard of conduct, shall be a defense to the action or create a presumption that claimant has not met the applicable standard of conduct.

Section 4.    Provisions Nonexclusive.  The rights conferred on any person by this Article shall not be exclusive of any other rights that such person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, agreement, vote of disinterested directors, or otherwise, both as to action in an official

-14-

capacity and as to action in another capacity while holding such office. To the extent that any provision of the Certificate, agreement, or vote of the disinterested directors is inconsistent with these Bylaws, the provision, agreement, or vote shall take precedence.

Section 5.    Authority to Insure.  The Association may purchase and maintain insurance to protect itself and any Agent against any Expense, whether or not the Association would have the power to indemnify the Agent against such Expense under applicable law or the provisions of this Article.

Section 6.    Survival of Rights.   The rights provided by this Article shall continue as to a person who has ceased to be an Agent and shall inure to the benefit of the heirs, executors, and administrators of such a person.

Section 7.    Settlement of Claims.   The Association shall not be liable to indemnify any Agent under this Article (a) for any amounts paid in settlement of any action or claim effected without the Association's written consent, which consent shall not be unreasonably withheld; or (b) for any judicial award if the Association was not given a reasonable and timely opportunity, at its expense, to participate in the defense of such action.

Section 8.    Effect of Amendment.  Any amendment, repeal, or modification of this Article shall not adversely affect any right or protection of any Agent existing at the time of such amendment, repeal, or modification.

Section 9.    Subrogation.   In the event of payment under this Article, the Association shall be subrogated to the extent of such payment to all of the rights of recovery of the Agent, who shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Association effectively to bring suit to enforce such rights.

Section 10.    No Duplication of Payments.  The Association shall not be liable under this Article to make any payment in connection with any claim made against the Agent to the extent the Agent has otherwise actually received payment (under any insurance policy, agreement, vote, or otherwise) of the amounts otherwise indemnifiable hereunder.

## ARTICLE XIII

## GENERAL PROVISIONS

Section 1.    Transactions with Interested Parties.  No transaction or agreement between the Association and one or more of the Directors, officers or Members, or between the Association and any corporation, partnership, limited liability company, association or other organization in which one or more of the Directors, officers or Members of the Association are directors or officers, or have a financial interest therein,

-15-

shall be void or voidable solely for this reason or solely because the Director, officer or Member is present or participates in the meeting of the Board or a committee of the Board which authorizes the transaction or agreement or solely because his or their votes are counted for such purpose, if:

      (a)    The material facts as to his or their relationship or interest and to the transaction or agreement are disclosed or are known to the Board or committee, and the Board or committee in good faith authorizes the transaction or agreement by the affirmative votes of a majority of the disinterested directors or committee members, even though the disinterested directors or committee members, together, may constitute less than a quorum;

      (b)    The material facts as to his or their relationship or interest and to the transaction or agreement are disclosed or are known to the Members entitled to vote thereon, and the transaction or agreement is disclosed or is known to the Members entitled to vote thereon, and the transaction or agreement is specifically approved in good faith by vote of the Members entitled to vote thereon; or

      (c)    The transaction or agreement is fair to the Association as of the time it is authorized, approved or ratified, by the Board, a committee of the Board or the Members.

Section 2.    <u>Severability</u>.  Any determination that any provision of these Bylaws is for any reason inapplicable, illegal or ineffective shall not affect or invalidate any other provision of these Bylaws.

Section 3.    <u>Effective Date</u>.  These Bylaws shall become effective immediately upon their adoption.  Amendments to these Bylaws shall become effective immediately upon adoption unless the Board is adopting them expressly to become effective at a later date.

Section 4.    <u>Laws</u>.  Notwithstanding anything contained in these Bylaws to the contrary, these Bylaws shall apply to the Members as shall be interpreted in a manner consistent with all federal and state laws and Delaware General Corporation Law.

Section 5.    <u>Inspection by Directors</u>.  Every Director shall have the absolute right at any reasonable time to inspect all books, records and documents of every kind and the physical properties of the Association.  This inspection by a Director may be made in person or by an agent or attorney, and the right of inspection includes the right to copy and make extracts of documents.

Section 6.    <u>Counsel</u>.  The Board shall be authorized to retain legal counsel for the Association.

-16-

Section 7.    <u>Accounting Firm, Auditors</u>.    The Board shall be authorized to retain an accounting firm and auditors for the Association.

Section 8.    <u>Exempt Activities</u>.    Notwithstanding anything to the contrary contained herein, no Director, officer, employee or agent of the Association shall take any action or carry on any activity by or on behalf of the Association not permitted to be taken or carried on by an organization exempt under Section 501(c)(6) of the Code, as it now exists or is hereafter amended.

## ARTICLE XIV

## REVIEW & AMENDMENTS

These Bylaws shall be reviewed at least annually.    These Bylaws and the Certificate of Incorporation may be amended or repealed and new Bylaws and a new Certificate of Incorporation adopted at any regular meeting of the Board or at any special meeting of the Board called for that purpose, provided that notice of any such proposed amendment, repeal or adoption of Bylaws or Certificate of Incorporation shall have been given to the Board at least twenty days prior to such regular or special meeting and that a copy of the proposed amendment or new Bylaws or new Certificate of Incorporation shall have been mailed to each Director with the notice of the meeting.

-17-

## CERTIFICATE OF SECRETARY

I, the undersigned, being the Secretary of National Association of Television Program Executives, Inc., hereby certify that the above Second Amended and Restated Bylaws were adopted as the Bylaws of this Association pursuant to the consent of the Members so required, effective June 14, 2018.   These Fourth Amended and Restated Bylaws are, as of the date of this certification, the duly adopted and existing Bylaws of this Association.

IN WITNESS WHEREOF, I have set my hand this August 10, 2020.


_____

JP Bommel, President & CEO

-18-

# EXHIBIT C

# PETER
# LAW
# GROUP

**270 Coral Circle**
**El Segundo, California 90245**

**(310) 277-0010 (Office)**
**(310) 432-0599 (FAX)**

**www.peterlawgroup.com**

ARNOLD P. PETER
apeter@peterlawgroup.com
(310) 432-0500 (Direct)

## MEMORANDUM

CONFIDENTIAL COMMUNICATION
ATTORNEY/CLIENT PRIVILEGE AND
ATTORNEY WORK PRODUCT DOCTRINE

DATE:          March 23, 2022

TO:            Andy Kaplan
               Chairman, Board of Directors
               National Association of Television Program Executives

SUBJECT:       *JP Bommel Employment Agreement and Deferred Compensation*
*Payment*

## BACKGROUND

JP Bommel commenced his employment with NATPE as Managing Director and
Chief Operating Officer (COO), effective August 11, 2015, pursuant to a written
employment agreement ("Initial Agreement," attached hereto as Exhibit A). The
Initial Agreement contained a two-year term, with a one-year option, exercisable at
NATPE's discretion ("Option"). The Option contained an "evergreen" clause
whereby the one-year extension was deemed exercised if NATPE did not inform JP
of non-renewal at least 180 days prior to the end of the two-year contract term.

Exhibit C                                    Page 80

Andy Kaplan
March 23, 2022
Page 2

By a written Amendment (Amendment), dated January 24, 2017, JP was promoted to NATPE's President and Chief Executive Officer.  Under the Amendment, the evergreen Option provision was eliminated and replaced with a four-year term.  The Amendment is attached hereto as Exhibit B.

Prior to the end of the four-year Amendment term, in June 2020, NATPE agreed that JP could relocate to New York for the final contract year (September 8, 2020, through September 7, 2021).  In addition, JP and NATPE agreed that the contract term could be extended for an additional year (September 8, 2021, through September 7, 2022). This one-year option had to be exercised not later than 90 days before the start of the final contract year (September 8, 2021).  It is my understanding that the one-year option was triggered because NATPE did not provide notice 90 days before  September 8, 2021, because I have not seen any such renewal document.  JP's contractual obligations to NATPE will end on September 7, 2022.

## COVID-RELATED RESTRUCTURING AND DEFERRED COMPENSATION

In light of the COVID shutdown and resulting decline in revenue, in November 2020, I worked with JP to implement an organizational restructuring that, along with outsourcing and/or eliminating various forms of overhead, included the elimination of the Chief Financial Officer position.  In addition, JP implemented an aggressive salary decrease amounting to a cumulative salary reduction of  50.97% for the remaining top five NATPE executives (including JP). The  individual salary reductions are described in Exhibits C and D hereto.  The cumulative reduction is set forth in Exhibit D and delivered $570,439.13 in salary savings to NATPE.

Under the restructuring plan, the salaries would be restored to their original levels effective April 1, 2020, if NATPE exceeded its 2022 Fiscal Year projected net revenue by at least 3 percent.  NATPE did not meet this benchmark.  Therefore, all key executive salaries remain at the levels set forth in Exhibit D.

In addition to the salary reduction, JP implemented a plan to retain NATPE's four highest paid and key executives:  JP, Wayneston Harbeson, Doug Finberg and Charlie Weiss.  Without these executives, NATPE would have been unable to operate.

Exhibit C                                    Page 81

Under this retention program, NATPE agreed to provide an incentive in the form of a "Deferred Compensation" payment equal to the amount each executive would have received through March 31, 2022, if paid their original salaries.  The Deferred Compensation payments are set forth in Exhibit D and range from $57,749.88 for Wayneston Harbeson to $204,025.02 for JP.

Please note that JP's Deferred Compensation amount covers a 16-month period (December 1, 2021 through March 31, 2022), along with a mandatory contractual retention payment equal to 10% of JP's base salary. Along with the obligatory 10% retention payment, the Board may elect to pay a discretionary bonus equal to 30% of JP's base salary.

Payments to all executives covered by the Deferred Compensation program have been discharged, with the exception of JP.  Specifically, Wayneston was paid the amount due, JP negotiated and paid a different amount to Charlie (which addressed and included unpaid commissions), and Doug was not eligible to receive the payment as he is no longer with NATPE.


RECOMMENDATIONS

1.  NATPE is contractually bound to make the deferred compensation payment to JP in the amount of  $204,025.02.  Therefore, this payment should be made in the first payroll cycle of April 2022.

2.  The Board should make a determination whether JP will receive an additional discretionary bonus under the terms of his employment agreement.

3.  JP's agreement with NATPE as President and Chief Executive Officer will expire on September 7, 2022.  Therefore, the Board should determine whether to enter into a new agreement with JP that, for the sake of clarity, replaces the prior agreements and amendments.

Exhibit C                                        Page 82

# EXHIBIT A

Initial Employment Agreement

August 11, 2015

Exhibit C                                   Page 83



Dear JP                                                    August 14, 2015

Attached is our final term agreement that shall serve as your contract with
NATPE. Congratulations!

Rod Perth
President and CEO

JP Bommel - Offering Employment Letter & Term Sheet - August 11, 2015

**Responsibilities:**

- Effective start date is: September 8, 2015 for two years.

- Position title: Managing Director, Chief Operating Officer

- The Managing Director will oversee all day-to-day operations,
  management and strategic planning for the organization.

- The Managing Director will have full P & L responsibility for the
  organization under budgets approved by the Board of Directors in
  consultation with Mr. Bommel.

- The Managing Director will be responsible for managing costs and
  achieving or surpassing yearly revenue objectives as shall be determined
  by the Executive Committee and the COO.

- The Managing Director will oversee hiring and firing of personnel as well
  as managing all staff matters. In matters that may involve dismissing an
  employee, to minimize potential negative repercussions, Mr. Bommel is
  obligated to fully inform the board chair of those decisions.

**Rod Perth**
5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-1621
Fax 310-453-6019

Exhibit C                                                    Page 84



- The Managing Director will report to the Board, on at least a quarterly basis

- The Managing Director will communicate more regularly with the Executive Committee of the Board and the various board committees, as is reasonably needed/requested.

- The Managing Director will be responsible for adhering to, and respecting all requirements of a non-profit as required by the by-laws.

- The Managing Director will, in coordination with the Board, oversee the development of a vision and strategic plan for the business as shall be mutually determined between them.

- The Managing Director will have direct responsibility - with the board of director's input – for final approval for the organization's annual markets and conferences.

- The Managing Director will oversee the development and implementation of other programs, events, etc., as he shall determine in collaboration with the board of directors, as part of his overall responsibilities.

- The Managing Director will to the best of his ability, inspire and manage the team by setting the example for high standards, customer service, and building morale and a positive culture.

- The Managing Director will develop a plan to grow NATPE's business through acquisitions or organic growth.

- The Managing Director will serve as the chief spokesperson for the organization, in consultation with the Executive Committee of the Board.

Rod Perth
5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-1621
Fax 310-453-6019

Exhibit C                                      Page 85



**Reporting Relationship:**

- After the management hand-off from Mr. Perth to Mr. Bommel (no later than May 8, 2016), Mr. Bommel will report to the Chair of the Board of Directors or a board member designee, the Executive Committee, and the full Board of Directors. Mr. Bommel's title will be effective upon his start date of September 8, 2015 (Mr. Perth will continue to be involved with NATPE as a board member, and most likely in some sort of ongoing "project/consulting" basis determined by the board's view of needs for those services).

- As agreed, the NATPE Board of Directors will consider adding him to the board in year two of his contract, subject to approval of the full board.

**Location:**

- Los Angeles, California. In connection with the move from New York to Los Angeles, NATPE will reimburse moving and legal expenses for furniture etc. (with receipts) up to $10,000.

**Terms:**

- Base salary: $350,000 per year.

- Discretionary bonus: up to 30% of base salary, based on achievement of yearly goals to be mutually determined by the COO and the Executive Committee. Bonus can potentially exceed 30% to a maximum of 50% with extraordinary circumstances and results. Objectives for bonus calculation to be mutually agreed upon between Executive Committee and JP Bommel within 90 days of start date and will include both measurable analytics and discretionary evaluation.

Rod Perth
5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-1621
Fax 310-453-6019

Exhibit C                                    Page 86



**Contract:**

- Two-year contract followed by a one-year option at the option of the Board of NATPE. If Mr. Bommel is not notified of non-renewal at least 180 days prior to the end of the two-year term, Mr. Bommel's third year option is automatically triggered.

- For every year after the second year, Mr. Bommel will be given at least 120 days notice of non-renewal absent which the contract will automatically renew for another year.

- Compensation Committee will determine a discretionary yearly increase based on performance, which increase shall not be less than 5% of Mr. Bommel's prior year's salary.

**Travel:**

- Business Class (or one class higher than coach) for all flights greater than 4 hours.

**Severance:**

- If terminated not "for cause," the balance of the term, but no less than 120 days. Mr. Bommel is not obligated to mitigate and no right to set off.

- NATPE will not cover costs of relocation in the case of termination

**Benefits:**

- Benefits will be commensurate with Mr. Bommel's level, which includes health and life insurance. The NATPE Benefits Plan and employee handbook will be supplied under separate cover.

- Mr. Bommel will have option to participate in the 401(k) plan subject to the rules of the plan, which has a six-month waiting period. Company contributions are capped at 4%.

**Rod Perth**
5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-1621
Fax 310-453-6019

Exhibit C                                        Page 87



**Vacation/Illness:**

- Three weeks of vacation in addition to all company holidays, and three
  weeks of medical, as needed.

On behalf of everyone on the board, congratulations and welcome to NATPE!

Rod Perth

5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-1621
Fax 310-453-6019

Exhibit C                                    Page 88

Benefits:

- Benefits will be commensurate with Mr. Bommel's level, which includes health and life insurance. The NATPE Benefits Plan and employee handbook will be supplied under separate cover.

- Mr. Bommel will have option to participate in the 401(k) plan subject to the rules of the plan, which has a six-month waiting period. Company contributions are capped at 4%.

Vacation/Illness:

- Three weeks of vacation in addition to all company holidays, and three weeks of medical, as needed.


On behalf of everyone on the board, congratulations and welcome to NATPE!


_____        8/11/15
Rod Perth                               Date
President & CEO


_____        8-11-15
Andy Kaplan                             Date
Chairman of NATPE Board


_____        8/4/15
JP Bommel                               Date

                                                    BHP

                                                    4

Exhibit C                                    Page 89

# EXHIBIT B

Amendment

January 24, 2017

Exhibit C                                    Page 90



Dated as of January 24, 2017

JP Bommel
1430 N Harper Ave #407
Los Angeles, CA 90046

Dear Mr. Bommel:

Reference is made to that certain Letter Agreement between JP Bommel ("you") and NATPE ("NATPE") dated August 14, 2015, as said agreement may have been heretofore amended and/or modified and which agreement is in full force and effect as of the date hereof (the "Agreement").   Except as otherwise provided herein, all capitalized terms not specifically defined herein will have the same meanings ascribed to them in the Agreement.

Notwithstanding anything to the contrary contained in the Agreement, in consideration of the promises, covenants, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned hereby mutually agree that the Agreement shall be deemed to be amended effective as of the date first written above (the "Effective Date") as set forth below:

    1. The Responsibilities Section, Effective Start Date: is hereby amended by deleting "two years", and replacing it with four years.

    2. The Responsibilities Section, Position Title: is hereby amended by deleting "Chief Operating Officer" and replacing it with President and Chief Executive Officer.

    3.  The Contract Section: is hereby amended by deleting "Two-year contract followed by a one-year option of the Board of NATPE. If Mr. Bommel is not notified of non-renewal at least 180 days prior to the end of the two-year term, Mr. Bommel's third year option will automatically triggered", and replacing it with Four-year contract.

    4.  The Vacation/Illness Section is hereby amended by deleting "Three Weeks" and replacing it with Four weeks.

    5.  Except as expressly modified in this agreement, all other terms and conditions of the Agreement are hereby ratified and affirmed and will remain in full force and effect.

    6.  This amendment may be executed by the parties in one (1) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This amendment shall not be effective until the execution and delivery between the parties of at least one (1) set of the counterparts.  A signed copy of this amendment delivered by facsimile transmission or by electronic mail will be deemed to have the same legal effect as delivery of an original signed copy of this amendment and any such signature transmitted by means of facsimile or electronic mail file will be deemed an original and valid signature hereto.

**ACCEPTED AND AGREED:**                        **NATPE**

_____               _____
JP BOMMEL                                      **ANDY KAPLAN**

5757 WILSHIRE BOULEVARD – PH 10 – LOS ANGELES  CA 90036

Exhibit C                                      Page 91

# EXHIBIT C

Deferred Compensation #1

Exhibit C                                        Page 92

Andy Kaplan
March 23, 2022
Page 7

# EXHIBIT D

Deferred Compensation #2

Exhibit C                                    Page 93

## Re: NATPE Restructuring

**Andy Kaplan <andy@kaplanwright.com>**
Wed 11/18/2020 5:16 PM
To: JP Bommel <jpbommel@natpeorg>

JP:

The Executive Committee has approved your plan. Thank you for continuing to make the tough choices.

Andy

> On Nov 16, 2020, at 11:24 AM, JP Bommel <jpbommel@natpe.org> wrote:
>
> Hi Andy,
> I hope you are well. I have been working with Arnold with the ultimate goal to reduce our payroll costs and ensure retention for some of our executive team members through a deferred compensation program. Attached is a memo that outlines the restructuring along with a cost-saving analysis spreadsheet.
>
> I am onboarding the Pery Group this afternoon as we are transitioning Jon's duties.
>
> Please let me know if you have any questions or concerns. As always I thank you for your support in these difficult times. I am confident it will position us best for a recovery in fiscal 2022.
>
> Sincerely,
>
> JPB
>
> JP Bommel
> President and CEO
> Direct: +1 (917) 602-2320
> New York | Los Angeles | Miami | London | Paris | Mumbai
> Email; jpbommel@natpe.org
> <image001.jpg>
> The contents of this e-mail message and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or phone and delete this message and its attachments, if any.
>
>
> <11-16-20 Memo to A Kaplan.docx><Deferred Executive Salary modeling 2021 - 2022.xlsx>

Exhibit C                                                    Page 94

To:                 Andy Kaplan

From:               JP Bommel

Subject:            Executive Salary Reductions

Date:               November 16th, 2020

---

Andy,

As we discussed, to address the significant downturn in revenue for NATPE due to the global COVID-19 pandemic, I am taking immediate steps to reduce our payroll costs.  First, I am eliminating the position of Chief Financial Officer effective November 13, 2020.  Second, effective December 1, 2020, I am implementing an aggregate salary reduction of 50.97% for the remaining top five NATPE executives (including myself).  The individual salary reductions are described in the attached.

If NATPE exceeds its 2022 Fiscal Year projected net revenue by at least 3 percent, I recommend a payment to each of the impacted executives equal to the amount of their salary reduction, through March 31, 2020.  These amounts which we are describing as "deferred salary payments" are also set out in the attached.  In addition, assuming we meet this target, we will restore each of these executives' salary to their original levels, effective April 1, 2020.

As I am the only executive under contract, if we meet the above target, I also request a guaranteed bonus of ten percent (10%) of my pre-reduction base salary which amount may be increased by the Board in its discretion to a maximum of thirty percent (30%).  This bonus would be payable no later than March 31, 2022.

Thank you for your continued support and let me know if you have any questions.

Exhibit C                                      Page 95

**NATPE MODELING - DEC 1ST 2020 / MAR 31ST 2022**

Executive Mananagement Compensation

| First | Last | Annual Salaries | Revised as of 12/1/2020 | Annual Reduction | Monthly Salary reduction amount | Deferred Comp at 3/31/2022 | Notes | Deferred comp calc for the period |
|---|---|---|---|---|---|---|---|---|
| JP | Bommel | 397,451.34 | $258,343.37 | 139,107.97 | $11,592.33 | $204,025.02 | Contract includes discretionary bonus at 30%. Req not lower than 10% | $204,025.02 |
| Wayneston | Harbeson | 164,999.90 | $107,249.94 | 57,749.97 | $4,812.49 | $57,749.88 | If fiscal 2022 exceeds by 3% | $76,999.96 |
| Doug | Finberg | 175,000.02 | $113,750.01 | 61,250.01 | $5,104.16 | $61,249.92 | If fiscal 2022 exceeds by 3% | $81,666.68 |
| Charlie | Weiss | 174,999.90 | $113,749.94 | 61,249.97 | $5,104.16 | $61,249.92 | If fiscal 2022 exceeds by 3% | $81,666.62 |
| TOTAL | | 912,451.16 | $593,093.25 | 319,357.91 | $26,613.14 | $384,274.74 | If fiscal 2022 exceeds by 3% | $444,358.28 |

| | | |
|---|---|---|
| Jon | 251,081.22 | |
| Previous Salary Total | 1,163,532.38 | Total annual savings |

| |
|---|
| 570,439.13 |

| |
|---|
| -50.97% |

Exhibit C    Page 96

# EXHIBIT D

EXECUTION VERSION

# EXECUTIVE EMPLOYMENT AGREEMENT

THIS EXECUTIVE EMPLOYMENT AGREEMENT ("Agreement") is made and entered into as of 1st day of April 2022 (the "Effective Date"), by and among The National Association of Television Program Executives (NATPE) and JP Bommel ("Executive").

## RECITALS

WHEREAS, JP Bommel commenced his employment with NATPE as Managing Director and Chief Operating Officer, effective August 11, 2015, pursuant to a written employment agreement ("Initial Agreement," attached hereto as Exhibit A).

WHEREAS, the Initial Agreement contained a two-year term, with a one-year option, exercisable at NATPE's discretion ("Option").

WHEREAS, the Option contained an "evergreen" clause whereby the one-year extension was deemed exercised if NATPE did not inform Executive of non-renewal at least 180 days prior to the end of the two-year contract term.

WHEREAS, by a written Amendment (Amendment) attached hereto as Exhibit B, dated January 24, 2017, Executive was promoted to NATPE's President, Chief Executive Officer and Member of NATPE Board,

WHEREAS, under the Amendment, the evergreen provision was eliminated and replaced with a four-year term which ended on September 7, 2021.

WHEREAS, prior to the end of the four-year Amendment term, in June 2020, NATPE agreed that Executive could relocate to the City and State of New York for the final contract year (September 8, 2020, through September 7, 2021).

WHEREAS, the option to extend the term of the Amendment had to be exercised not later than Ninety (90) days before the start of the final contract year.

Page 1 of 15

EXECUTION VERSION

WHEREAS, the one year option was triggered because NATPE elected to not provide notice Ninety (90) before September 8, 2021, thereby extending the term of the Amendment through September 7, 2022.

WHEREAS, absent this Agreement, Executive's contractual obligations to NATPE ends on September 7, 2022.

WHEREAS, in light of the COVID shutdown and resulting decline in revenue, in November 2020, Executive worked with counsel to implement an organizational restructuring that, along with outsourcing and/or eliminating various forms of overhead, included the elimination of the Chief Financial Officer position.

WHEREAS, Executive, with the approval of the Executive Committee, also implemented an aggressive salary decrease due to the COVID shutdown for the remaining top five NATPE executives (including Executive).

WHEREAS, Executive proposed a reduction of his own base salary from $397,451.34 to $258,343.37.

WHEREAS, under the COVID restructuring, NATPE implemented a retention program and agreed to provide an incentive in the form of a "Deferred Compensation" payment equal to the amount each executive would have received through March 31, 2022, if paid their original salaries.

WHEREAS, Executive is entitled, as approved by the Executive Committee, to a Deferred Compensation payment of $204,025.02 payable by March 31st, 2022.

WHEREAS, NATPE desires to retain Executive in his current position on the terms and conditions set forth herein

WHEREAS, Executive desires to accept such employment on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises made herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged and agreed to by the parties hereto, the parties hereto agree as follows:

Page 2 of 15

EXECUTION VERSION

1.    <u>Employment</u>. NATPE shall employ Executive in the capacity of President, Chief Executive Officer and Member of NATPE Board and Executive hereby accepts the employment, on the terms and conditions hereinafter set forth.

2.    <u>Duties</u>.

a)    <u>Primary Duties</u>. During the Term, Executive shall report to the Chairman of NATPE Board of Directors (Board). Executive shall render such administrative and management services for NATPE as are (i) currently rendered by Executive, (iii) consistent with the duties of a President and Chief Executive Officer, and/or (iv) delegated to Executive by the Executive Committee in its respective discretion.

b)    The Executive will oversee hiring and firing of personnel as well as managing all staff matters.

c)    The Executive will have full Profit and Loss responsibility for NATPE under budgets approved by the Board and/or the Executive Committee.

d)    The Executive will have direct responsibility, with the Board, for final approval for the organization's annual markets and conferences.

e)    The Executive will, in coordination with the Board, oversee the development of a vision and strategic plan for NATPE as shall be mutually determined between them.

f)    The Executive will oversee the development and implementation of other programs, events, and related programs, as he shall determine in collaboration with the Board, as part of his overall responsibilities.

g)    The Executive will serve as the chief spokesperson for the NATPE, in consultation with the Executive Committee.

Page 3 of 15

EXECUTION VERSION

h)    <u>Other Activities</u>. Executive agrees to perform Executive's duties and responsibilities for NATPE and to devote his full-time work duties to the performance thereof. Nothing herein shall preclude Executive from (i) engaging in charitable activities and community affairs, and (ii) managing his passive, personal investments; provided, that the activities set forth in clauses (i) and (ii) shall not interfere, individually or in the aggregate, in any material respect, with the performance of Executive's duties and responsibilities hereunder.

i)    <u>Location of Service</u>. During the Term, Executive shall perform Executive's duties primarily from his residence in the City and State of New York. Executive may be reasonably required to travel in connection with the performance of his duties.

3.    <u>Term</u>. The term of Executive's employment shall begin (and the Agreement between Executive and NATPE shall terminate) on the Effective Date and shall expire on September 7, 2023 ("Term"), unless terminated earlier pursuant to paragraph 5 of this Agreement. Upon expiration of the Term, Executive's employment will terminate.

4.    <u>Salary and Other Benefits</u>.  During the Term, as compensation for the services to be rendered by Executive to NATPE pursuant to this Agreement, Executive shall be paid compensation and benefits, described herein,

a)    <u>Base Salary</u>. Commencing on the Effective Date, NATPE will pay Executive a base salary at the annual rate of Three Hundred Ninety-Seven Thousand, Four Hundred and Fifty-One Dollars and Thirty-Four Cents ($397,451.34), less all applicable taxes and withholdings ("Base Salary"), payable in accordance with NATPE's regular payroll policies.

b)    <u>Discretionary Bonus</u>. Executive will be eligible to receive an annual bonus in the discretion of NATPE with a target of thirty (30%) of Executive's Base Salary, payable within thirty (30) days after the end of NATPE's current fiscal year. The bonus may potentially exceed 30% to a maximum of 50% based on extraordinary circumstances and results. The objectives for bonus calculation shall be mutually agreed upon between NATPE's Executive Committee and Executive within 90 days of the Effective Date and will include both measurable analytics and discretionary evaluation.  Executive must remain employed by NATPE through the end of the Term,

Page 4 of 15

EXECUTION VERSION

in order to receive such bonus. Should Executive's employment be terminated prior to the end of the fiscal year, Executive will be eligible to receive a discretionary pro-rated bonus with a target of thirty (30%) of Executive's base salary payable within thirty (30) days after the end of NATPE's current fiscal year.

c)    <u>Deferred Compensation Payment</u>.  Executive shall receive a Deferred Compensation payment in the amount of Two Hundred Four Thousand And Twenty-Five Dollars and Two Cents $204,025.02, payable in three equal payments not later than the following dates:  first installment not later than five (5) days after execution of this Agreement, second installment not later than July 15, 2022, and third installment not later than September 15, 2022.

d)    <u>Expenses</u>. The Executive shall timely submit and NATPE will reimburse Executive for all reasonable and necessary business expenses in accordance with NATPE's policies as in effect from time to time. Executive shall be permitted to travel in business class on international and transcontinental flights and coach class on any other flights.

e)    <u>Participation in Health and Welfare Benefits</u>. Executive shall be entitled to participate in any plan (including disability, life, health, vision and dental insurance) that NATPE maintains for the benefit of its employees similarly situated to the extent such participation is permitted under the terms of such plans, programs and practices. NATPE reserves the right from time to time to modify, amend and/or terminate its benefit plans, programs and practices as it deems necessary or advisable.

f)    <u>Paid Time Off</u>. Executive shall be entitled to paid time off for all NATPE holidays, Four (4) weeks of annual vacation and Four (4) weeks of sick leave.  NATPE shall pay Employee for unused vacation and sick leave at the end of the Term.  In addition to the foregoing, all accrued and unused leave, vacation, sick days and other employee benefits received by Executive under the prior agreement and its amendment shall be extended and incorporated into this Agreement.

g)    <u>Insurance</u>. NATPE shall use commercially reasonable efforts to obtain, and renew on an annual basis, director and officer liability and professional liability (errors and omissions) insurance with the terms and conditions of such insurance, including the amount of coverage, as determined by NATPE in its reasonable discretion.  Executive shall be included as an insured under said insurance policies.

Page **5 of 15**

EXECUTION VERSION

h)      Executive will have the opportunity to participate in the NATPE 401(k) plan, subject to the rules of the plan.

5.      <u>Termination</u>. Executive's employment under this Agreement will commence on the Effective Date and shall continue until the earlier of: the expiration of the Term; or the occurrence of any of the following:

a)      <u>Death</u>. If Executive dies during the Term, this Agreement and Executive's employment with NATPE shall terminate automatically on the date of Executive's death.

b)      <u>Disability</u>. If Executive becomes Disabled (as hereinafter defined) during the Term, NATPE shall have the right to terminate this Agreement and Executive's employment with NATPE. For purposes of this Agreement, Executive shall be deemed "Disabled" if Executive is unable, as a result of any medically determinable physical or mental disease or impairment, to discharge the essential functions of Executive's job for a period of (one hundred and eighty) 180 days or (one hundred and twenty) 120 consecutive days) during any 12-month period.

c)      <u>For Cause</u>. NATPE may terminate Executive's employment for "Cause" immediately upon written notice by NATPE to Executive. For purposes of this Agreement, "Cause" shall mean that one of the following events shall have occurred and, in the case of the events in clauses (3), (4) or (6) shall not have been cured by Executive within thirty (30) days after receipt of written notice from NATPE of the occurrence of such event, which written notice must be delivered to Executive within ninety (90) days of the occurrence of such event:

1)      Executive has committed an act of fraud, embezzlement, misappropriation or theft involving NATPE or its businesses, assets or employees.

2)      Executive has been convicted by a court of competent jurisdiction of, or pleaded guilty or nolo contendere to any felony or any crime of moral turpitude.

3)      Executive has refused to perform in any material respect specific, reasonable directives of the Board (other than a failure as a result of Executive's death or Disability).

**Page 6 of 15**

EXECUTION VERSION

      4)      Executive commits gross negligence, willful misconduct or a breach of fiduciary duty in the course of Executive's employment hereunder.

      5)      Executive participates in any unauthorized disclosure of any Proprietary Rights or Inventions of NATPE in violation of this Agreement.

      6)      Executive shall have breached any provision of this Agreement in any material respect.

      7)      Executive's use of illegal drugs, on NATPE time or at NATPE facilities or that otherwise impacts Executive's ability to perform Executive's duties provided for in this Agreement.

      d)      <u>Termination without Good Reason</u>. Executive may terminate his employment without Good Reason at any time; provided, however, that such termination shall not be effective until sixty (60) days after written notice of such termination is provided to NATPE by Executive.

      e)      <u>Termination without Cause</u>. NATPE may terminate Executive's employment without Cause at any time and such termination shall be effective immediately upon written notice of such termination to Executive by NATPE.  NATPE shall pay to Executive severance pay in an amount equal to the base salary that would be payable to Executive over the period commencing on the date of termination and ending at the end of the Term of this Agreement but no less than an amount equal to Four (4) months of Executive's Base Salary, less applicable taxes and withholding and all other Accrued Obligations due to Executive on the date of termination.  The term "Accrued Obligations" as used in this Agreement, shall mean: (i) any unpaid Base Salary then earned by and owed to Executive, (ii) reimbursement for  all expenses incurred in accordance with of this Agreement, and (iii) any other obligation due under the terms of this Agreement, at the time then owed to Executive.

      f)      <u>Termination by Executive for Good Reason</u>. Executive may terminate his employment for "Good Reason" and NATPE shall pay to Executive severance pay in an amount equal to the base salary that would be payable to Executive over the period commencing on the date of termination and ending at the end of the Term of this Agreement but no less than an amount equal to Four (4) months of Executive's Base Salary, less applicable taxes and withholding and all other Accrued Obligations due to

Page **7 of 15**

Executive on the date of termination by Executive. For purposes of this Agreement, "Good Reason" shall mean that one of the following events shall have occurred and shall not have been cured by NATPE within thirty (30) days after receipt of written notice from Executive of the occurrence of such event, which written notice must be delivered to NATPE within ninety (90) days of the occurrence of such event:

    1)    NATPE shall have breached any provision of this Agreement in any material respect including, without limitation, a material change in Executive's reporting relationship, compensation or work location; or

    2)    NATPE shall have engaged in illegal conduct affecting Executive.

    g)    <u>No Mitigation</u>. If Executive is terminated without "Cause," Executive is not obligated to mitigate, and NATPE shall have no right to a set off for any payment due to Executive.

    6.    <u>Rights and Remedies on Termination</u>.

    a)    <u>Expiration Of Term</u>. Upon the expiration of the Term, Executive's employment will terminate and NATPE shall have no further obligation to Executive except as provided for under this Agreement.

    b)    <u>Death</u>. If Executive's employment hereunder is terminated prior to the end of the Term as a result of Executive's death, Executive shall be entitled to payment of Accrued Obligations owed to Executive at the time of his death incurred prior to the Executive's death.

    c)    <u>Disability</u>. If Executive's employment hereunder is terminated prior to the end of the Term based on Executive being Disabled (as defined above), Executive shall be entitled to receive the Accrued Obligations due to Executive on the date of his disability.

    d)    <u>Termination For Cause/Termination Without Good Reason</u>. If Executive's employment hereunder is terminated for Cause prior to the end of the Term, or if Executive terminates his employment without Good Reason prior to the end of the Term, Executive shall be entitled to receive the Accrued Obligations due to Executive on the date of termination without Cause or Good Reason.

Page **8** of 15

e)    <u>Termination Without Cause/Termination for Good Reason</u>. If Executive's employment hereunder is terminated by NATPE without Cause, or if Executive terminates his employment hereunder for Good Reason, Executive shall be entitled to Accrued Obligations to Executive on the date of notice of termination without Cause or for Good Reason by NATPE.

7.    <u>Return of NATPE Documents</u>. When Executive leaves the employ of NATPE or at any other time upon the written request of NATPE, Executive will deliver to NATPE all drawings, notes, memoranda, plans, specifications, devices, formulas and documents, together with all copies thereof, and any other material containing or disclosing any inventions, third party information or proprietary information and Executive agrees that he will conduct a diligent search for such items in connection with complying with the same.

8.    <u>Arbitration</u>. Any dispute or controversy arising out of or relating to any interpretation, construction, performance, termination or breach of this Agreement, will be governed by the Federal Arbitration Act, 9 U.S.C §§ 1 et seq. and will be settled by final binding arbitration by a single arbitrator to be held in Los Angeles County, Los Angeles, in accordance with the JAMS rules for resolution of employment disputes then in effect, except as provided herein. The rules can be found online at http://www.jamsadr.com/rules-employment-arbitration/#one.  The arbitrator selected shall have the authority to grant any party all remedies otherwise available at law and in equity, including injunctions, but shall not have the power to grant any remedy that would not be available in a state or federal court in California . The arbitrator shall be bound by and shall strictly enforce the terms of this Section and may not limit, expand or otherwise modify its terms. The arbitrator shall make a good faith effort to apply the substantive law (and the law of remedies, if applicable) of the state of California, or federal law, or both, as applicable, without reference to its conflicts of law provisions, but an arbitration decision shall not be subject to review because of errors of law. The arbitrator is without jurisdiction to apply any different substantive law. The arbitrator shall have the authority to hear and rule on dispositive motions (such as motions for summary adjudication or summary judgment). The arbitrator shall have the powers granted by California law and the rules of JAMS which conducts the arbitration, except as modified or limited herein. Notwithstanding anything to the contrary in the rules of JAMS, the arbitration shall provide (i) for written discovery and depositions as provided under California law, and (ii) for a written decision by the arbitrator that

Page **9** of **15**

includes the essential findings and conclusions upon which the decision is based which shall be issued no later than thirty (30) days after a dispositive motion is heard and/or an arbitration hearing has completed. Executive and NATPE shall have the same amount of time to file any claim against any other party as such party would have if such a claim had been filed in state or federal court. In conducting the arbitration, the arbitrator shall follow the rules of evidence of the State of California (including but not limited to all applicable privileges), and the award of the arbitrator must follow California and/or federal law, as applicable.   The arbitrator shall be selected by the mutual agreement of the parties. If the parties cannot agree on an arbitrator, the parties shall alternately strike names from a list provided by JAMS until only one name remains. The decision of the arbitrator will be final, conclusive, and binding on the parties to the arbitration absent manifest error or disregard of the law. The prevailing party in the arbitration, as determined by the arbitrator, shall be entitled to recover his or its reasonable attorneys' fees and costs, including the costs or fees charged by the arbitrator and JAMS to the extent allowed by statute. Judgment may be entered on the arbitrator's decision in any court having jurisdiction.

9.    Miscellaneous.

a)    Waiver. A party's failure to insist on compliance with or enforcement of any provision of this Agreement, shall not affect the validity or enforceability or constitute a waiver of future enforcement of that provision or of any other provision of this Agreement by that party or any other party.

b)    Governing Law. This Agreement shall in all respects be subject to, and governed by, the laws of the State of California without regard to the principles of conflict of laws.

c)    Severability. The invalidity or unenforceability of any provision in this Agreement (including without limitation any provision regarding arbitration) shall not in any way affect the validity or enforceability of any other provision and this Agreement shall be construed in all respects as if such invalid or unenforceable provision had never been in the Agreement.

d)    Notice. Notices provided for herein shall be in writing and shall be deemed to have been duly given when delivered by overnight courier with a receipt obtained therefor or when received by United States registered or certified mail, return receipt

Page **10 of 15**

EXECUTION VERSION

requested, postage prepaid, addressed, to NATPE at the address set forth below
NATPE's signature on this Agreement and to Executive at the address set forth below
Executive's signature on this Agreement or such other address(es) as it or he may
provide to each other in accordance with the provision.

c)    Amendments. This Agreement may be amended at any time by mutual
consent of the parties hereto, with any such amendment to be invalid unless in writing,
signed by NATPE and Executive.

f)    Burden and Benefit. This Agreement, together with any amendments
hereto, shall be binding upon and shall inure to the benefit of the parties hereto and
their respective successors, assigns, heirs and personal representatives, except that the
rights and benefits of Executive under this Agreement may not be assigned (other than
to Executive's heirs and/or personal representatives in the event of Executive's death or
disability) without the prior written consent of NATPE.

g)    Withholding of Taxes. NATPE may withhold from any compensation,
benefits or other amounts payable under this Agreement all federal, state, city and
other taxes as shall be required pursuant to any law or governmental regulation or
ruling.

h)    References to Gender and Number Terms. In construing this Agreement,
feminine pronouns shall be substituted for those masculine in form and vice versa, and
plural terms shall be substituted for singular and singular for plural in any place in
which the context so requires.

i)    Headings.    The various headings in this Agreement are inserted for
convenience only and are not part of the Agreement.

j)    Ambiguity. Executive acknowledges that Executive has had an
opportunity to review and revise the Agreement and have it reviewed by legal counsel,
if desired, and, therefore, the normal rule of construction to the effect that any
ambiguities are to be resolved against the drafting party shall not be employed in the
interpretation of this Agreement.

k)    Counterparts. This Agreement may be executed in one or more
counterparts, each of which shall be deemed an original, and all of which shall

Page 11 of 15

EXECUTION VERSION

constitute one and the same instrument. Executed copies of the signature pages of this Agreement sent by facsimile or transmitted electronically in either Tagged Image Format Files ("TIFF") or Portable Document Format ("PDF") shall be treated as originals, fully binding and with full legal force and effect, and the parties waive any rights they may have to object to such treatment. Any party delivering an executed counterpart of this Agreement by facsimile, TIFF or PDF also shall deliver a manually executed counterpart of this Agreement but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

l)      Entire Agreement. This Agreement contains the entire agreement and understanding by and between Executive and NATPE with respect to the employment of Executive, supersedes any prior agreements and no representations, promises, agreement, or understanding, written or oral, relating to the employment of Executive by NATPE not contained herein shall be of any force or effect.

m)     Representation By Counsel.  NATPE and Executive represent and agree with each other that they have been represented by or had the opportunity to be represented by, independent counsel of their own choosing, and that they have had the full right and opportunity to consult with its respective attorney(s), that to the extent, if any, that they desired, they availed themselves of this right and opportunity, that they or their authorized officers (as the case may be) have carefully read and fully understand this Agreement in its entirety and have had it fully explained to them by such party's respective counsel, that each is fully aware of the contents thereof and its meaning, intent and legal effect, and that it or its authorized officer (as the case may be) is competent to execute this Agreement and has executed this Agreement free from coercion.

[Remainder of the Page Intentionally left Blank]

Page 12 of 15

EXECUTION VERSION

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first hereinabove written.

EXECUTIVE

By: _JP Bommel_____

JP BOMMEL
720 Greenwich Street, 2D
New York, NY 10014

National Association of Television Program Executives

By: _____

ANDY KAPLAN
Chairman, Board of Directors
3940 Laurel Canyon Blvd, Suite # 324
Studio City, CA 91604

Page **13** of **15**

EXECUTION VERSION

# EXHIBIT A
# Initial Agreement

Page 14 of 15



**CONTENT FIRST**

Dear JP                                                                August 14, 2015

Attached is our final term agreement that shall serve as your contract with
NATPE. Congratulations!

Rod Perth
President and CEO

JP Bommel - Offering Employment Letter & Term Sheet - August 11, 2015

**Responsibilities:**

- Effective start date is: September 8, 2015 for two years.

- Position title: Managing Director, Chief Operating Officer

- The Managing Director will oversee all day-to-day operations,
  management and strategic planning for the organization.

- The Managing Director will have full P & L responsibility for the
  organization under budgets approved by the Board of Directors in
  consultation with Mr. Bommel.

- The Managing Director will be responsible for managing costs and
  achieving or surpassing yearly revenue objectives as shall be determined
  by the Executive Committee and the COO.

- The Managing Director will oversee hiring and firing of personnel as well
  as managing all staff matters. In matters that may involve dismissing an
  employee, to minimize potential negative repercussions, Mr. Bommel is
  obligated to fully inform the board chair of those decisions.

**Rod Perth** ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-1621
Fax 310-453-6019



- The Managing Director will report to the Board, on at least a quarterly basis

- The Managing Director will communicate more regularly with the Executive Committee of the Board and the various board committees, as is reasonably needed/requested.

- The Managing Director will be responsible for adhering to, and respecting all requirements of a non-profit as required by the by-laws.

- The Managing Director will, in coordination with the Board, oversee the development of a vision and strategic plan for the business as shall be mutually determined between them.

- The Managing Director will have direct responsibility - with the board of director's input – for final approval for the organization's annual markets and conferences.

- The Managing Director will oversee the development and implementation of other programs, events, etc., as he shall determine in collaboration with the board of directors, as part of his overall responsibilities.

- The Managing Director will to the best of his ability, inspire and manage the team by setting the example for high standards, customer service, and building morale and a positive culture.

- The Managing Director will develop a plan to grow NATPE's business through acquisitions or organic growth.

- The Managing Director will serve as the chief spokesperson for the organization, in consultation with the Executive Committee of the Board.

**Rod Perth** ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-162?
Fax 310-463-6019



**Reporting Relationship:**

- After the management hand-off from Mr. Perth to Mr. Bommel (no later than May 8, 2016), Mr. Bommel will report to the Chair of the Board of Directors or a board member designee, the Executive Committee, and the full Board of Directors. Mr. Bommel's title will be effective upon his start date of September 8, 2015 (Mr. Perth will continue to be involved with NATPE as a board member, and most likely in some sort of ongoing "project/consulting" basis determined by the board's view of needs for those services).

- As agreed, the NATPE Board of Directors will consider adding him to the board in year two of his contract, subject to approval of the full board.

**Location:**

- Los Angeles, California. In connection with the move from New York to Los Angeles, NATPE will reimburse moving and legal expenses for furniture etc. (with receipts) up to $10,000.

**Terms:**

- Base salary: $350,000 per year.

- Discretionary bonus: up to 30% of base salary, based on achievement of yearly goals to be mutually determined by the COO and the Executive Committee. Bonus can potentially exceed 30% to a maximum of 50% with extraordinary circumstances and results. Objectives for bonus calculation to be mutually agreed upon between Executive Committee and JP Bommel within 90 days of start date and will include both measurable analytics and discretionary evaluation.



**CONTENT FIRST**

### Contract:

- Two-year contract followed by a one-year option at the option of the Board of NATPE. If Mr. Bommel is not notified of non-renewal at least 180 days prior to the end of the two-year term, Mr. Bommel's third year option is automatically triggered.

- For every year after the second year, Mr. Bommel will be given at least 120 days notice of non-renewal absent which the contract will automatically renew for another year.

- Compensation Committee will determine a discretionary yearly increase based on performance, which increase shall not be less than 5% of Mr. Bommel's prior year's salary.

### Travel:

- Business Class (or one class higher than coach) for all flights greater than 4 hours.

### Severance:

- If terminated not "for cause," the balance of the term, but no less than 120 days. Mr. Bommel is not obligated to mitigate and no right to set off.

- NATPE will not cover costs of relocation in the case of termination

### Benefits:

- Benefits will be commensurate with Mr. Bommel's level, which includes health and life insurance. The NATPE Benefits Plan and employee handbook will be supplied under separate cover.

- Mr. Bommel will have option to participate in the 401(k) plan subject to the rules of the plan, which has a six-month waiting period. Company contributions are capped at 4%.

**Rod Perth** ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
6757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-1621
Fax 310-453-6019



**Vacation/Illness:**

- Three weeks of vacation in addition to all company holidays, and three weeks of medical, as needed.

On behalf of everyone on the board, congratulations and welcome to NATPE!

**Rod Perth**
5757 Wilshire Blvd., Penthouse 10
Los Angeles, CA 90036
Tel 310-857-1621
Fax 310-453-6019

**Benefits:**

- Benefits will be commensurate with Mr. Bommel's level, which includes health and life insurance. The NATPE Benefits Plan and employee handbook will be supplied under separate cover.

- Mr. Bommel will have option to participate in the 401(k) plan subject to the rules of the plan, which has a six-month waiting period. Company contributions are capped at 4%.

**Vacation/Illness:**

- Three weeks of vacation in addition to all company holidays, and three weeks of medical, as needed.


On behalf of everyone on the board, congratulations and welcome to NATPE!


_____    8/11/15
Rod Perth                          Date
President & CEO


_____    8-11-15
Andy Kaplan                        Date
Chairman of NATPE Board


_____    8/4/15
JP Bommel                          Date

BHP

4

# EXHIBIT B
# AMENDMENT

Page 15 of 15



Dated as of January 24, 2017

JP Bommel
1430 N Harper Ave #407
Los Angeles, CA 90046

Dear Mr. Bommel:

Reference is made to that certain Letter Agreement between JP Bommel ("you") and NATPE ("NATPE") dated August 14, 2015, as said agreement may have been heretofore amended and/or modified and which agreement is in full force and effect as of the date hereof (the "Agreement"). Except as otherwise provided herein, all capitalized terms not specifically defined herein will have the same meanings ascribed to them in the Agreement.

Notwithstanding anything to the contrary contained in the Agreement, in consideration of the promises, covenants, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned hereby mutually agree that the Agreement shall be deemed to be amended effective as of the date first written above (the "Effective Date") as set forth below:

1. The Responsibilities Section, Effective Start Date: is hereby amended by deleting "two years", and replacing it with four years.

2. The Responsibilities Section, Position Title: is hereby amended by deleting "Chief Operating Officer" and replacing it with President and Chief Executive Officer.

3. The Contract Section: is hereby amended by deleting "Two-year contract followed by a one-year option of the Board of NATPE. If Mr. Bommel is not notified of non-renewal at least 180 days prior to the end of the two-year term, Mr. Bommel's third year option will automatically triggered", and replacing it with Four-year contract.

4. The Vacation/Illness Section is hereby amended by deleting "Three Weeks" and replacing it with Four weeks.

5. Except as expressly modified in this agreement, all other terms and conditions of the Agreement are hereby ratified and affirmed and will remain in full force and effect.

6. This amendment may be executed by the parties in one (1) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This amendment shall not be effective until the execution and delivery between the parties of at least one (1) set of the counterparts. A signed copy of this amendment delivered by facsimile transmission or by electronic mail will be deemed to have the same legal effect as delivery of an original signed copy of this amendment and any such signature transmitted by means of facsimile or electronic mail file will be deemed an original and valid signature hereto.

**ACCEPTED AND AGREED:**                                    **NATPE**

_JP BOMMEL_                                                 _ANDY KAPLAN_

5757 WILSHIRE BOULEVARD – PH 10 – LOS ANGELES  CA 90036

# EXHIBIT E

# <u>MEMORANDUM</u>

<u>CONFIDENTIAL COMMUNICATION
ATTORNEY/CLIENT PRIVILEGE AND
ATTORNEY WORK PRODUCT DOCTRINE</u>

DATE:            July 26, 2022

TO:              Executive Committee
                 National Association of Television Program Executives

CC:              Arnold Peter, Legal Counsel

SUBJECT:         NATPE's Current Financial Position, Potential Liabilities, and
                 Projections Through January 2023

# CONTENTS

I.   CURRENT FINANCIAL POSITION ........................................................ 3

II.  EXISTING CONTINGENT LIABILITIES ........................................... 3

     A.  JP Bommel Employment Agreement .......................................... 3

     B.  Fontainebleau Litigation ............................................................ 3

          i   Summary Of Claim And Defenses ....................................... 3

          ii.  Potential Insurance Coverage ........................................... 4

          iii.  Settlement Discussions .................................................... 4

     C.  Professional Fees ..................................................................... 4

II.    NATPE's DISSOLUTION/LIQUIDATION PLANS ........................................ 4

A  Summary Of Post-Covid Liabilities.................................................. 4

i.    NATPE COVID Related Financial Restructuring ........................... 4

ii  NATPE Has Limited Operating Liabilities5

B  NATPE Assets .......................................................................... 5

C  Options For Dissolution/Reorganization/Liquidation................................. 6

i  Winding Up Operations If There Is A Shortfall Prior To A
Fontainebleau Arbitration Award ........................................... 6

ii  Options To Address An Adverse Fontainebleau Arbitration Award . 6

iii  Timing Of Dissolution/Bankruptcy ................................................. 8

III.   RECOMMENDATION.......................................................................... 8

## I.   CURRENT FINANCIAL POSITION
<u>Available Funds</u>

| | |
|---|---|
| Bank Operating Account | $200,000 |
| Investments | $1,500,000 |
| TOTAL ACCESSIBLE FUNDS | **$1,700,000** |
| <u>Monthly Burn Rate</u>* | $240,000 |
| <u>Expected Withdrawals Through January 2023 (6.5 mos)</u> | **($1,560,000)** |

NATPE  had budgeted a cumulative net event revenue of $467,000 for the remainder of 2022.  However, in light of the current cancellation credits, anemic interest in non-event sponsorship, and change in NATPE's flagship event location to Baha Mar, Bahamas, the net revenue projection has decreased and now assumes that events for the remainder of the fiscal year break-even at best.  Because there is no prior year comparison data, it is difficult to predict the amount of revenue the Baha Mar event will generate.  Further, even if the event produces a net profit, NATPE will only see the benefit once the event is over (given the up-front costs a new venue and locale will require).

Simply put, to support NATPE to Baha Mar (at end of January 2023), NATPE will need total operating funds of $1,560,000, but current projections show that NATPE will run out of cash in early January 2023.  And because we have no idea what kind of net revenue Baha Mar will yield, even if we are able to get to Baha Mar, we must assume that unless we have other sources of financial support, NATPE we will continue to operate from a place of financial instability, post Baha Mar and for the foreseeable future.

## II.   EXISTING CONTINGENT LIABILITIES
### A.  JP Bommel Employment Agreement
NATPE entered into an employment agreement with JP with an effective date of April 1, 2022.  JP's base salary under the agreement is $397,451.34 ($33,120.95 per month).  The term of the agreement extends through September 7, 2023.  If his employment is terminated without cause, JP is entitled to a severance payment equal to the greater of four (4) JP's base salary or base salary through the date of termination and September 7, 2023.

### B.  Fontainebleau Litigation
#### i.  Summary Of Claim And Defenses
The Fontainebleau Hotel has filed an arbitration claim, alleging that it is entitled to a cancellation fee of $3,389,618.69.  NATPE has filed an answer asserting defenses

---

* As discussed below, the current burn rate does not include increased professional fees as the parties get closer to a November hearing date for an arbitration demand filed by the Fontainebleau hotel.

based on a *force majeure* provision in the event agreement, along with the legal doctrines of impossibility and frustration of purpose. NATPE argues that, under the terms of the hotel agreement, the national spike in active COVID-19 cases in January 2022 constitute an act of God, disaster, and/or an emergency making it illegal or impossible to hold the event, all of which constitute reasons that excuse further performance by NATPE. In addition, the agreement allowed NATPE to cancel the event without further liability if there was a curtailment of transportation facilities (preventing at least 25% or more of NATPE's attendees from attending). The arbitration of the Fontainebleau claim is scheduled for November 8-11, 2022. Should the arbitration result in an award adverse to NATPE, then Fontainebleau will go to court and ask that the award be converted to a court enforceable judgment.

ii.    Potential Insurance Coverage

NATPE has filed a claim under its Officers and Directors policy and is awaiting a decision. However, the policy limit is $1,000,000, which would not cover the entire amount of a judgment should the Fontainebleau prevail in full on its claim. NATPE recently increased its coverage to $2,000,000. However, this increase applies prospectively and will not cover the claim asserted by the Fontainebleau in connection with the cancelled22022 Miami Event.

iii.    Settlement Discussions

NATPE and the Fontainebleau engaged in preliminary settlement discussions. NATPE's last offer to settle the arbitration was $175,000 and the Fontainebleau's last proposal was $1,500,000, payable in equal installments over three (3) years. Should NATPE's insurance claim be accepted, NATPE intends to engage the carrier to contribute a substantial amount of the $1,000,000 policy limits towards a settlement and reimbursement of its legal fees incurred in defense of the arbitration.

C.    Professional Fees

NATPE has thus expended approximately $100,000 in legal and arbitration fees for the Fontainebleau litigation. Absent a settlement, NATPE anticipates that its expenditure for legal and arbitration fees and costs will grow to $50-70,000 per month through the hearing date in November. This increase in professional fees will increase the monthly burn rate through the November hearing date.

II.    NATPE's DISSOLUTION/LIQUIDATION PLANS

A.    Summary Of Post-Covid Liabilities

i.    NATPE COVID Related Financial Restructuring

In light of the COVID shutdown and resulting decline in revenue, in November 2020, NATPE implemented an organizational restructuring that, along with outsourcing and/or eliminating various forms of overhead, included the elimination of the Chief Financial Officer position. In addition, NATPE imposed an aggressive salary decrease amounting to a cumulative salary reduction of 50.97% for the

remaining top five NATPE executives (including JP). The cumulative reduction delivered $570,439.13 in salary savings to NATPE.

Under the restructuring plan, the salaries would be restored to their original levels effective April 1, 2022, if NATPE exceeded its 2022 Fiscal Year projected net revenue by at least 3 percent. NATPE did not meet this benchmark. Therefore, all key executive salaries remained at the reduced levels.

In addition to the salary reduction, NATPE implemented a plan to retain NATPE's four highest paid and key executives: JP, Wayneston Harbeson, Doug Finberg and Charlie Weiss. Without these executives, NATPE would have been unable to operate. Under this retention program, NATPE agreed to provide an incentive in the form of a "Deferred Compensation" payment equal to the amount each executive would have received through March 31, 2022, if paid their original salaries. The Deferred Compensation payments ranged from $57,749.88 for Wayneston Harbeson to $204,025.02 for JP.

JP's Deferred Compensation amount covered a 16-month period (December 1, 2021 through March 31, 2022), along with a mandatory contractual retention payment equal to 10% of JP's base salary. Payments to all executives covered by the Deferred Compensation program have been discharged.

NATPE has been operating virtually, with all employees working remotely from their homes after NATPE negotiated a release from a lease for its office space. Therefore, other than JP's severance payment, the potential judgment to the Fontainebleau and ongoing professional fees, NATPE has no other significant liabilities that are not being paid in the ordinary course of business.

    ii.   NATPE Has Limited Operating Liabilities
NATPE has been following all applicable wage and hour laws. Further, all of NATPE's payroll tax withholding obligations and workers' compensation obligations, such as health care/savings plan obligations are paid and up to date.

NATPE management has negotiated cancellation provisions for both the pending Baha Mar 2023 and Budapest 2023 events. The Baha Mar event can be cancelled without any further liability by November 4, 2022 and the Budapest event can be cancelled by July 31, 2022. NATPE has asked the Budapest hotel for an extension of this cancellation deadline to January 31, 2023, and is awaiting a decision. If the hotel has either not responded or refuses the extension, NATPE intends to cancel the Budapest event by this Friday, January 29 and look for other options.

    B.   NATPE Assets
NATPE has no marketable assets other than its mailing list and the goodwill associated with its name and brand. These assets are of minimal value because the mailing list could be easily recreated with AI resources, and the goodwill associated with NATPE's brand is unique to NATPE and has limited appeal to another organization.

C.  Options For Dissolution/Reorganization/Liquidation
   i.  Winding Up Operations If There Is A Shortfall Prior To A
       Fontainebleau Arbitration Award

Should NATPE determine that it does not have sufficient funds to maintain
operations prior to imposition of an arbitration award by the Fontainebleau,
nonprofit public benefit corporations (which include both the operating company
and the NATPE Foundation) are permitted to end their legal existence upon the
completion of the dissolution procedures.  Traditionally, this requires the Board of
Directors to vote to dissolve the corporation, and cease all activities other than
those activities needed to wind up and dissolve the corporation (although the law
gives the Board latitude to maintain the day-to-day operations needed to preserve
corporate good will or the value of remaining assets).

Notice of the dissolution must be given to a variety of parties, including the
California Attorney General and all known creditors and claimants.  A deadline
must be set for the submission of claims, and then all debts and liabilities must be
paid or otherwise "adequately provided" for by depositing cash with certain parties
in an amount the Board in good faith at the time of the transfer believes to be
adequate.

After paying or adequately providing for claims, all remaining assets must be
disposed in conformity with NATPE's articles of incorporation and bylaws, and is
subject to the Attorney General's oversight, particularly if assets remain after all
liabilities are settled.  The process can take significant time (four to five months if
not more in light of COVID), so it is important to ensure that NATPE has sufficient
liquidity available to go through the process.

It also should be noted that nonprofit corporations do at times elect to wind up
operations in a far more informal fashion (without legal dissolution) by shutting
down operations, terminating employees, paying all known creditors, and then
simply allowing the corporation to go into suspense with the California state taxing
authorities.  While as a general rule, nonprofit directors do not face personal
liability for the acts of the nonprofit (except for wage and hour violations), this
approach should not be taken lightly, particularly in the face of a pending
Fontainebleau award, as it provides little protection against further litigation or
harassing creditors.

   ii.  Options To Address An Adverse Fontainebleau Arbitration
        Award

The types of bankruptcies most applicable to NATPE's situation are:  (a) a case
under Chapter 7 of the Bankruptcy Code where NATPE ceases all operations and
files for bankruptcy to liquidate its assets, and (b) a case under Chapter 11 of the
Bankruptcy Code where NATPE remains in operation and restructures its assets
and liabilities.  If NATPE's liabilities remain under $7.5 million (which they almost
certainly will), NATPE should be able to take advantage of a new part of Chapter 11

called "Subchapter V," which offers small businesses an expedited process of reorganization.  Both options are described below.

Chapter 7:  Chapter 7 bankruptcy provides a procedure for the orderly liquidation of the assets of the debtor and the ultimate payment of creditors in the order of priority set forth in the Bankruptcy Code.  Upon the filing of a chapter 7 petition, a trustee is appointed who is charged with marshalling all of NATPE's assets, liquidating them, and eventually distributing the proceeds of the liquidation to creditors.

The main benefit of a Chapter 7 proceeding is that all litigation against NATPE would cease (absent further court order).  Additionally, unsecured creditors quickly realize that their ability to receive a meaningful distribution on account of their claims is significantly reduced.  The main detriment to a Chapter 7 proceeding is that the trustee takes over all control of NATPE's assets, including claims against officers, directors, employees and creditors.  Since trustees are primarily paid from assets recovered on behalf of the estate, they are motivated to dig into past transactions and distributions and look for allegedly improper actions to prosecute or undo in order to maximize assets for creditors and pay for their services.

Chapter 11 and "Subchapter V:"  Chapter 11 of the Bankruptcy Code provides a framework for a formal, court-supervised business reorganization.  The goal is to put the company back on the path to solvency and rehabilitation, while ensuring equity of treatment of creditors holding claims of the same priority.  Unfortunately, it is a very complex process (and thus is long and expensive).

Subchapter V, however, is a fairly new, debtor-friendly process within Chapter 11, meant to streamline and expedite the reorganization process and thus give small business debtors a better opportunity to succeed.  A trustee is appointed (as in a Chapter 7 proceeding), but is focused on the administration of the case, with an eye towards encouraging the confirmation of a consensual plan of reorganization and handling the distributions due creditors once the plan is confirmed.

The benefits of Subchapter V (as compared to a traditional Chapter 11) are numerous—only the debtor can propose a plan (and no one else can propose a competing plan).  The debtor need not obtain the acceptance of an impaired class of creditors to get court approval (or "confirmation") of its plan.  NATPE can continue to own and manage their business even where all creditors vote *against* the plan and object to confirmation, so long as the corporation can demonstrate that, among other things, the plan pays unsecured creditors all of the debtor's "disposable income" for a period of three to five years.  "Disposable income" excludes income that is reasonably necessary for expenditures to continue, preserve or operate the business.  This gives a debtor significant latitude when putting together its plan of reorganization, and if the debtor needs most of its income for operations, it is not unusual for a court to approve a Subchapter V plan that only pays unsecured creditors cents on the dollar.  This would be far less than what Fontainebleau is

currently demanding, and could be significant leverage to use against Fontainebleau in settlement negotiations, so long as NATPE puts sufficient funds aside to fund a case and complete the process.

### iii.   Timing Of Dissolution/Bankruptcy

At this stage, the soonest NATPE would be obligated to dissolve and wind-up its affairs is early January 2023.  However, without immediate funding, it would be prudent to explore whether this decision should be made and implemented sooner.

The earliest that NATPE would be forced to place the corporation into a bankruptcy is when a court converts an arbitration award into an enforceable judgment.  This is likely to take 2-3 months after an arbitration award.  With an arbitration hearing date in early November, therefore, the Fontainebleau can likely secure an enforceable judgment in February 2023.  However, legal counsel's recommendation would be to immediately place the corporation into bankruptcy as soon as an arbitration going against NATPE is issued.  This, of course, is all contingent upon NATPE's insurance carrier either refusing to extend coverage and/or not settling with the Fontainebleau and the Fontainebleau subsequently securing an arbitration award in its favor.  In other words, this is NATPE's worst-case scenario,

As discussed below, NATPE management is recommending that the NATPE Board secures an immediate cash infusion of $1 million.  If the NATPE Board is unable to secure this funding, legal counsel recommends that NATPE immediately commence either dissolution or a bankruptcy filing while it has sufficient funds to pay for professional fees and to handle any operating liabilities such as payroll and vendor payments during the winding up process.

## III.   RECOMMENDATION

NATPE was formed in 1963 and served as the premier organization for content creators and distributors during the 1980-1990 during the period of television program syndication.  In 2010 NATPE re-branded itself as NATPE Content First, and expanded into actively pursuing new media and technology speakers, exhibitors, and attendees in addition to their customary television members. This effort has allowed NATPE to re-grow and expand much of its membership base.  As an added link between the television industry, the academic community, the NATPE Educational Foundation, was formed in 1978, underwritten by membership fees and the support of sponsors and special endowments, provides a number of annual internships, fellowship, and grants to the academic community and students.

Like many trade associations that rely on live events to sustain their operations, NATPE has been adversely impacted by the COVID-19 pandemic.  NATPE has undertaken difficult reductions in its operations and headcount to remain viable and solvent.

Andy Kaplan and Executive Committee
Page 9

NATPE's survival is contingent, at the very least, on a successful Baha Mar event. In order to maintain a margin of financial security to stage the Baha Mar event, it is essential that NATPE obtain an immediate infusion of financial support. NATPE management requests a minimum of $1,000,000, which would likely allow it to meet existing overhead obligations and maintain an appropriate cushion to address any emergency events and contingencies up to the Baha Mar event, and would help sustain it post event as NATPE evaluates its future. NATPE management seeks guidance from the Executive Committee and Board for the requested funding of $1,000,000.



# EXHIBIT F

# NATIONAL ASSOCIATION OF TELEVISION PROGRAM EXECUTIVES, INC.
## 3940 Laurel Canyon Blvd, Suite # 324
## Studio City, CA 91604


**September 30, 2022**


Dear JP:

As you are aware, NATPE has experienced significant financial difficulties due to the impact of the COVID pandemic on events and operations. The NATPE Board explored many options, but has concluded that filing for court supervised reorganization is NATPE's best option.  Therefore, the Board has authorized, and our bankruptcy counsel has been directed to file a petition for reorganization.

In light of this decision, it is with deep regret and sadness, that I have the responsibility to advise you that NATPE is terminating the employment of all NATPE employees.  Therefore, your employment with NATPE will be terminated without cause and your last date of employment will be October 3, 2022, at 12:00 midnight (PST).

You entered into an employment agreement with NATPE with an effective date of April 1, 2022.  Your base salary under the agreement is $397,451.34 per annum ($33,120.95 per month).  The term of the agreement extends through September 7, 2023.

Pursuant to your current employment agreement, if terminated without cause, you are entitled to a termination payment in an amount equal to four (4) months of your base salary or an amount equal to your base salary through April 1, 2022 and September 7, 2023, whichever amount is greater.  Therefore, you are entitled to a severance payment equal to the salary you would have earned between September 30, 2022, and September 7, 2023, equaling almost 11 months of base salary.  However, you have graciously agreed to accept compensation that is lower than what is due to you under your employment agreement, by accepting a payment equal to six (6) months of your base salary which totals $198,725.70, which shall be paid by NAPTE to you on or before October 3, 2022, at 12:00 midnight (PST).  In addition, you have agreed to provide services to NATPE in support of its anticipated bankruptcy petition, commencing effective October 5, 2022, 12:01 am (PST).  The terms of that engagement are set forth in a separate independent contractor agreement.  You will receive your final paycheck on or before October 3, 2022, which will include a payment for any remaining paid time off. The Company represents that the termination payment is a disbursement in the ordinary course of business required under your employment agreement and constitutes a settlement beneficial to the Company.

1

In addition, with gratitude and as a recognition of your contributions to NAPTE, the Board has authorized a severance payment equal to one week of your current base salary for each year of employment, which amount will be prorated for any period that is less than a full calendar year. Based on your period of employment, we have calculated your severance payment in the amount of $54,004.97. In order to receive this payment, you must sign and return the Settlement Agreement and Release of Claims, attached below.

Our HR administrator Tri-Net will contact you directly with information regarding your COBRA benefits, if you currently receive health benefits. Meanwhile if you have any questions about the continuation of your benefits please contact NATPE's Human Resources Administrator Tri-Net at employees@trinet.com or 800-638-0461.

On behalf of the NATPE Board of Directors and myself personally, I want to thank you for your dedicated service to NATPE. I wish you the very best in your future personal and professional endeavors.

Sincerely,

Andy Kaplan
Chairman, Board of Directors
National Association of Television Program Executives

THE ABOVE IS AGREED TO AND ACCEPTED

JP Bommel
JP Bommel
Dated:      Friday, September 30th, 2022

## SEPARATION AGREEMENT AND RELEASE

**THIS SEPARATION AGREEMENT** ("Agreement") is made and entered into by and between [Name of Employee] ("Employee"), and NATIONAL ASSOCIATION OF TELEVISION PROGRAM EXECUTIVES, INC. ("Company").

A.     Employee's employment with the Company will terminate effective at the close of business October 3, 2022, 12:00 midnight (PST).

B.     The parties desire to resolve all issues and disputes between them and have agreed to a full settlement of such issues.

**NOW, THEREFORE,** in consideration of the mutual promises and provisions contained in the Agreement, the parties, intending to be legally bound, agree as follows:

## AGREEMENTS

1. **Termination of Employment.**  Employee confirms the termination of employment with the Company and any affiliates is effective on October 3, 2022, 12:00 midnight (PST). ("Termination Date").  Employee will be paid the base salary due through the Termination Date, in accordance with the regular payroll practices of the Company.

2. **Separation Benefits.**  In consideration for Employee's execution and compliance with this Agreement, including the waiver and release of claims included herein, the Company will pay to Employee as severance pay an amount equal to one week of regular salary for each full year of employment which amount will be prorated for periods of less than one full calendar year, less all applicable state and federal withholding taxes and any other deductions the Company is required by law to make, in accordance with the Company's regular payroll practices.  This severance pay will be paid to Employee in one lump sum with the payment to be made on within seven (7) business days after the Effective Date.  Based on Employee's period of employment, Company has calculated this severance payment as the amount of $54,004.97 and Employee agrees to accept this payment as full payment in consideration for execution of this Agreement.

Employee understands and acknowledges that this severance payment is in addition to anything of value that Employee would be entitled to receive from the Company if Employee did not sign the Agreement.  Nothing in this Agreement shall be deemed or construed as an express or implied policy or

practice of the Company to provide these or other benefits to any individuals other than the Employee.

3. **Release by Employee**.

   A. Employee's General Release.

   Except with respect to Company's obligations pursuant to (i) this Agreement, and (ii) the letter from Company to Employee terminating Employee's employment, Employee and Employee's heirs, legal representatives, successors, and assigns (collectively, the "Releasors") hereby forever irrevocably and unconditionally release and forever discharge the Company and its subsidiaries, successors, affiliates, and assigns, and its current and former Employees, officers, directors, shareholders, attorneys, plans, insurers, fiduciaries, and agents (the "Company Releasees") from any claims, causes of actions, suits, debts, complaints, or demands of any nature whatsoever, arising out of any acts or omissions by any of the Company Releasees up to and including the date of this Agreement, including, without limitation, any claims under any federal, state, local, or foreign law, that Releasors may have, have ever had, or may in the future have arising out of, or in any way related to the Employee's hire, benefits, employment, termination, or separation from employment with the Company any acts or omissions which relate to Employee's work or employment with the Company or any of its affiliates, whether such claims are past or present, known, suspected, or unknown, and any actual or alleged act, omission, transaction, practice, conduct, occurrence, or other matter, including, but not limited to:

   i.  Claims for violations of Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Family Medical Leave Act (with respect to existing but not prospective claims), the Equal Pay Act, the Employee Retirement Income Security Act (with respect to unvested benefits), the Fair Labor Standards Act, the Civil Rights Act of 1991, Section 1981 of U.S.C. Title 42, all including any amendments and their respective implementing regulations, any other federal, state, local, or foreign employment laws based on race, gender, or age or any other protected class status, and any other federal, state, local, or foreign law (statutory, regulatory, or otherwise) that may be legally waived and released;

   ii. Claims for violations of the California Family Rights Act and any other state or local law or ordinance;

iii. Any and all claims arising under tort, contract, and quasi-contract law, including but not limited to claims of breach of an express or implied contract, tortious interference with contract or prospective business advantage, breach of the covenant of good faith and fair dealing, fraud, misrepresentation, promissory estoppel, detrimental reliance, invasion of privacy, negligence or other breach of duty, nonphysical injury, personal injury or sickness or any other harm, wrongful or retaliatory discharge, fraud, defamation, slander, libel, false imprisonment, and negligent or intentional infliction of emotional distress, retaliation, harassment, and any other claims for any other unlawful employment practices, whether legal or equitable;

iv. Any and all claims for compensation of any type whatsoever, including but not limited to claims for salary, wages, bonuses, commissions, incentive compensation, vacation, and severance that may be legally waived and released; and,

v. Any and all claims for monetary or equitable relief, including but not limited to attorneys' fees, back pay, front pay, reinstatement, experts' fees, medical fees or expenses, costs, and disbursements.

These releases cover both claims that Employee knows about or may not know about or expect to exist, at the time of the signing of the Agreement.

B. <u>Acknowledgment of Waiver of Claims under ADEA.</u>

Employee acknowledges that Employee is waiving and releasing any rights Employee may have under the Age Discrimination in Employment Act of 1967 ("ADEA"), and that this waiver and release is knowing and voluntary. Employee agrees that this waiver and release does not apply to any rights or claims that may arise under the ADEA after the Supplemental Release Effective Date. Employee acknowledges that the consideration given for this waiver and release is in addition to anything of value to which Employee was already entitled. Employee further acknowledges that Employee has been advised by this writing that: (a) Employee should consult with an attorney prior to executing this Supplemental Release; (b) Employee has had twenty-one (21) days within which to consider this Supplemental Release; (c) Employee has seven (7) days following Employee's execution of this Supplemental Release to revoke it; (d) this Supplemental Release shall not be effective until after the revocation period has expired; and (e) nothing in this Supplemental Release prevents or precludes Employee from challenging or seeking a determination in good faith of the validity of this waiver under the ADEA, nor does it impose any condition precedent, penalties, or costs for doing so, unless specifically authorized by federal law. In the event Employee signs this Supplemental Release and returns it to the Company in less than the 21-day period identified above, Employee hereby acknowledges that Employee has knowingly and voluntarily chosen to

waive the time period allotted for considering this Supplemental Release. Employee acknowledges and understands that revocation must be accomplished by a written notification to the undersigned Company representative that is received prior to the Supplemental Release Effective Date. The Parties agree that changes, whether material or immaterial, do not restart the running of the 21-day period.

C.  <u>California Civil Code Section 1542</u>.

Employee acknowledges that Employee has been advised to consult with legal counsel and is familiar with the provisions of California Civil Code Section 1542, a statute that otherwise prohibits the release of unknown claims, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Employee, being aware of said code section, agrees to expressly waive any rights Employee may have thereunder, as well as under any other statute or common law principles of similar effect.

D.  <u>Indemnification of Employee</u>.

Company shall, to the maximum extent permitted by law, indemnify and hold Employee harmless for any acts or decisions made in good faith while performing services for the Company. To the same extent, the Company will pay, and subject to any legal limitations, advance all expenses, including reasonable attorneys' fees and costs of court-approved settlements, actually and necessarily incurred by Employee in connection with the defense of any action, suit or proceeding and in connection with any appeal, which has been brought against Employee by reason of his service as an officer or agent of the Company.

4.  <u>Claims Not Released</u>. Notwithstanding anything in this Agreement, Employee is not waiving any right that cannot by law be waived.  Nothing in this Agreement shall interfere with the right of Employee to file a charge with the Equal Employment Opportunity Commission ("EEOC"), or other similar federal or state administrative agencies, or to participate in an EEOC investigation or proceeding although, under this Agreement, Employee has waived any right to recover individual relief or money damages which may be awarded on account of such a charge.  This waiver and release is not effective to waive the right of

Employee to enforce the terms of this Agreement or to assert claims that are based on events that happen after this Agreement becomes effective.

5. **Effective Date**. This Agreement shall not become effective, until the day the Employee and the Employer execute this Agreement. This date shall be the "Effective Date" of this Agreement. No payments due to the Employee under this Agreement shall be made or begin before the Effective Date.

6. **Documents and Property**. Employee acknowledges and agrees that Employee has returned to the Company all records, documents, computer disks, or files of any type which were in Employee's possession, together with all copies thereof. Employee also acknowledges and agrees that Employee has returned all keys, computers, credit cards, or other property of the Company or any of its subsidiaries or affiliates in Employee's possession.

7. **Confidential Information**. Employee acknowledges that during the time Employee was employed by the Company, Employee had access to confidential and proprietary information of the Company, and its subsidiaries and affiliates. Employee agrees that Employee shall not at any time disclose any confidential information obtained during the course of Employee's association with the foregoing to any person, firm, corporation, association, or other entity for any purpose or reason whatsoever, unless otherwise required to do so by law or unless such information has become public other than through disclosure by Employee. Employee acknowledges that any breach of the provisions of this section 7 will be considered a material breach of the Agreement and will entitle the Company or its affiliates to pursue all legal and equitable remedies and will entitle the Company to recover the full amount of the payments made to Employee under the Agreement.

8. **Full Compensation**. Employee understands that consideration provided by the Company under (i) the Agreement, and (ii) the letter from Company to Employee terminating Employee's employment entered into between Company and Employee will fully compensate Employee for and extinguish any and all of the potential claims Employee is releasing herein, including without limitation, any claims for attorneys' fees and costs, and any and all claims for any type of legal or equitable relief.

9. **No Admission of Wrongdoing**. Employee agrees that the Agreement does not constitute an admission that the Company has violated any local ordinance, state or federal statute, or principle of common law, or that the Company has engaged in any unlawful or improper conduct towards Employee or others.

10. **Legal Representation**. Employee acknowledges that Employee has been advised by the Company to consult with Employee's own attorney before

executing this Agreement, that Employee has had a full opportunity to consider the Agreement, that Employee has had a full opportunity to ask any questions that Employee may have concerning the Agreement, the release contained herein, or the settlement of Employee's potential claims against the Company, and that Employee has not relied upon any statements or representations made by the Company or its attorneys, written or oral, other than the statements and representations that are explicitly set forth in the Agreement and any qualified Employee benefit plans sponsored by the Company in which Employee is a participant.

11. **Successors and Assigns**. The Company may freely assign this Agreement at any time. This Agreement shall inure to the benefit of the Company and its successors and assigns. The Employee may not assign this Agreement in whole or in part. Any purported assignment by the Employee shall be null and void from the initial date of the purported assignment.

12. **Governing Law, Jurisdiction, and Venue**. This Agreement and all matters arising out of or relating to this Agreement, whether sounding contract, tort, or statute, for all purposes shall be governed by and construed in accordance with the laws of California (including its statutes of limitations) without regard to any conflicts of laws principles that would require the laws of any other jurisdiction to apply. Any action or proceeding by either of the Parties to enforce this Agreement shall be brought in any state or federal court located in the state of California, County of Los Angeles. The Parties hereby irrevocably submit to the exclusive jurisdiction of these courts and waive the defense of inconvenient forum to the maintenance of any action or proceeding in these venues.

13. **Entire Agreement**. This Agreement is intended to define the full extent of the legally enforceable undertakings of the parties, and no promises or representations, written or oral, that are not set forth explicitly in the Agreement, or any of the aforementioned plans sponsored by the Company in which Employee is a participant are intended by either party to be legally binding. All other agreements and understandings between the parties are hereby cancelled, terminated, and superseded.

14. **Captions**. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

15. **Modification and Waiver**. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the Employee and President and Chief Executive Officer of the Company. No waiver by either Party of any breach by the other party of any condition or provision of this Agreement to be performed by the other party shall

be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the Parties in exercising any right, power, or privilege under this Agreement operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

16. **Confidentiality of Agreement**. Employee agrees not to disclose, publicize, or allow or cause to be publicized or disclosed any of the terms of this Agreement, except as necessary to Employee's legal and tax advisors, or as required by law, court order or to enforce this Agreement. Should Employee disclose to Employee's legal or tax advisors or spouse any of the terms of this Agreement, Employee must first advise them of the confidential nature of the disclosure and that they under the same obligation of confidentiality.

17. **Remedies**. In the event of a breach or threatened breach by the Employee of any of the provisions of this Agreement, the Employee hereby consents and agrees that the Company shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. Any equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available relief.

If the Employee fails to comply with any of the terms of this Agreement or post-termination obligations contained in it, the Company may, in addition to any other remedies it may have, reclaim any amounts paid to the Employee under the provisions of this Agreement or terminate any benefits or payments that are later due under this Agreement, without waiving the releases provided in it.

The Parties mutually agree that this Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

18. **Counterparts**. This Agreement may be executed simultaneously in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile, email in portable document format (.pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document has the same effect as delivery of an executed original of this Agreement.

**IN WITNESS WHEREOF,** the parties have executed the Agreement as set forth in the dates below:


Dated: Friday September 30th, 2022.    *JP Bommel*

[Employee Signature]


JP Bommel

[Employee Printed Name]


NATIONAL        ASSOCIATION        OF
TELEVISION    PROGRAM    EXECUTIVES,
INC.


Dated: _Sept 30_____, 2022.

Andy Kaplan
Chairman
Board of Directors

# EXHIBIT G

# Independent Contractor Agreement

This agreement (the "Agreement") between the NATIONAL ASSOCIATION OF TELEVISION PROGRAM EXECUTIVES, INC. (the "Company") and JP Bommel, hereinafter called Contractor," reflects the agreement between the Company and Contractor, who intend to be legally bound by the following conditions:

Company hereby engages Contractor to render administrative and business operation services to Company both before and after its anticipated bankruptcy petition for reorganization under Chapter 11 and/or liquidation under Chapter 7 of the United States Bankruptcy Code. This agreement shall be effective on September 30, 2022, 12:00 midnight (PST), your title will be Interim President and Chief Executive Officer, and you will have the same role as set forth in the Executive Employment Agreement between Contractor and Company, dated April 1, 2022.

Contractor accepts such engagement upon the terms herein specified. In consideration for the services to be performed by Contractor, Company agrees to pay Contractor the flat fee sum of $15,000 dollars per month, in advance of the work to be performed for each month. Said amount will be prorated for any partial periods of time.

Contractor represents that Contractor has the skills, resources, expertise, and experience necessary and appropriate to provide the services and perform all of obligations under this Agreement in a prompt, competent, efficient, and effective manner.

This Agreement may be terminated at any time by Company or Contractor with or without cause upon 30 days' notice. In the event of termination, Company agrees to pay Contractor for all work performed pursuant to this Agreement through the date of termination.

THIS AGREEMENT IS AN AGREEMENT FOR THE SERVICES OF AN INDEPENDENT CONTRACTOR. IT IS NOT UNDER ANY CIRCUMSTANCES A CONTRACT FOR EMPLOYMENT OR BETWEEN AN EMPLOYER AND AN EMPLOYEE. CONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR ANY WORKERS' WAGES, SOCIAL SECURITY AND MEDICARE CONTRIBUTIONS, AND SIMILAR WITHHOLDINGS, DEDUCTIONS, AND PAYMENTS WHICH MAY BE REQUIRED BY FEDERAL, STATE, OR LOCAL LAW WITH RESPECT TO SUMS PAID TO CONTRACTOR HEREUNDER AND CONTRACTOR'S EMPLOYEES, SUBCONTRACTORS, AND VENDORS, AND CONTRACTOR'S EMPLOYEES SHALL LOOK SOLELY TO CONTRACTOR IN CONNECTION THEREWITH. CONTRACTOR IS NOT COMPANY'S EMPLOYEE HEREUNDER FOR PURPOSES OF COMPANY'S EMPLOYEE BENEFITS OR ANY OTHER SUCH PURPOSES.

1

Contractor understands this is the sole agreement and no other agreement whether verbal or written has been understood or undertaken in this matter. This is the final agreement; no further negotiation will be taken into consideration by either Company or Contractor. Any termination of this Agreement, for any reason, shall not affect any accrued rights or liabilities of Company agreed upon herein.

<u>COMPENSATION:</u> Company shall report payments made pursuant to this Agreement on IRS Form 1099. It will be the sole responsibility of Contractor to pay all applicable taxes on all compensation paid by Company. None of Contractor's compensation will be subject to withholding by Company for the payment of any social security, federal, state or any other employee payroll taxes. Contractor nor Contractor's employees, subcontractors, and vendors may not and shall not claim unemployment compensation or any other severance or benefits from Company.

<u>OWNERSHIP OF WORK PERFORMED</u>: All of Contractor's services and the results and proceeds thereof (including any physical materials created by Contractor) (collectively, the "Work Products") are considered a "work made for hire." As such, Company is the sole and exclusive author and Company of all Work Products and all rights therein, whether now or hereafter known, in perpetuity, for all purposes, throughout the universe. Contractor waives any and all so called "moral rights" and any personal or other proprietary rights in and to all of the Work Products. To the extent any Work Products are ever determined not to be a "work made for hire", Contractor hereby grants to Company all right, title and interest (including the copyright) in and to any such Work Products. Contractor shall sign and deliver to Company any and all such documents as are necessary in the sole opinion of Company to execute a full and complete assignment from Contractor to Company of all right, title and interest in and to the Work Products and the Program and the above-described project.

<u>CONFIDENTIALITY</u>

(a) Definition. "Confidential Information" means all information of either party which (i) by virtue of the circumstances surrounding the disclosures, in good faith ought to be treated as proprietary or confidential, and (ii) is furnished or otherwise disclosed in any form (e.g., in writing, orally or in any other format, electronic or otherwise) by such party or its employees or authorized representatives, before, on or after the date of this Agreement, related to any aspect of such party's operations. The presence of a copyright notice on any Confidential Information shall not constitute publication or otherwise impair the confidential nature thereof.

(b) Obligations. Each party and its employees shall use the Confidential Information solely for the purposes of performing its obligations under this

2

## Independent Contractor Agreement

Agreement. Each party shall exercise at least the same degree of care to carry out its obligations under this paragraph and to protect the confidentiality of the Confidential Information which it exercises to protect the confidentiality of its own similar confidential information, but in no event less than reasonable care. Neither party shall remove any confidentiality, copyright, or similar notices or legends from the Confidential Information, and shall implement such safeguards and controls as may be necessary or appropriate to protect against unauthorized uses or disclosures of the Confidential Information.

(c) Restrictions. Neither party shall disclose the other party's Confidential Information, except to its employees, consultants or any third party having a legitimate business purpose with respect to this Agreement and having a need to know such Confidential Information. Prior to permitting access to the Confidential Information, each party shall inform such employees, consultants or any third party of the confidential nature of the Confidential Information and shall execute written agreements with its consultants or other third parties in form and substance reasonably satisfactory to the other party sufficient to enable each party to comply with all the provisions of this paragraph.

(d) Breach of Confidentiality. If any employee, officer, director, consultant, or agent of either party violates or threatens to violate the provisions of this paragraph or if any third party obtains any Confidential Information through either party's breach of its obligations under this paragraph, then the party in breach shall take commercially reasonable steps to remedy such violation. Each party acknowledges that the Confidential Information contains valuable trade secrets and proprietary information, that any actual or threatened breach of this paragraph may constitute immediate, irreparable harm to the party whose Confidential Information is wrongfully disclosed for which monetary damages would be an inadequate remedy, and that injunctive relief is an appropriate remedy for such breach. Therefore, each party agrees that, in the event of any actual or threatened violations or breaches of this paragraph, the other party shall have the right to seek and to obtain equitable relief, including obtaining an injunction or specific performance, from any court of competent jurisdiction, without the necessity of posting a bond (or other security) and without the necessity of showing actual damages or that monetary damages would not afford an adequate remedy, without prejudice to and in addition to any other rights and remedies it may have.

3

Independent Contractor Name:           JP BOMMEL
                                       _____

Independent Contractor Address:        ███████████████████████ ▉
                                       _____

                                       New York, NY 10014
                                       _____

Tax ID:                                ██████████████████

Company's Signature:                   _____

                                       By:   Andy Kaplan

                                       Date: Oct 7, 2022

4

# EXHIBIT H

**National Association of Television Program Executives, Inc.**
**1 Year Payments - Jean-Pierre Bommel**
Source: DS1 Payroll Register's from TriNet

| | | | | *Gross Pay Breakdown* | | | | |
|---|---|---|---|---|---|---|---|---|
| **Paycheck Date** | **TriNet Invoice No.** | **Gross Pay** | **Regular Earnings** | **Deferred Compensation** | **Termination Pay** | **Severance Pay** | **Holiday Pay** | **Vacation Pay** |
| 10/15/2021 | 5555437 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 10/29/2021 | 5571566 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 11/12/2021 | 5585135 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 11/24/2021 | 5601620 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 12/10/2021 | 5621555 | 11,426.73 | 9,141.38 | - | - | - | 2,285.35 | - |
| 12/23/2021 | 5639035 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 01/07/2022 | 5657167 | 11,426.73 | 9,141.38 | - | - | - | 2,285.35 | - |
| 01/21/2022 | 5674538 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 02/04/2022 | 5690668 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 02/18/2022 | 5708611 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 03/04/2022 | 5725042 | 11,426.73 | 10,284.06 | - | - | - | 1,142.67 | - |
| 03/18/2022 | 5743574 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 04/01/2022 | 5759823 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 04/14/2022 | 5769050 | 11,426.73 | 11,426.73 | - | - | - | - | - |
| 04/14/2022 | 5769547 | 70,320.26 | - | 70,320.26 | - | - | - | - |
| 04/29/2022 | 5789216 | 15,286.59 | 13,757.93 | - | - | - | 1,528.66 | - |
| 05/13/2022 | 5806424 | 15,286.59 | 15,286.59 | - | - | - | - | - |
| 05/27/2022 | 5821038 | 15,286.59 | 15,286.59 | - | - | - | - | - |
| 06/10/2022 | 5838718 | 15,286.59 | 13,757.93 | - | - | - | 1,528.66 | - |
| 06/24/2022 | 5855259 | 15,286.59 | 15,286.59 | - | - | - | - | - |
| 07/08/2022 | 5872974 | 83,294.93 | 15,286.59 | 68,008.34 | - | - | - | - |
| 07/22/2022 | 5889879 | 15,286.59 | 13,757.93 | - | - | - | 1,528.66 | - |
| 08/05/2022 | 5907571 | 15,286.59 | 15,286.59 | - | - | - | - | - |
| 08/19/2022 | 5924276 | 15,286.59 | 15,286.59 | - | - | - | - | - |
| 09/02/2022 | 5941982 | 83,290.93 | 15,282.59 | 68,008.34 | - | - | - | - |
| 09/16/2022 | 5958485 | 15,286.59 | 13,757.93 | - | - | - | 1,528.66 | - |
| 09/30/2022 | 8206529 | 15,286.59 | 15,286.59 | - | - | - | - | - |
| 10/04/2022 | 8215256 | 253,757.42 | 9,171.95 | - | 198,725.70 | - | - | 45,859.77 |
| 10/12/2022 | 8227989 | 54,004.97 | - | - | - | 54,004.97 | - | - |
| | **Total** | **857,508.63** | **340,753.24** | **206,336.94** | **198,725.70** | **54,004.97** | **11,828.01** | **45,859.77** |

# EXHIBIT I

**National Association of Television Program Executives, Inc.**
**1 Year Payment and Post Petition Payment Analysis - Arnold P. Peter DBA Peter Law Group**
**Adv. # 1:24-ap-01055-MB**

| Type | Bank Clear Date | Account | Payee | Amount | | Invoice # | Invoice Date | Invoice Amount |
|------|-----------------|---------|-------|--------|--|-----------|--------------|----------------|
| | *Bank Detail* | | | | | | *Invoice Detail* | |
| | | | | | | 423 | 08/02/2023 | 13,940.00 |
| Bill.com | 08/18/2022 | FRB #7987 | Arnold Peter, APC | 13,940.00 | | | | **13,940.00** |
| | | | | | | 455 | 09/01/2022 | 6,325.00 |
| | | | | | | 456 | 09/01/2022 | 3,135.00 |
| Bill.com | 09/07/2022 | FRB #7987 | Arnold Peter, APC | 41,518.25 | | 457 | 09/01/2022 | 48,675.00 |
| Bill.com | 09/15/2022 | FRB #7987 | Arnold Peter, APC | 44,791.75 | | 458 | 09/01/2022 | 28,175.00 |
| | | | | **86,310.00** | | | | **86,310.00** |
| | | | | | | 459 | 09/28/2022 | 41,009.00 |
| | | | | | | 460 | 09/28/2022 | 7,025.00 |
| | | | | | | 461 | 09/28/2022 | 8,913.25 |
| | | | | | | 462 | 09/28/2022 | 22,695.00 |
| ACH/Wire | 09/29/2022 | FRB #7987 | Arnold Peter, APC | 79,642.25 | | | | **79,642.25** |
| | | | **Total 1 Year Payments** | **421,783.15** | | | | |
| ACH/Wire | 06/30/2023 | AXOS #0568 | Arnold Peter, APC | 30,725.00 | | | *See fee application* | |
| ACH/Wire | 11/08/2023 | AXOS #0568 | Arnold Peter, APC | 19,460.00 | | | *See fee application* | |
| Bill.com | 07/18/2024 | AXOS #0568 | Arnold Peter, APC | 25,335.00 | | | *See fee application* | |
| | | | **Total Post Petition Payments** | **75,520.00** | | | | |

Exhibit I                                            Page 143

# EXHIBIT J

**National Association of Television Program Executives, Inc.**
**Post Petition Payments - Jean-Pierre Bommel**

|  |  | Bank Detail |  |  | Invoice Detail |  |  |
|---|---|---|---|---|---|---|---|
| Type | Bank Clear Date | Account | Payee | Amount | Invoice # | Invoice Date | Invoice Amount |
|  |  |  |  |  | 100122 | 10/07/2022 | 15,000.00 |
| Bill.com | 10/11/2022 | FRB #7987 | Jean-Pierre Bommel | 15,000.00 |  |  | **15,000.00** |
|  |  |  |  |  | 100123 | 10/31/2022 | 15,000.00 |
| Bill.com | 11/09/2022 | AXOS #0568 | Jean-Pierre Bommel | 15,000.00 |  |  | **15,000.00** |
| Bill.com | 12/02/2022 | AXOS #0568 | Jean-Pierre Bommel | 15,000.00 | N/A | N/A | N/A |
| Bill.com | 01/05/2023 | AXOS #0568 | Jean-Pierre Bommel | 15,000.00 | N/A | N/A | N/A |
| Bill.com | 02/03/2023 | AXOS #0568 | Jean-Pierre Bommel | 15,000.00 | N/A | N/A | N/A |
| Bill.com | 03/02/2023 | AXOS #0568 | Jean-Pierre Bommel | 15,000.00 | N/A | N/A | N/A |
| Bill.com | 04/06/2023 | AXOS #0568 | Jean-Pierre Bommel | 15,000.00 | N/A | N/A | N/A |
| Bill.com | 06/13/2023 | AXOS #0568 | Jean-Pierre Bommel | 1,202.50 | N/A | N/A | N/A |
|  |  |  |  |  | 5312024 | 06/30/2023 | 1,110.00 |
| Bill.com | 07/05/2023 | AXOS #0568 | Jean-Pierre Bommel | 1,110.00 |  |  | **1,110.00** |
| Bill.com | 02/23/2024 | AXOS #0568 | Jean-Pierre Bommel | 5,550.00 | N/A | N/A | N/A |
| Bill.com | 04/02/2024 | AXOS #0568 | Jean-Pierre Bommel | 701.25 | N/A | N/A | N/A |
| Bill.com | 05/30/2024 | AXOS #0568 | Jean-Pierre Bommel | 413.50 | N/A | N/A | N/A |
| Bill.com | 07/02/2024 | AXOS #0568 | Jean-Pierre Bommel | 412.50 | N/A | N/A | N/A |
|  |  |  |  |  | 5312030 | 07/26/2024 | 453.75 |
| Bill.com | 08/06/2024 | AXOS #0568 | Jean-Pierre Bommel | 453.75 |  |  | **453.75** |
|  |  |  | **Total Post Petition Payments** | **114,843.50** |  |  |  |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
16030 Ventura Blvd., Suite 470, Encino, CA 91436

A true and correct copy of the foregoing document entitled: **FIRST AMENDED COMPLAINT FOR: (1) BREACH OF FIDUCIARY DUTY;(2) CORPORATE WASTE; (3) NEGLIGENCE;(4) VOID CONTRACTS DUE TO UNLAWFUL PURPOSE [CAL. CIV. CODE §§ 1598, 1667, AND 1668(5) VOIDABLE CONTRACT UNDER CAL. CORPORATIONS CODE § 23304.1(A); (6) FRAUD IN THE INDUCEMENT;(7) AVOIDANCE, RECOVERY, AND PRESERVATION OF ACTUAL FRAUDULENT TRANSFERS [11 U.S.C.§§ 548(A)(1)(A), 550, AND 551];(8) AVOIDANCE, RECOVERY, AND PRESERVATION OF CONSTRUCTIVELY FRAUDULENT TRANSFERS [11 U.S.C. §§ 548(A)(1)(B), 550, AND 551];(9) AVOIDANCE, RECOVERY AND PRESERVATION OF PREFERENTIAL TRANSFERS [11 U.S.C. §§ 547, 550, AND 551]; (10) AVOIDANCE, RECOVERY, AND PRESERVATION OF UNAUTHORIZED POSTPETITION TRANSFERS [11 U.S.C. §§ 549, 550, AND 551];(11) CONVERSION;(12)  UNJUST ENRICHMENT; AND(13)DECLARATORY RELIEF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On **March 6, 2026**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On **March 6, 2026**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**JUDGE**: Pursuant to Amended General Order 23-01, no Judge's copy is being served.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

NONE.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 6, 2026 | Angela Saba | /s/ Angela Saba |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                  **F 9013-3.1.PROOF.SERVICE**

## ADDITIONAL SERVICE INFORMATION (if needed):

1. <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:

Samuel Mushegh Boyamian on behalf of Plaintiff Jeremy W. Faith, Chapter 11 Plan Fiduciary
samuel@marguliesfaithlaw.com, Angela@MarguliesFaithLaw.com;Vicky@MarguliesFaithLaw.com

John-Patrick McGinnis Fritz (TR)
jpftrustee@lnbyg.com, jpf@trustesolutions.net

Melissa Davis Lowe on behalf of Defendant Jean Pierre Bommel, an individual
mlowe@shulmanbastian.com, avernon@shulmanbastian.com

Arnold P Peter on behalf of Defendant Arnold P. Peter, an individual
apeter@peterlawgroup.com, aramirez@peterlawgroup.com

Jonathan Serrano on behalf of Interested Party Courtesy NEF
Jonathan@MarguliesFaithLaw.com, vicky@marguliesfaithlaw.com;angela@marguliesfaithlaw.com

Meghann A Triplett on behalf of Plaintiff Jeremy W. Faith, Chapter 11 Plan Fiduciary
Meghann@MarguliesFaithlaw.com,
Angela@MarguliesFaithLaw.com;Vicky@MarguliesFaithLaw.com;Amber@MarguliesFaithLaw.com;Drew
@MarguliesFaithLaw.com

United States Trustee (SV)
ustpregion16.wh.ecf@usdoj.gov

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**